**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JACKIE WILSON, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| Administrator of the Estate of Former Chicago | ) | **Case No.** |
| Police Department Commander Jon Burge; Mayor | ) | |
| and former State's Attorney RICHARD M. | ) | |
| DALEY; former Chicago Police Department | ) | |
| detective THOMAS MCKENNA; Administrator of | ) | |
| the Estate of former Police Department Detective | ) | |
| PATRICK O'HARA; Administrator of the Estate of | ) | **JURY TRIAL DEMANDED** |
| former Chicago Police Department Detective JOHN | ) | |
| YUCAITIS; former Cook County ASA | ) | |
| LAWRENCE HYMAN; former Cook County ASA | ) | |
| NICHOLAS TRUTENKO; former Cook County | ) | |
| Court Reporter, MICHAEL HARTNETT; Cook | ) | |
| County Assistant State's Attorney T. ANDREW | ) | |
| HORVAT; former Assistant State's Attorney and | ) | |
| former Special City of Chicago Corporation | ) | |
| Counsel WILLIAM KUNKLE; former jailhouse | ) | |
| informant WILLIAM DAVID COLEMAN, aka | ) | |
| ALFRED CLARKSON; Administrator of the Estate | ) | |
| of former Chicago Police Department | ) | |
| Superintendent LEROY MARTIN; former Chicago | ) | |
| Police Department Superintendent TERRY | ) | |
| HILLARD; former OPS Director GAYLE | ) | |
| SHINES; former aide to the Chicago Police | ) | |
| Department Superintendent, THOMAS | ) | |
| NEEDHAM; CITY OF CHICAGO; and COOK | ) | |
| COUNTY, ILLINOIS; | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff JACKIE WILSON, for his complaint against the Administrator of the Estate of

Former Chicago Police Department Commander JON BURGE; former Mayor and former State's

Attorney RICHARD M. DALEY; former Chicago Police Department Detective THOMAS

1

MCKENNA; Administrator of the Estate of former Chicago Police Department Detective

PATRICK O'HARA; Administrator of the Estate of former Chicago Police Department

Detective JOHN YUCAITIS; former Assistant State's Attorney (ASA) LAWRENCE HYMAN;

former Cook County ASA NICHOLAS TRUTENKO; Cook County State's Attorney T.

ANDREW HORVAT; former Cook County Court Reporter, MICHAEL HARTNETT; former

Assistant State's Attorney and former Special City of Chicago Corporation Counsel WILLIAM

KUNKLE; former jailhouse informant WILLIAM DAVID COLEMAN, aka ALFRED

CLARKSON; Administrator of the Estate of former Chicago Police Superintendent LEROY

MARTIN; former Chicago Police Department Superintendent TERRY HILLARD; former

Office of Professional Standards Director GAYLE SHINES; former aide to the Chicago Police

Department Superintendent THOMAS NEEDHAM; CITY OF CHICAGO; and COOK

COUNTY, ILLINOIS; alleges as follows:

## INTRODUCTION

1.     Plaintiff, Jackie Wilson, is an innocent man who spent 36 years and five months

imprisoned for crimes he did not commit.

2.     The pattern of blatant and coordinated law enforcement misconduct causing

Plaintiff to spend the last 39 years of his life fighting to clear his name and exposing Defendants'

egregious misdeeds is unparalleled in the annuals of Chicago history.

3.     On December 18, 2020, Plaintiff's Petition for a Certificate of Innocence was

granted, and as a result, the State of Illinois officially recognizes Plaintiff to be an innocent man.

4.      In granting a Certificate of Innocence, the Honorable William H. Hooks found:

On February 9, 1982, two Chicago Police Officers were murdered.  Andrew Wilson alone
was their murderer.  Every day since, the Cook County justice system itself has been
tortured.

Jackie Wilson has also been physically tortured by a brutal electrical box torture ritual and has already wrongfully served a sentence that has taken roughly 70 percent of his life.  Jackie Wilson will never be able to recoup the value of his life lost to the living hell he experienced at the hands of his government.  While Jackie Wilson extraordinarily deserves and has earned this Certificate of Innocence, others deserve to pay for that they have so unjustly caused both directly and indirectly.

5.      After 39 years, it is time for Defendants to be held civilly accountable for their egregious misconduct that caused Plaintiff to nearly die imprisoned for crimes he did not commit.

6.      Due to Defendants' egregious misconduct, Jackie Wilson was wrongfully convicted of the armed robbery and murders of Chicago Police Officers William Fahey and Richard O'Brien in 1983.  Plaintiff's first wrongful conviction was reversed by the Illinois Appellate Court in 1987.

7.      Prior to the 1989 retrial, Defendants continued to conspire to frame Plaintiff for crimes he did not commit by fabricating additional false evidence and withholding exculpatory evidence. Defendants' misconduct caused Plaintiff's second wrongful conviction in 1989.

8.      Due to Defendants' misdeeds, Plaintiff spent the following 29 years incarcerated for crimes he did not commit.

9.      Moreover, Defendants violated Plaintiff's constitutional rights long before his 1983 wrongful conviction.

10.      On February 14, 1982, Plaintiff was tortured by Area Two detectives Thomas McKenna and Patrick O'Hara, at the direction and with the participation of disgraced former Chicago Police Commander Jon Burge.

11.      Plaintiff's torture occurred with the knowledge and participation of former Cook County Assistant State's Attorney, Lawrence Hyman, and Cook County Court Reporter, Michael Hartnett.

12. This torture resulted in the false, fabricated, and manufactured statement implicating Plaintiff in crimes he did not commit.

13. Based on the false, fabricated, and coerced statement, by the evening of February 14, 1982, Jackie Wilson was charged with the armed-robbery and murders of Officers Fahey and O'Brien.

14. Incarcerated at the age of 22, Jackie Wilson was not set free until he reached 58 years of age. By then, Plaintiff had served the majority of his life behind bars.

15. Plaintiff's coerced and manufactured false confession was introduced at his 1983 and 1989 trials and substantially contributed to his wrongful convictions.

16. Plaintiff was not alone in enduring torture at Area Two as part of the investigation into the death of Officers Fahey and O'Brien.

17. On February 14, 1982, Andrew Wilson was also tortured by Area Two detectives at the direction and with the participation of disgraced former Chicago Police Commander Jon Burge.

18. Andrew Wilson's torture also occurred with the knowledge and participation of former Cook County Assistant State's Attorney, Lawrence Hyman, and Cook County Court Reporter, Michael Hartnett.

19. Like Plaintiff, Andrew Wilson's tortured statement was introduced at his 1983 criminal trial, which was later reversed by the Illinois Supreme Court in 1987.

20. In 1987, the Illinois Appellate Court reversed Plaintiff's 1983 conviction and remanded for a new trial.

21. Prior to his 1989 retrial, Defendants ASA Trutenko and jailhouse informant William David Coleman manufactured and fabricated a false story that falsely implicated

Plaintiff in these crimes. In doing so, Defendants Trutenko engaged in such misconduct as part of Defendants' conspiracy, which began in 1982, to frame Plaintiff for crimes he did not commit.

22.     Coleman's false, manufactured and fabricated testimony, together with Plaintiff's tortured false confession, was introduced at Plaintiff's 1989 re-trial. Also introduced at Plaintiff's retrial was testimony from DeWayne Hardin that was coerced and fabricated by Defendants during the underlying investigation.

23.     The false and manufactured testimony, coupled with Plaintiff's coerced false confession, provided the basis for Plaintiff's 1989 wrongful convictions.

24.     After Plaintiff was re-convicted in 1989, Defendants Trutenko, William Kunkle, and Coleman suppressed the fact that Coleman's story was false, manufactured, purchased by County and City monies, and that the continued suppression of these facts were, in part, accomplished by a continuing personal relationship between Trutenko and Coleman.

25.     In May of 2015 the Illinois Torture Inquiry and Relief Commission (TIRC) returned Plaintiff's case to the Cook County Criminal Court for a hearing on the issue of whether Plaintiff's confession was tortured from him.

26.     In June of 2018, after an extensive evidentiary hearing, Cook County Criminal Court Judge William H. Hooks ruled that Plaintiff's confession was tortured from him, granted him a new trial, and suppressed his confession. In doing so, Judge Hooks opined:

> There is more than enough to surmise what happened in the investigation and interrogation of Jackie Wilson was not good – instead, very bad and ugly. The conduct of those involved in this most serious of investigations, which involved attempting to discover and ethically prosecute the murderer or murderers of two Chicago police officers required more. Much more was required of the Chicago Police Department, the Office of the Cook County State's Attorney, our courts, the private and public defense bar, and indeed, our federal government…The abhorrence of basic rights of suspects by Mr. Burge and his underlings has been costly to the taxpayers, the wrongfully convicted, and worst of all, the dozens of victims and their families who have suffered untold grief – in many cases, a 30-plus year horror story.

27.     In September of 2020, the Cook County Office of the Special Prosecutor (OSP) subjected Plaintiff to yet another retrial, with its primary evidence being the false, manufactured and fabricated 1989 testimony of William Coleman.

28.     During the third trial, Defendant Horvat joined and participated in Defendant Trutenko's continuing effort to withhold critical and material exculpatory evidence that would have unraveled Trutenko's continuing illicit relationship with jailhouse informant Coleman.

29.     Defendants Horvat and Trutenko not only withheld this exculpatory and impeachment evidence from Plaintiff and the OSP, but Defendant Horvat also actively concealed this evidence from the OSP and urged OSP to not inquire into it.

30.     Defendant Horvat's actions were done as part of Defendants' long-standing conspiracy to frame Plaintiff for crimes he did not commit.

31.     After a two-week bench trial before Judge Hooks, the OSP dismissed all pending charges against Plaintiff with prejudice.  In doing so, OSP informed the Court that Trutenko suppressed the fact that he had a continuing relationship with Coleman and committed perjury on the witness stand.

32.     In June of 2021, Cook County Criminal Court Judge Alfredo Maldonado ordered that a special prosecutor investigate alleged criminal conduct by inter alia, Defendants Trutenko, Horvat, and Coleman.  While doing so, the Court recognized that the "sordid history of the investigation and criminal prosecutions in this case serve as a shameful chapter in Chicago's history."

33.     The unparalleled nearly 39 years of unconstitutional misconduct was not an isolated occurrence.  Rather, it was part of several interrelated patterns and practices of systemic

torture and physical abuse of African American suspects at the Area 2 and, later, at the Area 3 Police Headquarters under Defendant Jon Burge's command and supervision.

34.    Plaintiff's torture, wrongful prosecutions and false imprisonment occurred and continued because command personnel in the Chicago Police Department (hereinafter "CPD"), successive Superintendents of Police and several Mayors of the City of Chicago, most notably former Mayor Richard M. Daley, as well as Cook County, its State's Attorney, and its State's Attorneys' Office, all concealed and suppressed their knowledge of ongoing torture and physical abuse under Burge, blocked and undercut all efforts to expose, discipline, and prosecute offending officers, and refused to intervene to stop the continuing egregious and criminally unconstitutional misconduct.

35.    Plaintiff seeks damages for the grievous injuries inflicted upon him from the persons responsible for this egregious miscarriage of justice.

## JURISDICTION AND VENUE

36.    The actions of the Defendants violated the United States Constitution, the Civil Rights Act, 42 U.S.C. §§ 1983, 1985 and 1986, as well as Illinois and common law.  This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a) and over his state law claims pursuant to the court's supplemental jurisdiction, as codified in 28 U.S.C. § 1367(a).

37.    Venue is proper in this District under 28 U.S.C. § 1391(b).  The parties reside, or, at the time of the events took place, resided in this judicial district, and the events giving rise to Plaintiff's claims also occurred in this judicial district.

## PARTIES

38.     Plaintiff Jackie Wilson is an African American man, a citizen of the United States, and resident of the State of Illinois

39.     Jon Burge who is deceased and therefore sued by and through his estate, was a duly appointed and sworn Chicago Police Lieutenant and was, from 1982 to August of 1986, the commanding officer of Chicago Police Area 2 Detective Violent Crimes Unit.  In 1988, Burge was appointed Commander of Area 3 Detective Division by Defendant Martin and held this assignment until November of 1991, when he was suspended and, ultimately, fired by the CPD for the torture and abuse of Andrew Wilson.  Defendant Burge engaged in a pattern and practice of torture and brutality himself, and also supervised, encouraged, sanctioned, condoned and ratified brutality and torture by other detectives and supervisors, including, but not limited to, the police officer Defendants named herein.  Defendant Burge, who was the supervising Lieutenant, inter alia, of Defendants McKenna, O'Hara, and Yucaitis, on, before, and after February of 1982, was, on June 28, 2010, convicted of perjury and obstruction of justice for falsely denying that he participated in, was aware of, and supervised police torture. Burge engaged in the conduct complained of in the course and scope of his employment, and is sued, through his estate, in his individual capacity.

40.     Defendant Thomas McKenna was formerly a duly appointed and sworn Chicago Police detective in the Chicago Police Area 2 Detective Violent Crimes Unit. He engaged in the conduct complained of herein in the course and scope of his employment, and is sued in his individual capacity.   Defendant McKenna, like Defendant Burge, engaged in patterns and practices of torture and brutality as alleged herein.

41.     Defendant Patrick O'Hara, who is deceased and therefore sued by and through his estate, was a duly appointed and sworn Chicago Police detective who was assigned to the Detective Division at Area 2 Violent Crimes Unit under Defendant Burge's command; engaged in a pattern and practice of torture and brutality, and engaged in the conduct complained of in the course and scope of his employment.  He is sued, through his estate, in his individual capacity.

42.     Defendant John Yucaitis, who is deceased and therefore sued by and through his estate, was a duly appointed and sworn Chicago Police detective who was assigned to the Detective Division at Area 2 Violent Crimes Unit under Defendant Burge's command; engaged in a pattern and practice of torture and brutality, and engaged in the conduct complained of in the course and scope of his employment.  He is sued, through his estate, in his individual capacity.

43.     From 1987 to 1992, Defendant Leroy Martin, who is deceased and therefore sued by and through his estate, was the Superintendent of Police for the City of Chicago, and as such was responsible for the policies, practices, and customs complained of herein.  In 1983 and early 1984, he was Commander of the Area 2 Detective Division and was thereby Defendant Burge's direct supervisor, as well as the command supervisor of Defendants O'Hara, McKenna and Yucaitis.  He engaged in the conduct complained of in the course and scope of his employment and is sued, through his estate, in his individual capacity.

44.     From 1998 to 2004, Defendant Terry Hillard was the Superintendent of Police for the City of Chicago, and as such was responsible for the policies, practices, and customs complained of herein.  He engaged in the conduct complained of in the course and scope of his employment and is sued in his individual capacity.

45.     From 1998 to 2002, Defendant Thomas Needham was counsel to, and administrative assistant for, Defendant Hillard, who was his direct supervisor.  Defendant

Needham engaged in the conduct complained of in the course and scope of his employment and is sued in his individual capacity.

46. From 1981 to 1989, Richard M. Daley was the State's Attorney of Cook County and during that period was responsible for the policies, practices and customs of that office. From 1989 to 2011, Defendant Daley was the Mayor of the City of Chicago and as such was a chief policymaker for the City of Chicago, its Police Department, City Council, Corporation Counsel's Office, and Police Board and was and is therefore responsible for the policies, practices, and customs complained of herein. Defendant Daley was acting in the scope of his employment at all times material to this complaint and is sued in his individual capacity.

47. From 1990 to 1998, Defendant Gayle Shines was the Director of the Office of Professional Standards (hereinafter "OPS") of the CPD. Her direct supervisor was the Chicago Police Superintendent. She was appointed by Defendant Daley, engaged in the conduct complained of in the course and scope of her employment, and is sued in her individual capacity.

48. Defendant City of Chicago is an Illinois municipal corporation, and as such is responsible for the policies, practices and customs of the CPD, its OPS, its Personnel Division, its Detective Division, and its Superintendent of Police, as well as those of the Mayor, his office, and the Chicago City Council, the Corporation Counsel's Office, and the Chicago Police Board. The City of Chicago is and/or was the employer of each of the Defendant Officers and police, governmental, and executive officials. The City of Chicago is responsible for the acts of the Defendant Officers and Defendant police, executive, and governmental officials while employed by the City of Chicago and while acting within the scope of their employment.

49. Defendant Lawrence Hyman was an Assistant Cook County State's Attorney and the supervisor of the Felony Review Unit of the Cook County State's Attorneys' Office

(hereinafter referred to as the "CCSAO") in February of 1982. He engaged in the conduct complained of in the course and scope of his employment and is sued in his individual capacity.

50. Defendant Nicholas Trutenko was an Assistant Cook County State's Attorney from 1981 to 1991, and from 2008 to 2020. He engaged in the conduct complained of in the course and scope of his employment and is sued in his individual capacity.

51. Defendant T. Andrew Horvat is an Assistant Cook County State's Attorney. He is sued in his individual capacity.

52. Defendant Michael Hartnett is a former court-reporter that served as a contractor and agent of Cook County and its State's Attorneys' Office at the time in question. He engaged in the conduct complained of in the course and scope of his employment and is sued in his individual capacity.

53. Defendant William Kunkle was an Assistant Cook County State's Attorney from 1973 to 1985, a Special Cook County Assistant State's Attorney in 1986 and 1987, and a Special City of Chicago Corporation Counsel from 1988 to 1996. He engaged in the conduct complained of in the course and scope of his employment and is sued in his individual capacity.

54. Defendant William David Coleman, aka Alfred Clarkson, was a jailhouse informant under the control of Defendants Trutenko and Kunkle from 1988 to the present. He is sued in his individual capacity.

55. Defendant Cook County is a governmental entity within the State of Illinois, which consists in part of its CCSAO and the Cook County Board. At certain times relevant to this action, Cook County was the employer of Defendants Daley, Hyman, Trutenko, Hartnett, Horvat, and Kunkle, and is therefore a necessary party to this lawsuit.

56.     At all times relevant to this action, each of the named individual Defendants acted individually and/or collectively, under the color of the laws, regulations, and customs of the State of Illinois.  Each Defendant's actions constituted "state action" as defined under federal law.

## FACTUAL ALLEGATIONS

### The Manhunt, the Torture of Numerous Suspects, and the Terrorization of the Black Community

57.     The murders of two white police officers - William Fahey and Richard O'Brien - on February 9, 1982 led the Chicago Police Department to conduct the City's largest manhunt in history.

58.     Defendant Burge, who was the commanding Violent Crimes Lieutenant at Area 2 led the manhunt/investigation into the murders of the officers.

59.     Defendants McKenna, O'Hara, and Yucaitis, as longtime Area 2 detectives, were working directly under Burge's supervision and played an important role in the investigation and manhunt.

60.     According to former Chicago Police Department officer Chester Batey, retaliation was on the mind of everyone at CPD: "That particular moment before I went out, I think there was a feeling of revenge and retaliation and let's get them and what have you in the mind of every police officer in the city; and when you hear about, like I said, somebody in your profession getting killed, the first thought is something of that nature."

61.     Hundreds of complaints of racially motivated police violence, including at least twelve documented cases of torture, arose under Burge's command during the manhunt.

62.     These documented cases of torture and physical abuse included those alleged by Roy Brown, Larry Milan, Paul Mike, Walter Johnson, Alfonzo Pinex, Nick Owens, Donald Judkins, and Kenneth Harris.

**The Torture of Anthony Williams**

63.     On February 12, 1982, Anthony Williams was arrested. At the time of his arrest, Williams was knocked to the ground and told that he "was the one that shot two officers."

64.     At Police Headquarters, Anthony Williams was tortured at length after being brought into a room, with Burge being one of the officers involved. First, the officers put a plastic bag on his head and started beating him before beating him with a phone book on his head and ribs.

65.     During this time, Burge was trying to get him to "confess to killing two police officers." When Williams refused to confess, Burge said "let's take the handcuffs off of him, take him to the staircase and shoot him, and say he was trying to escape."

66.     As Williams continued refusing to confess, Burge pulled out his gun and said he "was going to shoot this nigger." After that, the officers continued torturing Williams as he continued to profess his innocence.

**Donald White was Tortured Into Providing a False Statement**

67.     On or about February 12, 1982, an eyewitness to the murders made a tentative identification of Donald White as the shooter of the two officers.

68.     Donald White was arrested in the evening hours of February 12, 1982, together with his brother-in-law, Dwight Anthony, whom the witness had tentatively identified as the driver of the car in which the shooter was riding. Both Donald White and Dwight Anthony were transferred to CPD headquarters at 11th and State.

69.     Donald White was taken to the Fifth Floor and was questioned by Defendants McKenna, O'Hara and Burge, Detective Fred Hill, and several other Area 2 Detectives. Dwight Anthony was placed in an adjacent interrogation room.

70.     The officers repeatedly questioned Donald White about whether he killed the officers or had any information about who did it. After he denied involvement, Hill said, "I am tired of this fucking shit" and then got a black bag and put it over White's head while he was beaten with a phone book. He begged the officers to stop and was "begging for [his] life."

71.     McKenna, O'Hara, and Hill then continued to suffocate Donald White, who felt as if he was "about to go unconscious [from] the plastic bag."

72.     These officers then brought Donald's brothers, Lamont White and Walter White, into the room. After Donald continued denying any involvement, these officers put the bag back on his head and beat him again. He was "screaming because [he] couldn't breathe."

73.     Throughout his interrogation, Donald White continued to be beaten while Burge and his men kept asking if he killed the police officers. When White responded that he did not, they continued to beat him.

74.     At some point, Detective Hill told Donald White that if he didn't "cooperate, that he was going to shoot [him], tell [him] to run or push [him] out the window or something."

75.     Donald White's brothers, Lamont and Walter, were also being tortured by Burge, O'Hara, McKenna, Hill and the other detectives and were screaming in the other room.

76.     Burge then took the bullets out of his gun, put a bullet in the gun, and said, "we're going to play Russian roulette" before putting the gun inside Donald's mouth. Burge then cocked the gun two or three times before taking Donald's leg and holding him out of a top floor window by one leg. Donald White thought "[he] was going to die."

77.     Donald White eventually gave a false statement. White believed he "had to sign a statement," and would "do anything they told [him] to do..." because "they beat [my] family,

they beat [me], they beat [my] brothers, they beat other people that came from around my house..."

78.     In granting Plaintiff a new trial in 2018, and after being presented with unrebutted testimony illustrating that nearly a dozen potential suspects and witnesses were tortured prior to the arrests of Andrew and Jackie Wilson on February 14, 1982, the Honorable William H. Hooks found there was a pattern of torture that infected the underlying investigation into the deaths of Officers Fahey and O'Brien (see, Paragraph 26 above).

**By February 14, 1982, the State's Star Witness Had Already Informed Detectives that Plaintiff Did Not Participate in the Fatal Shooting**

79.     Tyrone Sims was an eyewitness to the tragic murders of Officer Fahey and O'Brien.  Police reports reveal that Mr. Sims was first interviewed on February 9, 1982.

80.     Mr. Sims was "sitting in his living room and looking out the front window" when he saw the brown Chevrolet pulled over.  According to Mr. Sims, the driver exited and engaged in a conversation with the driver of the police car.

81.     Shortly thereafter, Mr. Sims "saw the passenger of the Chevrolet had gotten out and had his coat in his hand.  He then saw the passenger throw his coat in the back of the car."  At that point, "the policeman looking through the coat and he thinks that he found something in it.  At that time, it looked like the policeman grabbed the passenger in the Chevrolet like he was going to put hand cuffs on him."

82.     According to Mr. Sims, a struggle ensued between the passenger and Officer Fahey.  Mr. Sims then saw the passenger, Andrew Wilson, shoot both officers.

83.     Tyrone Sims did not implicate the driver, Jackie Wilson, as having any involvement in the robbery and murder of either officer.  Mr. Sims would later testify that

Plaintiff was cooperative with law-enforcement, stood by the driver side door during the events at issue, and was in a "state of shock" as Andrew Wilson committed the crimes at issue.

84.     In light of this eyewitness account exculpating Jackie Wilson, Burge and those working under his command were determined to torture a false statement that could be used to hold him accountable for the crimes his brother committed.

## The Torture of Andrew Wilson

85.     On the morning of February 14, Plaintiff Jackie Wilson, and his brother, Andrew, were separately arrested.

86.     At approximately 5:15 a.m. on February 14, 1982, Andrew Wilson was arrested at 5401 West. Jackson Blvd in Chicago, Illinois.  Defendants Burge, McKenna, and O'Hara, among many others, participated in Andrew's arrest.

87.     Plaintiff, Jackie Wilson, was arrested at 5157 South Prairie Avenue at 8:05 a.m. on February 14, 1982.

88.     Eventually, both were brought to Area 2 headquarters which was then located at 91st and Cottage Grove in Chicago, Illinois.

89.     Andrew Wilson arrived at Area 2 headquarters at 9059 South Cottage Grove between 5:30 a.m. and 6:00 a.m.

90.     A team of interrogators commanded by Defendant Burge, and comprised of Defendants Burge, O'Hara, McKenna and Yucaitis, then proceeded to torture and abuse Plaintiff and his brother in order to unlawfully retaliate against them for their alleged roles in the murders of their fellow officers and to coerce them into confessing to the crimes.

91.     Upon arrival at Area 2, four Area 2 detectives, acting pursuant to Burge's direction to "get him at the station," threw Andrew Wilson to the floor then hit, punched, and

kicked him. At some point, the detectives put a black bag over his head and continued hitting him.

92.     Defendants extensively tortured Andrew Wilson at Area 2, some of which is described below.

93.     One of the officers kicked Andrew in the eye. As the officers were beating Andrew, Burge walked into the room and instructed them not to mess up his face.

94.     Subsequent to this first torture session, O'Hara and McKenna, who were assigned by Burge to interrogate Andrew, entered the room where Andrew was located and they saw the injury to Andrew's eye.

95.     Burge eventually returned to the room and told Andrew that "his reputation was at stake" and that Andrew "was going to make a statement."

96.     Yucaitis entered the room and produced from a bag a black box that "had a crank on it, a black crank on it, had a wire." The wires had clips on them.

97.     One of the wires was then pulled out and placed onto Andrew's ear as another was put on his left nostril. Yucaitis then cranked the device which caused Andrew to begin "hollering real loud." Andrew "kept hollering when he kept cranking."

98.     Later, Burge joined in on the electroshock and "was doing it, kept cranking it and cranking it, I mean for a long period of time." Burge became frustrated because the wires kept coming off Andrew's ears so he placed them on Andrew's fingers.

99.     The electroshock had a devastating effect on Andrew, "It stays in your head and it grinds your teeth. It makes your teeth grind. It grinds like that. It grinds, constantly grinds, constantly…it just stays in your head. The pain just stays in your head."

100.     At some point later that morning, Defendant O'Hara took Andrew to meet with Defendant Lawrence Hyman who had been at Area 2 during the period of time that Andrew was being tortured. After Hyman entered the room, Andrew told him: "You want me to make a statement after they have been in there torturing me like that?" Hyman responded by saying "[g]et the jagoff out of here." Immediately after, O'Hara took Andrew back to the interrogation room.

101.     Defendant Burge eventually came back in the room with a brown paper bag and announced that it was "fun time." Shortly thereafter, Burge took out the black box and sat in a chair before proceeding to electroshock Andrew again. Andrew's "teeth [were] grinding, flickering in [his] head, pain and all that stuff." Defendant Burge "just kept on doing it over and over and over."

102.     Because Andrew kept rubbing the wire off his ear, Burge and Yucaitis handcuffed him across a radiator and they continued to electroshock him while kicking him in his back.

103.     Andrew was later transferred to Area 1 Detective Division to stand in a lineup.

104.     At some point, Burge entered the room where Andrew was being held at Area 1 and was playing with his gun.

105.     After the lineup, Defendants McKenna and O'Hara drove Andrew back to Area 2 for further questioning. During the car ride, Detective McKenna told Andrew that "he would prefer to kill [him], he would like to shoot [him], he would like to empty his gun in [him]." After Andrew was again placed in an Area 2 interrogation room, Burge entered and asked if Andrew was ready to make a statement or whether they were going to need to torture him again. At that point, Andrew finally agreed to give a statement which he gave to Hyman in the presence of O'Hara and Hartnett.

106.     Later, Defendant Hartnett took a photograph of Andrew around 8:30 p.m.  After

his picture was taken, Andrew told Defendant Hartnett that "they was going to torture [him]

some more like that."  Defendant Hartnett replied by saying that "he couldn't do anything about

it" and left.

**The Torture of Plaintiff Jackie Wilson**

107.     After Plaintiff's arrest at 5157 South Prairie Avenue on February 14, 1982, he

was first taken to Area 1.

108.     Shortly thereafter Plaintiff was transferred into the custody of four white Area 2

police detectives who transported him to Area 2.

109.     Almost immediately after entering the vehicle, the detective to the right of

Plaintiff told him that he was going to say something about the murders.

110.     After Plaintiff denied knowledge, the same detective elbowed him six times in the

chest and ribs, followed by another detective who also repeatedly elbowed him.

111.     Then, the detective in the front passenger seat turned around and backhanded

Plaintiff three times in the face.

112.     In the early morning hours of February 14, 1982, Jackie Wilson was dragged into

Area 2 headquarters by the back of his neck.

113.     After Plaintiff Jackie Wilson was taken to Area 2, he was interrogated by

Defendants McKenna and O'Hara at the behest and instruction of Defendant Burge, to whom

they were reporting about the interrogation.

114.     Jackie Wilson's interrogation began around 9:30 a.m. on February 14, 1982.  At

that time, Detectives McKenna and O'Hara began interrogating Jackie in the Case Management

Office.

115.    After Plaintiff denied knowledge about the murders, McKenna responded by striking Plaintiff five to six times on his face and body.

116.    Plaintiff continued to deny involvement, and in response Defendants O'Hara and McKenna continued hitting and slapping Plaintiff while calling him a liar; then O'Hara proceeded to hit him in his face, chest, and side.

117.    Plaintiff was in pain and "worried because this was something [he] had never experienced before."

118.    Then Defendant McKenna hit Plaintiff in the head three to four times with a phone book. While abusing Plaintiff, Detective McKenna was making comments such as "You ready to talk now? You gon[na] say something?"

119.    Detective O'Hara, too, was making comments: "You're lying, you're gonna tell us something eventually, and every time you lie, this is what's gonna happen to you."

120.    Plaintiff was disorientated from all the abuse he was suffering.

121.    Later, Detective McKenna kicked Plaintiff in the groin.  The kick caused Plaintiff to urinate on himself.  As he was kicked, McKenna told Plaintiff that he was "gon[na] talk…gon[na] tell us something."

122.    Plaintiff was "hurt, scared, [and] worried" because he had "never been subjected to this."  Plaintiff was scared that he would never make out of the station alive.

123.    Eventually, Defendant O'Hara asked Plaintiff if he knew a person named Donald White. Plaintiff was punched after he denied knowing White. He then was uncuffed and dragged to the door where he was shown Donald White, a person that he knew by the nickname of Kojak.

124.    Plaintiff was then brought back into the interrogation room and slammed down into a chair.

125.    A short time later, McKenna asked Plaintiff whether he knew Derrick Martin. Plaintiff was slapped again on his body, chest, ribs, and head numerous times after denying that he knew Martin.

126.    McKenna told Plaintiff that he was "lying" and that he was "gon[na] come clean" as he continued to beat him.

127.    At that point, Plaintiff was uncuffed and walked to the door: It was then that Plaintiff saw Derrick Martin, the person he recognized as "D."

128.    At some point, Defendant Burge joined O'Hara and McKenna in Plaintiff's interrogation.

129.    As Burge entered, O'Hara was slapping Plaintiff in the face. Burge immediately told O'Hara to stop hitting Plaintiff in the face because "they don't want to leave marks on... [his] face like they did with [his] brother."

130.    After Burge made this instruction, Defendant McKenna started choking Plaintiff and pulled out a revolver and stuck it in his mouth.

131.    McKenna then "start[ed] moving it around in a circular motion, cocking it back and forwards. Cock it and then let it go back down. He didn't let it hit, but he is holding it, easing it back in, cock it back, ease it back in. He is doing this, rolling around in [his] mouth" for a few minutes.

132.    With a gun in his mouth, McKenna asked Plaintiff if this made him nervous. Plaintiff thought the same thing he believed was going to happen "all along, they gonna kill me."

133.    Burge told McKenna to take the gun out of Plaintiff's mouth, and in response to Plaintiff's refusal to give a statement, said "I am getting tired of this shit. I got something that will make him talk."

134.    Defendant Burge then stepped out of the room and returned with a bag that contained a black box. Plaintiff was then uncuffed, and Burge put little wires on Plaintiff's hand.

135.    Burge then "proceeded to wind up a little thing, like it's a little jack in the box, if you will, and [Plaintiff] felt an electrical jolt hit [him] in [his] hand and go through [his] body."

136.    Plaintiff was electroshocked three times by Burge.

137.    During Plaintiff's torturous interrogation, he could also hear his brother Andrew screaming and hollering and telling the police to "leave him alone."

138.    As Plaintiff heard Andrew screaming, Burge told Plaintiff that if he didn't cooperate, that he was "getting it next."

139.    Eventually Plaintiff told his interrogators "game over" and that he'd "tell them whatever they wanted to know. Game over. What you want me to say, I am gon[na] say it."

140.    By this time, Plaintiff was "hurt, scared, [and] uncertain of even coming out of this police station alive." He was in pain "all over. Head, face, ribs. Then [they] kicked [him] in the grind [groin]. This electric business."

141.    Plaintiff told his interrogators "I am through. I'm through. . . They say I shot the president, I shot him. I'm tired. I want it to end."

142.    Shortly thereafter, Defendant Lawrence Hyman, who was on the second floor of Area 2 during the torturous interrogations of Plaintiff and his brother that were being conducted in close proximity, came into the room and said that he heard Plaintiff "was gonna make a statement."

143. Plaintiff then told Hyman that he wanted to see his lawyer and gave him a business card for his attorney, Frederick Solomon. Hyman then left and Defendants McKenna and O'Hara returned.

144. Plaintiff was again beaten by O'Hara and McKenna as they told him that he didn't "need no fucking lawyer," and that if he requested one again, he would be tortured once again. Plaintiff believed that the only way he would leave Area 2 alive was if he gave a statement.

**Defendants Hartnett and Hyman Are Present at Area 2 as Plaintiff, Andrew Wilson, and Others Were Brutally Tortured by Defendants**

145. Defendants Hartnett and Hyman were present at Area 2 as Defendants tortured Plaintiff, Andrew Wilson, and others.

146. As Plaintiff – and others – were tortured, Defendant Hartnett was on the second floor reading the Sunday newspaper while waiting for the Defendants to call him into the interrogation rooms.

147. Defendant Hartnett has admitted that he "didn't give a damn" if Plaintiff was tortured and that he considered Defendant Burge to be a friend.

148. After Plaintiff's torture session ended, Defendants Hyman and Hartnett were called in to obtain a statement.

149. Defendants Hyman and Hartnett, knowing that Plaintiff and his brother were tortured by Defendants Burge, McKenna, O'Hara and Yucaitis, then took Plaintiff's statement in the presence of Detective McKenna.

150. Knowing that Plaintiff and his brother were tortured and coerced into giving their statements, Defendant Hyman, deviating from the policy and practice of the Cook County State's Attorneys' Office at that time, did not ask either of them if they had been physically abused or otherwise mistreated.

151. Defendant Hartnett, despite knowing that Plaintiff and his brother had been tortured, and knowing that the CCSAO's policy was to inquire about coercion, did not intervene to inform Defendant Hyman that he should ask Plaintiff and his brother those crucial questions.

152. Defendants Burge, McKenna, O'Hara, Hyman, and Yucaitis, not only knew that Plaintiff's confession was physically coerced by torture, but also, because of, inter alia, the witness statement of Tyrone Sims, that it falsely implicated Plaintiff in the murders.

### The Torture of Derrick Martin

153. Derrick Martin, who Burge and his men believed was in the back seat of the car just before the murders took place, was arrested and present at Area 2 on February 14, 1982.

154. At some point, Defendant Burge came into the room where Martin was being held, and told Area 2 detectives to "find out where he been at." The detectives then started kicking and punching Derrick in his body, face, and groin area.

155. Burge was present when the officers were abusing Martin.

156. Defendant Burge brought Andrew Wilson into a hallway on the second floor of Area 2 and Burge said to Martin, "is this him?" Martin was then brought to a room close to the one where Andrew Wilson was being interrogated.

157. As Martin was being beaten, Burge took Andrew Wilson to the corner of the wall as a detective said "so you like killing police officers, huh" before punching Andrew Wilson in the stomach.

158. After being punched, Andrew Wilson was taken out of the room by Defendants Burge and O'Hara.

159. Martin was eventually brought to the Area 2 mugshot room. There, Martin heard "unbearable" screaming from another interrogation room. The screaming was long and

Defendant Hyman was present for some of it. After hearing the screams, Defendant Hyman revealed to Martin, "Andrew won't talk" before stating "[w]hen we get through with him, he going to tell on his momma."

**Doris Miller Bears Witness to Torture**

160.     Doris Miller, a carrier for the United States Postal Service, was awakened by loud knocking at her door during the early morning hours of February 14, 1982.

161.     Miller had known the Wilsons since they were children. The police went to speak with Miller because Donald White had told Defendants O'Hara and McKenna that Miller transported Plaintiff at one point during the manhunt. Miller was arrested by four white police officers and taken to Area 2 for questioning.

162.     Once there, Doris Miller was taken to a room, handcuffed to the wall and remained there for "a long time." She was eventually taken out of that room and brought to a room where Andrew Wilson was sitting. At the time, Andrew was sitting on a stool and naked from his waist up.

163.     Although the station was cold, Miller noticed that "Andy's body was just full of sweat, it was just sweaty. He was sweaty." After seeing Andrew, she was placed in the room adjacent to his and was again handcuffed to a windowsill.

164.     As Miller sat in a room adjacent to Andrew, she heard the police "beating him. The boy was begging and pleading, somebody have mercy on me, somebody have mercy. They beat him, they beat him over and over again." As she was handcuffed to the window sill, she heard Andrew's "body falling on the floor."

165.     According to Miller, Andrew was screaming, hollering, and begging the police to stop torturing him. To her, this abuse lasted "forever...it would stop sometimes."

166.     Later, Miller heard the police tell Andrew, "Look motherfucker, we are going to take you out of here now, and if you try anything, we will blow your head off."

167.      Doris Miller was not released from custody at Area 2 until 9:00 p.m. on February 14, 1982. She was handcuffed to the windowsill from dawn until her release nearly fifteen hours later. Although she begged to use the bathroom, the police refused and she was forced to urinate in an ashtray.

## The First Trial of the Plaintiff and Andrew Wilson

168.     In November of 1982, a hearing was held on Plaintiff's and his brother Andrew's motion to suppress.

169.     As part of the conspiracy to cover up their misconduct, Defendants Burge, McKenna, O'Hara, Yucaitis, Hartnett, and Hyman, coached by Defendant Kunkle, presented false denials at the hearing.

170.     Defendant Kunkle had previously been made aware that Burge and his men had tortured Andrew Wilson in order to obtain his statement.

171.     Defendant Kunkle had previously been made aware that Burge and his men had tortured Plaintiff in order to obtain his statement.

172.     On the basis of these false denials, Plaintiff and his brother's motions were denied.

173.     In January of 1983, Plaintiff and his brother were tried jointly for the murders.

174.     During the pretrial investigation, Defendant O'Hara and Detective Hill told DeWayne Hardin that he qualified for the reward money before putting "pressure on [him]…to come back" from Texas to testify.

175.     Prior to the 1983 trial, Hardin participated in a meeting with Defendant William Kunkle and ASA Mike Angorola.

176.     In this meeting, Hardin informed the prosecutors that Plaintiff was not involved in the robbery and murder of the two police officers, and that he stood by the door of the car the entire time.

177.     In response, Angarola, in the presence of Kunkle, repeatedly threatened Hardin in order to force him to falsely implicate Plaintiff.  Defendant Kunkle did not intervene to stop the misconduct.  Instead, he encouraged ASA Angarola's misdeeds.

178.     This misconduct was committed as part of the conspiracy that began before the initiation of charges to frame Plaintiff for crimes he did not commit.

179.     Two days later, Area 2 detectives came to Hardin's house, told him that he "better do what the State's Attorney wants me to do" as they put a plastic bag over his face.

180.     Hardin subsequently testified at Plaintiff and his brother Andrew's joint 1983 trial consistent with what the detectives and prosecutors coerced him to say.

181.     Hardin has subsequently admitted that this coerced and fabricated testimony was false when he claimed that that Plaintiff was smiling when he entered the vehicle and that he gave this false testimony because "that was something they told me to say," and because he was threatened.

182.     The tortured confessions were introduced at the joint trial, and Plaintiff and his brother were convicted of the murders and robbery.

183.     Plaintiff's wrongful conviction was based on the tortured false and fabricated statement, Andrew Wilson's tortured statement, and Hardin's manufactured and coerced testimony.

184.    Plaintiff received two life sentences and his brother received the death penalty.

**Plaintiff's Second Trial and Wrongful Re-Conviction**

185.    In 1987 the Illinois Appellate Court reversed Plaintiff's conviction and he was granted a new trial that was to be severed from his brother's trial.

186.    Also in 1987, the Illinois Supreme Court reversed Andrew Wilson's conviction, finding that "extensive medical testimony and photographic evidence corroborates" Andrew's torture allegations.

187.    At the time of the retrial, given that the only evidence implicating Plaintiff in the crimes for which he was charged was false, fabricated, and manufactured, the State did not have probable cause to continue the initiation of charges against Plaintiff.

188.    Defendant Trutenko, who replaced Defendant Kunkle as the lead prosecutor in Plaintiff's retrial, then proceeded to manufacture additional false, inculpatory evidence to supplement Plaintiff's false and manufactured confession and Hardin's false, coerced, and manufactured statement.

189.    To do so, Trutenko met on several occasions with Defendant William David Coleman, aka Alfred Clarkson, a jailhouse informant, career criminal, and British national, during which time they fabricated a story that Plaintiff had admitted his involvement in the murders as well as that he was a participant in a plan to break out of Cook County Jail.

190.    Defendant Trutenko and his fellow prosecutors reduced this false and manufactured story to an official memorandum.

191.    In exchange for this manufactured evidence, Defendant Trutenko provided Coleman with a promise that Coleman's drug charge, which carried a 6 to 30 year sentence,

would be dismissed, as well as undisclosed promises of financial rewards, and undisclosed assistance in obtaining relief from pending federal and international charges.

192.     Prior to and during Plaintiff's April 1989 re-trial, Defendants Trutenko and Coleman destroyed and otherwise suppressed exculpatory and impeaching evidence from the Plaintiff, his lawyer, and the Court.

193.     At Plaintiff's 1989 re-trial, Defendant Coleman, coached by Defendant Trutenko, presented the false testimony that he and Trutenko had manufactured, and withheld significant parts of the promises that Trutenko had made to convince Coleman to fabricate and present his false and perjured testimony.

194.     Prior to Plaintiff's 1989 re-trial, Defendant Trutenko met with Dwayne Hardin, and threatened Hardin with perjury if he did not present false inculpatory testimony against Plaintiff.

195.     Plaintiff's false and tortured confession, together with Coleman and Hardin's false and fabricated testimony formed the basis for Plaintiff's wrongful re-conviction for the murder of Officer O'Brien and the armed-robbery of both officers; however, Plaintiff was acquitted of the murder of Officer Fahey at the 1989 re-trial.

**The Wrongful Conviction and Suppression of Evidence Continues**

196.     Shortly after Plaintiff's second wrongful conviction, Defendants Coleman and Trutenko appeared before a Cook County judge and consummated the deal to which Coleman and Trutenko had agreed.

197.     Contemporaneously, Defendant Trutenko informed then Special City of Chicago Corporation Counsel William Kunkle that Defendant Coleman claimed that Andrew Wilson had purportedly made inculpatory jailhouse statements to Coleman.

198.     Kunkle, who had twice previously prosecuted Andrew Wilson, and had previously prosecuted Plaintiff at his 1983 trial, was then representing Defendants Burge, Yucaitis and O'Hara in Andrew Wilson's 42 U.S.C Sec. 1983 case alleging torture.

199.     Trutenko and Kunkle knew that Coleman's story about Andrew Wilson, like the one that Trutenko and Coleman had manufactured against Plaintiff, was false.

200.     Nonetheless, at Trutenko's urging, Kunkle, after coaching Coleman, presented him to testify at the §1983 trial in accordance with his false and manufactured story about Andrew Wilson.

201.     Two months later, Defendant Coleman was returned to his homeland of England as a free man.

202.     After his 1989 wrongful conviction, Plaintiff pursued an appeal in the Illinois Appellate Court, with a major point being Coleman's lack of credibility as a witness.

203.     After Coleman returned to England, and while Plaintiff's appeal was pending, Defendants Trutenko and Kunkle continued to have communications with Defendant Coleman, during which Coleman "extorted" money from them that had been previously promised by Trutenko and Kunkle for his prior testimony and as "hush money" to prevent him from revealing that his testimony in Plaintiff and his brother's cases was false and manufactured.

204.     While Plaintiff's appeal was pending, Defendant Trutenko traveled to England to discuss Coleman's prior testimony, and Trutenko stood up as godfather for one of Defendant Coleman's infant children.

205.     During Plaintiff's pending appeal, neither Trutenko nor Kunkle informed the Plaintiff, his counsel, or the court, about their continuing illicit relationship with Coleman, his

extortion of money to keep quiet, the fact that he had been promised money for his testimony, and that they considered him to be a "con man" whose testimony was not worthy of belief.

206.    Instead, Defendants Trutenko, Kunkle, and Coleman withheld this exculpatory and impeachment evidence as part of the effort to frame Plaintiff for crimes he did not commit.

207.    Despite what they knew, Defendants Trutenko and Kunkle attempted to convince Coleman to testify on behalf of Defendants Burge, Yucaitis and O'Hara at the 1992 Chicago Police Board hearing at which they were being administratively prosecuted for torturing Andrew Wilson.

208.    Unaware of any of the evidence concerning Coleman, and relying on Plaintiff's tortured confession, the Appellate Court affirmed Plaintiff's conviction in 1993.

### Plaintiff is Granted a New Trial

209.    In 2011, Plaintiff filed a petition for court review before the Illinois Torture Inquiry and Relief Commission (TIRC).

210.    In 2015, his TIRC petition was granted, and his case was reopened and sent to the Cook County criminal courts for an evidentiary hearing on the question of whether his confession was tortured from him.

211.    In June of 2018, after extensive discovery and an evidentiary hearing, Cook County Criminal Court Judge William H. Hooks ruled that Plaintiff's confession was tortured from him, and granted him a new trial at which the confession would be barred. In doing so, Judge. Hooks found:

> Overall, the evidence adduced in this hearing establishes that the State is incapable of rebutting that Jackie's statement was involuntary. Jackie's claims and credibility are not unassailable. Ordinarily, adding an allegation as significant as police using a device to give electric shocks, when not included in an original motion to suppress, would be reason to doubt. The State labels Jackie's addition of this allegation "a fantastic story." Such an allegation should be [a] fantastic story. But pattern and practice evidence show

shocking suspects was common. And each witness in a position to deny it invoked the fifth amendment. Those considerations take the "story" out of the realm of fiction.

Jackie has made the requisite showing, not only that the probability [of] the outcome of his suppression hearing would differ had the witnesses been subject to impeachment, but, more, that the State could not meet its burden to show Jackie's statement was voluntary in a new suppression hearing. Whirl, 2015 IL App (1st) 111484, P 110 ("Indeed, it is impossible to conceive of how the State could prevail at a new suppression hearing with the officer alleged to have coerced a suspect's confession invoking his privilege against self-incrimination"). Accordingly, a new suppression hearing could only result in a finding that Jackie's confession was involuntary and his statement would be suppressed.

212.     In December of 2019, the Illinois Appellate Court affirmed Judge Hooks'

decision. There the Appellate Court found there was "no error" when Judge Hooks determined

that "petitioner demonstrated by a preponderance of the evidence that his confession resulted

from coercion." In doing so, the Appellate Court later remarked, "the decision of government

actors to invoke their fifth amendment privilege against self-incrimination is judicially deafening

under the facts of this morbid tale of improper law enforcement."

213.     Nonetheless, the Office of the Special Prosecutor decided to prosecute Plaintiff a

third time, relying almost exclusively on the manufactured 1989 testimony of Defendant William

Coleman and the manufactured false statement of DeWayne Hardin.

214.     During the pre-trial discovery period, neither Defendant Trutenko, who was an

Assistant Cook County State's Attorney, nor Defendant Kunkle, who was a retired Cook County

Judge, nor Defendant Coleman who continued to be contact with Trutenko, revealed to the

Plaintiff, his lawyers, the Special Prosecutors, or the trial judge, any of the extraordinary

exculpatory and impeaching evidence about Coleman of which they were aware, or that Coleman

was not only alive but in continuing and current contact with Defendant Trutenko.

## Plaintiff's New Trial, Exoneration, and Finding of Innocence

215.     The third trial of Plaintiff for the murder of Officer O'Brien commenced in September of 2020 with Defendants Trutenko, Kunkle, and Coleman continuing their deception and suppression of evidence.

216.     As a result of this deception and suppression, the Special Prosecutor, asserting that Coleman was unavailable and in all likelihood dead, offered Defendant Coleman's manufactured, false and incredible 1989 trial testimony, and trial Judge Hooks, on the basis of these representations, reluctantly admitted the evidence.

217.     Defendant Trutenko testified at Plaintiff's trial after he and Defendant Horvat met with one of the Special Prosecutors and had continued their deception concerning Coleman at this meeting.

218.     By this period of time, Defendant Horvat joined the conspiracy among Defendants to withhold the exculpatory and impeachment evidence about Coleman of which they were aware of, and that Coleman was not only alive, but in continuing contact with Defendant Trutenko.

219.     Immediately prior to Defendant Trutenko's testimony, Defendant Horvat provided a warning about the testimony to Special Prosecutor Larry Rosen.  Defendant Horvat's warning to the OSP was designed to withhold exculpatory evidence from Plaintiff.

220.     During his testimony, Trutenko revealed that Coleman was alive, living in England, and that he had communicated with him during the trial.

221.     During his testimony, Trutenko committed perjury when he denied that he had discussed Coleman during his meeting with one of the Special Prosecutors.

222. During Trutenko's testimony, the Special Prosecutor, on October 1, 2020, after two weeks of trial during the COVID 19 pandemic, immediately moved to dismiss all charges against the Plaintiff with prejudice, and Judge Hooks granted the motion.

223. Immediately after his testimony, Defendant Trutenko destroyed and otherwise suppressed evidence of his relationship with Defendant Coleman by, inter alia, wiping his cellphone, and suppressing email communications between him and Coleman.

224. On December 18, 2020, Judge Hooks, based on all the evidence that he heard, granted Plaintiff a certificate of innocence. In doing so, the Court found:

> Jackie Wilson has also been physically tortured by a brutal electrical box torture ritual and has already wrongfully served a sentence that has taken roughly 70 percent of his life. Jackie Wilson will never be able to recoup the value of his life lost to the living hell he experienced at the hands of his government. While Jackie Wilson extraordinarily deserves and has earned this Certificate of Innocence others deserve to pay for what they have so unjustly caused both directly and indirectly.

225. Thus, 38 years, 10 months and 4 days after Plaintiff was arrested and tortured into making a false confession, he was adjudged to be innocent of all charges connected to the murders and armed robbery of Officers Fahey and O'Brien.

226. Upon referral from the Chief Judge of the Criminal Court of Cook County, Cook County Circuit Court Judge Alfredo Maldonado, on June 10, 2021, found that "the sordid history of the investigation and criminal prosecutions in this case serve as a shameful chapter in Chicago's history," and further that "at best, the CCSAO acted in a misguided and inept manner as to Trutenko and the ethical crisis created by his misconduct and trial testimony . . . [and], at worst, the actions of the CCSAO, as to Trutenko, could have been motivated by unethical and, perhaps, illegal reasons to cover up misconduct." The Court then ordered:

> [I]n the interests of justice, the special prosecutor will be authorized to conduct an independent investigation of the actions of any person, including, but not limited to, any current or former members of the Cook County State's Attorney Office, relative to the

substance of Nicholas Trutenko's October 1, 2020 testimony and/or his alleged perjury on October 1, 2020, whether such actions occurred before, during or after his October 1, 2020 testimony and that, in the interests of justice, the special prosecutor may conduct [t]any criminal prosecutions warranted by the special prosecutor's independent investigation.

### The Conspiratorial Pattern and Practice of Torturing and Abusing Suspects and to Conceal and Cover Up the Torture and Abuse

227.    Plaintiff's torture and abuse was not an isolated incident of individual police officer brutality and misconduct.

228.    Rather, the interrogation and torture of Plaintiff in pursuit of his false confession was part of a long-standing pattern and practice of similar acts of racially motivated torture, including electric shock, baggings, mock executions and Russian roulette, suspensions, telephone bookings, and beatings, often with various kinds of objects including rubber nightsticks and hoses, committed, frequently with the use of racial epithets, against almost exclusively African American men under the supervision, and with the encouragement, participation and ratification of Defendant Burge. The torture, abuse, and wrongful conviction of Plaintiff, as alleged above, was a crucial part of this pattern and practice.

229.    The earliest known cases of torture in this pattern occurred on or about August of 1972, when Defendant Burge, then a detective on the Area 2 midnight shift, and his associates, brutally beat African American suspects Rodney Mastin, Lindsey Smith, and Phillip Moore, and in May of 1973 when Burge tortured Anthony Holmes, using an electric shock box, suffocation with a bag, beating and racial epithets.

230.    The CPD took no action to punish or restrain Defendant Burge at that time. Over the next decade, Burge and other Area 2 detectives tortured many African American suspects, including Lawrence Poree, Virgil Robinson, George Powell, Tony Thompson, Timothy

Thompson, Willie Porch, Ollie Hammonds, Derrick King, Michael Coleman, Sylvester Green, and Melvin Jones.

### Richard M. Daley, Jane Byrne, Richard Brzeczek and Richard Devine

231.     In February 1982, the Superintendent of the CPD, Richard Brzeczek, and the Mayor of the City of Chicago, Jane Byrne, placed Defendant Burge in charge of a manhunt for the killers of two white Chicago Police officers named William Fahey and Richard O'Brien.

232.     In the course of that manhunt, Burge and other Area 2 detectives, including Defendants O'Hara and McKenna, tortured a number of African American citizens, including Donald White, Anthony Williams, Lamont White, Walter White, Roy Brown, Walter Johnson, Paul Mike, Alphonso Pinex, Donnell Traylor, and Larry Milan, and abused and terrorized a large number of other African American civilians.

233.     In the early morning hours of February 14, 1982, Defendant Burge and numerous Area 2 detectives arrested Andrew Wilson and the Plaintiff for the police officer murders. Throughout that day, Burge and other Area 2 detectives tortured the Wilsons, using the following techniques, among others: electric-shocking on the genitals, ears, and other parts of the body with a black box and a second plug in electrical device; suffocating with a plastic bag; burning on a radiator; and beating, including with a telephone book.

234.     Defendant Cook County State's Attorney Daley, the then Mayor of the City of Chicago, Jane Byrne, and the then Superintendent of the Chicago Police Department, Richard Brzeczek, all closely monitored developments in the manhunt.  All three learned from numerous sources about the widespread abuse during the manhunt, including the torture and abuse of Andrew Wilson, and did nothing to prevent or stop that torture and abuse or to discipline, investigate, or otherwise bring to justice Burge and the other detectives who perpetrated it.

235.     As a direct and proximate result of the failure of Defendant Daley, CPD Superintendent Brzeczek and Mayor Byrne to discipline and to adequately supervise, Defendant Burge and other Area 2 and 3 Detectives tortured numerous additional almost exclusively African American suspects with electric shock, baggings, mock executions, and beatings, often while using racial epithets, in the period from February of 1982 to November of 1991.

236.     The victims in this period, in addition to Plaintiff and his brother, included the following men: Shadeed Mumin, Michael Johnson, Lee Holmes, Rodney Benson, Stanley Wrice, Bobby Joe Williams, Eric Smith, Franklin Burchette, James Andrews, David Fauntleroy, Vincent Wade, Reginald Mahaffey, Jerry Mahaffey, Gregory Banks, David Bates, Darrell Cannon, Lee Norah, Leonard Hinton, Mearon Diggins, Leroy Orange, Leonard Kidd, L.C. Riley, Philip Adkins, Robert Billingsley, Stanley Howard, Dwight Cavin,  Alphonso Pinex, Thomas Craft, Lavert Jones, Alex Moore, Terry Harris, Lonza Holmes, Mearon Diggins, Michael Tillman, Stephen Bell, Eric Caine, Aaron Patterson, Andrew Maxwell, Gregory Howard, Darrell Cleveland, Terrence Houston, David Randle, Richard Terrell, Donald Torrence, Madison Hobley, Curtis Milsap, Ronald Kitchen, Marvin Reeves, Pedro Sepulveda, Maurice Deloney, Javon Deloney, James Marshall, Tony Anderson, Cortez Brown, Marcus Wiggins, Jesse Clemon, Imari Clemon, Damoni Clemon, Diyez Owens, Clinton Welton, Grayland Johnson, Enrique Valdez, Johnny Plummer, Tyshaun Ross, Keith Walker, Gerald Reed, Anthony Jakes, Travis Richardson, Michael Peterson, James Gibson, Kevin Bailey, Corey Batchelor, and Ricardo Rodriguez.

**Defendant Daley's Failure to Intervene and Concealment of Exculpatory Evidence**

237.     By no later than February 1982, Defendant Daley had direct, personal knowledge that Defendant Burge and other Area 2 detectives committed acts of torture against African American suspects at Area 2.

238.     During the February 1982 manhunt described above, Defendant Daley closely monitored events, receiving regular reports from subordinates who, at various times, were at Area 2.

239.     Daley therefore knew or should have known of the abuses of African American civilians that occurred in the course of the manhunt, including, in particular, the abuse of the White brothers and Anthony Williams, who were placed in protective custody by the Cook County State's Attorney's Office following acts of torture that Defendants Burge, O'Hara, McKenna and their fellow Area 2 detectives perpetrated against them.

240.     Defendant Daley was also informed of the arrests of Plaintiff and his brother Andrew on the morning of February 14, 1982.

241.     Throughout the day of February 14, as the Wilsons were tortured (frequently screaming in the course of the abuse), several high-ranking Assistant State's Attorneys were present at Area 2.

242.     An Assistant State's Attorney assigned as a supervisor to the Felony Review Unit, Defendant Larry Hyman, participated directly in the interrogation of the Wilsons, which occurred between sessions of torture at the hands of Defendants Burge, Yucaitis, O'Hara and McKenna, and was specifically aware of the torture.

243.     The other high-ranking members of the State's Attorney's Office present at Area 2 on February 14, 1982 knew or should have known that the Wilsons were being tortured. Those

high-ranking assistants were reporting directly to Defendant Daley and to the First Assistant State's Attorney at the time, Richard Devine.

244.    Neither Daley nor any of his top assistants did anything to halt or prevent the torture of the Wilsons.

245.    On or about February 17, 1982, CPD Superintendent Brzeczek received a letter from Dr. John Raba, the Director of Medical Services at Cook County Jail, informing the Superintendent that a medical examination of Andrew Wilson revealed unmistakable evidence that Wilson had been brutalized while in police custody, and that Wilson reported being tortured with electric shock.

246.    In this letter, Dr. Raba demanded an investigation into Andrew Wilson's allegations.

247.    After conferring with high-ranking police command personnel, the Superintendent wrote a letter to Defendant Daley, enclosing the Raba letter and advising Daley that, in light of the pending prosecution of the Wilsons for the murder of the two white police officers, the Superintendent would not investigate or otherwise pursue the matter without instructions from Daley.

248.    Defendant Daley received the Brzeczek letter (with its enclosure) and shared and discussed it with his First Assistant, Richard Devine, and other high-level subordinates, including his Deputy Chief, Defendant William Kunkle.

249.    Daley never responded to the letter.

250.    Defendant Daley and his subordinates, including Defendant Kunkle, were fully aware that Superintendent Brzeczek's letter set forth criminal conduct by Burge and other

Chicago police detectives and officers, and they knew or should have known that Defendant Larry Hyman might be complicit in this criminal conduct.

251.    They also knew that there was physical, medical, and testimonial evidence which supported Andrew Wilson's claim of torture and physical abuse.

252.    Not only did Daley fail to instruct the Superintendent of Police to conduct a criminal and/or administrative investigation, but he also failed to conduct a criminal investigation of his own, and did not refer the evidence to an independent agency for investigation.

253.    Instead, Daley, Devine, and/or Kunkle communicated to Dr. Raba, through Cook County Board President George Dunne, that Raba "should not get involved" in the Wilson case, and subsequently, both Daley and Superintendent Brzeczek officially commended Burge and his men.

254.    As a direct result of Defendant Daley's refusal to act, the CPD, and its OPS indefinitely suspended all investigations into the allegations of torture and abuse made against Burge and his men, both by Andrew Wilson and Raba, and by scores of African American civilians who were tortured and abused during the manhunt.

255.    Throughout the manhunt, the arrests first of the Whites then of the Wilson brothers, the receipt and discussions of the Brzeczek letter, and the decision not to contact Brzeczek or to investigate, Defendant Daley and his subordinates, on information and belief, generated memoranda, notes, and other written communications documenting these events and decisions.

256.     This documentation, including the original copy of the Brzeczek letter, which contained a received stamp from Defendant Daley, no longer exists, and, on further information and belief, was destroyed by Daley.

257.     In the period of time between the Wilsons' torture, in February 1982, and when Defendant Daley left the Cook County State's Attorney's Office in December of 1988, Cook County prosecutors, under Daley's direction, not only prosecuted the Plaintiff and his brother, but also at least thirty other African American men who were tortured by Defendant Burge, and Area 2 detectives under Burge's command and supervision.

258.     In none of these cases, including Plaintiff's, did Daley or his subordinates disclose specific exculpatory information within the possession of the office regarding the torture of Andrew Wilson and the specific knowledge of Daley and his high-ranking subordinates as to the truth of Wilson's allegations.

259.     Additionally, in none of these cases, did Daley request or pursue an investigation into the allegations of torture.

260.     Defendant Daley had direct, personal knowledge of the claim of torture in a substantial number of the torture cases that the CCSAO prosecuted during this period of time, including in cases where Defendant Daley made the most grave and important decision to seek the death penalty against numerous defendants, most significantly including in Plaintiff and his brother Andrew's case, who alleged they were tortured into confessing to crimes for which they stood accused.

261.     Each and every such decision was made personally by State's Attorney Daley himself after careful review of the case and full consultation with both his high command and the line assistants handling the prosecution.

262.     Subsequent to seeking and obtaining the death penalty in Andrew Wilson's case, Defendant Daley personally decided to seek the death penalty against Darrell Cannon, Leroy Orange, Leonard Kidd, Stanley Howard, Aaron Patterson, Reginald Mahaffey, Jerry Mahaffey, Michael Tillman, Steven Bell, Madison Hobley, and Ronald Kitchen—all of whom were tortured by Defendant Burge and/or detectives under his command and supervision.

263.     On information and belief, Daley's personal review of these cases revealed to him that each of these African American men claimed to have been tortured by Burge, and/or his men, in some cases using techniques identical or very similar to those Daley knew had been used against Plaintiff and his brother Andrew.

264.     Knowing that these individuals all credibly claimed that they had been tortured into confessing, Daley nonetheless decided to seek the ultimate punishment against each of them, in each case declining to pursue any investigation of the involved Area 2 officers and deliberately failing to disclose the exculpatory information in his personal possession and in possession of the CCSAO.

265.     At the time Defendant Daley reviewed these cases and decided to seek the death penalty he (a) had near-certain personal knowledge that Andrew Wilson had been tortured and that numerous other African Americans, including Plaintiff, had been tortured, abused, and terrorized by Burge and his men during the Wilson manhunt; (b) had personal knowledge that Burge and his Area 2 detectives were allegedly continuing to practice extreme physical abuse and torture against African American suspects; and (c) personally knew of exculpatory information regarding the pattern of torture, which he had deliberately suppressed since at least February 1982.

266. Daley nonetheless decided to seek the ultimate punishment against these African American men without pursuing any investigation of their allegations and deliberately failing to disclose the exculpatory information in his personal possession and in possession of the Office of the Cook County State's Attorney.

267. The actions and inaction of Defendant Daley in refusing and failing to investigate the actions of Defendant Burge and his confederates and in suppressing the exculpatory evidence in his possession proximately caused Plaintiff's wrongful prosecution, conviction, re-conviction, and re-prosecution, and more than 36 years of wrongful incarceration for crimes that he did not commit.

**Defendant Martin's Failure to Intervene and Concealment of Exculpatory Evidence**

268. Defendant Martin was the Commander of Area 2 in 1983 and at that time was Defendant Burge's direct supervisor.

269. At that time, Defendant Martin learned that Defendant Burge and detectives under his command systematically tortured and abused numerous African American suspects, including the Plaintiff and his brother Andrew, Eric Smith, Alonzo Smith, James Andrews, Jerry Mahaffey, Reginald Mahaffey, Gregory Banks, David Bates, Darrell Cannon, James Cody and Leonard Hinton.

270. Defendant Martin failed to initiate appropriate investigations or to discipline Defendant Burge in connection with any of these cases.

271. In 1987, Martin was named Superintendent of the CPD.

272. As Superintendent, possessing direct knowledge of Burge's practices from his time as Area 2 commander, Defendant Martin continued to fail to intervene, to supervise, discipline or otherwise act to prevent the ongoing misconduct of Burge and his men.

273.     Instead, Defendant Martin worked actively to conceal and suppress evidence of the pattern of torture, as is fully alleged below.

274.     The actions and inactions of Defendant Martin in refusing and failing to investigate the actions of Defendant Burge and his confederates and in suppressing the exculpatory evidence in his possession proximately caused Plaintiff's wrongful prosecution, conviction, re-conviction, and re-prosecution, and more than 36 years of wrongful incarceration for crimes that he did not commit.

**The Actions and Inactions of Defendants Daley, Martin, Hillard, Needham and Shines to Conceal and Cover-up the Pattern of Torture under Burge**

275.     Following his wrongful conviction in 1983 and his second wrongful conviction in 1989, Plaintiff languished in prison until June of 2018, when he was released on bond. He continued to suffer under his wrongful prosecution until his case was dismissed by the Special Prosecutor in October of 2020.

276.     Plaintiff's wrongful prosecutions were continued, his exoneration was delayed and his imprisonment and wrongful convictions lasted far longer than they otherwise would have because, for many years, Defendants Daley, Martin, Hillard, Needham and Shines, in conspiracy amongst themselves and with others, including Defendants Burge, McKenna, O'Hara, Yucaitis and their police confederates, and successive Police Superintendents and police command personnel, continued to make extraordinary efforts to suppress, conceal and discredit exculpatory evidence regarding the pattern of torture and physical abuse of African American men by Chicago Police detectives under Burge's command.

277.     In 1989, Defendant Daley became the Mayor of the City of Chicago and was thereby directly responsible for the appointment of the Superintendent of the Chicago Police Department.

44

278.    Defendant Daley also had ultimate responsibility for the operations of the CPD.

279.    Daley therefore had the duty to take all necessary steps to ensure that the Department and its officers disclosed exculpatory information to victims of Defendant Burge and his men, including Plaintiff.

280.    In addition, Daley had an ongoing duty to disclose exculpatory information to Plaintiff and other Burge victims of which Daley had become personally aware while he was State's Attorney of Cook County.

281.    Defendant Daley, while Mayor, 1) did not disclose exculpatory information in his possession at any time from the date he resigned as State's Attorney of Cook County, until he left the Mayor's office in 2011; 2) did not intervene at any time to direct the CPD to disclose exculpatory information in its possession regarding Burge; and 3) did not direct the CPD to conduct a thorough and aggressive investigation of Defendant Burge, and the other detectives who tortured and abused African American men while working under Burge's command.

282.    Rather than disclose exculpatory material and conduct appropriate investigations, Defendants Daley, Martin, Hillard, Needham, Shines and other co-conspirators caused the CPD to actively conceal and suppress information regarding the scope and extent of the torture and abuse of African American suspects that occurred under Burge.  Their actions in this regard included, but are not limited to, those alleged above and below.

283.    In 1990 a report (hereinafter, the "Goldston Report") was prepared by OPS investigator Michael Goldston, which found that there was systematic abuse of suspects held in custody at Area 2 and that Area 2 command personnel were aware of the systematic abuse and encouraged it by actively participating or failing to take action to stop it.

284.     In 1991, the Goldston Report was supplemented with a finding that Defendants Burge, O'Hara, McKenna and Yucaitis were among the prime movers in this pattern of abuse and that Defendants Burge, O'Hara and Yucaitis had tortured Andrew Wilson.

285.     In a companion Report (the Sanders Report) the OPS found that Defendants Burge, O'Hara and Yucaitis tortured Andrew Wilson and recommended that all three be fired.

286.     The Goldston Report, and the information it contained, was highly exculpatory for Plaintiff, as he was tortured during the time period analyzed by the Goldston Report by officers cited in the Report as primary actors in the systematic torture.

287.     Defendant Martin and other police command personnel delayed, obstructed, and otherwise undermined the OPS investigation, the Goldston Report, and its findings and conclusions set forth above, inter alia, by suppressing the findings that Wilson was tortured and by refusing to suspend, transfer or remove Burge either before, or for nearly a year after, the Goldston Report's findings were first made known to them in November of 1990.

288.     Defendant Martin and other command personnel further delayed, obstructed, and otherwise undermined the OPS investigation, the Goldston Report, and its findings and conclusions set forth above, inter alia, by suppressing the findings that there was systematic abuse at Area 2, which implicated Defendants Martin, Burge, O'Hara, Yucaitis, and other Area 2 detectives who worked under Burge's command.

289.     The Goldston Report and its findings were not publicly released until February 7, 1992, when Federal District Judge Milton I. Shadur ordered the Report's release.

290.     On or before February 7, 1992, Defendant Daley was specifically informed or was otherwise aware of the Goldston Report's findings of "systematic" Area 2 torture that was "condoned and participated in" by Area 2 command personnel.

291. Defendant Daley knew or should have known that Defendant Martin had been the commanding officer at Area 2 and Defendant Burge's direct supervisor during part of the time the Goldston Report found there to be "systematic" torture, and that Defendant Martin therefore had a motive and the intent to suppress and discredit the Goldston Report and its findings.

292. Despite this and all that he previously knew about torture by Burge and his men, and despite the findings of the Goldston Report itself, Defendant Daley did not 1) seek an independent federal investigation; 2) direct Defendant Martin to initiate a criminal investigation or to open disciplinary proceedings against the Area 2 detectives, supervisors and command officers identified in the Goldston Report; or 3) seek the prosecution of Burge and his confederates.

293. Instead, in a joint effort with Defendant Martin, Defendant Daley sought to publicly discredit the Goldston Report and defend Martin's prior suppression of it, saying "these are only allegations . . . rumors, stories, things like that."

294. The intent and effect of these statements was, inter alia, to undermine the accuracy and validity of the Goldston Report's finding that the torture at Area 2 was "systematic" and participated in by command personnel.

295. Even after learning of the findings in the Goldston Report, Defendant Martin, Defendant Shines, and other command personnel, in violation of police regulations, refused to investigate numerous other allegations of police torture that were brought to their attention, including allegations of electric shock and abuse previously made by electric shock victim Melvin Jones against Defendant Burge.

296. From 1989 to 1992, Defendants Daley and Martin, and their command subordinates, through several public hearings held by the Chicago City Council and the Chicago

Police Board, and a report by Amnesty International, were given additional actual notice that Defendant Burge was the leader of a group of Chicago detectives that systematically tortured and abused African American suspects in order to obtain confessions in murder and other serious felony cases.

297.    In January of 1992, Defendant Martin admitted in a publicly filed pleading that there was an "astounding pattern or plan" on the part of Burge and his confederates "to torture certain suspects, often with substantial criminal records, into confessing to crimes."

298.    In February 1993, the Chicago Police Board fired Defendant Burge for torturing Andrew Wilson.  These findings became final in December 1995.

299.    In 1993 the OPS re-opened investigations into approximately ten Area 2 torture cases.  After exhaustive re-investigations, which uncovered substantial new evidence in support of the allegations, OPS investigators sustained numerous allegations that two of Defendant Burge's self-admitted "right hand men," Sergeant John Byrne and Detective Peter Dignan, racially abused and tortured Darrell Cannon, Phillip Adkins, Gregory Banks, Thomas Craft, Lee Holmes and Stanley Howard.

300.    From 1993 until 1998, Defendant Shines (who had previously been appointed by Defendant Daley), under pressure from her fellow Defendants and co-conspirators, suppressed these findings and the evidence which supported them by secreting the files in her personal office.

301.    In 1996, Defendant Daley, despite numerous allegations and sustained findings of torture and abuse against Burge confederate Peter Dignan, meritoriously promoted him to the police rank of lieutenant.

302.     In 1998, Defendants Hillard and Needham, with full knowledge that Byrne and Dignan, together with Defendants Burge, Yucaitis, O'Hara, and McKenna, and other Area 2 and Area 3 detectives, participated in a pattern and practice of torture and abuse of suspects, including Plaintiff, violated police regulations and obstructed justice by overturning the OPS sustained findings in the six re-opened cases set forth above; by refusing to investigate other torture victims' claims that they had been tortured; by refusing to investigate Defendant Shines' suppression of evidence; and by suppressing these OPS files and findings from Plaintiff and other criminal defendants.

303.     On information and belief, Defendant Daley also personally insisted, from the time he became Mayor in 1989 until he was succeeded in 2011, that the City of Chicago continue to finance the defense of Defendant Burge and his accused colleagues and subordinates, despite his personal knowledge that Burge committed acts of torture against African American men while employed as a Chicago Police officer and supervised and condoned such acts by supervisors and detectives under his command.

304.     Daley's insistence on defending Burge was contrary to the recommendation of Daley's senior staff that the City sue rather than defend Burge, and continued throughout Daley's tenure as Mayor, despite Burge's indictment in October of 2008 for perjury and obstruction of justice, and his conviction on these charges on June 28, 2010.

**The Defendants' Misconduct Was Committed in Furtherance of Conspiracy**

305.     All of the named individual Defendants, acting jointly and with other police and prosecutorial investigative, supervisory, and command personnel, together reached an understanding, engaged in an ongoing course of conduct and joint action and otherwise

conspired and continue to conspire among and between themselves to deprive Plaintiff of his constitutional rights.

306.     This conspiracy is evidenced, inter alia, by the overt acts set forth above and below, and has continued to the present, as evidenced, inter alia, by the false testimony and statements denying torture by these Defendants and their fellow officers; false statements and testimony that Burge, co-conspirator and former Area 2 detective Michael McDermott, and various other police and assistant state's attorney co-conspirators gave to the FBI, before the Federal Grand Jury, and/or at trial in *U.S. v Burge*; and by false public statements concerning police torture made by, inter alia, Defendants Daley and Burge, and co-conspirator Richard Devine, including those made in July of 2006 in response to the Special Prosecutor's Report, in October of 2008 in response to Burge's indictment, in June and July of 2010 in response to Burge's conviction, and in April and May of 2015 in response to Chicago City Council passing of the Reparations For Burge Torture Victims' Ordinance.

307.     By and through these overt acts, together with those set forth above, each and every Defendant, jointly and in conspiracy, with  a shared understanding, intent,  and/or meeting of the minds, deprived, and continues to deprive, Plaintiff of his constitutional rights, including his right to be free from unreasonable arrest, seizure, wrongful confinement, imprisonment, and the excessive use of force; his right to be free from involuntary self-incrimination and from interrogation techniques that "shock the conscience;" his right to access to the courts, to a fair and impartial trial and to be free from wrongful prosecution and conviction; and his right to equal protection of the law, all as protected by the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**Plaintiff's Damages**

308.     Plaintiff spent nearly 36 years and 5 months incarcerated in jail and prisons for crimes he did not commit.

309.     This time was emotionally, physically, and psychologically dehumanizing and debilitating, and Plaintiff has suffered from constant fear and anxiety, deep depression, despair, , boredom and loneliness.

310.     Plaintiff also suffered from the loss of sustained contact with his family, and was prevented from holding gainful employment or pursuing educational opportunities outside the prison walls.

311.     After Plaintiff's conviction was reversed in June of 2018, and he was released on bond, he continued to be subject to his third wrongful prosecution until his case was dismissed, after a two-week trial during the COVID 19 pandemic, on October 1, 2020.

312.     Plaintiff continues to live under the effects of his isolation, incarceration, and depression, and, until after being judicially declared innocent on December 18, 2020, under the stigma of his wrongful conviction as a "cop killer."

313.     Additionally, Plaintiff suffered, and continues to suffer, egregious pain and suffering, physical injury, humiliation, constant fear, anxiety, deep depression, despair, rage, and severe mental distress and anxiety from his torture and abuse, his wrongful prosecutions, convictions and imprisonment.

**COUNT I - 42 U.S.C. § 1983**
**Due Process**
**(Fourteenth Amendment)**

314.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

315. Defendants Daley, Burge, O'Hara, McKenna, Yucaitis, Hartnett, and Hyman, individually, jointly, and in conspiracy, caused the wrongful charging, prosecutions, convictions, and imprisonment of Plaintiff.

316. Additionally, these same Defendants, together with Defendants Trutenko, Horvat, Kunkle, Coleman, Shines, Hillard, and Needham, individually, jointly, and in conspiracy, caused the continuation of that wrongful conviction.

317. These Defendants caused and/or continued Plaintiff's wrongful charging, prosecution, conviction and imprisonment by committing or causing to be committed one or more of the following acts: physically and mentally coercing, constructing and fabricating the false and totally unreliable confession which formed the basis for Plaintiff's charging, prosecution, conviction, re-prosecution and re-conviction; by manufacturing and fabricating false witness testimony that formed the basis to his re-prosecutions, and re-conviction; by also withholding from the prosecutors, judges and defense attorneys involved in Plaintiff's prosecution the fact that this confession was false, totally unreliable, constructed and physically and mentally coerced; by suppressing, destroying and preventing the discovery and development of additional exculpatory torture findings and evidence, including, but not limited to, the instruments of torture as well as other exculpatory evidence; by giving a false and incomplete version of events to prosecutors; by writing false reports and giving false testimony; by improperly influencing the judges hearing Plaintiff's case, inter alia, by making false public statements; by obstructing and improperly influencing investigations which would have led to discovery of further exculpatory evidence; by suppressing and attempting to discredit findings of individual and systematic torture and abuse; and by the additional wrongdoing set forth above, thereby unconstitutionally depriving Plaintiff of his liberty and violating his right to a fair and

impartial trial and not to be wrongfully convicted, as guaranteed by the United States Constitution.

318.     Additionally and/or alternatively, the Defendants named above failed to intervene to stop Plaintiff's wrongful prosecution and conviction, re-prosecution and re-conviction, and resultant imprisonment despite having the opportunity and duty to do so.

319.     The actions of Defendants Daley, Burge, O'Hara, McKenna, Yucaitis, Hyman, Trutenko, Hartnett, Horvat, Kunkle, Coleman, Martin, Shines, Hillard, and Needham in depriving Plaintiff of his right to a fair trial and not to be wrongfully convicted and imprisoned, and, additionally and/or alternatively, in failing to intervene to stop said violations, were the direct and proximate cause of the injuries to Plaintiff which are set forth above.

320.     Additionally and alternatively, these actions were taken maliciously, willfully, wantonly and/or with reckless disregard for Plaintiff's constitutional rights.

321.     The Defendants' misconduct directly resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment.

322.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

323.     The misconduct described in this Count by the CPD Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count V.

WHEREFORE, Plaintiff demands judgment against Defendants Daley, the Estate of Burge, the Estate of O'Hara, McKenna, the Estate of Yucaitis, Hyman, Trutenko, Hartnett,

Horvat, Kunkle, Coleman, the Estate of Martin, Shines, Hillard, and Needham, for substantial compensatory damages, and, additionally, for substantial punitive damages against Defendants Daley, the Estate of Burge, the Estate of O'Hara, McKenna, the Estate of Yucaitis, Hyman, Trutenko, Hartnett, Horvat, Kunkle, Coleman, the Estate of Martin, Shines, Hillard, and Needham, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT II- 42 U.S.C. § 1983
### Coercive Interrogation
### (Fifth and Fourteenth Amendments)

324.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

325.    The actions of Defendants Burge, O'Hara, McKenna, Yucaitis, Hartnett and Hyman, individually, jointly, and in conspiracy, in coercively interrogating Plaintiff, and of using torture techniques which "shock the conscience" during said interrogations, resulted in the false, coerced, and fabricated confession that was subsequently used against him in his first and second prosecutions, and thereby violated Plaintiff's Fifth and Fourteenth Amendment rights to be free from compulsory self-incrimination and deprivation of liberty without due process of law as guaranteed by the United States Constitution.

326.    The actions of Burge, O'Hara, McKenna, Yucaitis, Hartnett and Hyman, in using torture and other coercive techniques to interrogate Plaintiff, and/or, in encouraging, condoning and permitting the use of said techniques, and/or failing to intervene to stop the coercive interrogation of Plaintiff, were the direct and proximate cause of Plaintiff's injuries and damages as more fully set forth above.

327.    Additionally, and alternatively, these actions were taken maliciously, willfully, wantonly and/or with reckless disregard for Plaintiff's constitutional rights.

328.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

329.     The misconduct described in this Count by the CPD Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count V.

WHEREFORE, Plaintiff demands judgment against Defendants the Estate of Burge, the Estate of O'Hara, McKenna, the Estate of Yucaitis, Hartnett, and Hyman, for substantial compensatory damages, and, additionally, for substantial punitive damages against Defendants the Estate of Burge, the Estate of O'Hara, McKenna, the Estate of Yucaitis, Hartnett, and Hyman, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

### COUNT III – 42 U.S.C. § 1983
### Deprivation of Liberty without Probable Cause
### (Fourth and Fourteenth Amendments)

330.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

331.     In the manner described more fully above, the Defendants, individual, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used false evidence that they had manufactured in order to accuse Plaintiff of criminal activity and to cause the institution and continuation of criminal proceedings against Plaintiff, without probable cause.

332.     In so doing, these Defendants caused Plaintiff to be deprived of his liberty without probable cause, in violation of his rights secured by the Fourth and Fourteenth Amendments.

333.     These Defendants initiated and continued judicial proceedings against Plaintiff maliciously, resulting in injury.

334.     The judicial proceedings against Plaintiff were terminated in his favor when the Special Prosecutor dismissed all charges against him.

335.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

336.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

337.     The misconduct described in this Count by the CPD Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count V.

WHEREFORE, Plaintiff demands judgment against Defendants the Estate of Burge, the Estate of O'Hara, McKenna, the Estate of Yucaitis, Hartnett, and Hyman, for substantial compensatory damages, and, additionally, for substantial punitive damages against Defendants the Estate of Burge, the Estate of O'Hara, McKenna, the Estate of Yucaitis, Hartnett, and Hyman, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT IV - 42 U.S.C. § 1983, 1985, 1986
## Conspiracy to Deprive Constitutional Rights

338.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

339.     Defendants Daley, Burge, O'Hara, McKenna, Yucaitis, Hyman, Trutenko, Hartnett, Horvat, Kunkle, Coleman, Shines, Needham, and Hillard, together with the named and

other unsued co-conspirators, including police and prosecutorial investigative, supervisory, executive, and command personnel, together reached an understanding, engaged and continue to engage in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to commit the unconstitutional overt acts set forth in the facts above.

340.    Because said conspiracy or conspiracies and the overt actions in furtherance thereof were done and continue to be done with the knowledge and purpose of depriving Plaintiff, who is African American, and numerous other African American torture victims of the equal protection of the laws and/or of equal privileges and immunities under the law, and with racial animus toward the Plaintiff and the other victims of this racially motivated conspiracy, the Defendants also deprived Plaintiff of his right to equal protection of the laws under the Fourteenth Amendment of the United States Constitution, and 42 U.S.C. § 1985.

341.    Additionally, or alternatively, Defendants Burge, O'Hara, McKenna, Yucaitis, and Hyman, knowing that the above §1985 conspiracy to torture and wrongfully convict Plaintiff was about to be committed, and having the power to prevent or aid in preventing the commission of the acts in furtherance of said conspiracy, neglected and/or refused so to do, in violation of 42 U.S.C.§1986.

342.    Additionally, and alternatively, these actions were taken maliciously, willfully, wantonly and/or with reckless disregard for Plaintiff's constitutional rights.

343.    The misconduct described in this Count by the CPD Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count V.

WHEREFORE, Plaintiff demands compensatory damages, jointly and severally from Defendants Daley, the Estate of Burge, the Estate of O'Hara, McKenna, the Estate of Yucaitis,

Hyman, Trutenko, Hartnett, Horvat, Kunkle, Coleman, the Estate of Martin, Shines, Hillard, and

Needham, and, additionally, for punitive damages against Defendants Daley, the Estate of Burge,

the Estate of O'Hara, McKenna, the Estate of Yucaitis, Hyman, Trutenko, Hartnett, Horvat,

Kunkle, Coleman, the Estate of Martin, Shines, Hillard, and Needham, plus attorneys' fees, the

costs of this action and whatever additional relief this Court deems equitable and just.

## COUNT V- 42 U.S.C. § 1983
### *Monell* Policy Claim Against the City of Chicago

344.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

345.     The actions of Defendants Daley, Burge, McKenna, O'Hara, Yucaitis, Kunkle,

Martin, Shines, Hillard, and Needham, as alleged above, were done pursuant to one or more

interrelated de facto policies, practices and/or customs of the Defendant City of Chicago.

346.     At all times material to this complaint, the Defendant City of Chicago through its

Police Department, Police Superintendents, Police Board, Mayors, City Council and/or the

Corporation Counsel's Office, had interrelated de facto policies, practices, and customs which

included, inter alia:

a.   conducting physically, psychologically or otherwise illegal or improperly
coercive interrogations of witnesses, suspects and arrestees in order to obtain
confessions and wrongful convictions, including with the use of torture
techniques under the command and supervision of Defendants Martin and Burge
at Area 2, and later at Area 3;

b.   conducting physically, psychologically or otherwise illegal or improperly
coercive interrogations of witnesses, suspects and arrestees suspected of being
involved in the killing or injuring or otherwise attacking Chicago police officers
in order to obtain confessions and wrongful convictions, including with the use of
torture techniques under the command and supervision of Defendants Martin and
Burge at Area 2, and later at Area 3;

c.   manufacturing, fabricating, and/or using improper suggestive tactics to obtain
false witness statements and identifications;

d.  the filing of false reports, and giving false statements and testimony about said interrogations and confessions and fabricating or constructing parts or all of said confessions, suppressing evidence concerning said interrogations and confessions, pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of confessions obtained during said interrogations, denying suspects their right to full and fair access to the courts, and otherwise covering up the true nature of said interrogations and confessions, particularly in circumstances where torture techniques were used by Area 2 and Area 3 detectives under the command and supervision, and with the active participation of, Defendant Burge;

e.  the failure to video and/or audio tape the interrogation or questioning of suspects, arrestees, and witnesses, particularly in the circumstances set forth in a-c above;

f.  the failure to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who were repeatedly accused of torture and related abuse of suspects; of false arrests, wrongful imprisonments, malicious prosecutions and wrongful convictions; of making false reports and statements; and/or of physically, psychologically or otherwise illegally or improperly coercively questioning or interrogating witnesses, suspects and arrestees, particularly persons who were tortured and or physically and/or psychologically abused during questioning. This failure to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control includes the "repeater" Defendants Burge, Yucaitis, O'Hara, and McKenna, as well as all the other Area 2 and 3 detectives who were repeatedly accused of torturing and physically abusing suspects;

g.  the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a-e above (i.e., police torture and other unconstitutional and coercive interrogations at Area 2 and Area 3 under the command and supervision of Defendant Burge) whereby police officers refused to report or otherwise covered-up instances of police misconduct, and/or fabricated, suppressed and destroyed evidence of which they were aware, despite their obligation under the law and police regulations to so report. Said code of silence also includes police officers either remaining silent, invoking the Fifth Amendment, or giving false and misleading information during official investigations and Grand Jury proceedings in order to protect themselves and/or fellow officers from internal discipline, civil liability, and/or criminal charges, and perjuring themselves in criminal cases where they and/or their fellow officers have tortured or coercively or otherwise unconstitutionally interrogated a suspect, arrestee or witness, or falsely arrested, imprisoned and prosecuted a criminal defendant, particularly in cases where torture techniques under the command and supervision of Defendant Burge at Area 2, and later at Area 3, were employed. An egregious example of this code of silence in the torture cases is evidenced and invoked in response to the Government's investigation and prosecution of Defendant Burge.

h. covering up and suppressing evidence and findings; refusing to properly investigate, arrest and charge, continuing to finance the defense of Defendants Burge, McKenna, O'Hara, Yucaitis and other Area 2 and 3 detectives who have been sued for their misconduct, and otherwise attempting to both publicly and judicially defend these officers' actions long after repeatedly and officially acknowledging that Burge had committed repeated acts of torture, and after he had been indicted and convicted for lying about these acts; and otherwise obstructing justice in police torture cases, particularly those that arose at Area 2 and Area 3 under the supervision, and with the participation of, Defendant Burge.

347. The pattern and practice of torture and abuse at Area 2 and Area 3, the cover-up of that abuse and the wrongful prosecutions and convictions which resulted therefrom, were well known within Area 2 and Area 3 both well before, during, and after Plaintiff was tortured and wrongfully convicted, including by the command officers at Area 2, which included Defendants Burge and Martin, and Burge's successor, Phil Cline, as well as to former Chicago Mayor Jane Byrne and to Defendant Daley (both before and throughout his tenure as Mayor of Chicago) and their Chiefs of Staff, successive Police Superintendents, (including Richard Brzeczek, Fred Rice, Defendant Martin, Matt Rodriguez, Defendant Hillard, and Cline), to the successive OPS Directors, including Defendant Shines, and Callie Baird, various Command Personnel, including Deputy Superintendents McCarthy, Lyons, Hoke and Townsend, the Chiefs of Detectives, including William Hanhardt and Hillard, to the Chicago City Council and the Chicago Police Board, and to other policy making, command, and supervisory City and police personnel, who participated in the cover-up and suppression of evidence, the wrongful prosecutions and convictions of the Plaintiff and other torture victims, and the denial of their full and fair access to the courts, inter alia, in the manner set forth in this complaint.

348. The interrelated pattern and practices of police torture and abuse under Defendant Burge, and the continuing police code of silence, have been repeatedly admitted to, and apologized for, by Chicago Mayors Daley, Emanuel and Lightfoot, been recognized by the

Chicago City Council in its unanimous passing of the 2015 Reparations Resolution and Ordinance, by Defendant Superintendent Martin, and by the Chicago Police Department's Office of Professional Standards.

349.    Additionally, these patterns and practices have also been established by findings of the Cook County Special Prosecutors' Office, by numerous state and federal trial and appellate courts, including by Judge William H. Hooks in Plaintiff's TIRC case,  by the Seventh Circuit Court of Appeals in Andrew Wilson's Section 1983 case and in the appeal of Defendant Burge's obstruction of justice conviction, and by several federal court juries.

350.    Said interrelated policies, practices and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference; they encouraged, inter alia, the coercing of statements from suspects, witnesses and arrestees, by torture and related abusive tactics and techniques, the construction and fabrication of confessions, admissions, statements, identifications, and other false witness evidence, the suppression and destruction of evidence of torture and other exculpatory evidence, the intimidation of witnesses, the making of false statements and reports, the giving of false testimony, the obstruction of justice, the manipulation and obstruction of the State and Federal courts, and the pursuit and continuation of wrongful convictions and false arrests and imprisonments; and were, separately and together, a moving force behind, and a direct and proximate cause of, the unconstitutional acts and perjury committed by the named Defendants and their co-conspirators, and the injuries suffered by the Plaintiff.

351.    Additionally, the City of Chicago's said failure to properly train, discipline, monitor, control, assign, transfer, supervise, and counsel Defendants Burge, McKenna, O'Hara, and Yucaitis, who were involved in numerous other acts of torture and abuse, as well as

Defendants Martin, Shines, Hillard, and Needham, was also done with deliberate indifference and likewise acted as a direct and proximate cause of the injuries to Plaintiff.

352.    Additionally, and/or alternatively, the involvement in, and ratification of, the unconstitutional actions set forth above, by Chicago governmental, executive and police policymakers, including, but not limited to, successive Police Superintendents, including Defendants Martin and Hillard, and their direct subordinates, including, but not limited to, Defendants Shines and Needham, and several Mayors, most notably Defendant Mayor Richard M. Daley, who continued to publicly both ratify, obfuscate and deny his involvement in said conduct until well after he left office in 2011, establish that said constitutional violations were directly and proximately caused by the City of Chicago and its Police Department.

WHEREFORE, Plaintiff demands judgment against Defendant City of Chicago for substantial compensatory damages, plus costs and attorneys' fees and whatever additional relief this Court finds equitable and just.

## COUNT VI – State Law Claim
## Malicious Prosecution

353.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

354.    Defendants Burge, O'Hara, McKenna, Yucaitis, Hartnett, and Hyman, individually, jointly, and in conspiracy, initiated a malicious prosecution without probable cause against Plaintiff, and these same Defendants, together with Defendants Daley, Trutenko, Kunkle, Horvat, Coleman, Martin, Shines, Hillard, and Needham, individually, jointly, and in conspiracy, continued said prosecution and re-prosecutions, again without probable cause. Said prosecution was ultimately terminated in Plaintiff's favor.   The Defendants' actions were done in a willful and wanton manner, and directly and proximately caused the injury and damage to Plaintiff set forth above.

WHEREFORE, Plaintiff demands compensatory damages, jointly and severally from Defendants Daley, the Estate of Burge, the Estate of O'Hara, McKenna, the Estate of Yucaitis, Hyman, Trutenko, Hartnett, Horvat, Kunkle, Coleman, the Estate of Martin, Shines, Hillard, and Needham, and, additionally, for punitive damages against Defendants Daley, the Estate of Burge, the Estate of O'Hara, McKenna, the Estate of Yucaitis, Hyman, Trutenko, Hartnett, Horvat, Kunkle, Coleman, the Estate of Martin, Shines, Hillard, and Needham plus attorneys' fees, the costs of this action and whatever additional relief this Court deems equitable and just.

## COUNT VII – State Law Claim
## Intentional Infliction of Emotional Distress

355.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

356.    Defendants Burge, O'Hara, McKenna, Yucaitis, Hartnett, and Hyman individually, jointly, and in conspiracy, by, inter alia, torturing a false confession from Plaintiff and/or by failing to prevent or stop said torture, by constructing and fabricating the confession, and by procuring Plaintiff's prosecution, conviction, and imprisonment for a murder and other crimes he did not commit by means of said false confession, engaged in extreme and outrageous conduct.

357.    Additionally, these same Defendants, together with Defendants Daley, Trutenko, Hartnett, Horvat, Kunkle, Coleman, Martin, Shines, Hillard, and Needham, individually, jointly, and in conspiracy, engaged in additional extreme and outrageous conduct inter alia, by fabricating, coercing, and suppressing other false evidence, by continuing Plaintiff's false imprisonment after procuring his wrongful convictions, by refusing to investigate or discipline the torturers, and by making false public statements.

358.    Defendants Daley, Burge, O'Hara, McKenna, Yucaitis, Hyman, Trutenko, Hartnett, Horvat, Kunkle, Coleman, Martin, Shines, Needham, and Hillard, intended, by

subjecting Plaintiff to such humiliating, degrading conduct, to inflict severe emotional distress on Plaintiff, and knew that their conduct would cause Plaintiff and his family severe emotional distress.

359.     As a direct and proximate result of Defendants' outrageous conduct, Plaintiff was, and continues to be, injured, and has, and continues to, experience severe emotional distress, including nightmares, sleep disruption, anxiety, depression, inability to focus or concentrate, and a recurring fear of re-arrest, torture, and re-prosecution.

WHEREFORE, Plaintiff demands judgment against Defendants Daley, the Estate of Burge, the Estate of O'Hara, McKenna, the Estate of Yucaitis, Hyman, Trutenko, Hartnett, Horvat, Kunkle, Coleman, the Estate of Martin, Shines, Hillard, and Needham, for compensatory damages, plus the costs of this action, and such other relief as this Court deems equitable and just.

## COUNT VIII – State Law Claim
## Conspiracy

360.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

361.     Defendants Daley, Burge, O'Hara, McKenna, Yucaitis, Hyman, Trutenko, Hartnett, Horvat, Kunkle, Coleman, Martin, Shines, Needham, and Hillard, with the named and other unsued co-conspirators, including police and prosecutorial investigative, supervisory, executive, and command personnel, together reached an understanding, engaged and continue to engage in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to maliciously prosecute and/or continue said prosecutions, and to intentionally inflict continuing severe emotional distress on Plaintiff.

362. In furtherance of this conspiracy or conspiracies, the Defendants named above in this Count, together with their unsued co-conspirators, committed the overt acts set forth in the facts above.

363. Said conspirac(ies) and overt acts were and are continuing in nature.

364. Defendants' and their co-conspirators' overt acts, as set forth above, which were committed jointly and/or while conspiring together to maliciously prosecute, and intentionally inflict emotional distress on the Plaintiff, constitute the tort of conspiracy as set forth above.

WHEREFORE, Plaintiff demands compensatory damages, jointly and severally from Defendants Daley, the Estate of Burge, the Estate of O'Hara, McKenna, the Estate of Yucaitis, Hyman, Trutenko, Hartnett, Horvat, Kunkle, Coleman, the Estate of Martin, Shines, Hillard, and Needham, and, additionally, for punitive damages against Defendants Daley, the Estate of Burge, the Estate of O'Hara, McKenna, the Estate of Yucaitis, Hyman, Trutenko, Hartnett, Horvat, Kunkle, Coleman, the Estate of Martin, Shines, Hillard, and Needham plus attorneys' fees, the costs of this action and whatever additional relief this Court deems equitable and just.

## COUNT IX – State Law Claim
### *Respondeat Superior*

365. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

366. Defendants Burge, O'Hara, McKenna, Yucaitis, Martin, Shines, Needham, and Hillard, were, at certain times material to this complaint, employees of the Defendant City of Chicago, were acting within the scope of their employment, and their acts which violated state law are directly chargeable to the Defendant City under state law pursuant to respondeat superior.

367. Defendant Daley, at certain times specified in the complaint, (from 1989 to 2011) was an employee of the Defendant City of Chicago, was acting at these times within the scope of

his employment as a City employee, and those acts which are actionable under state law are directly chargeable to the Defendant City under state law pursuant to respondeat superior.

368.　Defendant Kunkle, at certain times specified in the complaint, (from 1988 to 1996) was an employee of the Defendant City of Chicago, was acting at these times within the scope of his employment as a City employee, and those acts which are actionable under state law are directly chargeable to the Defendant City under state law pursuant to respondeat superior.

WHEREFORE, Plaintiff demands judgment against the City of Chicago for any and all compensatory damages awarded on Plaintiff's state law claims against the Defendants named in this Count, plus the costs of this action and whatever additional relief this Court deems equitable and just.

## COUNT X – State Law Claim
### Indemnification Pursuant to 745 ILCS 10/9-102 and
### Common Law Claims Against the City and County

369.　Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

370.　Defendant City of Chicago was the employer of Defendants Burge, O'Hara, McKenna, Yucaitis, Martin, Shines, Needham, and Hillard at certain times relevant and material to this complaint.

371.　These Defendants committed the acts alleged above under color of law and in the scope of their employment as employees of the City of Chicago.

372.　Additionally, Defendant City of Chicago was the employer of Defendant Daley at the times so specified in this complaint (1989-2011); Daley committed the acts which he committed during his employment with the City in the scope of his employment as an employee of the City of Chicago.

373. Defendant Kunkle, at certain times specified in the complaint (from 1988 to 1996) was an employee of the Defendant City of Chicago, and was acting at these times within the scope of his employment as a City employee.

374. Defendant Cook County was at certain times material to this complaint the employer of Defendants Hyman, Trutenko, Horvat, and Hartnett; additionally, it was the employer of Defendant Daley while he was State's Attorney of Cook County (from 1980 through 1988) and Defendant Kunkle when he was an Assistant Cook County State's Attorney (from 1975-1985) and as a Special Cook County State's Attorney (1986-1987).

375. Said County is therefore responsible for any judgment entered against Defendants Hyman, Trutenko, Horvat, and Hartnett, and for any judgment entered against Defendants Daley and Kunkle for acts committed by them during said employment with the County, making the County a necessary party to this complaint. Defendants Hyman, Trutenko, Horvat, Kunkle, Hartnett and Daley committed the acts alleged above under color of law and, when so employed, in the scope of their employment as employees of Cook County and its State's Attorneys' Office.

WHEREFORE, Plaintiff, pursuant to 745 ILCS § 10/9-102, and otherwise pursuant to law, demands judgment against the Defendants City of Chicago, and Cook County in the amounts awarded to Plaintiff against the individual Defendants as damages, attorneys' fees, costs and interest, and for whatever additional relief this Court deems equitable and just.

DATED: JUNE 30, 2021                    RESPECTFULLY SUBMITTED,

s/ Elliot Slosar                        s/ Flint Taylor

LOEVY & LOEVY                           People's Law Office
311 N. Aberdeen, 3rd Fl                 1180 N. Milwaukee Ave.
Chicago, IL 60607                       Chicago, IL 60642
312-243-5900                            773-235-0070
elliot@loevy.com                        flint.taylor10@gmail.com