**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| | ) | Case No. 21-CV-3487 |
| JACKIE WILSON | ) | |
| | ) | |
| Plaintiff | ) | HON. JUDGE FRANKLIN U. |
| | ) | VALDERRAMA |
| **vs.** | ) | |
| | ) | |
| Estate of Former Chicago Police Department | ) | HON. MAG. JUDGE JEFFREY T. |
| Commander Jon Burge, et al., | ) | GILBERT |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | JURY TRIAL DEMANDED |

**PLAINTIFF'S CONSOLIDATED RESPONSE TO**
**DEFENDANTS' MOTIONS TO DISMISS**[1]

---

[1] The Estates of Burge, O'Hara, Yucaitis and Martin, as well as Defendants Coleman and Cook County have not yet filed motions. The briefs in support of the 11 moving Defendants total 147 pages.

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

I.  SUMMARY OF ALLEGATIONS AGAINST DEFENDANTS .......................................1

    A.  Defendants Burge, McKenna, O'Hara, and Yucaitis.................................................1

    B.  Defendants Hyman and Hartnett...............................................................................3

    C.  Defendants Kunkle, Trutenko, and Coleman (1982-1993)........................................5

    D.  Defendants Trutenko, Kunkle and Horvat (1993-present) .........................................8

    E.  Defendants Daley and Kunkle (1981-1989) .............................................................10

    F.  Defendants Mayor Daley, Martin, Shines, Hillard and Needham ...........................11

    G.  City of Chicago..........................................................................................................14

STANDARD OF REVIEW .................................................................................................16

ARGUMENT ......................................................................................................................17

II.  PLAINTIFF'S CLAIMS ARE TIMELY ........................................................................17

    A.  Relevant Procedural History For Accrual ...............................................................17

    B.  Plaintiff's Claims (Counts I-IV) Are Not Time-Barred Because They Did Not Accrue Until 2020 When the State Dismissed All Charges ....................................................18

    C.  Defendants' accrual argument is not persuasive.......................................................21

    D.  Plaintiff's Section 1983 *Manuel* Claim is Timely ...................................................25

        1.  Plaintiff's claim did not accrue until favorable termination ...........................25

III.  DEFENDANT HYMAN'S ATTACK ON THE LEGITIMACY OF THE ILLINOIS TORTURE INQUIRY AND RELIEF COMMISSION ACT LACKS MERIT................26

IV.  CONTRARY TO ARGUMENTS BY DEFENDANTS TRUTENKO AND KUNKLE, PLAINTIFF'S 67-PAGE COMPLAINT MORE THAN SATISFIES FED. R. CIV. P. 8(a)(2) PLEADING STANDARDS ................................................................................28

V.  DEFENDANTS HYMAN, DALEY, KUNKLE, AND TRUTENKO DO NOT ENJOY ABSOLUTE PROSECUTORIAL IMMUNITY ............................................................ 30

i

A.  Defendant Hyman, a Former Cook County Assistant State's Attorney, is Not Absolutely Immune when Acting in an Investigatory Capacity ................................32

    1.  Given His Investigative Capacity, Absolute Prosecutorial Immunity Does Not Protect Defendant Hyman From Participating in Plaintiff's Tortured Interrogation Session and Fabricating Evidence Prior to Probable Cause ......32

    2.  Defendant Hyman Does Not Enjoy Absolute Prosecutorial Immunity Because False Testimony and Fabricated Evidence was Presented at Trial ................38

    3.  State Law Immunity Does Not Apply ......................................................... 39

B.  Defendants Kunkle and Trutenko Are Not Entitled to Absolute Prosecutorial Immunity for Fabricating Evidence ............................................................. 39

    1.  Absolute Immunity Does Not Apply to Defendant Kunkle's Fabrication of DeWayne Hardin's Statement........................................................... 40

    2.  Absolute Prosecutorial Immunity is Unavailable for Defendant Trutenko's Fabrication of Evidence as a Cook County State's Attorney ........................ 44

    3.  Absolute Prosecutorial Immunity is Unavailable for Defendants Trutenko and Kunkle's Withholding of Exculpatory Evidence Relating to Coleman After Plaintiff's 1989 Criminal Trial.........................................................46

    4.  Defendant Kunkle Does Not Enjoy Absolute Immunity Due to His Status as an Attorney.........................................................................................48

    5.  Defendant Trutenko's Color of Law Arguments Are Without Merit and 48Should be Rejected .......................................................................48

VI.  SOVEREIGN IMMUNITY DOES NOT PROTECT DEFENDANTS KUNKLE AND TRUTENKO FOR THE VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS ................................................................................................49

VII.  PLAINTIFF'S COMPLAINT STATES VIABLE CLAIMS AGAINST DALEY, INDIVIDUALLY AND AS A CO-CONSPIRATOR, ARISING FROM HIS ACTIONS AND INACTIONS BOTH AS COOK COUNTY STATE'S ATTORNEY AND AS MAYOR OF THE CITY OF CHICAGO ........................................................50

VIII.  PLAINTIFF'S ALLEGATIONS ARE SUFFICIENT TO SUPPORT HIS CLAIMS THAT DALEY, AS MAYOR, PARTICIPATED IN A CONSPIRACY TO CONCEAL EVIDENCE OF POLICE TORTURE AT AREA 2........................................53

IX.     PLAINTIFF SUFFICIENTLY ALLEGES CLAIMS AGAINST DEFENDANTS
        SHINES, HILLARD, AND NEEDHAM FOR CONCEALING EXCULPATORY
        EVIDENCE OF TORTURE, IN VIOLATION OF PLAINTIFF'S FOURTEENTH
        AMENDMENT RIGHT TO DUE PROCESS ...................................................................61

X.      PLAINTIFF HAS SUFFICIENTLY ALLEGED CLAIMS AGAINST DEFENDANT
        MICHAEL HARTNETT .........................................................................................67

        A.  Counts I, II, and III of Plaintiff's Complaint are Sufficiently Pled ............................69

XI.     PLAINTIFF HAS SUFFICIENTLY ALLEGED FEDERAL DUE PROCESS CLAIMS
        AGAINST DEFENDANT ANDREW T. HORVAT (COUNT I)....................................73

        A.  Defendant Horvat's Misconduct Resulted in a Violation of Plaintiff's Due Process
            Rights Under the Fourteenth Amendment ...................................................................74

        B.  Defendant Horvat's Ancillary Arguments are Unavailing ..........................................77

XII.    DEFENDANTS ARE LIABLE FOR THEIR FAILURE TO INTERVENE, AS
        ALLEGED IN COUNT I OF PLAINTIFF'S COMPLAINT...........................................79

        A.  Failure to Intervene Claims Against Prosecutors are Permissible ..............................79

        B.  As Court Reporter, Plaintiff Has Sufficiently Alleged that Defendant Hartnett Failed
            to Intervene ................................................................................................................80

XIII.   PLAINTIFF HAS SUFFICIENTLY ALLEGED CONSPIRACY CLAIMS AGAINST
        HYMAN, KUNKLE, TRUTENKO, HORVAT AND HARTNETT ...............................81

XIV.    THE ILLINOIS LOCAL GOVERNMENTAL AND GOVERNMENTAL EMPLOYEES
        TORT IMMUNITY ACT DOES NOT IMPACT THE TIMELINESS OF PLAINTIFF'S
        STATE-LAW CLAIMS AGAINST DEFENDANT TRUTENKO .................................84

XV.     PLAINTIFF'S COMPLAINT PROPERLY ALLEGES A STATE LAW MALICIOUS
        PROSECUTION CLAIM .......................................................................................85

        A.  Plaintiff's Malicious Prosecution Claim is Timely.....................................................85

XVI.    DEFENDANTS HORVAT, TRUTENKO, AND HYMAN COMMENCED OR
        CONTINUED CRIMINAL PROCEEDINGS AGAINST PLAINTIFF ..........................85

XVII.   THE COMPLAINT SUFFICIENTLY ALLEGES MALICE AND LACK OF
        PROBABLE CAUSE.............................................................................................88

XVIII.  DEFENDANTS DO NOT ENJOY QUALIFIED IMMUNITY FOR THEIR
        VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS....................................91

XIX.   PLAINTIFF'S *MONELL* CLAIM MUST SURVIVE .......................................................96

XX.    COOK COUNTY SHOULD BE REQUIRED TO ANSWER THE COMPLAINT
       ALONG WITH ALL OTHER DEFENDANTS ................................................................96

XXI.   PLAINTIFF'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IIED)
       CLAIM IS TIMELY AND ADEQUATELY PLED .........................................................97

       A.  Plaintiff's IIED Claim is Timely ...............................................................................97

       B.  Plaintiff adequately alleges that Hartnett and Horvat engaged in extreme or
           outrageous conduct ..................................................................................................99

CONCLUSION ..................................................................................................................101

## TABLE OF AUTHORITIES

*Adedeji v. Cobble*, 10 C 0892, 2013 WL 449592  (N.D. Ill. Feb. 5, 2013) ...................................97

*Alexander v. McKinney*, 692 F.3d 553 (7th Cir. 2012)................................................................... 75

*Alvarado v. Litscher*, 267 F.3d 648 (7th Cir. 2001)...................................................................... 92

*Andrews v. Burge*, 660 F. Supp. 2d 868 (N.D. Ill. 2009)...............................................................79

*Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429 (1993) .............................................................81

*Armstrong v. Daily*, 786 F.3d 529 (7th Cir. 2015)..........................................................................75

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ......................................................................................16

*BBL, Inc. v. City of Angola*, 809 F.3d 317 (7th Cir. 2015) ...........................................................25

*Beaman v. Freesmeyer*, 131 N.E.3d 488 (2019)......................................................................86, 88

*Beaman v. Freesmeyer*, 776 F.3d 500 (7th Cir. 2015)..............................................................86, 93

*Behrens v. Pelletier*, 516 U.S. 299 (1996) ....................................................................................92

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................................. 16

*Bianchi v. McQueen*, 818 F.3d 309 (7th Cir. 2016).......................................................................81

*Bowen v. Maynard*, 799 F.2d 593 (10th Cir. 1986) .......................................................................70

*Bradford v. Schherschligt*, 803 F.3d 382 (9th Cir. 2015) ............................................................ 20

*Brady v. Maryland*, 373 U.S. 83 (1963) ................................................................................. 19, 92

*Bridewell v. Eberle*, 730 F.3d 672 (7th Cir. 2013) ................................................................. 98, 99

*Brooks v. Ross*, 578 F.3d 574 (7th Cir. 2009)............................................................................... 85

*Brown v. City of Chicago*, 2019 U.S. Dist. LEXIS 165148...........................................................22

*Brown v. City of Chicago*, No. 18 C 7064, 2019 WL 4694685 (N.D. Ill. Sept. 26, 2019) ..... 98, 99

*Buckley v. Fitzsimmons*, 509 U.S. 259 (1993) ................................................................... passim

*Burns v. Reed*, 500 U.S. 478 (1991) ..............................................................................................31

*Cairel v. Alderden*, 821 F.3d 823 (7th Cir. 2016) .......................................................... 75

*Camm v. Faith*, 937 F.3d 1096 (7th Cir. 2019) ................................................. 20, 22, 23

*Cannon v. Burge*, No. 05 C 2192, 2006 WL 273544 (N.D. Ill. Feb. 2, 2006) ...................... passim

*Carter v. Buscher*, 973 F.2d 1328 (7th Cir. 1992) ...................................................... 60, 66

*Carvajal v. Dominguez*, 542 F.3d 561 (7th Cir. 2008) ................................................. 71

*Casciaro v. Von Allmen*, No. 17 C 50094, 2017 WL 5626200 (N.D. Ill. Nov. 22, 2017) ........... 99

*Cates v. Manning*, 19 C 5248, 2020 WL 1863299 (N.D. Ill. Apr. 14, 2020) ............................... 97

*Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939 (7th Cir. 2013) .................................................. 28

*Collier v. City of Chicago*, No. 14 C 2157, 2015 WL 5081408 (N.D. Ill. Aug. 26, 2015) .... 90, 91

*Cooney v. Rossiter*, 583 F.3d 967 (7th Cir. 2009) ....................................................... 82

*Crawford-El v. Britton*, 523 U.S. 574 (1998) ................................................................. 92

*D'Ambrosio v. Marino*, No. 1:11 CV 933, 2013 WL 256312 (N.D. Ohio Jan. 23, 2013) ............ 24

*Dobbey v. Jeffreys*, 417 F. Supp. 3d 1103 (N.D. Ill. 2019) .......................................... 83

*Fields v. Wharrie*, 672 F.3d 505 (7th Cir. 2012) ........................................................ 47

*Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014) ........................................................ passim

*Filarsky v. Delia*, 566 U.S. 377 (2012) ...................................................................... 80

*Forrester v. White*, 484 U.S. 219 (1988) .................................................................... 81

*Forrester v. White*, 484 U.S. 538 (1988) .................................................................... 31

*Fox v. Tomczak*, 04 C 7309, 2006 WL 1157466 (N.D. Ill. Apr. 26, 2006) ............................... 100

*Gardunio v. Town of Cicero*, 674 F.Supp.2d 976 (N.D. Ill. 2009) ................................... 76

*Gibson v. City of Chicago*, No. 19 C 4152, 2020 WL 4349855
    (N.D. Ill. July 29, 2020) ........................................................................... 73, 79, 83

*Gomez v. Toledo*, 446 U.S. 635 (1980) ..................................................................... 91-92

*Gonzalez v. City of Waukegan*, No. 16 C 2906, 2016 WL 7451627 (N.D. Ill. Dec. 28, 2016) .... 99

*Gordon v. Devine*, No. 08 C 377, 2008 WL 4594354 (N.D. Ill. Oct. 14, 2008) ...........................79

*Hampton v. Hanrahan*, 600 F. 3d  600 (7th Cir. 1979) ......................................................58, 71, 78

*Hanson v. LeVan*, 967 F.3d 584 (7th Cir. 2020)........................................................... 92

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ..................................................................31

*Hartford Acc. and Indem. Co. v. Sullivan*, 846 F.2d 377 (7th Cir. 1988)......................................54

*Hartman v. Board of Trustees of Community College District No. 508, Cook County, Illinois*
     4 F.3d 465 (7th Cir. 1993) ....................................................................................83

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) .................................................26

*Heck v Humphrey*, 512 U.S. 477 (1994).............................................................. passim

*Heidelberg v. Manias*, No. 118CV01161SLDJEH, 2019 WL 4862069
     (C.D. Ill. Mar. 26, 2019) ....................................................................................... 98

*Hill v. City of Chicago,* No. 06 C 6772, 2009 WL 174994 (N.D.Ill. Jan. 26, 2009) .................... 35

*Hill v. Cook Cnty.*, 463 F. Supp. 3d  820 (N.D. Ill. May 31, 2020).............................................86

*Hill v. Coppelson*, 627 F.3d 601 (7th Cir. 2010) .........................................................32, 41, 45, 52

*Hobbs v. Cappelluti*, 899 F. Supp. 2d 738 (N.D. Ill. 2012) ................................................ 43, 79, 87

*Holland v. City of Chicago*, 643 F.3d 248 (7th Cir. 2011) .............................................................91

*Houston v. Partee*, 978 F.2d 362 (7th Cir. 1992) .......................................................... 38

*Howard v. City of Chicago*, No. 03 C 8481, 2004 WL 2397281 (N.D.Ill. Oct. 25, 2004)............65

*Hunt v. Jaglowski*, 926 F.2d 689 (7th Cir. 1991)..........................................................................37

*Huon v. Mudge*, No. 12-CV-0166-MJR-PMF, 2013 WL 12152427 (S.D. Ill. Aug. 22, 2013).... 84

*Jacobs v. City of Chicago*, 215 F.3d 758 (7th Cir. 2000) ................................................32, 35,  91

*Johnson v. Dossey*, 515 F.3d 778 (7th Cir. 2008)........................................................................19

*Johnson v. Winstead*, 447 F. Supp. 3d 715 (N.D. Ill. 2019) ........................................... 86, 87, 88

*Johnson v Winstead*, 900 F.3d 428 (7th Cir. 2018) ......................................................................21

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) ................................................54, 69, 76, 92

*Justices of Boston Municipal Court v. Lydon*, 466 U.S. 294, 104 S.Ct. 1805,
    80 L.Ed.2d 311 (1984) ........................................................................................................ 76

*KFC Corp. v. Iron Horse of Metairie Rd., LLC*, 18 C 5294, 2020 WL 3892989
    (N.D. Ill. July 10, 2020) ...................................................................................................... 25

*Kitchen v. Burge*, 2011 U.S. Dist. LEXIS 42021 (N.D. Ill) ................................................. 65-66

*Kitchen v. Burge*, 2012 U.S. Dist. LEXIS 12059 (N.D. Ill) ...................................................... 36

*Kitchen v. Burge*, No. 10 C 4093, 2012 WL 346450 (N.D. Ill. Feb. 1, 2012)............................ 93

*Kluppelberg v. Burge*, No. 13 C 03963, 2017 WL 3142757 (N.D. Ill. July 25, 2017)................. 93

*Kroll v. Bd. of Trustees of Univ. of Ill.*, 934 F.2d 904 (7th Cir. 1991)......................................... 50

*Kuri v. City of Chicago*, No. 13 C 1653, 2017 WL 4882338 (N.D. Ill. Oct. 30, 2017)................ 90

*Kyles v. Whitley*, 514 U.S. 419 (1995)...................................................................................... 70

*Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019) .............................................................. 26

*Lewis v. Mills*, 677 F.3d 324 (7th Cir. 2012) ..................................................................... passim

*Lieberman v. Liberty Healthcare Corp.*, 408 Ill. App. 3d 1102 (4th Dist. 2011).................. 97, 98

*Loubser v. Thacker*, 440 F.3d 439 (7th Cir. 2006) .............................................................. 80, 82

*Lovelace v. Gibson*, No. 17 CV 1201, 2017 WL 5196641 (C.D. Ill. Nov. 9, 2017) .................... 83

*Malley v. Briggs*, 475 U.S. 335 (1986) .............................................................................. 31, 43

*Manuel v. City of Joliet, IL.*, 903 F.3d 667 (7th Cir. 2018) ................................................. 25, 26

*Maxwell v. City of Indianapolis*, 998 F.2d 431 (7th Cir. 1993)................................................... 89

*McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 720 N.E.2d 242,
    Ill. Dec. 787 (1999)..................................................................................................... 56, 82

*McDonough v. Smith*, 139 S. Ct. 2149 (2019)................................................................... passim

*McNamee v. MinXray, Inc.*, No. 17 C 02057, 2017 WL 6039960 (N.D. Ill. Dec. 6, 2017).......... 30

*Merrilees v. Merrilees*, 2013 IL App (1st) 121897, 998 N.E.2d 147, 375 Ill. Dec. 855 (1st Dist. 2013)................................................................................................ 82

*Mooney v. Holohan*, 294 U.S. 103 (1935) .............................................................92, 95

*Mosley v. City of Chicago,* 614 F.3d 391 (7th Cir. 2010)...........................................75

*Mut. Medical Plans, Inc. v. Cnty. of Peoria*, 309 F. Supp. 2d 1067 (C.D. Ill. Mar. 16, 2004)..... 90

*Myvett v. Chicago Police Detective Edward Heerdt*, 232 F. Supp. 3d 1005 (N.D. Ill. 2017)......................................................................................74, 75

*Napue v. Illinois*, 360 U.S. 264 (1959) .................................................................92, 95

*Newsome v. James*, No. 96 C 7680, 2000 WL 528475 (N.D. Ill. Apr. 26, 2000) ........................83

*Newsome v. McCabe,* 256 F.3d 747 (7th Cir. 2001).........................................50, 61, 64

*Nichol v. Stass,* 735 N.E.2d 582 (2000)......................................................................50

*Northfield Ins. Co. v. City of Waukegan*, 701 F.3d 11247 (7th Cir. 2012).................................. 98

*Ochoa v. Lopez*, No. 20-CV-02977, 2021 WL 4439426 (N.D. Ill. Sept. 28, 2021)....19, 21, 22, 23

*Orange v. Burge*, No. 04 C 0168, 2005 WL 742641 (N.D. Ill. Mar. 30, 2005) ..........64, 65, 67, 93

*Orange v. Burge,* No. 04 C 0168, 2008 WL 4443280 (N.D. Ill. Sept. 29, 2008).............35, 39, 66

*Parish v. City of Elkhart*, 614 F.3d 677 (7th Cir. 2010) ............................................... 99

*Patrick v. City of Chicago*, 213 F. Supp. 3d 1033 (N.D. Ill. 2016) ................................................90

*Patterson v. Burge*, 328 F. Supp. 2d 878 (N.D. Ill. 2004)...................................... passim

*People v. Savory*, 82 Ill. App. 3d 767 (Ill. App. Ct. 1980) ..........................................23

*People v. Wilson*, 158 N.E.3d 1067 (Ill. App. Ct. 2019) ............................................27

*People v. Wilson*, 2019 IL App (1st) 181486.......................................................24, 34

*Pinkerton v. United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946)......................58

*Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806 (7th Cir. 2015) ............................... 82

*Puffer v. Allstate Ins. Co.*, 675 F.3d 709 (7th Cir. 2012)...............................................27

*Pyle v. Kansas*, 317 U.S. 213 (1942) ....................................................................92, 95

*Reed v. City of Chicago*, 77 F.3d 1049 (7th Cir. 1996) ....................................85

*Richman v. Sheahan*, 270 F.3d 430 (7th Cir. 2001)........................................50

*Rivera v. Lake Cnty.*, 974 F. Supp. 2d 1179 (N.D. Ill. Sept. 26, 2013) ........ 80

*Roldan v. Town of Cicero*, No. 17-CV-3707, 2019 WL 1382101 (N.D. Ill. Mar. 27, 2019) ........26

*Rosado v. Mora*, No. 17 C 2210, 2019 WL 4450523 (N.D. Ill. Sept. 17, 2019) ........................ 86

*Ruiz–Cortez v. City of Chicago,* No. 11 C 1420, 2016 WL 6270768 (N.D. Ill. Oct. 26, 2016) ... 72

*Santiago v. Walls*, 599 F.3d 749 (7th Cir. 2010) ....................................... 16

*Saunders v. City of Chicago*, No. 12-cv-09158, 2013 WL 6009933
    (N.D. Ill. Nov. 13, 2013)...................................................72, 80, 81

*Savory v. Cannon*, 532 F. Supp. 3d 628 (N.D. Ill. 2021)................................23

*Savory v. Cannon*, 947 F.3d 409 (7th Cir. 2020)....................................22, 23

*Serrano v. Guevara*, 315 F. Supp. 3d 1026 (N.D. Ill. 2018) ........................ 36

*Shelton v. Wright*, No. 09-cv-6413, 2011 WL 856811 (N.D. Ill. Mar. 9, 2011) ........................84

*Smith v. Burge* 222 F Supp. 669 (N.D. Ill. 2016) ............................... passim

*Smith v. City of Chicago*, 3 F.4th 332 (7th Cir. 2021) ....................25, 76, 77

*Sneed v. Rybicki*, 146 F.3d 478 (7th Cir. 1998) ................................... 85, 87

*Steidl v. Fermon*, 494 F.3d 623 (7th Cir. 2007)........................... 47, 51, 61, 64

*Storey v. Illinois State Police*, No. 05-CV-4011-JPG, 2006 WL 278168
    (S.D. Ill. Feb. 2, 2006) ......................................................... 30

*Swanson v. Citibank, N.A.,* 614 F.3d 400 (7th Cir. 2010)........................16, 60

*Tabet v. Mill Run Tours, Inc.*, No. 10-CV-4606, 2013 WL 1103695 (N.D. Ill. Mar. 15, 2013) .. 84

*Tamayo v. Blagojevich*, 526 F.3d 1074 (7th Cir. 2008)............................ 28

*Taylor v. City of Chicago*, 2018 U.S. Dist. LEXIS 145105........................20

*Thomas v. City of Blue Island*, 178 F. Supp. 3d 646 (N.D. Ill. 2016)................................................82

*Tillman v. Burge*, 813 F. Supp. 2d 946 (N.D. Ill. 2011) ......................................................... passim

*Travis v. Gary Community Mental Health Center, Inc.,* 921 F.2d 108 (7th Cir. 1990)................83

*Treadwell v. Salgado*, 19 C 3179, 2021 WL 3129290 (N.D. Ill. July 23, 2021)................... 98, 99

*Tully v. Del Re*, No. 00 C 2829, 2002 WL 31175983 (N.D. Ill. Oct. 1, 2002) ........................... 90

*United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374 (7th Cir. 2003) ................ 28

*United States General, Inc. v. Schroeder*, 400 F. Supp. 713 (E.D. Wis. 1975)........................... 48

*United States v. Bagley*, 473 U.S. 667 (1985) .........................................................................92, 95

*United States v. Cueto*, 151 F.3d 620 (7th Cir. 1998)................................................................... 58

*United States v. Howell*, 231 F.3d 615 (9th Cir. 2000)................................................................70

*United States v. Martins*, 2008 U.S. Dist. LEXIS 60564 (N.D. Ill. July 21, 2008).....................54

*United States v. Porter*, 542 F.3d 1088, 1093 n. 3 (5th Cir. 2008)........................................54, 62

*United States v. Read*, 658 F.2d 1225 (7th Cir. 1981) ........................................................ 54, 62

*Van de Kamp v. Goldstein*, 555 U.S. 335 (2009)......................................................... 32, 44, 45

*Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429 (7th Cir. 1993)...........................76

*Volk v. Coler*, 845 F.2d 1422 (7th Cir. 1988) ..............................................................................83

*Walker v. White*, No. 16 CV 7024, 2017 WL 2653078 (N.D. Ill. June 20, 2017)...................... 99

*Ware v. Lake County Sheriff's Office*, 2017 WL 914755 (N.D. Ill. 2017) ..................................76

*Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012)................................................... passim

*Wiley v. City of Chicago*, 361 F.3d 994 (7th Cir. 2004) ..............................................................64

*Wilkerson v. Utah*, 99 U.S. 130 (1878)........................................................................................94

*Williams v. City of Chicago*, 315 F. Supp. 3d 1060 (N.D. Ill. 2018).......................................... 90

*Williams v. Valtierra,* No. 00 C 5734, 2001 WL 686782 (N.D.Ill. June 18, 2001).....................36

*Wilson v. Civil Town of Clayton*, 839 F.2d 375 (7th Cir. 1988) ................................................... 50

*Wrice v. Burge*, 187 F. Supp. 3d 939 (N.D. Ill. 2015) ...................................................53

*Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) .........................................................80

*Zimmerman v. Tribble*, 226 F.3d 568 (7th Cir. 2000)...................................................16

## STATUTES AND OTHER AUTHORITIES

735 ILCS 5/2-702 ............................................................................................................63

775 ILCS 40/50(a) ..........................................................................................................27

FED. R. CIV. P. 8(a)(2)......................................................................................................16

Fed. R. Civ. Pro. 12(b)....................................................................................................76

## INTRODUCTION

On December 18, 2020, Cook County Circuit Court Judge William H. Hooks granted

Plaintiff Jackie Wilson a Certificate of Innocence, finding:

> On February 9, 1982, two Chicago Police Officers were murdered. Andrew
> Wilson alone was their murderer. Every day since, the Cook County justice
> system itself has been tortured. Jackie Wilson has also been physically tortured by
> a brutal electrical box torture ritual and has already wrongfully served a sentence
> that has taken roughly 70 percent of his life. Jackie Wilson will never be able to
> recoup the value of his life lost to the living hell he experienced at the hands of
> his government. While Jackie Wilson extraordinarily deserves and has earned this
> Certificate of Innocence, others deserve to pay for that they have so unjustly
> caused both directly and indirectly.

Dckt. No. 1, Plaintiff's Complaint ("Comp.") ¶ 4. Plaintiff has alleged, as summarized below, the

facts that more than plausibly establish 42 U.S.C. §1983 et seq. and state law claims against each

perpetrator, individually, jointly, and in conspiracy who "deserve to pay for what they have so

unjustly caused." *Id*. Defendants' motions should be denied in their entirety.

## I.     SUMMARY OF ALLEGATIONS AGAINST DEFENDANTS

### A.  Defendants Burge, McKenna, O'Hara, and Yucaitis

These Defendants do not challenge the detailed allegations, most of which have been

judicially established, *inter alia*, by the findings of Judge Hooks in Plaintiff's criminal case, that

establish the factual predicate for Plaintiff's claims against them. Hence these allegations, set

forth in paragraphs 57-144, 149, 152-167, 169 and 174 of the complaint, are only briefly

summarized below.

In response to the murder of officers Fahey and O'Brien, the Chicago Police Department

(CPD) initiated the largest manhunt in the city's history. Comp. ¶ 57. Burge, who was the

commanding officer of Area 2 violent crimes, was placed in charge of the manhunt/investigation

with McKenna, O'Hara, and Yucaitis playing important roles under his supervision. *Id*. ¶¶ 58-59.

Revenge and retaliation reigned at CPD and hundreds of complaints, including twelve documented cases of torture, arose under Burge's command during the manhunt. *Id*. ¶¶ 60-61.

On February 12, 1982, Burge, McKenna, and O'Hara tortured several suspects at police headquarters, including Donald White, his brothers Lamont and Walter, Anthony Williams, and Dwight Anthony, using tactics that mirror those later used to torture Plaintiff and his brother Andrew. Comp. ¶¶ 63-78. After hearing this unrebutted evidence of torture and abuse that preceded the arrests of Plaintiff and his brother, Judge Hooks found that there was a pattern of torture that infected the underlying investigation into the murders. *Id*. ¶ 78.

On the morning of February 14, 1982, Plaintiff and his brother Andrew were separately arrested for the murders of officers Fahey and O'Brien. Comp. ¶¶ 85, 87. The eyewitness, Tyrone Sims, had previously told investigators that the shooter was the passenger in the car and that the driver had no involvement in the crimes. *Id*. ¶¶ 79-83.

Andrew, who was identified as the shooter, was then tortured on the second floor of Area 2 by Burge Yucaitis, O'Hara and McKenna for many hours, with tactics that included electric shocks from a black box, burning on a radiator, beatings, and suffocation with a bag. Comp. ¶¶ 85-106. Andrew, who repeatedly hollered out in pain, ultimately gave a confession. *Id*. ¶¶ 99, 105-106.

Plaintiff was arrested later in the morning of February 14. Comp. ¶ 87. A team of interrogators commanded by Defendant Burge, and comprised of Defendants Burge, O'Hara, McKenna and Yucaitis, then proceeded to torture and abuse Plaintiff, as they were also torturing his brother, in a coordinated effort to unlawfully retaliate against them for their alleged roles in the murders of their fellow officers and to coerce them into confessing to the crimes. *Id*. ¶ 90. Burge and those working under his command were determined to torture a false statement from

Plaintiff that could be used to hold him accountable for the crimes his brother committed. *Id*. ¶ 84.

Plaintiff's torture occurred for several hours. Comp. ¶¶ 107-144. Plaintiff was interrogated and extensively tortured by Burge, O'Hara and McKenna, with tactics that included repeated beatings, blows to the head with a phonebook, kicks to the groin, sticking a gun into his mouth and cocking it, and electric shocks from a black box. *Id*. Held in a room near his brother, Plaintiff heard Andrew cry out in pain and Burge told him that he would be "getting it next' if he did not cooperate. *Id*. ¶¶ 137-138.

Eventually Plaintiff told his interrogators that he would "tell them whatever they wanted to know. … What you want me to say, I am gon[na] say it." Comp. ¶ 139. By this time, Plaintiff was "hurt, was in pain all over." Plaintiff requested that he see his lawyer before giving the statement but was again beaten by O'Hara and McKenna as they told him that he didn't "need no fucking lawyer," and that if he requested one again, he would be tortured once again. *Id*. ¶¶ 143-144. Plaintiff believed that the only way he would leave Area 2 alive was if he gave a false and fabricated statement. *Id*. ¶144.

### B. Defendants Hyman and Hartnett

In February of 1982 Defendant Lawrence Hyman was the supervisor of the Felony Review Unit of the Cook County State's Attorneys' Office, (SAO) while Defendant Michael Hartnett was a court-reporter who served as an agent of the SAO. Comp. ¶¶ 49, 52. Hyman was on the second floor of Area 2 in close proximity to the rooms where Plaintiff and Andrew were being tortured and crying out in pain. *Id*. ¶¶ 100, 142. That morning, O'Hara took Andrew to meet with Hyman, and Andrew said to them "You want me to make a statement after they have been in there torturing me like that?" *Id*. ¶ 100. Hyman responded by saying "[g]et the jagoff out

3

of here." Id. Immediately thereafter, O'Hara took Andrew back to the interrogation room and

Burge and Yucaitis resumed his torture. *Id*. ¶¶ 101-104. When Hyman heard Andrew screaming,

he said "Andrew won't talk…[w]hen we get through with him, he's going to tell on his

momma." *Id*. ¶ 159.

Plaintiff was also tortured for many hours. *Id*. ¶ 112-152. After Plaintiff had been brutally

tortured for hours, Hyman entered the room and said to Plaintiff that he heard Plaintiff "was

gonna make a statement," Comp. ¶ 142. Plaintiff responded that he wanted to see his lawyer. Id.

¶ 143. Hyman then left the room, O'Hara and McKenna returned, resumed the torture, and told

Plaintiff that he didn't "need no fucking lawyer," and if he asked again, he would again be tortured

once more. *Id*. ¶ 144.

Subsequently, Hyman took statements from Plaintiff, and later that day, from Andrew.

Comp. ¶¶ 105, 148-149. The statements were transcribed by Hartnett, who had also been at Area

2 in close proximity to the torturous interrogations and was told by Andrew that "they was going

to torture [him] some more like that," but Hartnett "didn't give a damn" about the torture. *Id*. ¶¶

106, 145-147. Both Hyman and Hartnett knew that Plaintiff and Andrew had been tortured when

they took the statements, and they intentionally avoided asking either Plaintiff or Andrew

whether they had been physically abused. *Id*. ¶¶ 150-151. McKenna was in the room while

Plaintiff's statement was taken, and O'Hara was present for Andrew's statement. *Id*. ¶¶ 105, 149.

Hyman, Burge, McKenna, O'Hara, and Yucaitis, not only knew that Plaintiff's confession was

physically coerced by torture, but also that it falsely implicated Plaintiff in the murders. *Id*. ¶

152.

In November of 1982, a hearing was held on Plaintiff's motion to suppress. Comp. ¶ 168.

As part of the conspiracy to cover up their misconduct, Hartnett, Hyman, Burge, McKenna,

O'Hara, and Yucaitis, presented false denials at the hearing, and the motion was denied. *Id*. ¶¶ 169, 172. In January of 1983, Plaintiff and his brother were tried jointly for the murders, both statements were introduced, and Plaintiff and his brother were convicted. *Id*. ¶¶ 173, 182-184.

### C. Defendants Kunkle, Trutenko, and Coleman (1982-1993)

Defendant Kunkle was a Cook County ASA from 1973 to 1985, a Special Cook County ASA in 1986 and 1987, and a Special City of Chicago Corporation Counsel from 1988 to 1996. Comp. ¶ 53. In February of 1982, Kunkle was specifically informed of the torture by Defendant Daley, and knowing that Plaintiff and his brother Andrew had been tortured by Burge and his men, Kunkle coached Burge, McKenna, O'Hara, Yucaitis, Hartnett, and Hyman to present false denials concerning the torture of Plaintiff and his brother at the motion to suppress hearing. *Id*. ¶¶ 169-171, 248, 250.

Prior to the 1983 trial, potential witness DeWayne Hardin met with Kunkle and ASA Mike Angarola during which Hardin informed them that Plaintiff was not involved in the crimes. Comp. ¶ 176. In response, Angarola, with Kunkle's encouragement, repeatedly threatened Hardin in order to force him to falsely implicate Plaintiff. *Id*. ¶ 177. This conduct was part of the conspiracy to frame Plaintiff that began before the initiation of charges. *Id*. ¶ 178. Area 2 detectives came to Hardin's house, told him that he "better do what the State's Attorney" told him to do as they put a bag over his face. *Id*. ¶ 179. Hardin subsequently falsely testified consistent with what Kunkle, Angarola and the Area 2 detectives coerced him to say *Id*. ¶¶ 180-181. Plaintiff's 1983 conviction was based in part on Hardin's testimony. *Id*. ¶ 183.

In 1987, the Illinois Appellate Court granted Plaintiff a new trial that was to be severed from his brother's, whose conviction had been reversed by the Illinois Supreme Court which found that "extensive medical testimony and photographic evidence corroborates" Andrew's

torture allegations. Comp. ¶¶ 185-186. Given that the only evidence implicating Plaintiff was false, fabricated, and manufactured, the State did not have probable cause to continue the initiation of charges against Plaintiff. *Id*. ¶ 187.

Defendant Trutenko, who was a Cook County Assistant State's Attorney from 1981 to 1991, and again from 2008 to 2020, replaced Kunkle as the lead prosecutor in Plaintiff's retrial. Defendant Trutenko proceeded to manufacture additional false, inculpatory evidence to supplement Plaintiff's false and manufactured confession and Hardin's false, coerced, and manufactured statement. Comp. *Id*. ¶¶ 50, 188. In furtherance, Trutenko met on several occasions with Defendant William Coleman, a jailhouse informant, career criminal, and British national who was under the control of Trutenko and Kunkle, from 1988 to the present. *Id*. ¶¶ 54, 189. At these meetings Coleman and Trutenko fabricated a story, which Trutenko reduced to an official memorandum, that Plaintiff had admitted his involvement in the murders. *Id*. ¶¶ 189-190.

In exchange for this manufactured evidence, Trutenko provided Coleman with a promise that Coleman's drug charge, which carried a 6 to 30 year sentence, would be dismissed, as well as undisclosed promises of financial rewards, and undisclosed assistance in obtaining relief from pending federal and international charges. Comp. ¶ 191. Prior to and during Plaintiff's 1989 retrial, Trutenko and Coleman destroyed and otherwise suppressed exculpatory and impeaching evidence from the Plaintiff, his lawyer, and the Court. *Id*. ¶ 192.

At the retrial, Coleman presented the false and perjured testimony that he and Trutenko had manufactured, and withheld significant parts of the promises that Trutenko had made to convince Coleman to fabricate and present this false testimony. *Id*. ¶ 193. Prior to the retrial, Trutenko met with Dwayne Hardin, and threatened Hardin with perjury if he did not present false inculpatory testimony against Plaintiff. *Id*. ¶ 194. Plaintiff's false and tortured confession,

together with Coleman and Hardin's false and fabricated testimony, formed the basis for

Plaintiff's wrongful re-conviction for the murder of Officer O'Brien and the armed robbery of

both officers. *Id*. ¶ 195.

Shortly after the re-trial, Coleman and Trutenko appeared before a Cook County judge

and consummated the deal to which they had agreed. Comp. ¶ 196. Contemporaneously,

Trutenko informed Special City of Chicago Corporation Counsel Kunkle that Coleman claimed

that Andrew Wilson had purportedly made inculpatory jailhouse statements to Coleman. *Id*. ¶

197. Kunkle was then representing Burge, Yucaitis and O'Hara in Andrew Wilson's 42 U.S.C §

1983 case alleging torture. *Id*. ¶ 198. Trutenko and Kunkle both knew that Coleman's story about

Andrew Wilson, like the one that Trutenko and Coleman had manufactured against Plaintiff, was

false. *Id*. ¶ 199. Nonetheless, at Trutenko's urging, Kunkle presented him to falsely testify at the

§ 1983 trial. *Id*. ¶ 200. Two months later, Defendant Coleman was returned to his homeland of

England as a free man. *Id*. ¶ 201.

Plaintiff pursued an appeal, with a major point being Coleman's lack of credibility.

Comp. ¶ 202. While the appeal was pending, Trutenko and Kunkle continued to have

communications with Coleman, during which Coleman "extorted" money from them that

had been previously promised by Trutenko and Kunkle for his prior testimony and as "hush

money" to prevent him from revealing that his testimony in Plaintiff and his brother's cases

was false and manufactured. *Id*. ¶ 203. While the appeal was pending, Defendant Trutenko

traveled to England to discuss Coleman's prior testimony, and Trutenko stood up as

Godfather for one of Coleman's children. *Id*. ¶ 204.

During Plaintiff's pending appeal, neither Trutenko nor Kunkle informed Plaintiff,

his counsel, or the court, about their continuing illicit relationship with Coleman, his

extortion of hush money, the fact that he had been promised money for his testimony, and that they considered him to be a "con man" whose testimony was not believable. Comp. ¶ 205. Instead, Trutenko, Kunkle, and Coleman withheld this exculpatory and impeachment evidence as part of the continuing effort to frame Plaintiff for crimes he did not commit. *Id*. ¶ 206. Despite what they knew, Trutenko and Kunkle attempted to convince Coleman to testify on behalf of Burge, Yucaitis and O'Hara at the 1992 Chicago Police Board hearing at which they were being administratively tried for torturing Andrew Wilson. *Id*. ¶ 207. Unaware of the suppressed evidence concerning Coleman, and relying on Plaintiff's tortured confession, the Appellate Court affirmed Plaintiff's conviction in 1993. *Id*. ¶ 208.

### D. Defendants Trutenko, Kunkle and Horvat (1993-present)

In 2015, Plaintiff's petition for court review before the Illinois Torture Inquiry and Relief Commission (TIRC), was granted, and his case was sent to the Cook County courts for an evidentiary hearing. Comp. ¶¶ 209-210. In 2018, Judge William H. Hooks ruled that Plaintiff's confession was tortured from him and granted him a new trial at which the confession would be barred. *Id*. ¶ 211. In doing so, Judge Hooks found:

> Overall, the evidence adduced in this hearing establishes that the State is incapable of rebutting that Jackie's statement was involuntary. . . [P]attern and practice evidence shows shocking suspects was common. And each witness in a position to deny it invoked the fifth amendment. Those considerations take the "story" out of the realm of fiction. Jackie has made the requisite showing, not only that the probability [of] the outcome of his suppression hearing would differ had the witnesses been subject to impeachment, but, more, that the State could not meet its burden to show Jackie's statement was voluntary in a new suppression hearing. . . Accordingly, a new suppression hearing could only result in a finding that Jackie's confession was involuntary and his statement would be suppressed.

*Id*.

In December of 2019, the Illinois Appellate Court affirmed the court's ruling, but the Office of the Special Prosecutor (OSP) decided to continue to prosecute Plaintiff, relying almost

exclusively on the manufactured 1989 testimony of Coleman and the manufactured false statement of DeWayne Hardin. Comp. ¶¶ 212-213. During the pre-trial period, neither ASA Trutenko nor retired Judge Kunkle, nor Coleman, who continued to be in contact with Trutenko, revealed any of the extraordinary exculpatory and impeaching evidence about Coleman, or that he was alive and in continuing contact with Trutenko. *Id*. ¶ 214.

The third trial of Plaintiff began in the fall of 2020 with Trutenko, Kunkle, and Coleman continuing their deception and suppression of evidence. Comp. ¶ 215. As a result, the OSP, asserting that Coleman was unavailable and in all likelihood dead, offered Coleman's manufactured, false and incredible 1989 trial testimony, and trial Judge Hooks, on the basis of these representations, reluctantly admitted this evidence. *Id*. ¶ 216. During this time, Defendant Horvat met with Trutenko and joined the conspiracy with Trutenko and Kunkle to withhold the exculpatory and impeachment evidence about Coleman of which they were aware, *Id*. ¶¶ 217-218.

Immediately prior to Trutenko's testimony, Horvat provided a warning to the Special Prosecutor that was designed to withhold exculpatory evidence from Plaintiff. Comp. ¶ 219. During his testimony, Trutenko admitted that Coleman was alive, living in England, and that he had communicated with him during the trial; Trutenko committed perjury when he denied that he had discussed Coleman during his meeting with one of the Special Prosecutors. *Id*. ¶¶ 220-221. The Special Prosecutor immediately moved to dismiss all charges with prejudice, and Judge Hooks granted the motion. *Id*.¶ 222. Immediately after his testimony, Trutenko destroyed and otherwise suppressed evidence of his relationship with Coleman by wiping his cell phone and suppressing email communications between him and Coleman. *Id*. ¶ 223.

9

On December 18, 2020, Plaintiff received a certificate of innocence that adjudged him to be innocent of all charges connected to the murders and armed robbery of Officers Fahey and O'Brien. Comp. ¶¶ 224-225. On June 10, 2021, Judge Alfredo Maldonado found that "the sordid history of the investigation and criminal prosecutions in this case serve as a shameful chapter in Chicago's history," and "in the interests of justice" appointed a special prosecutor "to conduct an independent investigation of the actions of any person, including, but not limited to, any current or former members of the Cook County State's Attorney Office, relative to the substance of Nicholas Trutenko's October 1, 2020 testimony and/or his alleged perjury on October 1, 2020." *Id*.

**E. Defendants Daley and Kunkle (1981-1989)**

From 1981 to 1989, Defendant Daley was the State's Attorney of Cook County Comp. ¶ 46. In February of 1982 Daley closely monitored developments in the manhunt, and he received reports from his assistants who were at Area 2. *Id*. ¶¶ 234, 239. Daley learned from numerous sources about the widespread abuse during the manhunt, including the torture and abuse of the White brothers, Anthony Williams, Plaintiff and Andrew Wilson, and did nothing to prevent or stop that torture and abuse or to discipline, investigate, or otherwise bring to justice Burge and the other detectives who perpetrated it. *Id*. ¶¶ 234, 239-244.

On or about February 25, 1982, Defendants Daley and Kunkle were served with unmistakable evidence that Andrew Wilson had been tortured while in police custody. Comp. ¶¶ 245-247. They knew that this evidence set forth criminal conduct by Burge, his men, and Hyman, but they took no action. *Id*. ¶¶ 248-254.

As a result of Daley's failure to act, Burge and other Area 2 and 3 Detectives tortured numerous additional almost exclusively African American suspects with electric shock, baggings, mock executions, and beatings, often while using racial epithets, in the period from February of

10

1982 to November of 1991. Comp. ¶¶ 235-236. As a further result, at least 30 men were prosecuted on the basis of tortured confessions, including in numerous cases where Daley made the decision to seek the death penalty, most significantly including in Plaintiff and brother's case, despite knowing that the men had been tortured. *Id*. ¶¶ 257-267. Furthermore, Daley deliberately failed to disclose the exculpatory information in his personal possession and in possession of the CCSAO, and his refusal to investigate the actions of Burge and his confederates and his suppression of the exculpatory evidence in his possession proximately caused Plaintiff's wrongful prosecution, conviction, re-conviction, and re-prosecution, and more than 36 years of wrongful incarceration for crimes that he did not commit. *Id*. ¶¶ 265-267.

### F. Defendants Mayor Daley, Martin, Shines, Hillard and Needham

Defendant Leroy Martin Sr. was the Commander of Area 2 in 1983 and at that time was Burge's direct supervisor. Comp. ¶ 268. [2] As Commander, Martin learned that Burge and detectives under his command systematically tortured numerous Black suspects, including Plaintiff and his brother, but failed to initiate appropriate investigations or to discipline Burge in connection with any of these cases. *Id*. ¶¶ 269-270. Martin was named CPD Superintendent in 1987 and, possessing direct knowledge of Burge and his men's practices, he continued to fail to intervene, to supervise, discipline or otherwise act to prevent these ongoing practices, but rather worked actively to conceal and suppress evidence of the pattern of torture. *Id*. ¶¶ 43, 271-272.

In 1989, Daley became Mayor of Chicago and had the duty to take all necessary steps to ensure that the CPD and its officers disclosed exculpatory information to the victims of Burge and his men, including Plaintiff, of which he had become aware as State's Attorney. Comp. ¶¶ 277-280. Daley did not disclose exculpatory information in his possession at any time from the date he resigned as State's Attorney, until he left the Mayor's office in 2011, he did not intervene

---

[2] Leroy Martin Sr. is deceased and is sued through his estate.

at any time to direct the CPD to disclose exculpatory torture information in its possession, and he did not direct the CPD to conduct a thorough and aggressive torture investigation. *Id*. ¶ 281.

In 1990 the Goldston Report was prepared by the CPD's Office of Professional Standards (OPS) which found that there was systematic abuse of suspects at Area 2 and that Area 2 command personnel were aware of the systematic abuse and encouraged it by actively participating or failing to take action to stop it. Comp. ¶ 283. In 1991 the OPS supplemented this report with a finding that Burge, O'Hara, McKenna and Yucaitis were prime movers in this pattern of abuse. *Id*. ¶ 284. In the companion Sanders report, the OPS found that Burge, O'Hara and Yucaitis had tortured Andrew Wilson and recommended they be fired. *Id*. ¶ 285.

The Goldston Report was highly exculpatory for Plaintiff, as he was tortured during the time period analyzed in the Report by officers cited as primary actors in the systematic torture, but Martin delayed, obstructed, and undermined the OPS investigation, and the OPS Reports, by suppressing their findings that Andrew was tortured and by refusing to suspend or remove Burge either before, or for nearly a year after, the Goldston and Sanders Reports' findings were first made known to him, and by suppressing the findings that there was systematic abuse at Area 2, which implicated Martin, Burge, O'Hara, Yucaitis, McKenna and other Area 2 detectives who worked under Burge's command. Comp. ¶¶ 286-288.

Daley was specifically informed or was otherwise aware of the Goldston Report's findings of "systematic" Area 2 torture that was "condoned and participated in" by Area 2 command personnel. Comp. ¶¶ 289-290. He knew or should have known that Martin had been the commanding officer at Area 2 and Burge's direct supervisor during part of the time the Goldston Report found there to be "systematic" torture, and that Martin therefore had a motive and intent to suppress and discredit the Goldston Report, but despite all his previous knowledge and the

Goldston Report's findings, Daley did not seek an independent federal investigation; direct Martin to initiate a criminal investigation or to open disciplinary proceedings against the Area 2 detectives, supervisors and command officers identified in the Goldston Report; or seek the prosecution of Burge and his confederates. *Id*. ¶¶ 291- 292. Instead, Martin and Daley jointly sought to publicly discredit the Goldston Report and defend Martin's prior suppression of it, saying "these are only allegations . . . rumors, stories, things like that." *Id*. ¶ 293.

The intent and effect of these statements was to undermine the validity of the Goldston Report's finding that Area 2 torture was "systematic" and participated in by command personnel. Comp. ¶ 294. Daley and Martin, through several hearings held by City Council and the Police Board, and from an Amnesty International report, were given further notice that Burge and his men systematically tortured suspects in order to obtain confessions. *Id*. ¶ 296.

In 1993, OPS Director and Defendant Gayle Shines re-opened investigations into approximately ten Area 2 torture cases. Comp. ¶¶ 47, 299-300. After exhaustive re-investigations, OPS investigators sustained numerous allegations that two of Burge's self-admitted "right hand men" abused and tortured six suspects. *Id*. ¶ 299. Shines, under pressure from her fellow Defendants and co-conspirators, suppressed these findings and the evidence which supported them by secreting the files in her personal office for five years. Id. ¶ 300. Despite the findings in the Goldston Report, Martin and Shines refused to investigate numerous other allegations of police torture that were brought to their attention, including allegations of electric shock by Burge that took place only nine days before Plaintiff's torture. *Id*. ¶ 295. In 1996, Daley, despite numerous allegations and sustained findings of torture against Burge confederate Peter Dignan, meritoriously promoted him to lieutenant. *Id*. ¶ 301.

13

In 1998, Defendant Superintendent Terry Hillard and his Administrative Assistant, Defendant Thomas Needham, with full knowledge that Burge, Yucaitis, O'Hara, and McKenna participated in a pattern and practice of torture of suspects, including Plaintiff, obstructed justice by overturning the OPS sustained findings in the six re-opened cases; by refusing to investigate other torture claims; by refusing to investigate Shines' suppression of evidence; and by suppressing the sustained OPS files and findings from Plaintiff. Comp. ¶¶ 44, 45, 302. Daley also personally insisted from the time he became Mayor, and even after Burge was indicted and convicted of perjury and obstruction of justice, that the City continue to finance the defense of Burge and his men, despite his personal knowledge that Burge committed, supervised and condoned torture against Black men. *Id.* ¶¶ 303-304.

Plaintiff's wrongful prosecutions were continued, his exoneration was delayed, and his imprisonment and wrongful convictions lasted far longer than they otherwise would have because, for many years, Defendants Daley, Martin, Hillard, Needham and Shines, in conspiracy amongst themselves and with others, including Defendants Burge, McKenna, O'Hara, Yucaitis and their police confederates, and successive Police Superintendents and police command personnel, continued to make extraordinary efforts to suppress, conceal and discredit exculpatory evidence regarding the pattern of torture and physical abuse of African American men by Chicago Police detectives under Burge's command. Comp. ¶¶ 276, 282.

## G. City of Chicago

The City does not, and cannot, dispute the factual sufficiency of Plaintiff's allegations in support of his municipal liability claim. Briefly summarized, the pattern and practice of torture and abuse at Area 2, its cover-up, and the wrongful prosecutions and convictions which resulted, were well known within Area 2 well before, during, and after Plaintiff was tortured and

14

wrongfully convicted, including by the command officers at Area 2 including Defendants Martin and Burge, by former Chicago Mayors including Defendant Daley, successive Police Superintendents, including Defendants Martin, and Hillard, by successive OPS Directors, including Defendant Shines, by various Command Personnel and Chiefs of Detectives, including Defendant Hillard, by the Chicago City Council and the Chicago Police Board, and by other policy making, command, and supervisory City and police personnel, who participated in the cover-up and suppression of evidence, the wrongful prosecutions and convictions of Plaintiff and other torture victims, and the denial of their full and fair access to the courts. Comp ¶ 347.

The interrelated pattern and practices of torture and the continuing police code of silence, have been repeatedly admitted to, and apologized for, by Mayors Daley, Emanuel and Lightfoot, been recognized by the Chicago City Council by its passing of the Reparations Ordinance, by Defendant Martin, and by the OPS, and have also been established by findings of the Cook County OSP, by numerous state and federal trial and appellate courts, including by Judge Hooks in Plaintiff's case, by the Seventh Circuit in Andrew Wilson's § 1983 case and in Burge's criminal appeal, and by several federal court juries. Comp. ¶¶ 78, 297, 348-349.

The interrelated policies, practices and customs, both individually and together, were known to, maintained, implemented and ratified with deliberate indifference by each and every city policymaker, including all those named as Defendants, and these policies, practices and customs encouraged the coercing of statements from suspects, witnesses and arrestees, by torture and related abusive tactics, the construction and fabrication of confessions, admissions, statements, identifications, and other false witness evidence, the suppression and destruction of evidence of torture and other exculpatory evidence, the intimidation of witnesses, the making of false statements and reports, the giving of false testimony, the obstruction of justice, the

15

manipulation and obstruction of the State and Federal courts, and the pursuit and continuation of wrongful convictions and false arrests and imprisonments; and were, separately and together, a moving force behind, and a direct and proximate cause of, the unconstitutional acts and perjury committed by the named Defendants and their co-conspirators, and the injuries suffered by the Plaintiff. Comp. ¶¶ 347, 350-352.

## STANDARD OF REVIEW

To state a claim upon which relief can be granted, the plaintiff's complaint need only contain "a short and plain statement of the claim showing that [the plaintiff] is entitled to relief." FED. R. CIV. P. 8(a)(2). The plaintiff is not required to make "detailed factual allegations." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). Rather, the complaint must contain "only enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556). When determining whether a plaintiff has met this standard, this Court must "tak[e] all well-pleaded allegations of the complaint as true and view[] them in the light most favorable to the plaintiff." *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010) (quoting *Zimmerman v. Tribble*, 226 F.3d 568, 571 (7th Cir. 2000)).

In short, to survive a motion to dismiss, a plaintiff must merely "give enough details about the subject-matter of the case to present a story that holds together." *Swanson v. Citibank, N.A.,* 614 F.3d 400, 405 (7th Cir. 2010).  The court asks itself, "*could* these things have happened, not *did* they happen." *Id.* Plaintiff's complaint more than satisfies this pleading standard.

16

**ARGUMENT**

## II.  PLAINTIFF'S CLAIMS ARE TIMELY

The parties agree that Plaintiff's federal claims have a two-year statute of limitations but disagree about when the claim accrues as a matter of federal law. *See generally Regains v. City of Chicago*, 918 F.3d 529, 533 (7th Cir. 2019). Dckt. No. 75 at 13-16-, 20-25 (City Defs); Dckt. No. 69 at 3-5 (Daley); Dckt. No. 59 at 12-15 (Hartnett); Dckt. No. 47 at 12-13 (Trutenko). Under *Heck v. Humphrey*, 512 U.S. 477 (1994), a claim that implies the invalidity of a conviction does not accrue until the conviction has been invalidated. Defendants generally assert that Plaintiff's constitutional claims are time-barred because he failed to bring this lawsuit within two years of the date on which the trial court granted a new trial and suppressed his coerced and involuntary statement. As described below, Defendants are wrong.

### A.  Relevant Procedural History For Accrual

Plaintiff was first wrongfully convicted in 1983. Comp. ¶ 6. He was granted a new trial in 1987, and again wrongfully convicted in 1989. *Id*. ¶¶ 6, 23-24.  After TIRC found that his allegations of torture were credible and the trial court held hearings on those allegations, his conviction was vacated once again. Comp. ¶¶ 25-26. The Office of the Special Prosecutor (OSP) appealed the trial court's decision to the Illinois Appellate Court. *Id*. ¶ 212.

After the Illinois Appellate Court affirmed the trial court's decision granting Plaintiff a new trial, OSP retried Plaintiff in 2020. Comp. ¶ 20, 215-222. Plaintiff's third trial concluded on October 1, 2020, with the dismissal of all charges with prejudice. *Id*. at ¶ 222. Plaintiff filed suit on June 30, 2021, within two years of the Illinois Appellate Court's decision and within eight months of the OSP dismissing charges. *Id*. at ¶ 3.

As set forth in detail below, the overwhelming authority from this Circuit and the Supreme Court establishes that under *Heck*'s deferred-accrual rule, Plaintiff's claims accrued on

October 1, 2020, when the State dismissed all charges against him. As such, Plaintiff's claims

are timely.

### B. Plaintiff's Claims (Counts I-IV) Are Not Time-Barred Because They Did Not Accrue Until 2020 When the State Dismissed All Charges

There can be no doubt that the allegations in Plaintiff's Complaint would call into

question his criminal conviction and the criminal proceedings brought against him. In his

Complaint, Plaintiff alleges that Defendants violated his constitutional rights in a number of

ways. For example:

> (1) Defendants Burge, McKenna, and O'Hara's torture of Plaintiff – with the knowledge and participation of Defendants Hyman and Hartnett – resulted in "the false, fabricated, and manufactured statement implicating Plaintiff in crimes he did not commit." Comp. ¶¶ 10-12;

> (2) Prior to his 1989 retrial, Defendants Trutenko and Coleman manufactured a false and fabricated statement that falsely implicated Plaintiff in the crimes, *Id*. ¶¶ 21-22;

> (3) Defendants, including Kunkle, obtained a false, coerced, and fabricated statement from DeWayne Hardin that was used against Plaintiff, *Id*. ¶ 22;

> (4) After Plaintiff's 1989 wrongful conviction, "Defendants Trutenko, William Kunkle, and Coleman suppressed exculpatory evidence demonstrating that "Coleman's story was false, manufactured, purchased by County and City monies, and that the continued suppression of these facts were, in part, accomplished by a continuing personal relationship between Trutenko and Coleman," *Id*. ¶ 24;

> (5) "During the third trial, Defendant Horvat joined and participated in Defendant Trutenko's continuing effort to withhold critical and material exculpatory evidence that would have unraveled Trutenko's continuing illicit relationship with jailhouse informant Coleman," *Id*. ¶¶ 28-29; and

> (6) Defendants Daley, Martin, Shines, Hillard and Needham suppressed torture evidence favorable to the Plaintiff. *Id*. ¶¶ 276, 281-282, 293, 300, 302.

There is no question, and no dispute among the parties, that these claims were subject to

delayed accrual under *Heck*. The only question is whether Plaintiff's claims accrued at some

point before the criminal proceedings against him ended. The answer, which this Court recently

reached in another case with a nearly identical fact pattern, is that the claims did not accrue until the criminal proceedings ended. *See Ochoa v. Lopez*, No. 20-CV-02977, 2021 WL 4439426; *see also McDonough v. Smith*, 139 S. Ct. 2149, 2158 (2019) (holding that the *Heck* bar applies to a constitutional violation related to fabrication of evidence).

In *Ochoa v. Lopez*, this Court was faced with a fact pattern mirroring Plaintiff's case. *Ochoa v. Lopez*, No. 20-CV-02977, 2021 WL 4439426, at *6 (N.D. Ill. Sept. 28, 2021). There, the plaintiff was convicted of murder from events arising out of a 2002 shooting. *Id*. at *1. In 2007, the Illinois Appellate Court reversed Ochoa's conviction, and in 2013, Ochoa was retried and again convicted. *Id*. On February 15, 2017, the Illinois Appellate Court reversed Ochoa's conviction, and on October 23, 2019, the State dismissed all charges against him. *Id*. All told, Ochoa was in custody for approximately 17 years. *Id*. As Defendants do here, the defendants in *Ochoa* argued that Plaintiff's Fifth and Fourteenth Amendment claims were time-barred because those claims accrued in 2007 and again in 2017 when Ochoa's convictions were reversed. *Id*. at *6. This Court rejected the argument, noting that under *McDonough,* a due process claim "does not begin to run until the criminal proceedings against the defendant (i.e., the § 1983 plaintiff) have terminated in his favor."

This Court's decision in *Ochoa* was consistent not only with *McDonough* and the principles behind the *Heck* rule, but also with binding Seventh Circuit precedent. Namely, the Seventh Circuit addressed the precise due process accrual question raised by the Defendants here in *Johnson v. Dossey*, 515 F.3d 778 (7th Cir. 2008). In that case, the Plaintiff brought a § 1983 lawsuit, alleging that her due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963) were violated when the defendants suppressed exculpatory evidence in an arson prosecution that resulted in her wrongful conviction in January 2004. *Id*. at 779, 781. Upon discovery of the

19

exculpatory evidence on February 10, 2005, plaintiff's conviction was reversed and remanded for a new trial, and she was released from custody. *Id*. at 780. On September 2, 2005, Plaintiff was acquitted following a second trial (over six months after her conviction was reversed). *Id*. at 779. After Plaintiff brought suit, Defendants moved to dismiss the plaintiff's Due Process claims on statute of limitations grounds. The Seventh Circuit held that plaintiff's lawsuit was timely filed because her "claim based on a *Brady* violation did not accrue until Johnson was acquitted on September 2, 2005." *Id*. at 782; *see also Camm v. Faith*, 937 F.3d 1096, 1110 (7th Cir. 2019) (reiterating that *Brady* claims accrue upon acquittal).

*Taylor v. City of Chicago*, 2018 U.S. Dist. LEXIS 145105, is also instructive. There, defendants challenged the plaintiff's Due Process claim as untimely because it was filed more than two years after he was granted a writ of habeas corpus. *Id*. at *14. Taylor argued that his Due Process claims only accrued after he was acquitted following a retrial. *Id*. The district court sided with Taylor, noting that the habeas court did not unconditionally invalidate Taylor's conviction. Rather, it released him from custody contingent on the State's determination whether to retry him. *Id*. The court held that Taylor's acquittal was the date of accrual, not the date on which his conviction was vacated or when he was released from custody.

Other circuits have similarly held that due process claims do not accrue when a conviction is vacated if the State may retry the defendant. In *Bradford v. Schherschligt*, 803 F.3d 382, 382-84 (9th Cir. 2015), a plaintiff sued a detective for fabricating evidence that led to his imprisonment. When DNA evidence exonerated him, he was released from custody and petitioned to have his conviction vacated. *Id*. at 385. His petition was granted but the court permitted the prosecution to retry him, and he was acquitted on retrial. *Id*. The Ninth Circuit held the "claim seeking to vindicate his right to be free from those criminal charges based on the

20

allegedly fabricated evidence did not accrue until the charges were fully and finally resolved and could no longer be brought against him," which was the date of the acquittal. *Id*. at 388-89.

### C. Defendants' accrual argument is not persuasive

Ignoring the overwhelming weight of authority showing that Plaintiff's claims accrued when the criminal proceedings finally ended, and relying on *Johnson v Winstead*, 900 F.3d 428 (7th Cir. 2018), Defendants contend that Plaintiff's due process claims accrued when his convictions were reversed by the trial court. [3] Dckt. No. 75 at 13-16, 20-25 (City Defs.); Dckt. No. 69 at 3-5 (Daley); Dckt. No. 59 at 12-15 (Hartnett); Dckt. No. 47 at 12-13 (Trutenko). In doing so, Defendants ignore that the trial court's decision to grant a new trial and suppress Plaintiff's involuntary statement was appealed. Thus, even if the Defendants' erroneous argument is accepted, the correct accrual date would be December 19, 2019, when the Illinois Appellate Court affirmed Judge Hooks' 2018 decision. Plaintiff's suit was timely filed within two years of the final judgment affirming the grant of a new trial and suppressed confession. Moreover, Defendants' reliance on *Winstead* is misplaced and has already been rejected by other courts, including this one in *Ochoa*. Either way, for the reasons discussed above and below, Plaintiff's claims involving his tortured false confession are timely.

---

[3] Conveniently, Defendants avoid addressing Plaintiff's specific due process allegations outside of his coerced false confession. Dckt. No. 47, 12-15 (Trutenko); Dckt. No. 59 12-15 (Hartnett)(generally asserting that "Heck also did not toll the statute of limitations for Plaintiff's Fourteenth Amendment Due Process claim or Fifth Amendment Coercive Interrogation claim after June of 2018."); Dckt. No. 69 at 3-5 (Daley); Dckt. No. 75 at 14 (City Defendants) (claiming "The allegations that establish the untimeliness of plaintiff's § 1983 claims against the City Defendants are taken directly from the Complaint. Those claims arise out of the alleged coercion of a false confession from plaintiff, and the prosecution's use of that confession to detain and convict plaintiff in the 1983 and 1989 trials."). Defendants avoid addressing the substance of Plaintiff's due process claims unrelated to the involuntarily obtained statement because the *Heck* deferred-accrual rule unquestionably governs. *See Ochoa v. Lopez*, No. 20-CV-02977, 2021 WL 4439426; *see also McDonough v. Smith*, 139 S. Ct. 2149, 2158 (2019) (holding that the *Heck* bar applies to a constitutional violation related to fabrication of evidence). Defendants likewise fail to acknowledge that *Winstead* did not involve a Due Process claim, but rather, was confined to a Fifth Amendment compelled self-incrimination claim.

In fact, this Court held in the *Ochoa* case that *Winstead* could not be reconciled with the more recent Supreme Court decision on accrual in *McDonough*. *Ochoa,* 2021 WL 4439426, at *4 ("Ochoa concedes that *Johnson,* like his claim here*,* involved a Fifth Amendment compelled self-incrimination claim but maintains that *Johnson* cannot be reconciled with the United States Supreme Court decision in *McDonough v. Smith*, 139 S. Ct. 2149 (2019). The Court agrees."). Multiple judges in this district have reached the same conclusion.

In *Brown v. City of Chicago*, 2019 U.S. Dist. LEXIS 165148, the plaintiff was convicted of arson and two counts of murder in 1990. *Id*. at *2. Brown's conviction was reversed, but he was retried and convicted a second time in 2008. *Id*. Years later, Brown filed a post-conviction petition challenging his convictions and the State agreed to vacate his conviction and dropped all charges against him. Brown was finally released from prison in 2017. *Id*. As Defendants do here, the defendants in *Brown* argued that Plaintiff's Fifth and Fourteenth Amendment claims were time-barred because those claims accrued in 1990 when Brown's convictions were reversed the first time. *Id*. at *12. In rejecting this argument, the *Brown* court observed, "[a]though *Winstead*, 900 F.3d at 439, had held that a compulsory self-incrimination claim accrued once the plaintiff's first conviction was reversed, such a conclusion, as discussed above, cannot readily be reconciled with *McDonough* or with the Seventh Circuit's more recent decision in *Camm*. Plaintiff should not be expected to have brought his claim in 2005 while awaiting retrial." *Brown*, 2019 U.S. Dist. LEXIS 165148, *16-17. The *Brown* court found that Brown's Fifth Amendment claim, like his due process claims, accrued when all charges were dismissed against him.

Similarly, in *Savory v. Cannon*, the Seventh Circuit was faced with a lawsuit stemming from a plaintiff who served thirty years incarcerated for a murder he did not commit. *Savory v. Cannon*, 947 F.3d 409, 415 (7th Cir. 2020). Like this case, Mr. Savory's pre-filing procedural

history was complicated: (1) he was convicted of murder, based in part on an involuntary confession, in 1977; *People v. Savory*, 82 Ill. App. 3d 767 (Ill. App. Ct. 1980) (2) his conviction was reversed and his statement suppressed in 1980; *Id*. (3) he was reconvicted without the statement in 1981 and paroled in 2006; *Savory v. Cannon* at 415 (4) his sentence was commuted and his parole thereby terminated in 2011, *Id*.; and (5) he was granted a pardon that "acquitted and discharged" his conviction in 2015. *Id*. Less than two years after his pardon, he brought suit under § 1983 alleging, *inter alia*, a coerced false confession claim under the Fifth and Fourteenth Amendments. *Id*. The defendants argued that Savory's claims accrued when he was released from parole in 2011 – more than five years before he filed suit. *Id*. at 411. In reversing, the Seventh Circuit found that the *Heck* rule applied given that Savory's § 1983 claims implied the invalidity of his conviction or sentence and that his claims only accrued when the Illinois Governor pardoned him. *Id*. at 417-18. ("Until that moment, his conviction was intact and he had no cause of action under section 1983."). The Seventh Circuit specifically explained that the end of the plaintiff's custody was not a favorable termination for the purposes of accrual under the *Heck* rule. *Id.* at 428. On remand, Judge Feinerman concluded that *McDonough* overruled *Winstead*, holding and held that "Savory's Fifth Amendment coerced confession claim [was] timely in its entirety." *Savory v. Cannon*, 532 F. Supp. 3d 628, 634–35 (N.D. Ill. 2021).

Consistent with *Ochoa*, *Johnson*, *Camm*, *McDonough*, and *Brown*, *supra*, Plaintiff's due process claims did not accrue when his convictions were reversed in 1988 and 2018, but rather when the State ultimately dismissed charges against him in 2020 at the conclusion of his third trial. As *McDonough* notes, Plaintiff cannot be expected to bring a lawsuit at the exact same time that the State is continuing to prosecute him. Contrary to Defendants' arguments, Plaintiff should not have been expected to bring his Fourteenth Amendment due process claim (Count I) and his

Fifth and Fourteenth Amendment compelled self-incrimination claim (Count II) while he was awaiting re-trial either in 1988, when his conviction was first reversed, or in 2018 when his conviction was reversed a second time. This is especially the case because the OSP appealed the grant of a new trial and suppression of Plaintiff's coerced involuntary statement – an appeal that did not end until December 10, 2019. Comp. ¶ 212. *See Heck*, 512 U.S. at 487 n.8 (listing a pending criminal appeal as an example of a "bar to suit" requiring federal court abstention).

In short, Plaintiff could not have pursued this lawsuit while that criminal appeal was pending. *See* Comp. ¶212; *People v. Wilson*, 2019 IL App (1st) 181486, ¶ 64, 158 N.E.3d 1067, 1080; *see also Heck v Humphrey*, 512 U.S. 477, 487 and n.8 (1994) (listing appeal in criminal case as example of "bar to the suit" making federal court abstention appropriate); *see also D'Ambrosio v. Marino*, No. 1:11 CV 933, 2013 WL 256312, at *6 n.5 (N.D. Ohio Jan. 23, 2013) ("If the appropriate course of action for the federal court in § 1983 litigation is to abstain until all criminal litigation is concluded, then it makes no sense to require the litigant to file the case in the middle of this litigation, for fear the statute of limitations will run." (citing *Heck*, 512 U.S. at 487 n.8)). If Plaintiff had filed suit prior to December 2019, Defendants would have correctly argued that Plaintiff was attempting to circumvent *Heck's* "pragmatic concerns with avoiding parallel criminal and civil litigation over the same subject matter and the related possibility of conflicting civil and criminal judgments," 139 S. Ct. at 2157, and *McDonough*'s holding to avoid "allowing collateral attacks on criminal judgments through civil litigation," by filing suit as the grant of a new trial and suppression of his confession was not yet final. *See D'Ambrosio*, 2013 WL 256312, at *6 (explaining how requiring a § 1983 litigant to file suit before criminal appeal is resolved could lead to "absurd results" conflicting with *Heck*'s directive to avoid parallel criminal and civil litigation).

24

### D.  Plaintiff's Section 1983 *Manuel* Claim is Timely

Defendant Hartnett argues that Plaintiff is too late in bringing his *Manuel v. City of Joliet, IL* claim for deprivation of liberty without probable cause. In doing so, Hartnett argues that the claim accrued when Plaintiff was convicted, thus ending his pretrial detention. For the reasons explained below, Plaintiff's Fourth Amendment claim for deprivation of liberty without probable cause is timely. [4]

### 1.  Plaintiff's claim did not accrue until favorable termination

As discussed extensively above, Plaintiff was convicted two times and could not have brought his claims until the criminal proceedings against him ended. Although the Seventh Circuit recently held in *Smith v. City of Chicago*, 3 F.4th 332, 339 (7th Cir. 2021) that a plaintiff could bring a Fourth Amendment pretrial deprivation of liberty claim while charges were pending against him, that case did not involve a plaintiff who had been convicted of a crime. Thus, the Seventh Circuit held that the civil case alleging wrongful pretrial detention under the Fourth Amendment did not impugn a conviction and was not *Heck* barred once the plaintiff had

---

[4] Although the parties do not challenge the sufficiency of Plaintiff's pretrial detention claim, the City, McKenna, Hillard, Shines, and Needham all argue that Count III must be dismissed to the extent that it alleges "a federal malicious prosecution claim," as opposed to an unlawful detention claim, on the ground that there is no Constitutional claim for malicious prosecution in the Seventh Circuit. *See* Dckt. 75 at 10-11. It would be premature for the Court to make that determination at this stage, where the sole question is "whether the complaint includes factual allegations that state a plausible claim for relief." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015); *see also KFC Corp. v. Iron Horse of Metairie Rd., LLC*, 18 C 5294, 2020 WL 3892989, at *3 (N.D. Ill. July 10, 2020) ("As long as the plaintiff can, in response to a motion to dismiss, identify some plausible theory that would entitle it to relief on its claim, that claim may move forward and a motion to dismiss other legal theories must be denied."). With respect to Count III, the question that *City of Angola* directs courts to ask— "whether the complaint includes factual allegations that state a plausible claim for relief"—is not disputed. The Defendants do not contest that Plaintiff's allegations survive Rule 12(b)(6) on a Fourth Amendment legal theory. They merely disagree about which legal theory allows Plaintiff to pursue the claim. That question is not ripe for Rule 12(b)(6) adjudication. *E.g., City of Angola*, 809 F.3d at 325; *KFC Corporation*, 2020 WL 3892989, at *3 ("Based on that single set of operative facts, Iron Rooster has asserted that PSI is liable to it under theories of breach of contract, quasi-contract, fraud, negligence, and indemnity. And in seeking the dismissal of only some of those legal theories, PSI has not provided a basis to dismiss Iron Rooster's claim for relief; rather, it has raised arguments only against several theories upon which liability on that claim might be based. But Rule 12(b)(6) does not authorize the dismissal of legal theories.").

been released from custody, even if the plaintiff was still facing charges. *See id*.

Smith is distinguishable from the present case. Plaintiff, unlike the plaintiffs in *Smith* or other similar Seventh Circuit cases (such as *Manuel v. City of Joliet, IL.*, 903 F.3d 667, 670 (7th Cir. 2018) and *Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019)) was convicted, and *Heck* did not permit him to bring his pretrial detention claim while his conviction remained intact. *See generally McDonough*, 139 S. Ct. at 2156 (claim that fabricated evidence caused a plaintiff to be detained pretrial "challenge[d] the integrity of criminal prosecutions undertaken 'pursuant to legal process" and thus triggered *Heck*'s favorable termination bar); *see also Savory*, 532 F. Supp. 3d at 636–37 (Fourth Amendment claim did not accrue until end of criminal proceedings when plaintiff had been convicted and then retried); *Taylor*, 2019 WL 4597383, at \*16; *Roldan v. Town of Cicero*, No. 17-CV-3707, 2019 WL 1382101, at \*3 (N.D. Ill. Mar. 27, 2019).

The same holds true here because *Heck* barred Plaintiff from asserting a *Manuel* claim until either the criminal case was dismissed at the conclusion of a third trial in October 2020 or the appellate court affirmed the vacation of his conviction in December 2019. Either way, Plaintiff's *Manuel* claim is timely. *Manuel II*, 903 F.3d at 670.[5]

## III. DEFENDANT HYMAN'S ATTACK ON THE LEGITIMACY OF THE ILLINOIS TORTURE INQUIRY AND RELIEF COMMISSION ACT LACKS MERIT

Defendant Hyman argues that the Illinois Torture Inquiry and Relief Commission Act ("TIRC Act") is unconstitutional. Dckt. 72 at 3. According to Hyman, the TIRC Act is unconstitutional "since it could only be enforced against one person within the State of Illinois,

---

[5] Defendants' misconduct also resulted in a continuing violation of Plaintiff's constitutional rights, which began when Plaintiff was first deprived of his liberty and ended only when his third trial ended in a dismissal with prejudice. When a plaintiff suffers a continuing violation of his constitutional rights, the statute of limitations does not begin to run until the wrong has ended, which occurred at the earliest in December 2019. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380-81 (1982); *Manuel II*, 903 F.3d at 670.

Jon Burge, now deceased, a former police Lieutenant," and is an "Executive infringement on final judicial judgments by political bureaucrats . . . ." Dckt. 72 at 3.

Defendant Hyman provides no authority supporting his position, no explanation or analysis explaining why he believes the TIRC Act is unconstitutional or why even if it was that would bar Plaintiff's lawsuit, and no legal basis for his standing to challenge the Act. The Court need not consider arguments that "are underdeveloped, conclusory, or unsupported by law." *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012). The Court should therefore not consider Hyman's conclusory assertion about the TIRC Act.

In any event, Hyman's assertion that the TIRC Act is unconstitutional lacks merit. The Illinois Court of Appeals has helpfully explained the application of the TIRC Act in the context of Plaintiff's criminal case. The TIRC Act "establishes an extraordinary procedure to investigate and determine factual claims of torture related to allegations of torture . . . ." *People v. Wilson*, 158 N.E.3d 1067, 1076 (Ill. App. Ct. 2019). If a required number of members of the TIRC Commission conclude by a preponderance of the evidence that sufficient evidence of torture exists to merit judicial review, then the Commission refers the case to the Chief Judge of the Cook County Circuit Court. *Id.* "To be clear, the Commission's disposition of a torture claim is not a final determination that the claimant proved he was tortured; rather, it is merely a finding that there is sufficient evidence to proceed to the circuit court." *Id.* "When a case is referred, '[t]he court may receive proof by affidavits, depositions, oral testimony, or other evidence.'" *Id.* at 1076-77 (quoting 775 ILCS 40/50(a) (West 2010)). If the court finds in favor of the petitioner, it "has a variety of remedies at its disposal," including ordering a new trial or suppressing a confession. *Id.* at 1077. In Plaintiff's case, the Appellate Court affirmed the trial court's finding that Plaintiff demonstrated by a preponderance of the evidence that his confession resulted from

coercion "in all respects," and remanded the case for a new trial. *Id.* at 1078 (¶ 55) and 1085 (¶ 83).

Although Defendant Hyman appears to disapprove of the TIRC Act, his (or his counsel's) self-serving opinion about it does not render the law unconstitutional. Moreover, the constitutionality of the TIRC Act is irrelevant to Plaintiff's claims, and the request for dismissal on this ground is frivolous.

## IV. CONTRARY TO ARGUMENTS BY DEFENDANTS TRUTENKO AND KUNKLE, PLAINTIFF'S 67-PAGE COMPLAINT MORE THAN SATISFIES FED. R. CIV. P. 8(a)(2) PLEADING STANDARDS

Defendants Trutenko and Kunkle argue that they are unable to discern the conduct they are alleged to have committed or the date the conduct occurred. Dckt. No. 47 at 14-15 (Trutenko MTD); Dckt. No. 76 at 7-9 (Kunkle MTD). Defendants argue that Counts I, III, and IV should be dismissed because they are insufficiently pleaded. Dckt. No. 47 at 17 (Trutenko MTD); Dckt. No. 76 at 9 (Kunkle MTD).

Contrary to these assertions, Plaintiff's Complaint enumerates his claims and provides detailed allegations supporting those claims. "A plaintiff's complaint need only provide a 'short and plain statement of the claim showing that the pleader is entitled to relief,' sufficient to provide the defendant with 'fair notice' of the claim and its basis." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)(citations omitted). Dismissal is warranted only when the complaint is unintelligible. *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 946 (7th Cir. 2013); *see also United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003) ("Instead of insisting that the parties perfect their pleadings, a judge should bypass the dross and get on with the case.").

28

Plaintiff's Complaint contains a coherent narrative, providing notice to each and every Defendant, of his claims and allegations. The Complaint alleges, inter alia, that: (1) Defendant Kunkle participated in the coercion of a false witness statement from DeWayne Hardin, Comp. ¶¶ 176-181; (2) Defendants Trutenko and jailhouse informant William Coleman manufactured a fabricated story implicating Plaintiff before the 1989 retrial, (*Id.* ¶¶ 21, 187-196); and (3) that in exchange, Trutenko provided Coleman with undisclosed assistance with other pending federal and international charges and financial compensation. (*Id.* ¶¶191-96).

The Complaint further alleges that after Plaintiff's second wrongful conviction in 1989: (1) Defendants Trutenko and Kunkle continued having "communications with Defendant Coleman, during which Coleman 'extorted' money from them" and sought "hush money" to prevent him from revealing that his testimony in Plaintiff's and his brother's cases was false and manufactured." (Comp. ¶¶ 202-03)); (2) Defendants Trutenko and Kunkle hid the fact that Coleman's story was false and that Trutenko and Coleman continued maintaining a personal relationship, (*Id.* ¶ 24). Finally, Plaintiff's Complaint specifically alleges that before and during Plaintiff's third trial in 2020, Defendants Trutenko and Kunkle continued withholding "critical and material exculpatory evidence that would have unraveled Trutenko's continuing illicit relationship with jailhouse informant Coleman." (*Id.* ¶¶ 28, 214-215). These allegations provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

Defendant Kunkle asserts that Plaintiff's Complaint fails to satisfy Fed. R. Civ. P. 9(f) because it lacks specific time references. Dckt. 76 at 7-9 (Kunkle MTD). Rule 9(f) provides, "[f]or purposes of testing the sufficiency of a pleading, averments of time and place are material and shall be considered like all other averments of material matter." Fed. R. Civ. P. 9(f). "An

analysis of the plain language of the rule discloses that, on its face, [Rule 9(f)] does not require a plaintiff to plead the time and place of the alleged conduct giving rise to a claim for relief. It only states that when time and place are pleaded, they are material." *Storey v. Illinois State Police*, No. 05-CV-4011-JPG, 2006 WL 278168, at \*2 (S.D. Ill. Feb. 2, 2006); *see also McNamee v. MinXray, Inc.*, No. 17 C 02057, 2017 WL 6039960, at \*4 (N.D. Ill. Dec. 6, 2017) ("First, the word 'material as used in Rule 9(f) means important, rather than an absolute requirement in all cases. Sometimes a complaint, because of the nature of the case or because of the context provided by other allegations, need not recite precise time or place."). Specific allegations of time and place are not required in § 1983 actions. *Id.*

The Complaint cogently sets forth Plaintiff's claims and factual allegations against Defendants Kunkle and Trutenko. It is Defendants' doing—not Plaintiff's—that this case spans more than 38 years and involves numerous defendants. Moreover, Plaintiff does provide Kunkle with time frames during which his unconstitutional, conspiratorial conduct took place (*see, e.g.*, the paragraphs of the Complaint cited above.) Thus, Plaintiff's claims are properly pleaded. *See Hoskins v. Poelstra*, 320 F.3d 761, 764-65 (7th Cir. 2003) (reversing district court's decision dismissing complaint because complaint adequately pleaded "fundamental allegations" relying on established § 1983 theories that sufficiently notified defendant "of the principal events").

## V.  DEFENDANTS HYMAN, DALEY, KUNKLE, AND TRUTENKO DO NOT ENJOY ABSOLUTE PROSECUTORIAL IMMUNITY

During Plaintiff's decades of wrongful incarceration, various Assistant Cook County State's Attorneys (hereinafter referred to as "CCASA's") conspired with one another – and others – to frame Plaintiff for a crime he did not commit. As alleged in Plaintiff's Complaint, these CCASAs: (1) actively participated in the interrogation of Plaintiff that resulted in a tortured and false confession (Defendant Hyman), Comp. ¶¶ 18, 141-152, 159, 168-172, 241-242, 315-

30

317, 324-343; (2) assisted in fabricating a statement for DeWayne Hardin prior to Plaintiff's first trial (Kunkle), *Id*. ¶ 174-183; (3) fabricated a statement for jailhouse informant Defendant Coleman, in addition to withholding exculpatory evidence prior to Plaintiff's second trial (Trutenko), *Id*. ¶ 185-195; and (4) conspired with Defendant Coleman to withhold exculpatory evidence after Plaintiff's 1989 retrial (Trutenko and Kunkle), *Id*. ¶¶ 196-208, 213-226. Ignoring the above, Defendants claim that they are absolutely immune because of their function at all relevant times as sworn CCASAs. However, this argument is unfounded and fails to properly characterize Plaintiff's allegations.

"[P]rosecutors are absolutely immune from liability under § 1983 for their conduct in 'initiating a prosecution and in presenting the State's case,' insofar as that conduct is 'intimately associated with the judicial phase of the criminal process.'" *Burns v. Reed*, 500 U.S. 478, 486 (1991). On the other hand, a prosecutor acting in an investigative capacity is not entitled to absolute immunity. *Lewis v. Mills*, 677 F.3d 324, 331 (7th Cir. 2012) ("a showing that a prosecutor investigated and fabricated evidence against a target would automatically defeat absolute prosecutorial immunity, even if that target was later brought to trial") (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 276 (1993)); *Whitlock v. Brueggemann*, 682 F.3d 567, 579-80 (7th Cir. 2012). Furthermore, "the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns*, 500 U.S. at 486–87; *see also Buckley*, 509 U.S. at 269 ("Absolute immunity is exceptional and is to be applied sparingly, and Defendant bears the burden of establishing that it is justified."); *Forrester v. White*, 484 U.S. 538, 542 (1988); *Malley v. Briggs*, 475 U.S. 335, 340 (1986); *Harlow v. Fitzgerald*, 457 U.S. 800, 812 (1982). Because immunities almost always turn on the facts presented, "Rule 12(b)(6)

is a mismatch for immunity and almost always a bad ground of dismissal." *Jacobs v. City of Chicago*, 215 F.3d 758, 775 (7th Cir. 2000).

### A. Defendant Hyman, a Former Cook County Assistant State's Attorney, is Not Absolutely Immune when Acting in an Investigatory Capacity

The Supreme Court teaches that when "determining whether particular actions of government officials fit within a common-law tradition of absolute immunity, or only the more general standard of qualified immunity, [courts] have applied a 'functional approach,' "looking to "the nature of the function performed, not the identity of the actor who performed it." *Smith v. Burge*, 222 F.Supp.3d 669, 694 (N.D. Ill. 2016) (citing *Buckley*, 509 U.S. at 269); *see also Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009) ("immunity may not apply when a prosecutor is not acting as an officer of the court, but is instead engaged in other tasks, say, investigative or administrative tasks."). When considering a prosecutor's function, a significant factor is whether probable cause to arrest plaintiff existed. "A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Buckley*, 509 U.S. at 274; *see also Whitlock,* 682 F.3d at 578; *Hill v. Coppelson*, 627 F.3d 601, 605 (7th Cir. 2010) (denying summary judgment to prosecutor who allegedly fabricated plaintiff's false confession). For the reasons discussed below, Defendant Hyman's absolute immunity assertions fail.

### 1. Given His Investigative Capacity, Absolute Prosecutorial Immunity Does Not Protect Defendant Hyman From Participating in Plaintiff's Tortured Interrogation Session and Fabricating Evidence Prior to Probable Cause

To avoid the import of his investigative conduct, Defendant Hyman attempts to cast his actions as benign prosecutorial steps. Dckt. No. 72 at 7-10. Specifically, he claims that he simply met with Plaintiff "after his arrest and questioning by police, that occurred after plaintiff agreed to make a court reported statement" arguing that his actions "relate" directly to the initiation of the prosecution, entitling him to absolute immunity." *Id.* at 8. In doing so, Hyman attempts to

recraft the factual allegations in Plaintiff's Complaint to manufacture absolute immunity,

claiming: "Plaintiff's allegations do not allege that Mr. Hyman was present for, and took part in,

any alleged abuse nor are there allegations that Mr. Hyman engaged in conduct unrelated to the

initiation of judicial proceedings. In fact, Plaintiff mistakenly seeks to hold Mr. Hyman *liable for*

*his decision to indict* Plaintiff for which Mr. Hyman is entitled to absolute immunity." *Id*. at 9

(emphasis added). This assertion completely ignores the factual allegations in Plaintiff's

Complaint, each of which demonstrate that Defendant Hyman's involvement was not

prosecutorial in nature and occurred prior to the formation of probable cause:

- "Plaintiff's torture occurred with the knowledge and participation of former Cook County Assistant State's Attorney, Lawrence Hyman, and Cook County Court Reporter, Michael Hartnett." Comp. ¶ 11

- "Andrew Wilson's torture occurred with the knowledge and participation of former Cook County Assistant State's Attorney, Lawrence Hyman, and Cook County Court Reporter, Michael Hartnett." *Id*. ¶ 18

- Hyman obtained a tortured and involuntary statement from Derrick Martin, to whom he complained that "Andrew won't talk" before accurately boasting that "[w]hen we get through with him, he going to tell on his momma," *Id*. ¶ 159;

- "At some point later that morning, Defendant O'Hara took Andrew to meet with Defendant Lawrence Hyman who had been at Area 2 during the period of time that Andrew was being tortured. After Hyman entered the room, Andrew told him: "You want me to make a statement after they have been in there torturing me like that?" Hyman responded by saying "[g]et the jagoff out of here." Immediately after, O'Hara took Andrew back to the interrogation room. Defendant Burge eventually came back in the room with a brown paper bag and announced that it was "fun time." Shortly thereafter, Burge took out the black box and sat in a chair before proceeding to electroshock Andrew again. Andrew's "teeth [were] grinding, flickering in [his] head, pain and all that stuff." Defendant Burge "just kept on doing it over and over and over." *Id*. ¶¶ 100-101.

- As Plaintiff was hit, suffocated, electroshocked, Defendant Hyman, "who was on the second floor of Area 2 during the torturous interrogations of Plaintiff and his brother that were being conducted in close proximity, came into the room and said that he heard Plaintiff 'was gonna make a statement.' Plaintiff then told Hyman that he wanted to see his lawyer and gave him a business card for his attorney, Frederick Solomon. Hyman then left and Defendants McKenna and O'Hara returned. Plaintiff

was again beaten by O'Hara and McKenna as they told him that he didn't "need no fucking lawyer," and that if he requested one again, he would be tortured once again. Plaintiff believed that the only way he would leave Area 2 alive was if he gave a statement." *Id.* ¶¶ 142-144.

- "Defendants Hartnett and Hyman were present at Area 2 as Defendants tortured Plaintiff, Andrew Wilson, and others. After Plaintiff's torture session ended, Defendants Hyman and Hartnett were called in to obtain a statement. Defendants Hyman and Hartnett, knowing that Plaintiff and his brother were tortured by Defendants Burge, McKenna, O'Hara and Yucaitis, then took Plaintiff's statement in the presence of Detective McKenna." *Id.* ¶¶ 145-149.

- "Knowing that Plaintiff and his brother were tortured and coerced into giving their statements, Defendant Hyman, deviating from the policy and practice of the Cook County State's Attorneys' Office at that time, did not ask either of them if they had been physically abused or otherwise mistreated." *Id.* ¶¶ 150-151

- "Defendants Burge, McKenna, O'Hara, Hyman, and Yucaitis, not only knew that Plaintiff's confession was physically coerced by torture, but also, because of, inter alia, the witness statement of Tyrone Sims, that it falsely implicated Plaintiff in the murders." *Id.* ¶ 152.

- Throughout the day of February 14, as the Wilsons were tortured (frequently screaming in the course of the abuse), several high-ranking Assistant State's Attorneys were present at Area 2. An Assistant State's Attorney assigned as a supervisor to the Felony Review Unit, Defendant Larry Hyman, participated directly in the interrogation of the Wilsons, which occurred between sessions of torture at the hands of Defendants Burge, Yucaitis, O'Hara and McKenna, and was specifically aware of the torture. *Id.* ¶ 241-242.

- Hyman conspired with the Area 2 police Defendants to frame Plaintiff for a crime he did not commit, *Id.* ¶ 18, 141-152, 159, 168-172, 241-242, 315-317, 324-343.

- Defendant Hyman's participation in obtaining coerced and fabricated statements as part of a conspiracy with other Defendants all occurred prior to the formation of probable cause. *Id.* ¶¶ 331-332, 354.

- Defendant Hyman has asserted the Fifth Amendment when asked about his role in the interrogation and torture of Plaintiff, his brother Andrew, and Derrick Martin, the fabrication of Plaintiff's statement. *People v. Wilson*, 2019 IL App (1st) 181486, ¶ 34, 158 N.E.3d 1067, 1074, 1076.

34

As these detailed allegations clearly establish, Plaintiff sufficiently alleges that Hyman was present when Plaintiff was interrogated and tortured into giving a false confession, participated in that interrogation, and actively and knowingly covered up its physically coercive nature, all as part of a coordinated, conspiratorial interrogation of Plaintiff, his brother, and Derrick Martin, that was designed to, and in fact did violate Plaintiff's constitutional rights. Moreover, at the time Defendants coerced Plaintiff to falsely implicate himself there was no probable cause to believe Plaintiff had committed a crime. Comp. ¶¶ 330-332. Thus, Defendant Hyman was intimately involved in both the torturous interrogation of Plaintiff, and in the fabrication of Plaintiff's statement (in addition to the fabricated statements of Andrew Wilson and Derrick Martin), all in the absence of any probable cause.

At the motion to dismiss stage and against Plaintiff's well pleaded factual allegations, Defendant Hyman simply cannot avail himself of absolute prosecutorial immunity. *Jacobs*, 215 F.3d at 775. Courts in this District and the Seventh Circuit have repeatedly confirmed that felony review prosecutors working with detectives to obtain tortured statements and to fabricate evidence are not protected by prosecutorial immunity. *Orange v. Burge,* No. 04 C 0168, 2008 WL 4443280, at *10 (N.D.Ill. Sept. 29, 2008)(Judge Holderman found absolute immunity unavailable where felony review prosecutor acted more as an investigator than prosecutor as he was "personally involved" in the interrogation by Burge and other Area 2 detectives and "coached Orange regarding the false confession Orange was to deliver in exchange for cessation of the alleged torture sessions."); *Smith v. Burge* 222 F Supp. 669 (N.D. Ill. 2016) (Judge St. Eve held that felony review ASA alleged to be part of the Area 2 "investigative team" that used torture, with his knowledge, to obtain a false confession could not invoke prosecutorial immunity); *Hill v. City of Chicago,* No. 06 C 6772, 2009 WL 174994 (N.D.Ill. Jan. 26,

2009)(Judge St. Eve found that "a prosecutor involved in a conspiracy to target a criminal suspect is not protected by absolute immunity…nor is a prosecutor who fabricates evidence."); *Tillman v. Burge*, 813 F. Supp. 2d 946, 966–67 (N.D. Ill. 2011)(Judge Pallmeyer found that plaintiff's allegations that a felony review prosecutor who, together with Area 2 detectives, "personally participated in his interrogation…and then suppressed the truth concerning those events" placed the prosecutor's "conduct outside the scope of a prosecutorial function, and is therefore enough to survive an absolute immunity challenge."); *Serrano v. Guevara*, 315 F. Supp. 3d 1026, 1035 (N.D. Ill. 2018)(Judge Shah found that plaintiff sufficiently "alleged that the prosecutors were in the latter role" of acting in an investigatory capacity, and thus "are not entitled to absolute immunity on the fabrication claim."); *Patterson v. Burge*, 328 F. Supp. 2d 878, 891-893 (N. D. Ill. 2004) (Judge Gottschall found that felony review prosecutors who either participated with Area 2 detectives in Plaintiff's torture and/or covered it up were not entitled to prosecutorial immunity); *Kitchen v. Burge*, 2012 U.S. Dist. LEXIS 12059 at *4-9 (N.D. Ill) (Judge Bucklo held, on reconsideration, that felony a review prosecutor who participated in the plaintiff's interrogation and knew that plaintiff was being tortured was not entitled to prosecutorial immunity); *Fields v. Wharrie*, 740 F.3d 1107, 1114 (7th Cir. 2014) ("A prosecutor cannot retroactively immunize himself from conduct by perfecting his wrong-doing through introducing the fabricated evidence at trial and arguing that the tort was not completed until a time at which he had acquired absolute immunity. That would create a "license to lawless conduct," which the Supreme Court has said that qualified immunity is not to do."; *see also Williams v. Valtierra,* No. 00 C 5734, 2001 WL 686782, at *2 (N.D.Ill. June 18, 2001)(Judge Kennelly denied prosecutors' motion to dismiss where the plaintiff alleged that

"when the prosecutors arrived, they did not evaluate information but rather forced Williams to produce inculpatory information by denying her medical care.").

Ignoring these cases, Defendant Hyman argues that Plaintiff's allegations are akin to those in *Hunt v. Jaglowski*, a case where the Seventh Circuit found a prosecutor was entitled to absolute immunity. Dckt. No. 72 at 9; *Hunt v. Jaglowski*, 926 F.2d 689, 693 (7th Cir. 1991). *Hunt,* decided well before the important role that felony review prosecutors had played in obtaining tortured confessions at Area 2 had come to light, is clearly inapplicable because the prosecutor was not present at the police department *during* the time when the constitutional violations took place and arrived later simply to review and approve the charges proffered by the detectives. As recounted by the Seventh Circuit:

> Since the State's Attorney's Office is the agency that actually charges, [ASA] Petrocelli's function in being present was merely to review, approve or disapprove, and issue the charges the police were seeking. The police had conducted the investigation of this case, as was their function, before Petrocelli was called. Petrocelli was not present at the time Hunt was arrested and taken to Area 5; Petrocelli was not present during the polygraph test nor the lineup; Petrocelli was not present when Hunt claims he was beaten; and Petrocelli was not present at the particular time Hunt alleges he gave his coerced confession. . . ., Hunt's initial contact with Petrocelli came when Petrocelli was called after Hunt had confessed and the police were seeking review of and approval or disapproval of the charges they were detaining him on. Because this is an act toward "initiating a prosecution and in presenting the State's case," Petrocelli enjoyed absolute immunity.

*Hunt v. Jaglowski*, 926 F.2d 689, 693 (7th Cir. 1991).

Unlike *Hunt*, Plaintiff's Complaint alleges that Defendant Hyman was present when Plaintiff was tortured into a false confession and conspired with Defendants to violate Plaintiff's constitutional rights until an involuntary (and false) statement was obtained. *See* Dckt. No. 1 at ¶ 11, 100-101, 142-152, 159, 241-242. Plaintiff also maintains that there was no probable cause to believe Plaintiff had committed a crime at the time of the misconduct described above. *See* Dckt. No. 1 at ¶ 330-332. It is therefore clear that Defendant Hyman was acting as an investigator,

rather than as a prosecutor, during the coercive interrogation of the Plaintiff and the fabrication of his false statement, and therefore he cannot afford himself of prosecutorial immunity for those actions.[6]

### 2. Defendant Hyman Does Not Enjoy Absolute Prosecutorial Immunity Because False Testimony and Fabricated Evidence was Presented at Trial

Defendant Hyman next asserts that absolute prosecutorial immunity protects him from "knowingly present[ing] false testimony at plaintiff's criminal trial or suppression hearings." Dckt. No. 72 at 12-13. However, Plaintiff has not sued Hyman for his testimony, but rather, for the misconduct that occurred on February 14, 1982 when Hyman was present as Plaintiff was tortured into giving a false confession and conspired with the police Defendants to violate Plaintiff's constitutional rights by obtaining an involuntary (and false) statement. *See* Comp. ¶¶11, 100-101, 142-152, 159, 241-242. As the Seventh Circuit held in *Fields v. Wharrie*, "a prosecutor cannot retroactively immunize himself from conduct by perfecting his wrong-doing through introducing the fabricated evidence at trial and arguing that the tort was not completed until a time at which he had acquired absolute immunity. That would create a 'license to lawless conduct' which the Supreme Court has said that qualified immunity is not to do.'" *Fields v. Wharrie*, 740 F.3d 1107, 1114 (7th Cir. 2014). *See also, Patterson*, 328 F. Supp. at 893, quoting *Houston v. Partee*, 978 F.2d 362, 366 (7th Cir. 1992) for the proposition that since the ASAs "were not acting as advocates for the state when they participated in Patterson's abusive interrogation and did not personally prosecute Patterson, they cannot claim immunity from their later *Brady* violations simply because of their status as state's attorneys.") As a result, Defendant

---

[6] While Defendant Hyman argues that "Plaintiff mistakenly seeks to hold Mr. Hyman liable for his decision to indict Plaintiff for which Mr. Hyman is entitled to absolute immunity," that is simply not the case. Dckt. No. 72 at 9. As discussed *supra*, Plaintiff seeks to hold Defendant Hyman accountable for his egregious misconduct in obtaining a tortured false confession from Plaintiff and fabricating evidence prior to the formation of probable cause. Dckt. No. 1.

Hyman's testimony does not retroactively cloak him with absolute immunity for his previous misconduct outside the courtroom.

### 3. State Law Immunity Does Not Apply

As he must, Defendant Hyman concedes that Plaintiff's state law claims are predicated upon the same factual allegations as his federal claims. Dckt. No. 72 at 16. Given that absolute prosecutorial immunity does not apply to Plaintiff's federal claims against Hyman, it follows that it is also inapplicable to Plaintiff's state-law claims for Intentional Infliction of Emotional Distress, Malicious Prosecution, and Conspiracy. As explained by Judge Pallmeyer in *Tillman*:

> The intentional infliction of emotional distress claim might fairly be construed as brought against Frenzer acting not in the scope of his duties as a prosecutor, but rather as an investigator based on his participation in Plaintiff's torture. As explained *infra* Section I.C., the absolute immunity inquiry is a functional one, and where a prosecutor acts as an investigator, he loses absolute immunity. In *Orange,* for example, where the prosecutor "coached Orange regarding the false confession Orange was to deliver in exchange for the cessation of the alleged torture sessions" and "actively assisted in gathering the evidence that would later form the basis of the charges against Orange," he relinquished absolute immunity in the *Buckley* analysis. *Orange,* 2008 WL 4443280, at *10. As discussed previously at some length, the allegations against Frenzer—though not nearly as developed at the motion to dismiss stage as were the allegations in *Orange* at the summary judgment stage-are that he personally participated in the torture and that his role in doing so more closely resembled that of an investigator than a prosecutor. The court denies Frenzer's motion to dismiss the IIED claim without prejudice to renewal of his immunity argument at a later stage.

*Tillman v. Burge*, 813 F. Supp. 2d 946, 980 (N.D. Ill. 2011)

### B. Defendants Kunkle and Trutenko Are Not Entitled to Absolute Prosecutorial Immunity for Fabricating Evidence

Like Hyman, Defendants Kunkle and Trutenko also assert absolute prosecutorial immunity. Dckt. No. 76 at 3-6 (Kunkle); Dckt. No. 47 at 7-12. Kunkle argues that his actions consist "solely as an advocate for the State in plaintiff's prosecution" since: (1) "plaintiff had confessed to the crimes he was charged with and, (2) there was indisputably a judicial finding of probable cause to detain plaintiff, since he was held in custody prior to his trial." Dckt. No. 76 at

5. Defendant Trutenko makes an identical argument. Dckt. No. 47 at 9-10. But as discussed *supra*, a prosecutor acting in an investigative capacity is not entitled to absolute immunity. *Lewis v. Mills*, 677 F.3d 324, 331 (7th Cir. 2012) ("a showing that a prosecutor investigated and fabricated evidence against a target would automatically defeat absolute prosecutorial immunity, even if that target was later brought to trial") (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 276 (1993)); *Whitlock v. Brueggemann*, 682 F.3d 567, 579-80 (7th Cir. 2012). Here, Plaintiff's claims against Defendants Kunkle and Trutenko are clearly relating to their investigative capacities: (1) Kunkle's involvement in fabricating DeWayne Hardin's statement prior to Plaintiff's first trial; (2) Trutenko's involvement in fabricating Defendant Coleman's statement prior to Plaintiff's second trial; (3) Trutenko and Kunkle's engagement in a conspiracy with Defendant Coleman to fabricate false evidence and withhold exculpatory evidence after leaving the Cook County State's Attorney's Office. As shown below, none of Plaintiff's allegations against Defendants Kunkle and Trutenko warrant absolute immunity.

### 1. Absolute Immunity Does Not Apply to Defendant Kunkle's Fabrication of DeWayne Hardin's Statement

Plaintiff alleges that in February 1982, Defendant Kunkle, as an Assistant Cook County State's Attorney, was specifically informed that "Burge and his men had tortured" Plaintiff and his brother, Andrew Wilson, into obtaining statements. Comp. ¶¶ 169-171. Knowing this, Kunkle set about to coach Burge, McKenna, O'Hara, Yucaitis, Hartnett, and Hyman to present at the motion to suppress hearing false denials concerning the torture of Plaintiff and his brother. *Id*. at ¶¶ 169-171, 248, 250. Given that Kunkle was on notice that the statement obtained from Plaintiff was "false, fabricated, and manufactured," he knew "the State did not have probable cause to continue the initiation of charges against Plaintiff." *Id*. ¶ 187. Not a shred of legitimate evidence formed probable cause to initiate charges against Plaintiff. *Id*. ¶¶ 187, 331, 354.

40

Knowing that probable cause did not exist against Plaintiff, Kunkle joined the police investigation. As Plaintiff's Complaint sets forth, "during the pretrial investigation, Defendant O'Hara and Detective Hill told eyewitness DeWayne Hardin that he qualified for the reward money before putting pressure on [him]…to come back" from Texas to testify." Comp. ¶174. After arriving back in Chicago, Hardin met with Kunkle and fellow ASA Mike Angarola. *Id*. ¶ 175. At this meeting, Hardin informed the prosecutors that Plaintiff was not involved in the robbery and murder of the two police officers, and that he stood by the door of the car the entire time." *Id*. ¶ 176. In response, and in Kunkle's presence, Angarola repeatedly threatened Hardin in order to force him to falsely implicate Plaintiff in the crimes. *Id*. ¶ 177. Kunkle did not intervene to stop the misconduct, but rather encouraged Angarola. *Id*. ¶ 177. This misconduct was committed as part of the conspiracy that began before the initiation of charges to frame Plaintiff for crimes he did not commit. *Id*. ¶ 178.

Two days later, Area 2 detectives came to Hardin's house, told him that he "better do what the State's Attorney" wanted him to do as they put a plastic bag over his face. Comp. ¶ 179. Hardin subsequently falsely testified at Plaintiff's 1983 trial consistent with what Kunkle, Angarola and the Area 2 detectives coerced him to say. *Id*. ¶¶ 180-181. Plaintiff's 1983 conviction was based in part on Hardin's false, manufactured, and coerced testimony. *Id*. ¶ 183.

A growing body of law from the Seventh Circuit demonstrates that Kunkle's conduct alleged in this case is *not* protected by prosecutorial immunity since it occurred prior to any probable cause existing to believe that Plaintiff was involved in the crime. *See, e.g., Hill v. Coppleson*, 627 F.3d 601, 605 (7th Cir. 2010), *Lewis*, 677 F.3d at 331, *Whitlock v. Brueggemann*, 682 F.3d 567, 579-580 (7th Cir. 2012), *Fields,* 740 F.3d at 1114. As in this case, the plaintiff in *Fields* alleged that his due process guarantees were violated because the

41

prosecutor procured false statements from a prospective witness. *Id*. at 1111. The Seventh Circuit rejected the prosecutor's attempt to retroactively insulate his conduct by claiming it was "preparation" for a possible trial. *Id*. at 1114. Relying on the United States Supreme Court's decision in *Buckley*, the Seventh Circuit held:

> the [fact that] prosecutors later called a grand jury to consider the evidence this work produced does not retroactively transform that work from the administrative into the prosecutorial. A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial; *every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial."* *Buckley v. Fitzsimmons,* 509 U.S. at 275-76. A prosecutor cannot retroactively immunize himself from conduct by perfecting his wrongdoing through introducing the fabricated evidence at trial and arguing that the tort was completed until a time at which he had acquired absolute immunity.

*Fields* at 1114. (emphasis in *Fields*, citations omitted).

Similarly, in *Whitlock*, the plaintiff alleged that his due process rights were violated when the prosecutor manufactured false evidence prior to the prosecutor submitting arrest warrants for the criminal defendants. The Seventh Circuit, in rejecting the defendant prosecutor's assertion of prosecutorial immunity, observed that the point at which probable cause existed was a hotly debated issue and that if the plaintiffs "can prove that he [the prosecutor] fabricated evidence before probable cause arose, then absolute immunity is off the table." *Whitlock*, 682 F.3d at 579.

Contrary to Defendant Kunkle's motion to dismiss, all of the acts pertaining to Hardin described in Plaintiff's complaint occurred before any legitimate evidence was developed to suggest that Plaintiff was involved in the crimes. Kunkle declines to address the Hardin allegations at all, but instead argues that he is entitled to absolute immunity because "Plaintiff had confessed to the crimes he was charged with… and because there had been a judicial finding of probable cause." Dckt. No. 76 at 5. But Kunkle's reliance on Plaintiff's tortured false

confession is misplaced given that he knew the statement was false and manufactured. Comp. ¶¶ 169-171, 248, 250; *Hobbs v. Cappelluti*, 899 F. Supp. 2d 738, 769 (N.D. Ill. 2012) (holding that because plaintiff alleged that prosecutors "knew that his first confession was false and there was no other evidence that would have given defendants probable cause to arrest him" absolute immunity did not apply; *see also Buckley III,* 509 U.S. at 274, 113 S.Ct. 2606 ("A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested."). It is well settled that a manufactured, coerced, and false confession cannot form the basis of probable cause. *Tillman v. Burge*, 813 F. Supp. 2d 946, 980–81 (N.D. Ill. 2011); *Smith v. Burge*, 222 F. Supp. 3d 669, 691 (N.D. Ill. 2016)(finding that plaintiff "sufficiently alleged lack of probable cause" in reference to coerced false confession).[7]

Thus, while Kunkle seeks to position his actions as "acting solely as an advocate for the State," because it occurred after Plaintiff's coerced false confession, Plaintiff's Complaint cannot be read to suggest that Kunkle's investigative conduct, performed together with Area 2 detectives who assured that Hardin complied by torturing him with a plastic bag, took place in the context of preparing the case for trial or even for presentation before a grand jury. Kunkle and Angarola were not evaluating evidence that was assembled by the detectives, but rather, as pled, they were directly involved as investigators in procuring false evidence from Hardin before probable cause existed. In other words, Defendant Kunkle unquestionably acted in an investigatory capacity when he and Angarola, together with Area 2 detectives, coerced Hardin to provide a false statement implicating Plaintiff in the murders in the absence of any legitimate evidence to establish probable cause. Because Defendant Kunkle engaged in non-prosecutorial

---

[7] Similarly, Kunkle's reliance on a "judicial finding of probable cause to detain plaintiff" is not alleged in Plaintiff's Complaint and, more importantly, a defendant who participates in obtaining a fraudulent judicial finding of probable cause cannot use it as an immunity shield. See, *Malley v. Briggs*, 475 US 335 (1986)

work that was ultimately used to wrongfully convict Plaintiff, he is not entitled to absolute

immunity. *Lewis v. Mills*, 677 F.3d 324, 331 (7th Cir. 2012) ("a showing that a prosecutor

investigated and fabricated evidence against a target would automatically defeat absolute

prosecutorial immunity, even if that target was later brought to trial"); *see also Van de Kamp v.

Goldstein*, 555 U.S. 335, 342 (2009) ("immunity may not apply when a prosecutor is not acting

as an officer of the court, but is instead engaged in other tasks, say, investigative or

administrative tasks.").

Consistent with the Courts' holdings in *Whitlock, Fields* and *Buckley*, Defendant Kunkle

engaged in non-prosecutorial work when he and Angarola, with the assistance of Area 2

detectives, procured false evidence from Hardin that was later used to convict Plaintiff.

Accordingly, Defendant Kunkle is not entitled to absolute prosecutorial immunity for this

investigative work.

## 2. Absolute Prosecutorial Immunity is Unavailable for Defendant Trutenko's Fabrication of Evidence as a Cook County State's Attorney

Absolute immunity is likewise unavailable to Defendant Trutenko for the fabrication of

Coleman's statement. Plaintiff's Complaint alleges that in furtherance of a conspiracy with

Kunkle, among other Defendants, Trutenko met on several occasions with Defendant William

David Coleman, a jailhouse informant, career criminal, and British national from 1988 to the

present. Comp. ¶¶ 54, 189. At these meetings Coleman and Trutenko fabricated a story, which

Trutenko and his fellow ASAs reduced to an official memorandum, that Plaintiff had admitted his

involvement in the murders as well as that he was a participant in a plan to break out of Cook

County Jail. *Id*. ¶¶ 189-190. In exchange for this manufactured evidence, Trutenko provided

Coleman with a promise that Coleman's drug charge, which carried a 6 to 30 year sentence,

would be dismissed, as well as undisclosed promises of financial rewards, and undisclosed

assistance in obtaining relief from pending federal and international charges. *Id*. ¶ 191. Prior to

and during Plaintiff's April 1989 re-trial, Trutenko and Coleman destroyed and otherwise

suppressed exculpatory and impeaching evidence from the Plaintiff, his lawyer, and the Court.

*Id*. ¶ 192.

At the 1989 retrial, Coleman, coached by Trutenko, testified consistently with the

false and fabricated statement that he and Trutenko had manufactured. *Id*. ¶ 193. Defendant

Trutenko also withheld significant parts of the promises that he had made to convince

Coleman to fabricate and present his false and perjured testimony. *Id*. Additionally, prior to

the retrial, Trutenko met with DeWayne Hardin, and threatened Hardin with perjury if he did

not present false inculpatory testimony against Plaintiff. *Id*. ¶ 194. Plaintiff's false and

tortured confession, together with Coleman and Hardin's false and fabricated testimony,

formed the basis for Plaintiff's wrongful re-conviction for the murder of Officer O'Brien and

the armed robbery of both officers. *Id*. ¶ 195.

Defendant Trutenko is *not* protected by absolute prosecutorial immunity since he

fabricated evidence at a time when the "state did not have probable cause to continue the

initiation of charges against Plaintiff." Comp. ¶ 187; *See, e.g., Hill v. Coppleson*, 627 F.3d 601,

605 (7th Cir. 2010), *Lewis*, 677 F.3d at 331, *Whitlock v. Brueggemann*, 682 F.3d 567, 579-580

(7th Cir. 2012), *Fields,* 740 F.3d at 1114. Defendant Trutenko manufactured this evidence as an

investigator, not a prosecutor, and did so as part of "Defendants' conspiracy, which began in

1982, to frame Plaintiff for crimes he did not commit." Comp. ¶ 21. Because Trutenko engaged

in non-prosecutorial work that was ultimately used to wrongfully convict Plaintiff, he is not

entitled to prosecutorial immunity. *Lewis v. Mills*, 677 F.3d at 331; *see also Van de Kamp v.*

*Goldstein*, 555 U.S. at 342; *Whitlock*, 682 F.3d at 579. Consistent with the Courts' holdings in

*Whitlock, Fields* and *Buckley*, Defendant Trutenko is not entitled to absolute immunity for these acts of fabrication.

### 3. Absolute Prosecutorial Immunity is Unavailable for Defendants Trutenko and Kunkle's Withholding of Exculpatory Evidence Relating to Coleman After Plaintiff's 1989 Criminal Trial

Absolute immunity also does not protect Defendants Trutenko and Kunkle for the withholding of exculpatory evidence after Plaintiff's 1989 conviction. On this point, shortly after Plaintiff's second wrongful conviction, Plaintiff pursued an appeal in the Illinois Appellate Court, with a major point being Coleman's lack of credibility as a witness. Comp.¶ 202. At the same time, Defendants Coleman and Trutenko appeared before a Cook County judge and consummated the deal to which Coleman and Trutenko had agreed. *Id*. ¶ 196. By 1990, both Defendants Trutenko and Kunkle were no longer involved in Plaintiff's criminal case. *Id*. ¶¶ 50, 53. After Coleman returned to England, and while Plaintiff's appeal was pending, Trutenko and Kunkle continued to have communications with Coleman, during which Coleman "extorted" money from them in exchange for him not revealing that his statement (and testimony) in Plaintiff's case was false and manufactured. *Id*. ¶ 203. While Plaintiff's appeal was pending, Trutenko then traveled to England to discuss Coleman's prior statement and testimony. *Id*. ¶ 204. There, Trutenko stood up as a Godfather for one of Defendant Coleman's infant children. *Id*.

During Plaintiff's pending appeal, neither Trutenko nor Kunkle informed Plaintiff, his counsel, or the court, about their continuing illicit relationship with Coleman, his extortion of money to keep quiet, the fact that he had been promised money for his testimony, and that they considered him to be a "con man" whose testimony was not worthy of belief. Comp. ¶ 205. Instead, Trutenko, Kunkle, and Coleman withheld this exculpatory and impeachment evidence as part of the effort to frame Plaintiff for crimes he did not commit. *Id*. ¶ 206. Unaware of this

46

suppressed evidence concerning Coleman, and relying on Plaintiff's tortured confession, the

Illinois Appellate Court affirmed Plaintiff's conviction in 1993. *Id.* ¶¶ 208-211. Plaintiff

remained wrongfully incarcerated for the next 25 years of his life due in significant part to

Kunkle and Trutenko's withholding of exculpatory evidence. *Id.*

During this period of time, Trutenko and Kunkle had an obligation to disclose

exculpatory evidence discovered after trial. *Fields v. Wharrie*, 672 F.3d 505, 516 (7th Cir.

2012)(finding that "Wharrie had a continuing *Brady* obligation to reveal material evidence to the

defense until Fields' conviction became final, as the ongoing judicial process continued to

evolve."). The Seventh Circuit has repeatedly confirmed that prosecutors are not entitled to

absolute immunity when they learned of exculpatory evidence after a conviction but declined to

disclose it. *Id.; Houston v. Partee*, 978 F.2d 362, 368 (7th Cir.1992) (holding prosecutors who

learned exculpatory information while the plaintiff's appeals were pending were not entitled to

absolute immunity from a suit which sought to recover for the prolongation of the plaintiff's

incarceration while the information was being concealed); *Steidl v. Fermon*, 494 F.3d 623, 630

(7th Cir. 2007) ("For evidence known to the state at the time of the trial, the duty to disclose

[exculpatory information] extends throughout the legal proceedings that may affect either guilt or

punishment, including post-conviction proceedings."); *Patterson v. Burge*, 328 F. Supp. 2d 878,

888 (N.D. Ill. 2004) ("[A]ctions by government officials which influence a plaintiff's post-

conviction proceedings are not immune from suit"). As a result, Defendants Trutenko and

Kunkle are not entitled to absolute prosecutorial immunity for their suppression of exculpatory

evidence obtained regarding Coleman after Plaintiff's 1989 conviction.

### 4. Defendant Kunkle Does Not Enjoy Absolute Immunity Due to His Status as an Attorney

Defendant Kunkle also asserts that the allegations regarding his actions during Andrew Wilson's civil trial--i.e., that he conspired with Trutenko to manufacture and present false evidence from Coleman--are "irrelevant to any claim plaintiff makes here" and subject to absolute immunity. (Dckt. 76 at 6-7). First, the relevance of these particular factual allegations is not at issue in a motion to dismiss. The issue, rather, is whether the factual allegations as a whole support a claim upon which relief can be granted, and, as set forth above, they unquestionably do. Second, Kunkle's actions during the Andrew Wilson civil trial are highly relevant to Plaintiff's claims because they constitute overt acts in furtherance of a conspiracy between Kunkle, Trutenko and others, which violated Plaintiff's constitutional rights. Finally, with regard to immunity, Kunkle's reliance on *United States General, Inc. v. Schroeder*, 400 F. Supp. 713 (E.D. Wis. 1975) is badly misplaced. *Schroeder*, which preceded *Buckley* by almost 20 years and therefore does not reflect the current state of the law with regard to absolute immunity, actually supports Plaintiff's claim because in that case the court denied the defendant's motion to dismiss, finding that the private lawyer defendant, who was sued under § 1983, acted under color of law and was not entitled to immunity since the complaint alleged that he acted with malice. *Id*. at 717-18.

### 5. Defendant Trutenko's Color of Law Arguments Are Without Merit and Should be Rejected.

In addition to invoking absolute prosecutorial immunity, Defendant Trutenko likewise argues that his misconduct was not committed under color of law. Such arguments are without merit for the reasons discussed below

First, Trutenko asserts that since he was not employed by the CCSAO between 1991 and 2008, the "Court should strike from consideration any tortious conduct" alleged against him during this time period--i.e., the allegation that he attempted to convince Coleman to testify on behalf of Burge at the 1992 Chicago Police Board hearing--because he was not acting under color of law. Dckt. 47 at 14. This argument fails for multiple reasons. First, it is procedurally improper because Rule 12(f), not Rule 12(b)(6), is the appropriate vehicle for a motion to strike, and Trutenko has failed to set forth the standard for such a motion much less explain how the elements have been met here. Second, it is well established that a private citizen acts under color of law and is liable under § 1983 when he acts in conspiracy with a state actor to deprive the plaintiff of his civil rights, as Trutenko is alleged to have done here. *See Adickes v. Kress*, 398 U.S. 144 (1970). Additionally, Trutenko can be sued as a private citizen co-conspirator under 42 U.S.C. §§ 1985, 1986, as he is in Plaintiff's Complaint. Comp. ¶¶ 338-343. Finally, the issue to be decided in the present motion is not whether a portion of Plaintiff's factual allegations are sufficient to state a claim against Trutenko but whether the factual allegations as a whole are sufficient, and, as set forth above, they certainly are.

## VI.    SOVEREIGN IMMUNITY DOES NOT PROTECT DEFENDANTS KUNKLE AND TRUTENKO FOR THE VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS

Defendants Kunkle and Trutenko also claim that they are immunized by the Eleventh Amendment against Plaintiff's claims against them. They argue that sovereign immunity applies to Plaintiff's state-law claims against them for malicious prosecution, IIED, and conspiracy because "the decision to charge or prosecute a case, as discussed previously, falls clearly (and exclusively) within the duty of the State's Attorney." Dckt. No. 47 at 19-20 (Trutenko); Dckt. No. 76 12- 13 (Kunkle). But Plaintiff does not sue Kunkle or Trutenko for "the decision to

charge or prosecute." Rather, Plaintiff sues Kunkle and Trutenko for fabrication of evidence, suppression of exculpatory evidence, destruction of evidence, and other violations of Plaintiff's constitutional rights. *Cf., e.g., Wilson v. Civil Town of Clayton*, 839 F.2d 375, 383–84 (7th Cir. 1988) (individual capacity liability turns upon a showing of direct responsibility for the constitutional violation). The Eleventh Amendment is no defense to such a claim. *See, e.g., Kroll v. Bd. of Trustees of Univ. of Ill.*, 934 F.2d 904, 907 (7th Cir. 1991).

Absolute sovereign immunity does not apply to Defendants Kunkle and Trutenko's misconduct for a separate reason: their alleged misconduct violated Plaintiff's constitutional rights. As has long been held, "[s]overeign immunity affords no protection, however, when it is alleged that the State's agent acted in violation of statutory or constitutional law or in excess of his authority." *Richman v. Sheahan*, 270 F.3d 430, 441–42 (7th Cir. 2001); *Nichol v. Stass,* 735 N.E.2d 582, 586 (2000); *see also Feldman,* 171 F.3d at 498 ("Illinois follows the federal practice by making an exception for situations in which the public employee did not act within the scope of his employment or violated the Constitution."). For these reasons, sovereign immunity has no impact on Plaintiff's claims against Defendants Kunkle and Trutenko.

**VII.  PLAINTIFF'S COMPLAINT STATES VIABLE CLAIMS AGAINST DALEY, INDIVIDUALLY AND AS A CO-CONSPIRATOR, ARISING FROM HIS ACTIONS AND INACTIONS BOTH AS COOK COUNTY STATE'S ATTORNEY AND AS MAYOR OF THE CITY OF CHICAGO.**

Plaintiff's Complaint states viable claims against Defendant Daley for the time periods when he was State's Attorney and later when he served as Mayor for the City of Chicago. Specifically, Count I of Plaintiff's complaint alleges a claim against Daley and others based upon the established doctrine that the suppression or concealment of exculpatory information can give rise to a due process claim for infringement of a plaintiff's right to a fair trial. *Newsome v. McCabe,* 256 F.3d 747 (7th Cir. 2001).

The duty to disclose exculpatory information—and the potential for § 1983 liability for failure to disclose—does not terminate at conviction. To the contrary, it is firmly established that law enforcement officials may be liable for concealing exculpatory information after the plaintiff's conviction and thereby prolonging the plaintiff's wrongful conviction and incarceration. *See, e.g., Houston v. Partee*, 978 F.2d 362, 368 (7th Cir.1992) (holding prosecutors who learned exculpatory information while the plaintiff's appeals were pending were not entitled to absolute immunity from a suit which sought to recover for the prolongation of the plaintiff's incarceration while the information was being concealed); *Steidl v. Fermon*, 494 F.3d 623, 630 (7th Cir. 2007) ("For evidence known to the state at the time of the trial, the duty to disclose [exculpatory information] extends throughout the legal proceedings that may affect either guilt or punishment, including post-conviction proceedings."); *Patterson v. Burge*, 328 F. Supp. 2d 878, 888 (N.D. Ill. 2004) ("[A]ctions by government officials which influence a plaintiff's post-conviction proceedings are not immune from suit").

In this case, the concealment of exculpatory information from Plaintiff began prior to Plaintiff's conviction. Defendants Burge, McKenna, O'Hara and Yucaitis are all alleged to have concealed from Plaintiff and his criminal defense counsel their involvement in the torture and abuse of numerous other African American suspects (among other things). Comp. ¶¶ 34, 227-267, 317. Plaintiff alleges that this pretrial suppression of evidence caused his wrongful conviction. *Id.* ¶ 317. The cover-up and concealment of the Burge-connected torture continued for decades *following* Plaintiff's wrongful conviction, during the time that Daley first was Cook County State's Attorney, then was Mayor of Chicago. *Id.* ¶¶ 234-267; 277-304. Plaintiff alleges that specific actions (and inactions) by Daley, in each successive role, together with the other Defendants (including Defendants Leroy Martin, Terry Hillard, Thomas Needham and Gayle

51

Shines) to prevent and deflect public scrutiny of the actions of Burge and to deprive Plaintiff of exculpatory information regarding the scope and nature of the Burge pattern and practice of torture prolonged Plaintiff's unjust conviction and incarceration. *Id.*

Plaintiff's complaint also alleges that as Mayor of Chicago, Daley acted in furtherance of a conspiracy, which he had joined in February 1982 as State's Attorney, that had among its purposes the torture of African American suspects to coerce false confessions and thereby obtain wrongful convictions, and, thereafter, the concealment of exculpatory information about the pattern and practice of torture. This conspiracy included among its members Burge himself; the men who tortured Plaintiff and others with Burge's approval or direct involvement; high ranking Police officials including those who are named as defendants in this case (Martin, Hillard, Needham and Shines), and Assistant State's Attorneys under Daley's command, including Defendant Hyman.

With regard to Daley's own unconstitutional actions taken while State's Attorney, as set forth in the Complaint at paragraphs 234 to 267, he should not be afforded absolute prosecutorial immunity, *inter alia*, because he was not acting as a prosecuting attorney in Plaintiff's case and his actions in suppressing exculpatory evidence from Plaintiff and his brother occurred in the absence of probable cause. *See, e.g., Houston v. Partee*, 978 F.2d at 368; *Buckley,* 509 U.S. at 274; *Hill v. Coppleson*, 627 at 605; *Lewis* v. *Mills,* 677 F.3d at 331, *Whitlock v. Brueggemann*, 682 F.3d at 579-580.

As Mayor, the actions that Daley took, informed by his knowledge gained first as State's Attorney and later as Mayor, include:

- Discrediting the Chicago Police OPS Report, which had found that Burge and his subordinates, with the knowledge and participation of certain Area 2 command personnel, systematically abused African American suspects in their custody, Comp. ¶¶ 290-293;

- Overruling his senior staff's recommendation and directing that City lawyers continue to defend Burge (rather than sue him), even after Burge was indicted by federal authorities for crimes arising out of the torture, *Id*. ¶¶ 303-304;

- Promoting Area 2 detective Peter Dignan to lieutenant after the Goldston OPS report had identified him as one of the main "players" in the Burge pattern and practice of torture and after OPS investigators had sustained administrative charges of racially motivated electric shock torture and other brutality against him in several cases, *Id*. ¶¶ 299, 301;

- Continuing to conceal the information regarding the Burge torture pattern and practice that he personally had learned both during his years as State's Attorney, and later as Mayor. *Id*. ¶¶237-307.

Plaintiff was not exonerated until October 2020 (when the charges against him were finally dismissed with prejudice). *Id*. ¶ 311. Thus, Daley's efforts to cover up the Burge torture evidence materially and significantly continued the wrongful prosecution of Plaintiff. These allegations are sufficient to state a claim against Daley individually, both as State's Attorney and as Mayor, for his involvement in the efforts to cover up the Burge scandal and thereby conceal exculpatory information in violation of the principles laid down in *Newsome* and *Houston.*

## VIII. PLAINTIFF'S ALLEGATIONS ARE SUFFICIENT TO SUPPORT HIS CLAIMS THAT DALEY, AS MAYOR, PARTICIPATED IN A CONSPIRACY TO CONCEAL EVIDENCE OF POLICE TORTURE AT AREA 2

Plaintiff realizes that the courts in *Tillman*, *Smith* and *Kitchen*[8] granted motions to dismiss the plaintiffs' claims against Daley as State's Attorney on the basis of prosecutorial immunity and also dismissed the plaintiffs' claims against Daley, individually, as Mayor. As argued above, Plaintiff contends that those determinations are contrary to the facts alleged and the controlling law and should not be followed by this Court. Nevertheless, to the extent that this Court decides to

---

[8] While Defendants likewise cite to *Wrice* in support, Judge Bucklo merely adopted her earlier findings from *Kitchen* and declined to conduct any new analysis of the issues. *Wrice v. Burge*, 187 F. Supp. 3d 939, 949 (N.D. Ill. 2015).

follow *Kitchen, Smith* and *Tillman* and dismiss those same individual claims against Daley, it must still, at the very least, deny Daley's motion to dismiss Plaintiff's conspiracy claims against him, as Judge Pallmeyer did on two occasions in *Tillman* and Judge St. Eve did in *Smith*.

As a co-conspirator, of course, Daley is responsible not only for his own misconduct, but also for the "acts and declarations of [the other] conspirators, made after the formation and in furtherance of the conspiracy"—including those that preceded Daley's own involvement. *See United States v. Porter*, 542 F.3d 1088, 1093 n.3 (5th Cir. 2008) (citations and quotation marks omitted), *cert. denied*, 129 S. Ct. 2826 (2009); *Jones v. City of Chicago*, 856 F.2d 985, 990 (7th Cir. 1988) (the function of a Section 1983 conspiracy is to yoke particular individuals to the specific constitutional torts alleged in the complaint); *United States v. Read*, 658 F.2d 1225, 1230 (7th Cir. 1981) ("Each conspirator is liable for overt acts of every other conspirator done in furtherance of the conspiracy, whether the acts occurred before or after he joined the conspiracy."); *United States v. Martins*, 2008 U.S. Dist. LEXIS 60564, *9 (N.D. Ill. July 21, 2008) (same).[9]

In *Tillman*, the conspiracy claims were pleaded in almost exactly the same way as they have been in this case:

> Plaintiff's Complaint includes allegations regarding the torture of other individuals in Area 2, including the high-profile case of Andrew Wilson. (Comp. ¶¶ 48-52.) Plaintiff alleges that the named Defendants in this case, along with others, engaged in this practice, failed to intervene to end it, and suppressed information regarding this extensive pattern of abuse. (*Id*. ¶¶ 48-54.) Plaintiff alleges that as Mayor and State's Attorney, Defendant Richard Daley had personal knowledge of the alleged abuses perpetrated by Burge and other Defendants at Area 2, but declined to investigate the abuses . . . . (*Id*. ¶ 66.) Plaintiff asserts that, had Daley and Martin investigated the allegations of abuse at Area 2 prior to his arrest, he would not have been tortured and would not have been wrongfully convicted. (*Id*. ¶¶ 67, 70.) Plaintiff further alleges that as a result of a conspiracy between

---

[9] The criminal cases cited above apply equally here. It is well-established that "courts treat civil and criminal conspiracy alike ... so that the abundant precedents on the meaning of criminal conspiracy are available for use in the civil context." *Hartford Acc. and Indem. Co. v. Sullivan*, 846 F.2d 377, 383 (7th Cir. 1988).

Daley, Martin, Hillard, Needham, Shines and others to suppress information about torture at Area 2, "Plaintiff's wrongful prosecution was continued, his exoneration was delayed and his imprisonment lasted far longer than it otherwise would have." (*Id*. ¶¶ 72, 97.) According to Plaintiff, between 1989 and 1992, Daley and Martin were given "additional actual notice that Burge was the leader of a group of Chicago detectives that systematically tortured and abused African American suspects" through an Amnesty International report and public hearings. (*Id*. ¶ 85.) Plaintiff alleges that in 1996, despite his knowledge that findings of torture and abuse had been made against Defendant Dignan, Daley promoted Dignan to lieutenant. (*Id*. ¶ 91.) Plaintiff also alleges that Daley, against the advice of his senior advisers, "personally insisted" throughout his tenure that the City of Chicago "continue to finance the defense of Burge, Byrne, Dignan, and other Area 2 detectives, despite his personal knowledge that Burge committed acts of torture." (*Id*. ¶ 93.) . . . After the Goldston Report detailing torture was released . . . Martin and Daley publicly discredited its findings.

*Id.* at 958, 964.

With regard to Tillman's § 1983, § 1985, and § 1986 conspiracy claims, the court found

that they were pled with sufficient particularity against all of the individual defendants, including

Daley:

Plaintiff contends that all of the individual Defendants were involved in a wide-ranging conspiracy beginning in 1973 and lasting until the filing of the lawsuit. (Comp. ¶¶ 48-54; 119.) He alleges a § 1983 conspiracy, a § 1985 conspiracy, and a conspiracy as defined by Illinois state law. The conspiracy to torture and abuse suspects, in particular African-American men, allegedly began with the May 1973 torture of Anthony Holmes at Area 2 and continued under the direction of Burge and Byrne. Because Daley and Martin failed to intervene, a team of detectives and officers continued the misconduct, engaging in numerous instances of abuse from February 1982 through July 1986. (Comp. ¶ 53.) Plaintiff also alleges that [ASA] Frenzer and the Officers suppressed the truth about this torture and abuse, as well as the physical evidence of it, from Plaintiff and all those involved in his criminal proceedings. (*Id*. ¶ 54.)

\* \* \*

[Plaintiff's] allegations suggest that Plaintiff's torture was more than just an isolated incident, and suggest, further, that the suppression of the truth about what occurred at Area 2 was the result of coordinated efforts that continued for some time. (Comp. ¶¶ 119, 121.) As discussed above, the Defendant Officers are alleged to have participated directly in the torture, as did Burge; Frenzer allegedly did so as well, by attempting to take a statement when he knew the torture was ongoing; Martin and Daley are said to have undermined and obstructed findings of torture; Shines allegedly suppressed findings of torture; and Plaintiff claims that Needham and Hillard continued to suppress findings and undermine investigations into torture at Area 2 after they took office. Plaintiff has listed a litany of actions at Area 2 furthering and concealing the abuse that took place there (Comp. ¶¶ 48-

55

50, 52, 56, 63, 65, 88, 89), and has also provided specific allegations regarding acts of torture performed on this Plaintiff and on others. (*Id.* ¶¶ 21-34.) These allegations are sufficient to allege a § 1983 conspiracy. . . . The court concludes Plaintiff has presented more than "naked assertions," and his conspiracy claim survives.

* * *

Plaintiff here urges that there was a racial motivation behind the actions of the alleged conspirators; he has alleged that the conspiracy was engaged in "with racial animus toward the Plaintiff and the other victims of this racially motivated conspiracy." (Comp. ¶ 120.) Plaintiff also identified more than thirty alleged victims of police torture who are African-American. (Pl.'s Resp. to Officers' Br. at 20.) Plaintiff asserts that this conspiracy "is, without doubt, fundamentally premised on and permeated by powerful racial animus." (*Id.*) . . . . He has alleged that all or nearly all of the victims of the alleged conspiracy were members of the same class, and that racial epithets were commonly used during the course of this torture. Those allegations lend sufficient credence to Plaintiff's claims at the pleading stage. As in *Swanson*, the question before this court is whether the conspiracy alleged here could have been motivated by racial animus. Plaintiff's allegations appear to meet that test.

*Id.* at 975-978. As to Tillman's state law conspiracy claim, the court held:

Plaintiff must allege that each Defendant "knowingly and voluntarily participate[d] in a common scheme to commit an unlawful act or a lawful act in an unlawful manner." *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill.2d 102, 133, 720 N.E.2d 242, 258, 241 Ill. Dec. 787 (1999). The allegations discussed earlier also meet these criteria; Plaintiff has alleged that each of the individual Defendants participated in this common scheme to engage in torture, an unlawful act. Though he does not again outline the specifics of these actions in Count X, the allegations are the same—that Defendant Officers, Burge, and Frenzer participated in the torture itself and that Daley, Hillard, Martin, Needham, and Shines covered up and suppressed evidence of that pattern and practice of torture of which Plaintiff was a victim. Defendants' motion to dismiss the conspiracy claim is denied.

*Id.* at 978.

Daley subsequently moved to reconsider Judge Pallmeyer's decision, arguing, as he does here, that the court mistakenly relied on allegations pertaining to his role as Cook County State's Attorney in sustaining Tillman's conspiracy claims against him because he is entitled to absolute prosecutorial immunity with regard to those actions; and that Tillman's allegations failed to support his assertion that Daley, as Mayor, was part of a conspiracy to cover up and suppress evidence of torture because his challenged conduct as Mayor did not amount to substantive

56

*Brady* violations. *Tillman v. Burge*, 813 F. Supp. 2d 946, 983 (N.D. Ill. November 2, 2011). In

denying Daley's motion to reconsider, the court agreed with Daley that Tillman could not use

Daley's actions as State's Attorney in support of a conspiracy claim but found "[a]t the pleading

stage, Plaintiff's allegations sufficiently support the allegation that Daley participated in a

conspiracy to conceal evidence of police torture through his public statements as Mayor, and the

internal actions he took (or failed to take) in that role." *Id.* at 989-90.

Judge Pallmeyer explained why Tillman's conspiracy claims against Daley based on his

alleged actions as Mayor should not be dismissed even though she had previously determined

that those allegations were not sufficient to state a substantive *Brady* violation against Mayor

Daley himself:

> Defendant next argues that, because any actions he took as State's Attorney cannot be a
> basis for the conspiracy claim, Plaintiff has not alleged a basis for concluding that Daley
> was involved in the conspiracy based solely on his actions as Mayor. (Def.'s Mot. ¶¶ 8,
> 9.) In support of the challenge to conspiracy claims against him in his capacity as Mayor,
> Defendant Daley first asserts that "[t]here is no allegation Mr. Daley as Mayor concealed
> or covered up any evidence of *plaintiff's* torture at Area 2." (*Id.* ¶ 10.) Defendant next
> points to the court's analysis of the *Brady* claim against Daley, which the court dismissed
> because Plaintiff failed to identify what exculpatory information Daley allegedly
> concealed, and argues that the court's reasoning concerning that claim requires dismissal
> of the conspiracy claims, as well. (*Id.* ¶ 11.)

> The court has already addressed Defendant's argument that no *Brady* violation could have
> occurred because the type of evidence allegedly suppressed did not involve Plaintiff. The
> court explained that, "[h]ad Daley been in possession of undisclosed information that
> Burge and his subordinates had engaged in other instances of torture at Area 2, such
> information could be material and exculpatory even if it did not relate directly to
> Plaintiff." *Tillman*, 2011 U.S. Dist. LEXIS 79320, 2011 WL 2975671, at *14. Defendant
> presents no argument that calls that conclusion into question, nor any argument that was
> not presented in his earlier motion and addressed by the court.

> The court concludes that Plaintiff sufficiently alleged that Daley, as Mayor, participated
> in a conspiracy that included the concealment of exculpatory evidence. This conclusion is
> not undermined by Defendant's citation to the court's conclusions regarding the *Brady*
> claim against Daley. That the allegations may not have been sufficient to state a
> substantive *Brady* violation against Mayor Daley himself does not mean they were
> insufficient to allege his role in a conspiracy that included *Brady* violations. The court

notes that the allegations it found insufficient to state a *Brady* violation against Daley included public statements discrediting the Goldston report, refusal to launch investigations into allegations of police torture, promotion of one of those involved in police torture, and public statements undermining the findings of the special prosecutor investigating police torture. (Comp. ¶¶ 76-83, 93, 97.) Individual actions taken in furtherance of a conspiracy need not be illegal in order for the participant to be liable for the illegal acts performed in furtherance of the conspiracy. *See United States v. Cueto*, 151 F.3d 620, 636 ("'[A]cts which are themselves legal lose their legal character when they become constituent elements of an unlawful scheme.'" (quoting *United States v. Bucey*, 876 F.2d 1297, 1312 (7th Cir. 1989))). The Seventh Circuit has recognized numerous conspiracies aimed at covering-up prior illegal actions. (In many instances, these were considered two independent conspiracies, as they may well be here.) In one case, for example, the court noted that plaintiffs presented prima facie evidence of two conspiracies, the second of which "was intended to frustrate any redress the plaintiffs might seek and, more importantly, to conceal the true character of the . . . activities of the defendants involved in the first conspiracy." *Hampton*, 600 F.2d at 621-22. At the pleading stage, Plaintiff's allegations sufficiently support the allegation that Daley participated in a conspiracy to conceal evidence of police torture through his public statements as Mayor, and the internal actions he took (or failed to take) in that role.

Finally, Defendant argues that there can be no liability for Daley on the conspiracy claims because "[a]bsent an underlying constitutional claim, a § 1983 conspiracy claim necessarily must fail." (Def.'s Mot. ¶ 12.) But, of course, Plaintiff does have numerous underlying constitutional claims that survived Defendants' motions to dismiss. That none of those claims has survived against Daley himself does not matter for conspiracy purposes. The very purpose of the conspiracy doctrine is to hold coconspirators liable for the substantive acts of those with whom they have entered a conspiracy. *Pinkerton v. United States*, 328 U.S. 640, 647, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946).

*Id.*

Subsequently, Judge St. Eve upheld almost identical conspiracy claims against Defendant

Daley as Mayor to those alleged by Plaintiff here:

As discussed above, Plaintiff alleges that after his conviction and sentence, Defendants Martin, Shines, Hillard, and Needham acted in collusion with Defendant Daley (as Chicago's Mayor) and other high-ranking police officials to deflect public scrutiny of Defendant Burge's misconduct that deprived Plaintiff information regarding the scope and nature of the systemic misconduct prolonging his unlawful incarceration. (*Id.* ¶¶ 93, 118.) Plaintiff specifically alleges that while Defendant Daley was Mayor: (1) he did not disclose exculpatory information in his possession from the date he resigned as State's Attorney of Cook County in 1989 until he left the Mayor's office in 2011; (2) he did not intervene at any time to direct the CPD to disclose exculpatory information in its possession regarding Defendant Burge and detectives under his command; and (3) he did not direct the CPD to conduct a thorough and aggressive investigation of Defendants Burge, Byrne, Dignan, and the other detectives who tortured and abused African–

58

American men while working under Defendant Burge's command. (Comp. ¶ 95.) Plaintiff also alleges that in furtherance of this conspiracy, Defendant Daley: (1) repeatedly discredited OPS findings of the systemic torture under Defendant Burge at Area 2; (2) refused to direct Defendant Martin (as CPD Superintendent) to initiate criminal investigations or disciplinary proceedings against Defendant Burge and CPD Detectives under his command; (3) rejected advise from senior staff that the City should sue Defendant Burge rather than continue to defend him in civil proceedings despite Defendant Daley's knowledge of Defendant Burge's wrongdoing; and (4) made false public statements in July 2006 in response to a Special Prosecutor's Report. (*Id.* ¶¶ 97, 103, 104, 114, 118.) These allegations sufficiently allege that Defendant Daley, as Chicago's Mayor, participated in a conspiracy to conceal evidence of police torture. *See Tillman,* 813 F.Supp.2d at 989 ("The Seventh Circuit has recognized numerous conspiracies aimed at covering-up prior illegal actions."). The Court therefore denies this aspect of Defendant Daley's motion to dismiss.

*Smith v. Burge*, 222 F. Supp. 3d 669, 697 (N.D. Ill. 2016); *See also*, *Id*. at 688-689

Judges Pallmeyer and St. Eve's reasoning applies even more powerfully to Plaintiff's claims against Daley because Plaintiff additionally alleges here that among the evidence that Daley suppressed and attempted to discredit was exculpatory evidence about Plaintiff's and his brother's torture. Daley raises a variety of arguments, most of which are irrelevant because they depend upon a misreading of Plaintiff's complaint. For example, Daley argues that he cannot be liable for a negligent failure to investigate Burge related torture. He asserts that he should not be found liable for "failure to intervene," and he contends that he is exonerated because he was not present at the time of Plaintiff's torture and/or because he was not "personally involved" in the denial of Plaintiff's constitutional rights. Dckt. No. 69 at 13-15. All of these contentions completely miss the point of the portion of Count I that asserts a claim against Daley as Mayor—not for failure to investigate or failure to intervene—but for the concealment of exculpatory evidence. Daley cannot prevail on the theory that he was not "personally involved" in the concealment of evidence, because, to the contrary, the Complaint details a series of specific overt acts that Daley personally took in furtherance of the conspiracy to cover up the ongoing torture conspiracy.

Finally, Daley contends that Plaintiff's claim against him is "speculative," and that Plaintiff has not adequately alleged the existence of proximate cause. Arguing that Plaintiff was not released from prison in 1992, when the Goldston Report was released (and discredited as "rumor" by Daley), Daley contends that it is "more plausible" that Plaintiff would have remained incarcerated even if Daley and his co-conspirators had abandoned their cover up. Dckt. No. 69 at 9-10. This kind of factual debate, of course, has no place in the consideration of a motion to dismiss. *See, e.g., Carter v. Buscher*, 973 F.2d 1328, 1332 (7th Cir. 1992) (stating that courts should presume the existence of proximate cause "when considering a motion under Fed. R. Civ. P. 12(b)(6)"). At this stage, "it is not necessary to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences." *Swanson*, 614 F.3d at 405.

Daley is not alleged to have acted alone. Rather, he is alleged to have been a participant in a broad conspiracy to conceal a range of information relating to the scope of the Burge-connected pattern and practice of torture and relating to the credibility of allegations that an overwhelming number of victims had made against Burge and his confederates. In combination, the co-conspirators are alleged to have covered up a wide range of evidence demonstrating the truth of numerous allegations against Burge, and his cohorts—information that included evidence about the torture of Plaintiff and his brother, that would have dramatically bolstered Plaintiff's own torture claim. It is plausible to infer that, if the conspiracy had not existed, Plaintiff's continuing wrongful conviction and resulting imprisonment would have been far shorter. At the pleading stage, the plausibility of that inference ends the inquiry. Plaintiff's allegation of proximate causation is sufficient.

Thus, at the very least – following *Tillman* and *Smith* - this Court should deny Daley's motion to dismiss Plaintiff's conspiracy claims based on Daley's overt acts as Mayor in furtherance of the conspiracy to conceal evidence of police torture.

## IX. PLAINTIFF SUFFICIENTLY ALLEGES CLAIMS AGAINST DEFENDANTS SHINES, HILLARD, AND NEEDHAM FOR CONCEALING EXCULPATORY EVIDENCE OF TORTURE, IN VIOLATION OF PLAINTIFF'S FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS

Count I of the complaint alleges that the Municipal Defendants concealed and discredited exculpatory evidence concerning the use of torture in police interrogations, in violation of Plaintiff's due process right to a fair trial.[10] *Newsome v. McCabe,* 256 F.3d 747 (7th Cir. 2001). The duty to disclose exculpatory information—and potential § 1983 liability for failure to disclose, as demonstrated above —does not terminate at conviction. To the contrary, government officials may be liable for concealing exculpatory information after the plaintiff's conviction and thereby prolonging the plaintiff's wrongful incarceration. *See, e.g., Houston v. Partee*, 978 F.2d at 368; *Steidl*, 494 F.3d at 630; *Patterson v. Burge*, 328 F. Supp. 2d at 888.

In this case, the concealment of exculpatory evidence began well prior to Plaintiff's conviction. Defendants Burge, O'Hara, McKenna, and Yucaitis, as well as Assistant State's Attorney Defendant Lawrence Hyman, are alleged to have suppressed information pertaining to their involvement in the torture of African American suspects from Plaintiff and his defense counsel at Plaintiff's criminal trial and that this pre-trial suppression of evidence was a proximate cause of his wrongful conviction. Plaintiff further alleges that Defendants Martin and Daley, as supervisors and co-conspirators who failed to intervene, are also liable for this wrongful conviction. Moreover, this cover-up is alleged to have continued for decades *following* Plaintiff's

---

[10] Plaintiff additionally alleges in Count 1 that defendant Martin's failure to supervise or intervene with regard to Burge and his confederates, and his pre-trial suppression of his knowledge of a pattern of torture at Area 2, were direct and proximate causes of Plaintiff's initial wrongful conviction.

conviction. After his conviction, Martin, Shines, Hillard, and Needham acted in collusion with Daley and high-ranking police officials to deflect public scrutiny of the actions of Burge and his men, as well as to deprive Plaintiff of information regarding the scope and nature of the torture, which prolonged Plaintiff's unjust incarceration.

As co-conspirators, all of the Municipal Defendants are liable not only for their own misconduct, but also for the "acts and declarations of [the other] conspirators, made after the formation and in furtherance of the conspiracy"—including those that preceded their own involvement in the cover-up. *United States v. Porter*, 542 F.3d 1088, 1093 n. 3 (5th Cir. 2008) (citations and quotation marks omitted), *cert denied*, 129 S. Ct. 2826 (2009). In other words, these Defendants are liable as though they had participated in the conspiracy's original formation. *United States v. Read*, 658 F.2d at 1230

As set forth in paragraphs 268 to 272, 276, and 286 to 296 of Plaintiff's Complaint, Plaintiff alleges that Defendant Martin participated in the early phases of the conspiracy by facilitating the coercive interrogation practices in Area 2, and by suppressing evidence of the torture. Plaintiff alleges that, upon taking office as Police Superintendent, Martin continued his involvement. In a joint effort with Daley and the other Municipal Defendants, Martin undermined investigations and findings of official misconduct, despite his full awareness that African-American men were "systematically tortured and abused" by Burge and his detectives. He obstructed the dissemination of the Goldston Report, which detailed the abuse of suspects held in police custody, and when the Report was released by judicial order in 1992, Martin and defendant Daley publicly attempted to discredit its findings.

Plaintiff alleges, at paragraphs 295 and 299 to 302 his Complaint, that Shines, Hillard, and Needham also committed overt acts in furtherance of this conspiracy. Following the release

62

of the Goldston Report, additional allegations of torture surfaced concerning the brutal use of electric shock methods against African American suspects. These allegations were brought to the attention of Martin and Shines, but neither took any steps to investigate the claims. Thereafter, OPS re-opened investigations into at least ten torture cases, uncovering substantial evidence that various police officers, including four of the police defendants, used racial epithets as well as instruments of torture (such as cattle prods) to force suspects into confessing. In six of these investigations, OPS investigators made findings of torture and abuse against two of Burge's closest confederates. Shines, under pressure from her co-defendants, ensured these investigations never saw the light of day, secreting these official findings of torture and abuse against Byrne and Dignan, in her personal office. This evidence remained concealed for at least five years, until well after Plaintiff was re-tried and re-convicted in 1989.

As also alleged in paragraph 302, Defendants Hillard and Needham essentially took over where Martin and Shines had left off. Hillard and Needham refused to investigate Shines, despite knowing that she had hidden exculpatory information concerning the torture of specific victims. They also reversed OPS findings of systematic torture and concealed all OPS files detailing the nature of this abuse. Plaintiff was not released until 2018, his case was not dismissed until October 1, 2020, and he was not exonerated until December 18, 2020, when the Circuit Court of Cook County granted Plaintiff a certificate of innocence pursuant to 735 ILCS 5/2-702. The conspirators' efforts to cover up the Burge torture, thus, "materially and significantly continued the wrongful prosecution of Plaintiff." Comp. ¶¶ 94-96.

The Municipal Defendants raise several objections to Plaintiff's Count I due process claim. They contend, first, that a due process claim based on a theory of "continued" imprisonment is not cognizable. Dckt. No. 75 at 29. Second, they claim that Plaintiff does not

allege the Defendants' 'personal involvement' in violating his constitutional rights. Dckt. No. 75 at 28. Third, they assert that they may not be held liable for "failing to investigate" allegations of torture. Dckt. No. 75 at 31. Last, they argue that Plaintiff cannot allege a causal connection between their misconduct and Plaintiff's continuing incarceration. Each of these arguments is without merit. Dckt. No. 75 at 32.

In support of their "continuing tort" objection, they cite to *Wiley v. City of Chicago*, 361 F.3d 994 (7th Cir. 2004), in which the Seventh Circuit found that a plaintiff could not seek relief under the Fourth Amendment for wrongful prosecution, as "the scope of a Fourth Amendment claim is limited up until the point of arraignment." *Wiley*, 361 F.3d at 998. This holding has absolutely no bearing on Plaintiff's case. *Wiley*'s holding pertains to the scope of the Fourth Amendment, which only protects pre-arraignment liberty. Here, Plaintiff's brings a Fourteenth Amendment claim against the Municipal Defendants for prolonging his wrongful conviction and false imprisonment *after* his conviction, through deliberate concealment of evidence of police misconduct.[11] Plaintiff's claim against these defendants is well within the ambit of *Houston v. Partee, Steidl v. Fermon, Orange v. Burge,*[12] and other cases that recognize a *Newsome v. McCabe* wrongful conviction cause of action for the post-conviction concealment of exculpatory evidence.

The Defendants next argue that dismissal is warranted as to Shines, Hillard, and Needham, because Plaintiff's torture and conviction occurred before they assumed their respective supervisory roles and thus were not personally involved in any constitutional misconduct. This argument simply misapprehends the claim in Count I. These Municipal

---

[11] As set forth above, at note 4, Plaintiff also alleges in Count 1 that Martin's failure to supervise or intervene, and his pre-trial suppression of exculpatory evidence, were direct and proximate causes of Plaintiff's initial wrongful conviction.

[12] *Orange v. Burge*, No. 04 C 0168, 2005 WL 742641, at *13 (N.D. Ill. March 30, 2005).

Defendants are not being sued on the theory that they tortured Plaintiff. Rather, their personal involvement in Plaintiff's injury occurred later—after they had assumed their roles and used their authority to conceal exculpatory information, as detailed in the complaint.

Significantly, six separate courts in this district that have considered the Municipal Defendants' personal liability for the suppression of exculpatory evidence of Burge related torture on motions to dismiss have found that allegations mirroring Plaintiff's allegations here were sufficient to support an inference of personal liability for post-trial due process violations. In *Orange v. Burge*, 2005 WL 742641, at *13, Judge Holderman held that because "Orange asserts that Martin, Shines, Hillard and Needham participated in covering up alleged torture, failing to investigate and suppressing of information," these defendants may be "personally liable" under § 1983 for their "individual actions." In *Howard v. City of Chicago*, No. 03 C 8481, 2004 WL 2397281, at *13 (N.D.Ill. Oct. 25, 2004), Judge Andersen held that "both [the plaintiff's] due process claim and his § 1983 conspiracy claim state a cause of action against defendants Martin, Shines, Hillard and Needham." In *Cannon v. Burge*, No. 05 C 2192, 2006 WL 273544, at *12 (N.D.Ill. Feb. 2, 2006), Judge St. Eve held that these same defendants had a duty under *Brady* "to disclose exculpatory evidence regarding what transpired outside the interrogation room." In *Patterson v. Burge*, 328 F. Supp. 2d at 890, Judge Gottschall found that the allegations of evidence suppression by these defendants "support Patterson's claim that he suffered a deprivation of his constitutional right to a fair trial." In *Smith v. Burge*, Judge St. Eve held that Plaintiff sufficiently stated "a facially plausible conspiracy claim under the circumstances." *Smith v. Burge*, 222 F. Supp. 3d 669, 689 (N.D. Ill. 2016); And in *Kitchen v. Burge*, Judge Bucklo upheld a due process suppression of evidence claim against the same municipal defendants whom the Plaintiff sues here. *Kitchen v. Burge*, 2011 U.S. Dist. LEXIS

42021 (N.D. Ill) at *11-14. In accordance with this precedent, the allegations here are clearly sufficient to hold the Municipal Defendants liable for violating Plaintiff's rights.

In a third set of arguments, the Municipal Defendants contend that the "failure to investigate" does not present a cognizable constitutional claim, because there is no duty to "imposed on law enforcement officials to conduct an investigation in the hopes of uncovering potentially exculpatory material." Dckt. No. 75 at 29-30. As discussed above, the Municipal Defendants' post-conviction liability does not stem from a general 'failure to investigate' but rather from their purposeful concealment of clearly exculpatory evidence. Whether or not the Municipal Defendants negligently "failed to investigate," that failure is not the basis for their liability under Count I

Finally, Plaintiff's allegations support the reasonable inference that, by failing to disclose material and exculpatory evidence of torture, the Municipal Defendants proximately caused Plaintiff's prolonged wrongful conviction and imprisonment. The defendants argue otherwise, citing to Judge Holderman's opinion in *Orange v. Burge*, No. 04 C 168, 2008 WL 4443280, at *5 (N.D. Ill. Sept. 29, 2008), as evidence that the "chain of inferences" necessary to establish causation in this case is "too tenuous" to support recovery. Dckt. No. 75 at 31. What the defendants fail to note is that Judge Holderman's opinion was issued at the summary judgment stage of the case, rather than at the motion to dismiss, when the complaining party need only allege a plausible theory of proximate cause. *See Carter*, 973 F.2d at 1332 (courts should presume the existence of proximate cause "when considering a motion under Fed. R. Civ. P. 12(b)(6))"). Moreover, the opinion concerned only the adequacy of evidence against former State's Attorney Richard A. Devine; it made no ruling as to the entirely different claim and supporting facts that Plaintiff alleges against the Municipal Defendants. In fact, Judge

66

Holderman had previously denied the Municipal Defendants' motion to dismiss, finding the complaint sufficiently alleged that they "impacted [Orange's] post-conviction proceedings and limited his ability to free himself from prison." *Orange*, 2005 WL 742641, at *13; *See also*, *Kitchen*, 2011 Lexis at *13-15, rejecting an identical argument made by these Municipal Defendants while distinguishing *Orange*.

In the same way, Plaintiff alleges his illegal confinement and conviction were prolonged due to the Defendants' concerted efforts to suppress all evidence related to the systematic practice of torture under Burge, ensuring that Plaintiff could not possibly gather sufficient evidence to challenge his conviction. *See Cannon*, 2006 WL 273544, at *12. The fact that Plaintiff was re-convicted in his second criminal trial in 1989 does not negate the Municipal Defendants' liability for protracting Plaintiff's wrongful conviction and imprisonment. To the contrary, by continuing to conceal a significant portion of the official evidence of torture, the Municipal Defendants ensured that Plaintiff and his lawyers were unable to establish the extent of the "pattern and practice" of torture in the Chicago Police Department, as well as the primary role that several of his main torturers—Defendants Burge, McKenna, O'Hara, and Yucaitis— played in this pattern. Therefore, the allegations support the reasonable inference that the Municipal Defendants' conduct proximately caused Plaintiff's wrongful conviction and resulting imprisonment to be prolonged. For all of these reasons, Plaintiff has sufficiently alleged plausible individual and conspiracy claims against the Municipal Defendants.

## X. PLAINTIFF HAS SUFFICIENTLY ALLEGED CLAIMS AGAINST DEFENDANT MICHAEL HARTNETT

Defendant Hartnett argues that Counts I through IV of Plaintiff's Complaint should be dismissed due to Plaintiff's failure to state a claim. Dckt. No. 59 at 16-18. In making this assertion, Defendant Hartnett ignores the factual and legal allegations contained in Plaintiff's

Complaint, both of which clearly satisfy the standard at this stage of litigation. Specifically,

Count I of the Complaint alleges that Defendant Hartnett violated Plaintiff's constitutional rights

by participating in:

(1) "constructing and fabricating the false and totally unreliable confession which formed
the basis for Plaintiff's charging, prosecution, conviction, re-prosecution and re-
conviction;"

(2) "manufacturing and fabricating false witness testimony that formed the basis to his
re-prosecutions, and re-conviction;"

(3) "withholding from the prosecutors, judges and defense attorneys involved in
Plaintiff's prosecution the fact that this confession was false, totally unreliable,
constructed and physically and mentally coerced;"

(4) "suppressing, destroying and preventing the discovery and development of additional
exculpatory torture findings and evidence, including, but not limited to, the
instruments of torture as well as other exculpatory evidence;

(5) by giving a false and incomplete version of events to prosecutors;

(6) by writing false reports and giving false testimony; by improperly influencing the
judges hearing Plaintiff's case, inter alia, by making false public statements;

(7) by obstructing and improperly influencing investigations which would have led to
discovery of further exculpatory evidence;

(8) by suppressing and attempting to discredit findings of individual and systematic
torture and abuse;

(9) and by the additional wrongdoing set forth above, thereby unconstitutionally
depriving Plaintiff of his liberty and violating his right to a fair and impartial trial and not
to be wrongfully convicted, as guaranteed by the United States Constitution.

Comp. ¶ 317.

The allegations above are buttressed by a robust factual record describing Defendant

Hartnett's participation, individually and in a conspiracy to violate Plaintiff's constitutional

rights by the coercion of a false exculpatory statement, concealment of exculpatory evidence and

the fabrication of a false statement. At the time of Plaintiff's torture, Hartnett was a court-

reporter who served as an agent of Cook County and its State's Attorneys' Office. Comp. ¶¶ 49, 52. As Plaintiff and his brother had been brutally tortured for hours, Defendant Hartnett sat "in close proximity to the torturous interrogations" and did nothing to intervene. *Id*. ¶¶ 106, 145-147. Hartnett "didn't give a damn" about Plaintiff's torture and considered co-conspirator Burge to be his friend. *Id*. ¶ 147. When Hartnett was also told by Andrew Wilson that "they was going to torture [him] some more like that," Hartnett responded that he would not do anything about it. *Id*. ¶106. Subsequently, Hartnett took statements from Plaintiff, and later that day, from Andrew. *Id*. ¶¶ 105-106, 145-149. The statement obtained from Plaintiff was "false, fabricated, and manufactured." *Id*. ¶12. Defendant Hartnett knew that Plaintiff and Andrew had been tortured when he took the statements, and knowingly violated CCSAO policy by intentionally avoiding asking either Plaintiff or Andrew whether they had been physically abused. *Id*. ¶¶ 150-151. These fabricated, false, and coerced statements were later introduced at trial, in part, through Defendant Hartnett's testimony. *Id*. ¶¶ 169, 172-173, 182-184.

### A. Counts I, II, and III of Plaintiff's Complaint are Sufficiently Pled

As demonstrated above, Plaintiff's Complaint alleges that Defendant Hartnett was present when Plaintiff was tortured into a false confession, participated in the coercion and conspired with Defendants to violate Plaintiff's constitutional rights before, during, and after the false, involuntary statement was obtained. Comp. ¶¶ 11, 100-101, 142-152, 159, 241-242. The Seventh Circuit has clearly established that manufacturing of "false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty *in some way*." *Whitlock v. Brueggemann*, 682 at 580 (emphasis added) (citing *Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988)). At the time Defendants, including Hartnett, coerced Plaintiff to falsely implicate himself there was no probable cause to believe Plaintiff had

69

committed a crime. *See* Comp. ¶¶ 330-332 ("…Defendants, individual[ly], jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used false evidence that they had manufactured in order to accuse Plaintiff of criminal activity and to cause the institution and continuation of criminal proceedings against Plaintiff, without probable cause.") Thus, as Plaintiff alleges, and the underlying facts support, Defendant Hartnett was intimately involved in fabricating Plaintiff's statement (in addition to the fabricated statements of Andrew Wilson and Derrick Martin) in the absence of any legitimate evidence of probable cause with regard to Plaintiff's alleged involvement in the crimes.

And further, Defendant Hartnett's withholding of evidence supporting the conclusion that his fellow Defendants, with his knowledge and participation, violently induced a false admission from Plaintiff—such as the instruments of that brutality and any reports—certainly would have impugned the prosecution's extremely shaky case, impeached Defendants' credibility as prosecution witnesses, and rendered the entire investigation suspect. *See Kyles v. Whitley*, 514 U.S. 419, 445 (1995) (information which might have raised opportunities for the defense to attack "the thoroughness and even the good faith of the investigation" constitutes exculpatory, material evidence); *Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir. 1986) ("A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant and we may consider such evidence in assessing a possible *Brady* violation."); *United States v. Howell*, 231 F.3d 615, 625 (9th Cir. 2000). Moreover, evidence that Harnett suppressed the implements of Defendants' abuse, buried evidence of systemic abuse, and obstructed investigations into the systemic abuses would further support a *Brady* claim. *See Smith v. Burge*, 222 F. Supp. 3d 669 (N.D. Ill. 2016).

Defendant Hartnett cites *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008), to argue that since he is not a police officer, he does not have a *Brady* obligation. Dckt. No. 59 at 18. But *Carvajal* does not stand for such a proposition, nor could it, because courts apply a "functional approach, which looks to the nature of the function performed, not the identity of the actor who performed it," for immunity purposes. *Buckley v. Fitzsimmons*, 509 U.S. at 269. Given this, Defendant Harnett's court reporter title doesn't shield him from liability as he was acting in an investigatory capacity before the formation of probable cause against Plaintiff—the same capacity as the Defendant Officers and Defendant Hyman—when participating in Plaintiff's interrogation and formulating his fabricated statement. Defendant Hartnett was present in Area 2 when Plaintiff was tortured and knew that Plaintiff had been tortured before taking his fabricated statement. Dckt. No. 1 at ¶¶ 145-50. Moreover, even if it is determined that Hartnett was not acting under color of law despite acting as an agent and under the control of the interrogating and fabricating police and ASA Defendants, he nonetheless is properly joined as a co-conspirator pursuant to Plaintiff's 1983, 1985, and 1986 and state law conspiracy claims. *Adickes v. Kress,* 398 U.S. 144 (1970). *Hampton v. Hanrahan*, 600 F 3d 600 (7th Cir. 1979). Thus, Plaintiff's allegations are sufficient for holding Defendant Hartnett accountable.

Defendant Hartnett also argues that 'a coerced confession alone can never constitute a *Brady* claim because a plaintiff is aware of his own confession and that knowledge cannot be suppressed." Dckt. No. 59 at 18. But Plaintiff's allegations include more than just Hartnett's knowledge of his coerced false confession and a potential *Brady* claim is therefore sufficiently pled. In *Smith v. Burge*, the court considered allegations similar to Plaintiff's here and explained that claims of defendants suppressing the implements of their abuse, burying evidence of systemic abuse, and obstructing investigations into the abuses can support a *Brady* claim:

Plaintiff bases his *Brady* violation on more than just Defendant Officers' failure to disclose their unlawful interrogation tactics in relation to his coerced confession. Specifically, Plaintiff alleges that Defendant Officers suppressed the implements of their torture, including the plastic bag, the rubber nightstick, and Plaintiff's bloody clothes. [citation]. More importantly, Plaintiff alleges that Defendants suppressed and destroyed evidence of systemic torture and abuse in Area 2, obstructed investigations into the CPD's systemic torture, and discredited findings of systemic torture. [citation].

With the Seventh Circuit's *Gauger* and/or *Sornberger* decisions in mind, courts in this district have concluded that similar allegations state a *Brady* claim based on events that transpired outside of the interrogation room. *See Tillman v. Burge*, 813 F.Supp.2d 946, 962 (N.D. Ill. 2011) (allegations of "'suppressing, destroying, and preventing the discovery' of exculpatory evidence, including that of 'the instruments of torture,'" and "obstructing and improperly influencing investigations" are "circumstances that substantially exceed what Tillman was aware of based on his presence at the interrogation"); *Cannon v. Burge*, No. 05 C 2192, 2006 WL 273544, at *12 (N.D. Ill. Feb. 2, 2006) ("Plaintiff's knowledge of what transpired in the interrogation room does not relieve the City Defendants of their obligation under *Brady* to disclose exculpatory evidence regarding what transpired outside the interrogation room, or preclude the Court from finding the existence of a *Brady* violation."); *Patterson v. Burge,* 328 F.Supp.2d 878, 889 (N.D. Ill. 2004) ("in addition to charging defendants with hiding the fact that his confession was coerced and fabricated—an allegation which by itself might not state a *Brady* claim after *Gauger*—Patterson accuses defendants of obstructing justice and violating his right to a fair trial through actions they took outside the interrogation room."); *see also Ruiz–Cortez v. City of Chicago,* No. 11 C 1420, 2016 WL 6270768, at *16 (N.D. Ill. Oct. 26, 2016) (Plaintiff's claims "relate to things that ranged far outside Plaintiff's knowledge," including a "pattern of misconduct and obstruction of justice."). The decision in *Saunders-El* does not change this reasoning as it relates to Plaintiff's allegations of Defendants suppressing the implements of their torture, destroying evidence of systemic torture and abuse in Area 2, obstructing investigations into the CPD's systemic torture, and discrediting findings of systemic torture. In sum, at this stage of the proceedings, Plaintiff's allegations are distinguishable from the facts in *Saunders–El* because Plaintiff is not merely basing his *Brady* claim on Defendants "keeping quiet about their wrongdoing." *Saunders-El*, 778 F.3d at 562.

*Smith*, 222 F. Supp. 3d at 680-81.

Here, the allegations against Defendant Hartnett, a seasoned court reporter whose job was to take stationhouse statements for his friend Jon Burge and his Area 2 confederates, who never reported torture, intervened to stop it, nor gave a damn about it, and who gave false denials to prosecutors after the fact that were used to convict other tortured defendants, more than meet the

requirements of *Smith* and the cases cited therein and are thus easily distinguishable from *Wallace*. Given the above, Plaintiff's claims in Counts I, II, and III again survive.

## XI.    PLAINTIFF HAS SUFFICIENTLY ALLEGED FEDERAL DUE PROCESS CLAIMS AGAINST DEFENDANT ANDREW T. HORVAT (COUNT I)

Since 1982, nearly two-dozen individuals participated in framing Plaintiff for crimes he did not commit. In 2020, Defendant Horvat became the last person to join the conspiracy when he withheld exculpatory evidence regarding the ongoing conspiracy being maintained by Defendants Trutenko, Coleman, and Kunkle to hide the fabrication of Coleman's statement, undisclosed promises of consideration to Coleman, the untoward relationship between Trutenko and Coleman, and the extortion attempts that followed. Comp. ¶¶ 28-32, 215-223, 316-323. Not only did Horvat withhold exculpatory evidence, but he also affirmatively acted in furtherance of the conspiracy by providing a warning to the OSP prosecutors to avoid certain areas of inquiry that would have elicited exculpatory and impeaching evidence from Trutenko while he was testifying. Horvat took these actions as a CCASA while assigned to represent Trutenko in Plaintiff's 2020 re-trial.[13] Working for the civil division of the CCSAO, Horvat knew how devastating the withheld exculpatory evidence would be for his colleague, Trutenko, and his employer, Cook County, as well as the prosecution in general.[14] In appointing a special prosecutor to examine what went wrong with Plaintiff's prosecution, a judge explained, in

---

[13] Count I of Plaintiff's Complaint asserts a Fourteenth Amendment due process claim, and, alternatively, a failure to intervene theory of liability. Comp.  ¶ 318; *see Gibson v. City of Chicago*, No. 19 C 4152, 2020 WL 4349855, at *8 (N.D. Ill. July 29, 2020) (permitting plaintiff to pursue failure to intervene theory as alternative basis for liability). Defendant Horvat asserts that he is not liable for failure to intervene because his "peripheral involvement" in Plaintiff's prosecution did not occur until September 2020. Dckt. No. 58 at 19-20. However, as this section details, Defendant Horvat is liable for violating Plaintiff's due process rights, including for failure to intervene to prevent the withholding of exculpatory evidence from Plaintiff.

[14] As Defendant Horvat acknowledges, he has never been assigned to the prosecution of Plaintiff's case, and as a result, absolute prosecutorial immunity is not at issue. Dckt. No. 58 at 7.

relevant part, that "*the actions of the CCSAO, as to Trutenko, could have been motivated by unethical and, perhaps, illegal reasons to cover up misconduct.*" Dckt. No. 58-1 at 21; Comp. ¶226. For the reasons explained below, Plaintiff's claims against Defendant Horvat must survive.

### A. Defendant Horvat's Misconduct Resulted in a Violation of Plaintiff's Due Process Rights Under the Fourteenth Amendment

Defendant Horvat first argues that his conduct did not cause "Plaintiff's conviction or detention," since he is alleged to have joined the conspiracy just prior to the dismissal of Plaintiff's case. Dckt. No. 58 at 13. In his view, "by the time Horvat had any involvement whatsoever with Plaintiff's prosecution was during the third trial when Plaintiff had no pending conviction, Plaintiff was on bond, and Plaintiff was being prosecuted by the OSP, an entirely separate entity from Horvat's employer, the Cook County State's Attorney's Office." Dckt. No. 58 at 14. Nonetheless, Plaintiff has sufficiently alleged that Horvat "caused and/or continued Plaintiff's wrongful charging, prosecution" by withholding "exculpatory evidence" which "unconstitutionally depriv[ed] Plaintiff of his liberty and violat[ed] his right to a fair and impartial trial…" Comp. ¶317. Horvat's unconstitutional conduct was "the direct and proximate cause of the injuries to Plaintiff," which includes his "loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above." *Id*. ¶¶319, 322. While Horvat may attempt to minimize the harm caused by his withholding of exculpatory evidence before a jury, it does not warrant dismissal at this stage. *Myvett v. Chicago Police Detective Edward Heerdt*, 232 F. Supp. 3d 1005, 1022 (N.D. Ill. 2017)(holding that the question as to whether allegedly fabricated evidence was cause-in-fact of arrestee's liberty deprivation was for jury to resolve).

Defendant Horvat also argues that Plaintiff cannot allege a constitutional tort against him for the withholding of exculpatory evidence because plaintiff's criminal charges were subsequently dismissed. Dckt. No. 58 at 15. The Seventh Circuit rejected this argument in *Armstrong v. Daily*:

> Though we have not yet recognized a *Brady* claim under § 1983 absent a trial resulting in conviction, we have said that we may do so if the plaintiff shows "that if all parties had known of some piece of exculpatory evidence, the prosecution would not have moved forward with charges, the grand jury would not have indicted [the plaintiff], or the trial court would have granted a motion to dismiss the indictment." *Mosley v. City of Chicago*, 614 F.3d 391, 397 (7th Cir.2010). Armstrong's allegations support the inference that a reasonable prosecutor in these circumstances would not have moved forward with the charges in 2006 and kept Armstrong in prison if the semen stain had not been destroyed and the evidence had been provided to the defense for further testing.[7]

*Armstrong v. Daily*, 786 F.3d 529, 553–54 (7th Cir. 2015)

Following *Armstrong*, the Seventh Circuit reaffirmed in *Cairel v. Alderden* that "the key to a civil *Brady* claim is not a conviction or acquittal but a deprivation of liberty." *Cairel v. Alderden*, 821 F.3d 823, 833 (7th Cir. 2016). There, the Seventh Circuit found that "[u]nder other circumstances, such as where an accused is held in pretrial custody before acquittal or dismissal, a failure to disclose exculpatory evidence may cause the type of deprivation of liberty required for a *Brady* claim even if the case ends without a trial or conviction." *See also, Alexander v. McKinney*, 692 F.3d 553 (7th Cir. 2012)(where the Seventh Circuit "endorsed the proposition that a due process claim will lie where a plaintiff spent months in pretrial custody after bail was revoked on account of fabricated evidence); *Myvett v. Chicago Police Detective Edward Heerdt*, 232 F. Supp. 3d 1005, 1017-1019 (N.D. Ill. 2017)(finding that "the accused does not need to be tried and convicted for a deprivation to occur, something short of a conviction—such as pretrial detention—is sufficient."); *Fields v. Wharrie*, 740 F.3d 1107, 1111–12 (7th Cir. 2014) (fabrication of evidence "used to help indict" the plaintiff satisfies causation

75

requirement); *Jones v. City of Chicago*, 856 F.2d 985, 993 (fabricated facts "likely to influence" the decision to prosecute satisfy causation requirement).

Defendant Horvat also argues that Plaintiff's release from pretrial custody negates any alleged deprivation of liberty. Dckt. No. 58 at 15. In support, Horvat submits court materials, including a court order relating to Plaintiff's bond. Dckt. No. 58-1. But Defendant Horvat's attempts to interject additional materials into the record does not alter the viability of Plaintiff's due process claim in Count I. As discussed *infra*, Plaintiff has alleged that Defendant Horvat's withholding of exculpatory evidence "unconstitutionally depriv[ed] Plaintiff of his liberty and violat[ed] his right to a fair and impartial trial." Comp. ¶317. Nothing that Horvat has submitted alters these allegations.[15]  In nearly identical circumstances, the Supreme Court accepted in *McDonough* that pretrial restrictions such as a plaintiff's ability to travel out of state could constitute a deprivation of liberty:

> Though McDonough was not incarcerated pending trial, he was subject to restrictions on his ability to travel and other "'restraints not shared by the public generally,'" *Justices of Boston Municipal Court v. Lydon*, 466 U.S. 294, 301, 104 S.Ct. 1805, 80 L.Ed.2d 311 (1984), and as the case comes to this Court, it is undisputed that McDonough has pleaded a liberty deprivation. See 898 F.3d at 266.

*McDonough v. Smith*, 139 S. Ct. 2149, 2156, 204 L. Ed. 2d 506 (2019)

Ignoring *McDonough*, Horvat relies upon *Smith v. City of Chicago*, 3 F.4th 332, 341 (7th Cir. 2021). Dckt. No. 58 at 15. In doing so, Horvat argues that *Smith* stands for the proposition that "requirements to appear in court and to request permission before leaving the state – Smith's

---

[15] By challenging the narrative in Plaintiff's Complaint, Defendant Horvat asserts disputes of fact into his motion. The Court should disregard the extraneous factual statements. *See Gardunio v. Town of Cicero*, 674 F.Supp.2d 976, 985 (N.D. Ill. 2009) ("In the usual case, therefore, if a party moving for a 12(b)(6) dismissal submits documents with its motion to dismiss, the Court either must ignore the documents or convert the motion to one for summary judgment.") (citing Fed. R. Civ. Pro. 12(b); *Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)); *see also Ware*, 2017 WL 914755 at *3 (cautioning that "incorporation would become a backdoor to a one-sided summary judgment procedure—the very thing Rule 12(d) seeks to prevent.")

bond conditions here – do not fit within the historical and judicially recognized framework of what constitutes a seizure." But Plaintiff's due process claim against Horvat in Count I arises under the Fourteenth Amendment – not the Fourth – and as such, *Smith* has no bearing on this Court's analysis. *See Smith v. City of Chicago*, 3 F.4th 332, 338 (7th Cir. 2021) (acknowledging differences between Fourth and Fourteenth Amendment claims for accrual purposes). And, as described above, Plaintiff is differently situated than the plaintiff in *Smith* because he was wrongfully convicted whereas the *Smith* plaintiff was charged but never convicted. Thus, whether Horvat withheld exculpatory evidence for an hour, a day, a week, or a year before dismissal, it is undisputed that the unraveling of Trutenko's conspiracy resulted in the immediate dismissal of all charges against Plaintiff with prejudice. Had this evidence been disclosed, the deprivation of Plaintiff's liberty interests would have ceased prior to October 1, 2020, when the case was ultimately dismissed with prejudice at the conclusion of a two-week trial.[16]

### B. Defendant Horvat's Ancillary Arguments are Unavailing

Defendant Horvat next argues that since he "was not part of the prosecutorial team, he was under no obligation to disclose the [exculpatory] information and therefore, Plaintiff's *Brady* claim against Horvat also fails." Dckt. No. 57 at 18. The Seventh Circuit has held that prosecutors who, like Horvat, Trutenko and Kunkle, withhold exculpatory evidence while not leading the prosecution can be held civilly accountable. *Houston v. Partee*, 978 F.2d at 368; *see also Patterson*, 328 F. Supp. 2d at 888. Thus, this argument fails.

Next, any argument by Defendant Horvat that his representation of Trutenko as a private citizen serves as a bar to Plaintiff's claim also fails both on the facts and the law. Horvat was clearly working for the CCSAO and acting on its behalf when he is alleged to have joined the

---

[16] Additionally, it could be reasonably argued that the violation of Plaintiff's liberty interest did not completely expire until December 18, 2020 when judge hooks granted Plaintiff a certificate of innocence.

conspiracy and acted in furtherance of it. Moreover, it is well established that a private citizen

acts under color of law and is liable under § 1983 when he acts in conspiracy with a state actor to

deprive the plaintiff of his civil rights, and can also be sued as a private citizen, even absent color

of law, under §§ 1985 and 1986. *Adickes v. Kress*; *Hampton v. Hanrahan*. Plaintiff's well

pleaded complaint establishes each of these avenues for holding Horvat liable.

Finally, Defendant Horvat argues that "the Complaint is devoid of a single fact

establishing that Horvat engaged in any of the alleged activity." Dckt. No. 58 at 19. The actual

Complaint paints a far different picture:

- "During the third trial, Defendant Horvat joined and participated in Defendant Trutenko's continuing effort to withhold critical and material exculpatory evidence that would have unraveled Trutenko's continuing illicit relationship with jailhouse informant Coleman," Comp. ¶¶ 28, 218-221;

- By the point Defendant Horvat joined the conspiracy, Defendant Trutenko was withholding exculpatory evidence that:

    o (1) "Coleman's story was false, manufactured, purchased with County and City monies, and that the continued suppression of these facts were, in part, accomplished by a continuing personal relationship between Trutenko and Coleman," *Id*. ¶ 24;

    o (2) "After Coleman returned to England, and while Plaintiff's appeal was pending, Defendants Trutenko and Kunkle continued to have communications with Defendant Coleman, during which Coleman "extorted" money from them that had been previously promised by Trutenko and Kunkle for his prior testimony and as "hush money" to prevent him from revealing that his testimony in Plaintiff and his brother's cases was false and manufactured," *Id*. ¶203.

    o (3) "While Plaintiff's appeal was pending, Defendant Trutenko traveled to England to discuss Coleman's prior testimony, and Trutenko stood up as godfather for one of Defendant Coleman's infant children," *Id*. ¶ 204;

    o (4) "During Plaintiff's pending appeal, neither Trutenko nor Kunkle informed the Plaintiff, his counsel, or the court, about their continuing illicit relationship with Coleman, his extortion of money to keep quiet, the fact that he had been promised money for his testimony, and that they considered him to be a "con man" whose testimony was not worthy of belief. Instead, Defendants

78

Trutenko, Kunkle, and Coleman withheld this exculpatory and impeachment evidence as part of the effort to frame Plaintiff for crimes he did not commit," *Id*. ¶ 205;

- After joining the conspiracy, "Defendants Horvat and Trutenko not only withheld exculpatory and impeachment evidence from Plaintiff and the OSP, but Defendant Horvat also actively concealed this evidence from the OSP and urged OSP to not inquire into it," *Id*. ¶¶ 29, 219

- "Defendant Horvat's actions were done as part of Defendants' long-standing conspiracy to frame Plaintiff for crimes he did not commit," *Id*. ¶ 30.

Accordingly, Plaintiff's Complaint states viable claims against Horvat for the withholding of exculpatory evidence in violation of Plaintiff's constitutional rights as alleged in Count I.

## XII.  DEFENDANTS ARE LIABLE FOR THEIR FAILURE TO INTERVENE, AS ALLEGED IN COUNT I OF PLAINTIFF'S COMPLAINT

Count I of Plaintiff's Complaint asserts a Fourteenth Amendment due process claim and "[a]dditionally or alternatively, [that Defendants] failed to intervene to stop Plaintiff's wrongful prosecution and conviction, re-prosecution and re-conviction, and resultant imprisonment despite having the opportunity and duty to do so" (Comp. ¶ 318). *See Gibson v. City of Chicago*, No. 19 C 4152, 2020 WL 4349855, at *8 (N.D. Ill. July 29, 2020) (permitting plaintiff to pursue failure to intervene theory as an alternative basis for liability).

### A.  Failure to Intervene Claims Against Prosecutors are Permissible

Defendants Kunkle and Trutenko argue that failure to intervene is not a viable claim against prosecutors. Dckt. No. 47 at 23-24 (Trutenko MTD); Dckt. No. 76 at 10-11 (Kunkle MTD)(citing *Gordon v. Devine*, No. 08 C 377, 2008 WL 4594354, at *17 (N.D. Ill. Oct. 14, 2008); *Andrews v. Burge*, 660 F. Supp. 2d 868, 876 n.6 (N.D. Ill. 2009); and *Hobbs v. Cappelluti*, 899 F. Supp. 2d 738, 773 (N.D. Ill. 2012)). These cases, however, predate the Seventh Circuit case of *Whitlock v. Brueggeman*, 682 F.3d 567, 580 (7th Cir. 2012). There, the

Seventh Circuit held that when acting in an investigatory capacity, prosecutors are subject to the same rules as those governing police officers. and can therefore violate a citizen's due process rights "just as easily as a police officer." *Id.*

After *Whitlock*, trial courts have permitted claims against prosecutors for failure to intervene. *See, e.g.*, *Saunders v. City of Chicago*, No. 12-cv-09158, 2013 WL 6009933, at *10 (N.D. Ill. Nov. 13, 2013) (permitting claim against prosecutor for failure to intervene to proceed); *Rivera v. Lake Cnty.*, 974 F. Supp. 2d 1179, 1191 (N.D. Ill. Sept. 26, 2013) (same). Here, as demonstrated above, Defendants Kunkle and Trutenko acted in an investigatory capacity, exposing them to liability for failure to intervene.

### B. As Court Reporter, Plaintiff Has Sufficiently Alleged that Defendant Hartnett Failed to Intervene

"[U]nder certain circumstances a state actor's failure to intervene renders him or her culpable under § 1983." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). "Anyone whose conduct is 'fairly attributable to the State'"—certainly including court reporters who work directly for ASAs and police detectives—can be liable under § 1983. *Filarsky v. Delia*, 566 U.S. 377, 383 (2012); *Loubser v. Thacker*, 440 F.3d 439, (7th Cir. 2006).

As alleged in Paragraphs 52 and 145-151 of Plaintiff's Complaint, in 1982 Hartnett was a court reporter contracted with Cook County and the CCSAO who was present at Area 2 when Defendant officers tortured Plaintiff and others, and 'didn't give a damn' if Plaintiff was tortured." Hartnett knew that Plaintiff had been tortured before taking his statement but did not intervene to stop the torture or to inform Defendant Hyman that he should ask Plaintiff and Andrew Wilson whether they had been tortured or mistreated, despite the fact that the CCSAO at that time had a policy requiring law enforcement to ask whether a person giving a statement had been physically abused or mistreated.

Defendant Hartnett asserts that although he could find no case law discussing a court reporter's failure to intervene, "it would clearly stand to reason that if a prosecutor does not have a duty to intervene, a court reporter could not possibly have such a duty." Dckt. 59 at 20. First, as set forth above, a prosecutor does have the duty to intervene, so it follows that this argument must likewise fail. *See, e.g.*, *Saunders v. City of Chicago*, No. 12-cv-09158, 2013 WL 6009933, at *10. Moreover, contrary to Hartnett's further argument, he is not entitled to absolute prosecutorial immunity. *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, (1993) (holding that court reporters are entitled to qualified, not absolute, immunity); *see also Buckley v. Fitzsimmons*, 509 U.S. 259, 268-69 (1993) (acknowledging that most public officials are entitled only to qualified immunity, and that "we have been 'quite sparing' in recognizing absolute immunity for state actors in this context") (quoting *Forrester v. White*, 484 U.S. 219, 224 (1988)).

Here, Defendant Harnett failed to intervene during the investigation when he knew that Plaintiff was tortured before giving a statement. He was acting in the same investigatory capacity as the Defendant officers and Defendant Hyman when taking Plaintiff and Andrew Wilson's statements. Namely, he helped coerce a tortured and false statements against Plaintiff before probable cause arose. Based on Plaintiff's allegations and applicable case law, Harnett is not immune and, like his co-conspirators, can be sued for failing to intervene. *Bianchi v. McQueen*, 818 F.3d 309, 318 (7th Cir. 2016).

## XIII. PLAINTIFF HAS SUFFICIENTLY ALLEGED CONSPIRACY CLAIMS AGAINST HYMAN, KUNKLE, TRUTENKO, HORVAT AND HARTNETT

Defendants Hyman, Kunkle, Trutenko, Horvat and Hartnett each assert that Plaintiff's conspiracy claims should be dismissed because they are unduly vague. Dckt. 72 at 14-16; Dckt.

81

76 at 7-9; Dckt. 47 at 15-16; Dckt. 58 at 20-21; Dckt. 59 at 19-20. Their arguments are without

merit.

In *Smith v. Burge*, 222 F. Supp. 3d 669, 687 (N.D. Ill. 2016), Judge St. Eve set forth the

pleading standard for conspiracy claims under federal and state law as follows:

> To sufficiently allege a conspiracy claim under federal law, Plaintiff must set forth the
> parties to the conspiracy, the purpose of the conspiracy, and the approximate dates of the
> conspiracy. *See Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir. 2009); *Loubser v.
> Thacker*, 440 F.3d 439, 443 (7th Cir. 2006); *Thomas v. City of Blue Island*, 178 F. Supp.
> 3d 646 (N.D. Ill. 2016); *see also Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d
> 806, 820 (7th Cir. 2015) (section 1985(3) "makes it unlawful to commit certain acts, such
> as conspiring to deprive a person or class of persons of the equal protection of the laws").
> Under Illinois law, a "complaint must do more than merely characterize a combination of
> acts as a conspiracy," it must allege the "'necessary and important element' of an
> agreement." *Merrilees v. Merrilees*, 2013 IL App (1st) 121897, 998 N.E.2d 147, 162, 375
> Ill. Dec. 855 (1st Dist. 2013) (citation omitted); *see also McClure v. Owens Corning
> Fiberglas Corp.*, 188 Ill. 2d 102, 133, 720 N.E.2d 242, 241 Ill. Dec. 787 (1999) ("Civil
> conspiracy is defined as 'a combination of two or more persons for the purpose of
> accomplishing by concerted action either an unlawful purpose or a lawful purpose by
> unlawful means.") (citation omitted).

As shown in the Summary of Allegations, above, Plaintiff's Complaint contains detailed

factual allegations in support of his claims that Defendants Burge, McKenna, O'Hara, Yucaitis,

Martin, Shines, Hillard, Needham, Daley, Hyman, Kunkle, Trutenko, Horvat and Hartnett

conspired to deprive Plaintiff, who is African-American, of his constitutional rights, including

his right to a fair and impartial trial and equal protection of the law. Specifically, Plaintiff has

alleged that Defendant Burge and other Chicago Police Detectives began their unlawful

conspiracy as early as 1973, and that it lasted through Plaintiff's interrogation and torture in

1982, his conviction in 1983, his retrial in 1989, and continued throughout his incarceration and

his third trial in 2020.

The factual allegations regarding the roles played by Martin, Shines, Hillard, Needham

and Daley in this conspiracy are essentially identical to those made against these same

defendants in *Smith v. Burge*, where Judge St. Eve held that they stated a plausible claim for relief. 222 F. Supp, 3d at 687-89.

Likewise, Plaintiff's Complaint more than sufficiently alleges federal and state law conspiracy claims against Hyman, Kunkle, Trutenko, Horvat and Hartnett. [17] As set forth above, Hyman and Hartnett joined Burge, O'Hara, McKenna and Yucaitis in the conspiracy in 1982 when they were present for and participated in the torture, coercion, and fabrication of Plaintiff's and Andrew Wilson's confessions. Kunkle also joined the conspiracy in 1982 when he was specifically informed of the torture of Andrew Wilson by Defendant Daley and knowing that Plaintiff and his brother had been tortured by Burge and his men, coached Burge, McKenna, O'Hara, Yucaitis, Hartnett and Hyman to present false denials concerning the torture of Plaintiff and his brother at the motion to suppress hearing and participated in the coercion of witness Hardin. Trutenko joined the conspiracy in 1988 when he replaced Kunkle as the lead prosecutor in Plaintiff's retrial and manufactured false inculpatory evidence from Defendant Coleman and destroyed and otherwise suppressed exculpatory and impeaching evidence. Horvat joined the

---

[17] Defendant Hyman also argues that the intra-corporate conspiracy doctrine applies. Dckt. No. 72 at 21. Defendant Hyman is again mistaken as this doctrine applies when "managers of a corporation jointly pursuing its lawful business do not become 'conspirators' when acts within the scope of their employment are said to be discriminatory or retaliatory." *Travis v. Gary Community Mental Health Center, Inc.,* 921 F.2d 108, 110 (7th Cir. 1990). While the doctrine applies to claims under Section 1985, whether it also applies to claims under section 1983 is unsettled. *See Lovelace v. Gibson*, No. 17 CV 1201, 2017 WL 5196641, at *7 (C.D. Ill. Nov. 9, 2017) (collecting cases). The violation of Plaintiff's constitutional rights – as described amply above - does not reduce to "routine, collaborative business decisions that are later alleged to be discriminatory"—the kinds of business decisions that the intracorporate conspiracy doctrine was created to shield. *Newsome v. James*, No. 96 C 7680, 2000 WL 528475 at *15 (N.D. Ill. Apr. 26, 2000) (holding that the decision to frame someone for murder "is not the product of routine police department decision-making"). As Judge Gettlemen recognized recently, "Nor does the intracorporate conspiracy doctrine apply to conspiracies that are "part of some broader discriminatory pattern," or to conspiracies that "permeate the ranks of the organization's employees." *Dobbey v. Jeffreys*, 417 F. Supp. 3d 1103, 1111–12 (N.D. Ill. 2019); *Hartman v. Board of Trustees of Community College District No. 508, Cook County, Illinois* 4 F.3d 465, 470-71 (7th Cir. 1993); *Volk v. Coler*, 845 F.2d 1422, 1435 (7th Cir. 1988)(holding that the intracorporate conspiracy doctrine did not bar a section 1985 conspiracy claim based on "alleged numerous acts undertaken by several defendants"). As a result, Defendant Hyman's reliance on the intra-corporate conspiracy doctrine is misplaced and without merit.

conspiracy during Plaintiff's retrial in 2020 when he met with Trutenko and withheld exculpatory and impeachment evidence concerning Defendant Coleman. At various points, from the time that they each joined the conspiracy until the charges against Plaintiff were ultimately dismissed, these Defendants committed numerous additional overt acts in furtherance of the conspiracy as detailed above.

## XIV.  THE ILLINOIS LOCAL GOVERNMENTAL AND GOVERNMENTAL EMPLOYEES TORT IMMUNITY ACT DOES NOT IMPACT THE TIMELINESS OF PLAINTIFF'S STATE-LAW CLAIMS AGAINST DEFENDANT TRUTENKO

Plaintiff's Complaint alleges state-law malicious prosecution, intentional infliction of emotional distress, and conspiracy claims against Defendant Trutenko. Comp. ¶¶ 62-64. Defendant Trutenko argues that these state law claims are time-barred under the Illinois Local Governmental and Governmental Employees Tort Immunity Act. Dckt. No. 47 at 12.  No so. "The Illinois Tort Immunity Act establishes a one-year statute of limitations for civil actions against employees of a local entity for any injury." *Shelton v. Wright*, No. 09-cv-6413, 2011 WL 856811, at *3 (N.D. Ill. Mar. 9, 2011). Plaintiff's state-law malicious prosecution claim and IIED claim accrued on October 1, 2020, when charges were dropped against him. *Tabet v. Mill Run Tours, Inc.*, No. 10-CV-4606, 2013 WL 1103695, at *3 (N.D. Ill. Mar. 15, 2013) ("Under Illinois law, IIED claims that are based on facts alleged in parallel claims for malicious prosecution accrue, like claims for malicious prosecution, when state criminal proceedings are terminated in the plaintiff's favor."); *Cannon v. Burge*, No. 05 C 2192, 2006 WL 273544, at *10 (N.D. Ill. Feb. 2, 2006). Because Plaintiff's malicious prosecution and IIED claims are timely, so is his state-law conspiracy claim. *Huon v. Mudge*, No. 12-CV-0166-MJR-PMF, 2013 WL 12152427, at *8 (S.D. Ill. Aug. 22, 2013) ("Plaintiff's conspiracy claim based on his timely state law claims (IIED and malicious prosecution) is also timely."). Plaintiff filed his Complaint less than one

year after charges were dropped against him on October 1, 2020. As a result, the Illinois Tort

Immunity Act does not time-bar Plaintiff's state law claims.

## XV.  PLAINTIFF'S COMPLAINT PROPERLY ALLEGES A STATE LAW MALICIOUS PROSECUTION CLAIM

Count VI of the Complaint alleges a state law malicious prosecution claim. Comp. ¶¶

353-354. "'To state a claim for malicious prosecution under Illinois law, a plaintiff must allege

that: (1) he was subject to judicial proceedings; (2) for which there was no probable cause; (3)

the defendants instituted or continued the proceedings maliciously; (4) the proceedings were

terminated in the plaintiff's favor; and (5) there was an injury.'" *Sneed v. Rybicki*, 146 F.3d 478,

480-81 (7th Cir. 1998) (citing *Reed v. City of Chicago*, 77 F.3d 1049, 1051 (7th Cir. 1996)).

Plaintiff's Complaint adequately pleads each of these elements.

### A.  Plaintiff's Malicious Prosecution Claim is Timely

The City Defendants and Defendant Trutenko assert that Plaintiff's state law malicious

prosecution claim is untimely because it accrued when Plaintiff was released from custody in

June 2018. Dckt. 75 at 27 (City Defs. MTD); Dckt. 47 at 18 (Trutenko MTD). For the same

reasons explained in Section II, Plaintiff's claim is timely. *See Brooks v. Ross*, 578 F.3d 574,

578-79 (7th Cir. 2009) (noting that both state law and § 1983 claims rely on Illinois' two-year

statute of limitations for personal injury torts).

## XVI.  DEFENDANTS HORVAT, TRUTENKO, AND HYMAN COMMENCED OR CONTINUED CRIMINAL PROCEEDINGS AGAINST PLAINTIFF

Defendants Horvat, Hyman, and Trutenko contend that the Court should dismiss

Plaintiff's malicious prosecution claim against them because they were not involved in Plaintiff's

prosecution at the pertinent times. Dckt. 47 at 17-19 (Trutenko MTD); Dckt. No. 58 at 23-24

(Horvat MTD); Dckt. 72 at 23-24 (Hyman MTD). Horvat argues that he had nothing to do with

Plaintiff's 1983 and 1989 re-trials, and that he did not represent Trutenko until after Plaintiff's 2020 trial had started. So, purportedly, he played no role in Plaintiff's prosecution. Dckt. 58 at 24. Trutenko contends that he "is only clearly alleged to have played a relevant role with respect to the 1989 re-prosecution and re-trial of Plaintiff" and maintains that he "is entitled to dismissal of Plaintiff's malicious prosecution claim because he did not prosecute Plaintiff in 2020." Dckt. 47 at 18. Similarly, Hyman asserts that Plaintiff cannot maintain a malicious prosecution claim against him because, after he resigned from the CCSAO in May of 1982, he played no significant role in Plaintiff's prosecution. Dckt. 72 at 23-24 (Hyman MTD).

Although these Defendants minimize their roles in Plaintiff's prosecution, that tactic does not shield them from liability. Under Illinois law, "liability 'extends to all persons who played a significant role in causing the prosecution of the plaintiff . . . .'" *Johnson v. Winstead*, 447 F. Supp. 3d 715, 721 (N.D. Ill. 2019) (quoting *Beaman v. Freesmeyer*, 131 N.E.3d 488, 495 (2019)); *see also Hill v. Cook Cnty.*, 463 F. Supp. 3d 820, 845 (N.D. Ill. May 31, 2020) ("Illinois allows a plaintiff to bring this claim against certain defendants, like police officers and prosecutors, so long as they had a meaningful role in the ensuing prosecution."). Deciding liability "calls for a commonsense assessment" of the circumstances and extends to those who indirectly influenced the plaintiff's prosecution, including those who "'improperly exerted pressure on the prosecutor, knowingly provided misinformation to him or her, concealed exculpatory evidence, or otherwise engaged in wrongful or bad-faith conduct instrumental in the initiation of the prosecution.'" *Id.* (quoting *Beaman*, N.E.3d at 500); *see also Rosado v. Mora*, No. 17 C 2210, 2019 WL 4450523, at *6 (N.D. Ill. Sept. 17, 2019) (denying summary judgment to defendant officials who "participated in the chain of events" of plaintiff's prosecution).

Here, Hyman acknowledges that he approved charges against Plaintiff in 1982. Dckt. 72 at 23-24 (Hyman MTD). But, because prosecutors have absolute immunity for initiating charges, Plaintiff does not premise his malicious prosecution claim against Hyman on this decision. *Hobbs v. Cappelluti*, 899 F. Supp. 2d 738, 769 (N.D. Ill. 2012). Instead, Plaintiff's malicious prosecution claim against Hyman rests primarily on his investigative actions before probable cause arose—for which he has no absolute prosecutorial immunity. *See* Section V. Because Plaintiff's allegations against Hyman happened in February 1982 (when Plaintiff was tortured into a false statement), Defendant Hyman's subsequent resignation from the CCSAO does not protect him from liability. *See Lewis*, 677 F.3d at 330 ("But, prosecutors are *not* entitled to absolute immunity when performing 'acts of investigation or administration.'").

Similarly, Trutenko is not absolved of liability because he did not prosecute Plaintiff in 2020. Plaintiff's claim accrued on October 1, 2020, when charges were dismissed. Plaintiff could not have sued Trutenko *inter alia*, for malicious prosecution, before that date. *See Sneed v. Rybicki*, 146 F.3d 478, 481 (7th Cir. 2011) ("For malicious prosecution, all the elements cannot be pled until the proceedings are terminated in the plaintiff's favor. Thus, the cause of action does not accrue until the proceedings are over."). Trutenko played a significant role in Plaintiff's prosecution and engaged in "wrongful or bad-faith conduct." *Johnson*, 447 F. Supp. 3d at 721; *see* Section V(B) (discussing Trutenko's lack of immunity for fabricating evidence—*i.e.*, Coleman's statement—that formed the basis for Plaintiff's 1989 wrongful conviction and withholding exculpatory evidence that continued Plaintiff's wrongful prosecution for several more decades).

Finally, as set forth above and in paragraphs 214-221 of Plaintiff's Complaint, Horvat also played a significant role in continuing Plaintiff's prosecution. he learned of significant

87

exculpatory evidence relating to Trutenko and Coleman, withheld such exculpatory evidence from OSP in a meeting that took place before Trutenko's testimony, then at trial, while continuing to withhold exculpatory evidence that would have proved the conspiracy among Defendants Trutenko, Coleman, and Kunkle to fabricate false evidence, he warned OSP to avoid inquiring of Defendant Trutenko about his untoward relationship with Defendant Coleman. This was an effort designed to prevent Plaintiff and the court from learning this exculpatory and impeachment evidence and resulted in the continuation of Plaintiff's third trial, which lasted two weeks before unraveling. Thus, Defendant Horvat "caused the continuation of [Plaintiff's] wrongful conviction" by working to conceal evidence (Comp. ¶ 316) and thereby "'improperly exerted pressure on the prosecutor, knowingly provided misinformation to him or her, concealed exculpatory evidence, or otherwise engaged in wrongful or bad-faith conduct . . . .'" during the prosecution. *Johnson*, 447 F. Supp. 3d at 721 (quoting *Beaman*, 131 N.E.3d at 495 (2019)). This misconduct harmed Plaintiff in significant respects by forcing him to endure a third criminal trial for crimes he did not commit.

## XVII.  The Complaint Sufficiently Alleges Malice and Lack of Probable Cause

Defendants Horvat, Hyman, Kunkle, and Trutenko also argue that Plaintiff has pleaded no facts alleging a lack of probable cause. Dckt. 47 at 19 (Trutenko MTD); Dckt. 58 at 24 (Horvat MTD); Dckt. 72 at 24 (Hyman MTD); Dckt. 76 at 14 (Kunkle MTD). Kunkle contends that probable cause existed because "(1) plaintiff confessed to the crimes he was charged with,[18] (2) there was indisputably a judicial finding of probable cause to detain (since plaintiff was held in custody prior to his trial); and (3) plaintiff was convicted in the 1983 trial." Dckt. 76 at 14 (Kunkle MTD). Trutenko asserts, without elaboration, that probable cause to re-prosecute

---

[18] Defendant Kunkle omits important allegations from the Complaint, including that confession was the product of police torture. Dckt. 1 at 31-32, 34 (Comp. ¶¶ 211-212, 224).

Plaintiff was "plainly evident" for Plaintiff's 1989 re-prosecution. Dckt. 47 at 19. Hyman asserts, similarly without explanation, that "plaintiff has not pled any facts to suggest that Mr. Hyman lacked probable cause to believe that Plaintiff was *not* involved with the murders on February 9, 1982." Dckt. 72 at 30. Defendants cite no cases supporting their argument.

Defendants probable cause arguments are premature. Probable cause assessments typically are questions of fact for the jury. *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993). The court cannot resolve the factual disputes that Defendants raise at the pleading stage. *Id.*

Instead, the Court must accept Plaintiff's allegations that the only evidence supporting charges against Plaintiff were the tortured, false, and fabricated statements. Comp. ¶¶ 85-144. Hyman knew that the statements were false, coerced, and the product of torture. *Id.* ¶¶ 145-52. Also, before Plaintiff and his brother were tortured, eyewitness Tyrone Sims had reported that Plaintiff was not responsible for the murders. *Id.* ¶¶ 79-84. Later, before Plaintiff's second re-trial in 1987, Trutenko manufactured a false statement with Defendant Coleman that was unconstitutionally used as probable cause against Plaintiff. *Id.* ¶¶ 185-195. After receiving a new trial in 2018, Plaintiff was prosecuted for a third time based on Coleman and Hardin's manufactured evidence. *Id.* ¶¶ 209-226. These allegations amount to a plausible claim that Defendants lacked probable cause to initiate and maintain charges against Plaintiff. *See Smith v. Burge*, 222 F. Supp. 3d 669, 690 (N.D. Ill. 2016) ("In the context of a common law malicious prosecution claim in Illinois, '[p]robable cause is 'a state of facts that would lead a person of ordinary caution and prudence to believe, or entertain an honest and strong suspicion, that the person arrested committed the offense charged.'").

In *Smith*, the plaintiff alleged that the defendant officers had concocted probable cause by feeding him a false confession and coercing him to confess by physically beating and injuring him. *Id.* at 691. The Court concluded that these allegations sufficiently alleged a lack of probable cause at the pleading stage. *Id.*; *see also Williams v. City of Chicago*, 315 F. Supp. 3d 1060, 1070 (N.D. Ill. 2018) (denying motion to dismiss where plaintiff alleged that coerced statement containing falsehoods was the only evidence supporting probable cause).

The fact that there was a judicial finding of probable cause and that Plaintiff was later convicted does not defeat Plaintiff's claims as a matter of law. "Defendants cannot manufacture their own probable cause by fabricating evidence and manipulating eyewitnesses . . . ." *Kuri v. City of Chicago*, No. 13 C 1653, 2017 WL 4882338, at *7 (N.D. Ill. Oct. 30, 2017); *see also Serrano v. Guevara*, 315 F. Supp. 3d 1026, 1038 (N.D. Ill. 2018) (noting that false evidence cannot support probable cause); *Collier v. City of Chicago*, No. 14 C 2157, 2015 WL 5081408, at *4, 8-9 (N.D. Ill. Aug. 26, 2015) (denying summary judgment because defendants cannot manufacture probable cause by planting evidence, falsely representing important details, and ignoring exculpatory evidence); *Tully v. Del Re*, No. 00 C 2829, 2002 WL 31175983, at *5 (N.D. Ill. Oct. 1, 2002) (probable cause was a jury question where defendants "implicitly importuned witness to manufacture a basis for charges" and "thus could not reasonably have relied on what Ryba told them"). Although an indictment is prima facie evidence of probable cause, this presumption is rebutted "where there is evidence that the indictment was procured through false or fraudulent testimony." *Patrick v. City of Chicago*, 213 F. Supp. 3d 1033, 1057 (N.D. Ill. 2016); *see also Mut. Medical Plans, Inc. v. Cnty. of Peoria*, 309 F. Supp. 2d 1067, 1082 (C.D. Ill. Mar. 16, 2004) ("'Prima facie probable cause' is established by return of indictment by grand jury, but it is not conclusive evidence of probable cause and it may be rebutted by other evidence

90

such as proof that indictment was obtained by false or fraudulent testimony or other improper of fraudulent means."). Accordingly, the fact that Plaintiff was indicted and convicted does not defeat his claim.

Finally, "malice can be inferred when a defendant lacks probable cause and the circumstances indicate a lack of good faith." *Holland v. City of Chicago*, 643 F.3d 248, 255 (7th Cir. 2011); *see also Collier*, 2015 WL 5081408, at *8 ("Defendants mention in passing that there is no evidence of malice. But malice may be inferred from lack of probable cause when there is no other credible evidence which refutes that inference." (internal quotation marks and citations omitted)). As a result, the same allegations supporting a lack of probable cause support an inference of malice. Moreover, the outrageous, conspiratorial fact pattern alleged by Plaintiff, and judicially established in overwhelming part by the findings of Judges Hooks and Maldonado, establishes an almost uniquely powerful basis for establishing malice. Thus, Plaintiff's Complaint sufficiently pleads a malicious prosecution claim.

## XVIII. DEFENDANTS DO NOT ENJOY QUALIFIED IMMUNITY FOR THEIR VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS

Defendants Hartnett, Kunkle, Trutenko, Horvat, Hyman, and Kunkle assert various qualified immunity defenses. Dckt. No. 47 at 21 (Trutenko); Dckt. No. 59 at 82 (Harnett); Dckt. No. 58 at 23 (Horvat); Dckt. 72 at 18 (Hyman); Dckt. No. 76 at 10 (Kunkle). This case is not a qualified immunity case.

Dismissal based on qualified immunity is rarely appropriate at the motion to dismiss stage. "Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground for dismissal." *Jacobs v. City of Chi.*, 215 F.3d 758, 775 (7th Cir. 2000) (Easterbrook, J., concurring). Dismissal rarely is appropriate because all a plaintiff must do to state a claim under § 1983 is to allege that a person acting under color of state law has deprived him of a federal right. *Gomez v. Toledo*,

91

446 U.S. 635, 640 (1980). The Supreme Court has warned that lower courts may never alter this basic pleading requirement of § 1983 claims simply because a defendant asserts a qualified immunity defense. *Crawford-El v. Britton*, 523 U.S. 574, 594-97 (1998); *see also Alvarado v. Litscher*, 267 F.3d 648, 651-52 (7th Cir. 2001) ("Because an immunity defense usually depends on the facts of the case, dismissal at the pleading stage is inappropriate: The plaintiff is not required initially to plead factual allegations that anticipate and overcome a defense of qualified immunity."). "Ultimately, dismissal under Rule 12(b)(6) is appropriate based on qualified immunity only when the plaintiff's well-pleaded allegations, taken as true, do not 'state a claim of violation of clearly established law.'" *Hanson v. LeVan*, 967 F.3d 584, 590 (7th Cir. 2020) (citing *Behrens v. Pelletier*, 516 U.S. 299, 306 (1996)). Plaintiff need only identify a violation of a "broad constitutional right" to survive a Rule 12(b)(6) motion. *Id.*

Plaintiff's complaint easily satisfies this standard. As described above, Plaintiff's complaint provides detailed allegations of how Defendants, knowing that he was innocent, framed him for murder by torturing him and physically coercing him into giving a false confession; providing the false confession to prosecuting attorneys for their use in his criminal prosecution; and withholding exculpatory evidence. Because it has been clearly established since long before 1982 that coercing a confession, fabricating inculpatory evidence, and suppressing material exculpatory and impeaching evidence to deprive someone of their liberty is unconstitutional, Defendants' qualified immunity arguments fail. *See, e.g.*, *Mooney v. Holohan*, 294 U.S. 103 (1935); *Pyle v. Kansas*, 317 U.S. 213 (1942); *Napue v. Illinois*, 360 U.S. 264 (1959); *Brady v. Maryland*, 373 U.S. 83 (1963); *United States v. Bagley*, 473 U.S. 667 (1985); *Jones v. City of Chi.*, 856 F.2d 985 (7th Cir. 1988).

92

Courts in this district have uniformly rejected qualified immunity arguments in cases arising from systemic torture occurring in Area 2 in the 1980s. In *Smith v. Burge*, 222 F. Supp. 3d 669, 683 (N.D. Ill. 2016), the court rejected qualified immunity based on the plaintiff's "*Brady* claim, which includes allegations that Defendants suppressed and destroyed evidence of systemic torture and abuse in Area 2, obstructed investigations into CPD's systemic torture, and discredited findings of systemic torture." The court concluded that "Defendants fail to explain how it was not clearly established in 1983-84 that destroying and suppressing exculpatory evidence was unconstitutional." *Id.* "Moreover, viewing Plaintiff's allegations and all reasonable inferences in his favor, his allegations show that Defendants' conduct was 'so egregious that no reasonable person could have believed it would not violate established rights.'" *Id.* (quoting *Beaman v. Freesmeyer*, 776 F.3d 500, 508-09 (7th Cir. 2015); *see also Kluppelberg v. Burge*, No. 13 C 03963, 2017 WL 3142757, at *8 (N.D. Ill. July 25, 2017) (denying qualified immunity for suppression of exculpatory evidence, failure to intervene, and fabrication arising from torture case because these rights were clearly established before 1988); *Kitchen v. Burge*, No. 10 C 4093, 2012 WL 346450, at *4 (N.D. Ill. Feb. 1, 2012) (collecting cases and denying qualified immunity for suppression of evidence of torture); *Orange v. Burge*, No. 04 C 0168, 2005 WL 742641, at *11 (N.D. Ill. Mar. 30, 2005) (recognizing *Brady* claim where "defendants allegedly caused Orange to experience an unfair trial through their false testimony and other acts taken to cover up the torture obtained confession from Orange.). Defendants fail to acknowledge the myriad cases denying qualified immunity on similar facts.

Instead, Defendant Hyman argues that qualified immunity protects him because the "officers' coercive tactics toward witnesses [ ] did not violate plaintiff's rights, was not known to ASA Hyman and was not known by ASA Hyman to be false." Dckt. 72 at 18. Hyman is wrong

that the Defendant officers' "coercive tactics" did not violate Plaintiff's constitutional rights. "[T]hat torture is unlawful has been clearly established for decades, thus rendering futile any argument that an individual who engaged in torture should enjoy qualified immunity." *Tillman v. Burge*, 813 F. Supp. 2d 946, 966 n.12 (N.D. Ill. 2011) (citing *Wilkerson v. Utah*, 99 U.S. 130, 136 (1878)). Plaintiff's Complaint is rife with allegations that Defendant Hyman knew about and was involved in that torture. Comp. ¶¶ 11, 18, 100-01, 142-44, 145-49, 150-52, 241-42. Accordingly, qualified immunity does not shield Hyman from suit.

Harnett asserts that he deserves qualified immunity because, in 1982, "it was not clearly established that a court reporter had a constitutional obligation to either stop the police from physically harming a suspect or to refuse to record a confession of a suspect if the court reporter either knew or should have known the statement was coerced." Dckt. No. 59 at 82. Defendant Harnett's court reporter title doesn't shield him from liability. When considering qualified immunity, courts apply a "functional approach, which looks to the nature of the function performed, not the identity of the actor who performed it." *Buckley v. Fitzsimmons*, 509 U.S. at 269 (internal quotation marks and citations omitted). Here, Hartnett was acting in an investigatory capacity before the formation of probable cause against Plaintiff—the same capacity as the Defendant Officers and Defendant Hyman—when transcribing Plaintiff's statement. Defendant Hartnett was present in Area 2 when Plaintiff was tortured and knew that Plaintiff had been tortured before taking his statement. Dckt. No. 1 at 23 (Comp. ¶¶ 145-50). As a result, qualified immunity does not shield Defendant Hartnett just because he was a court reporter for the SAO, and he, like his ASA and police defendant co-conspirators, were bound by the clearly established law forbidding torture and fabrication and suppression of evidence.

94

Trutenko asserts that he is entitled to qualified immunity because "coerc[ing] or otherwise solicit[ing] a witness to falsely incriminate Plaintiff during a criminal investigation does not violate any established constitutional rights." Dckt. 47 at 21 (Trutenko MTD). The Seventh Circuit rejected this same argument in *Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014). There, the plaintiff alleged that the prosecutor coerced and fabricated testimony from witnesses, resulting in the plaintiff's wrongful conviction. *Id.* at 1109. The Seventh Circuit rejected the prosecutor's absolute and qualified immunity defenses because "it was established law by 1985 (indeed long before), when the fabrication is alleged to have occurred, that a government lawyer's fabricating evidence against a criminal defendant was a violation of due process." *Id.* at 1114 (citations omitted); *see Napue v. Illinois,* 360 U.S. 264, 269 (1959); *Pyle v. Kansas,* 317 U.S. 213, 215–16 (1942); *Mooney v. Holohan,* 294 U.S. 103, 110, 112–13 (1935) (per curiam). Accordingly, *Fields* precludes qualified immunity for Defendant Trutenko.

Horvat contends that qualified immunity shields him because it was not clearly established that withholding evidence of Trutenko's relationship with Coleman violated Plaintiff's constitutional rights. Dckt. No. 58 at 23. His assessment is inaccurate. Defendant Horvat had a clearly established duty to disclose exculpatory evidence about Trutenko's and Coleman's relationship. *See, e.g.*, *United States v. Bagley*, 473 U.S. 667, 690-91 (1985) (failure to disclose evidence about key witness' reliability violates defendant's constitutional rights). Further, Plaintiff's Complaint alleges additional withheld exculpatory evidence by Defendant Horvat, as set forth above in Sections I(D) and XI(B). Through *Bagley* and its progeny, Defendant Horvat had an obligation to disclose this exculpatory and impeachment evidence as well.

Kunkle invokes qualified immunity because, he argues, he did not become involved in the case until after the fabrication of evidence already had occurred. Dckt. 76 at 10. Kunkle, however, ignores his liability for fabricating DeWayne Hardin's statement and his important role in subsequently suppressing the exculpatory Coleman evidence. By 1982, fabricating a witness statement and suppressing exculpatory evidence were clearly established as violations of due process. *Fields*, 740 F.3d at 1114.

Qualified immunity is rarely appropriate at the motion to dismiss stage. This principle is especially applicable here, where there are allegations of egregious torture, fabrication, and suppression of evidence. Each of the alleged constitutional rights was clearly established at the time the violations occurred, and in any event, they are the types of violations that any reasonable person would have known would violate Plaintiff's rights. *Smith v. Burge*, 222 F. Supp. 3d at 683. The Court should deny Defendants' ill-founded pleas for qualified immunity.

## XIX.  PLAINTIFF'S *MONELL* CLAIM MUST SURVIVE

The City seeks to dismiss Plaintiff's *Monell* claims to the extent that his underlying constitutional claims are dismissed. Dkt. 75 at 36. As set forth above, Plaintiff has alleged viable constitutional claims. Therefore, the Court should reject the City's request to dismiss the *Monell* claims.

## XX.  COOK COUNTY SHOULD BE REQUIRED TO ANSWER THE COMPLAINT ALONG WITH ALL OTHER DEFENDANTS

Cook County separately moves for an order finding that Plaintiff seeks to hold the County liable only for indemnification and requests that it be excused from answering Plaintiff's complaint. Dkt. 42 ¶ 5. The County provides no support for this request. First, Plaintiff did name Cook County as a Defendant for indemnification purposes. At this point, Plaintiff has not named Cook County in the other counts of the complaint, which is apparent on the face of the

96

Complaint and need not be memorialized in a Court order. Second, the County provides no justification for its request to be excused from answering the Complaint. At least one other judge in this district recently rejected the same request (along with a request to be excused from discovery) on the grounds that the request was "tantamount to dismissal," which was not appropriate because the plaintiff had alleged viable claims. *Cates v. Manning*, 19 C 5248, 2020 WL 1863299, at *4 (N.D. Ill. Apr. 14, 2020). In this case, the County does not even argue that Plaintiff's indemnification claim is not viable, making the County's request even less persuasive than it might have been in *Cates*, where the County had at least sought dismissal from the case. The County should be ordered to answer the Complaint at the same time as the other Defendants. *See id.*; *see also Adedeji v. Cobble*, 10 C 0892, 2013 WL 449592, at *6 (N.D. Ill. Feb. 5, 2013) ("Plaintiff may proceed with his indemnification claim against Cook County. Cobble and Cook County shall answer the complaint within twenty-one days of the entry of this order.").

## XXI. PLAINTIFF'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IIED) CLAIM IS TIMELY AND ADEQUATELY PLED

Defendants have moved to dismiss Plaintiff's IIED claim, erroneously arguing it is untimely. In fact, Plaintiff's IIED claim is subject to the same accrual rules as his other claims, meaning that until the criminal proceedings finally ended, Plaintiff's IIED claim was *Heck* barred. Next, Defendants Horvat and Hartnett argue that Plaintiff's IIED claim does not sufficiently allege outrageous or extreme conduct. For the reasons stated below, Defendants' arguments are without merit.

### A. Plaintiff's IIED Claim is Timely

As described in detail above, Plaintiff's federal claims did not accrue until the criminal proceedings were dismissed in September 2020. *See infra* Section II; *see also* Comp. ¶¶ 27, 29. Illinois applies the *Heck* and federal accrual rules. *Lieberman v. Liberty Healthcare Corp.*, 408

Ill. App. 3d 1102, 1112-13 (4th Dist. 2011) (citing *Heck*, 512 U.S. 477); *see also Northfield Ins. Co. v. City of Waukegan*, 701 F.3d 1124, 1137 (7th Cir. 2012) (Hamilton, J., concurring) (referring to "Illinois's embrace of [the Heck] rule in *Lieberman*").

Relying primarily on *Bridewell v. Eberle*, 730 F.3d 672, 678 (7th Cir. 2013), the Defendants argue that an IIED claim accrues upon arrest. *See*, *e.g.*, Dckt. 59 at 18; Dckt. 72 at 30; Dckt. 75 at 25-26.[19] The more recent weight of authority has applied the *Heck* delayed-accrual rules to IIED claims, including in cases where there was a prosecution but no conviction, which suggests that the pronouncements in *Bridewell* no longer apply as the § 1983 accrual rules have subsequently evolved. *See*, *e.g.*, *Smith v. Burge*, 222 F.Supp.3d at 692-93 (noting that *Bridewell* did not involve a conviction and did not address the *Heck* bar). For example, earlier this year Judge Kendall declined to dismiss an IIED claim filed more than a year after criminal proceedings began despite the fact that the plaintiff in that case, unlike here, was never convicted of a crime. *See, e.g., Treadwell v. Salgado*, 19 C 3179, 2021 WL 3129290, at *4 (N.D. Ill. July 23, 2021) ("There would be little sense in holding Plaintiff cannot bring § 1983 claims for malicious prosecution until the criminal proceedings are terminated in the Plaintiff's favor but then require him to file a claim for IIED within a year of his arrest. The Court denies dismissal of Plaintiff's IIED claim under the statute of limitations."); *see also Brown v. City of Chicago*, No. 18 C 7064, 2019 WL 4694685, at *6-7 (N.D. Ill. Sept. 26, 2019) (applying *Heck* delayed accrual rule to IIED state-law claim in wrongful conviction case, holding that the claim did not accrue until criminal proceedings terminated in plaintiff's favor while noting other cases holding the same post-*Bridewell*); *Serrano v. Guevara*, 315 F. Supp. 3d 1026, at 1042–43 (cited in *Brown* and applying delayed accrual post-*Bridwell*); *Smith*, 222 F.Supp.3d at 693 (also cited in *Brown* and holding the same); *Heidelberg v. Manias*, No. 118CV01161SLDJEH, 2019 WL 4862069, at

---

[19] Pin cites are to the ECF pagination.

*23 (C.D. Ill. Mar. 26, 2019) (applying delayed accrual post-*Bridewell*); *Casciaro v. Von Allmen*, No. 17 C 50094, 2017 WL 5626200, at *6 (N.D. Ill. Nov. 22, 2017) (same); *Gonzalez v. City of Waukegan*, No. 16 C 2906, 2016 WL 7451627, at *8-9 (N.D. Ill. Dec. 28, 2016) (same); *Walker v. White*, No. 16 CV 7024, 2017 WL 2653078, at *6 (N.D. Ill. June 20, 2017) (same); *see also Parish v. City of Elkhart*, 614 F.3d 677, 683-84 (7th Cir. 2010) (under *Heck*, the plaintiff could not have brought his Indiana IIED claim based on fabrication of evidence and a wrongful conviction until he had favorable termination). As noted in the numerous cases cited above, it makes little sense to have a rule that would require Plaintiff to file a single IIED claim (perhaps while the criminal proceedings were still pending) while delaying the filing of multiple other claims that arise from the exact same facts and are based on the identical alleged wrongful conduct. *See, e.g.*, *Treadwell*, 2021 WL 3129290, at *4 (declining to dismiss IIED claim because, among other reasons, the case was proceeding regardless); *see also Brown*, 2019 WL 4694685, at *7 (explaining that the procedure urged by the Defendants would be "contrary to the 'pragmatic concerns with avoiding parallel criminal and civil litigation over the same subject matter and the related possibility of conflicting civil and criminal judgments' that motivated *Heck*") (quoting *McDonough*, 139 S. Ct. at 2157).

### B. Plaintiff adequately alleges that Hartnett and Horvat engaged in extreme or outrageous conduct

In addition to the statute of limitations argument, Hartnett and Horvat both argue that Plaintiff fails to adequately allege the type of extreme or outrageous conduct necessary for an IIED claim. Hartnett relies on the assertion that Plaintiff alleges only that Hartnett recorded Plaintiff's confession in 1982. Dkt. 59 at 25. But this characterization ignores the actual allegations in Plaintiff's Complaint, Plaintiff does not merely allege that Hartnett recorded his confession. Rather, he alleges that "Plaintiff's torture occurred with the knowledge and

99

participation of … Michael Hartnett," who took Plaintiff's false confession even though he knew

that he had been tortured, and even went so far as to say that he "'didn't give a damn'" if

Plaintiff was tortured. Comp. ¶¶ 11, 145-51.

Horvat contends that "Plaintiff fails to allege any conduct by Horvat that even

conceivably could rise to the level of extreme or outrageous," that Plaintiff does not allege that

Horvat caused him any emotional distress, and that because Trutenko eventually disclosed the

information Horvat tried to hide, there was no harm caused. Dkt. 58 at 25. Again, this and

attempts to reframe the allegations in Plaintiff's complaint, which is not appropriate at the

motion to dismiss stage. Contrary to Horvat's assertions, the Complaint does allege extreme and

outrageous conduct. In particular, it alleges that Horvat, then a public official, met with a key

witness before Wilson's third trial and entered into a conspiracy to withhold critical, exculpatory

information from Plaintiff, which caused Plaintiff's damages. Comp. ¶¶ 217-221, 316, 319

(alleging that actions by Horvat and the other Defendants "were the direct and proximate cause

of the injuries to Plaintiff" detailed in the complaint).

The above-described allegations against Hartnett and Horvat, both government officials

at the relevant times, more than sufficiently describe extreme and outrageous conduct necessary

for an IIED claim. In fact, these types of allegations against government officials are the

prototypical IIED claim. *See*, *e.g.*, *Fox v. Tomczak*, 04 C 7309, 2006 WL 1157466, at *6 (N.D.

Ill. Apr. 26, 2006) ("threats made by someone with the authority and with the ability to exercise

those threats over someone else's interests can be outrageous," and "[a]llegations that a state

official fabricated false or misleading evidence of guilt or concealed exculpatory evidence would

be sufficiently 'outrageous' to support an IIED claim"). thus, like the alleged conduct of their co-

conspirators, the allegations against Hartnett and Horvat clearly establish sufficient outrageous conduct to support Plaintiff's IIED claim against them.

## CONCLUSION

The Defendants in general, and Defendant Hyman in particular, make ad hominem attacks on the Plaintiff while attempting to cloak themselves with immunities that clearly do not apply to their egregious unconstitutional conspiracy to torture and frame an innocent man as part of a racially motivated conspiracy, that embodied City and County sanctioned patterns and practices of torture and cover-up. Moreover, Defendants' accrual arguments are misplaced, ignore the procedural history of this litigation and the binding precedent which applies, and hinge in large part on their own success in covering up their conspiracy for almost four decades.

Plaintiff's 67 page complaint sets forth in great detail each of these conspiring Defendants' roles in this conspiracy, and, unlike in most cases, these allegations are backed, paragraph by paragraph, by decades of court decisions, most important of which are the factual findings made by Judge Hooks in his exhaustive 2018 and 2020 decisions - - - findings that Plaintiff was victimized as part of the patterns and practices alleged herein, and that he was and is an innocent man who was tortured and framed for the acts of his brother. Thus, for all the reasons set forth above, the seven motions to dismiss must be denied.

Respectfully submitted,

s/ Flint Taylor
Flint Taylor
Ben Elson
People's Law Office
1180 N. Milwaukee Ave.
Chicago, IL 60642
773-235-0070

s/ Elliot Slosar
Jon Loevy
Scott Rauscher
Elliot Slosar
LOEVY & LOEVY
311 N. Aberdeen, 3rd FL
Chicago, IL 60607
312-243-5900

## <u>CERTIFICATE OF SERVICE</u>

I certify that true and correct copies of the foregoing have been served via CM/ECF on this, the 21st day of December 2021, to counsel of record for all parties.

<u>/s/ Elliot Slosar</u>
*Counsel for Plaintiff*

102