IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Jackie Wilson,

        Plaintiff,

        v.

Administrator of the Estate of Former
Chicago Police Department
Commander Jon Burge; Thomas
McKenna; Brian O'Hara, Special
Representative of Deceased Defendant
Patrick O'Hara; Geri Lynn Yanow,
Special Representative of Deceased
Defendant John Yucaitis; Lawrence H.
Hyman; Nicholas N. Trutenko; Michael
Hartnett; Timothy Andrew Horvat;
Susan Kunkle, Special Representative
of the Estate of William J. Kunkle;
William David Coleman; Anthony
Schumann, Special Representative of
Deceased Defendant Leroy Martin Sr.;
Terry Hillard; Robert Shines as Special
Representative for the Estate of Gayle
Shines; Thomas Needham; City of
Chicago; Cook County,

        Defendants.

No. 21-cv-03487
Judge Franklin U. Valderrama

**MEMORANDUM OPINION AND ORDER**

# Table of Contents

Background
    I.      Defendants Burge, McKenna, O'Hara, and Yucaitis
    II.     Defendants Hyman and Hartnett
    III.   Defendants Kunkle, Trutenko, Horvat, and Coleman
    IV.   Defendants Daley, Martin, Shines, Hillard, and Needham
    V.     Defendant City of Chicago

Legal Standard

Analysis
    I.      Statute of Limitations
      A.    Procedural History Relevant to Accrual
      B.    Timeliness of Section 1983 Claims
        1.   All Section 1983 Counts relating to Coerced Confession
        2.   Defendants' Alternative Argument for Dismissal of *All* Section 1983 Claims Associated with Wilson's 1983 and 1989 Convictions
        3.   Accrual of Claim for Deprivation of Liberty Without Probable Cause
      C.    Timeliness of State Law Claims
        1.   Malicious Prosecution
        2.   Intentional Infliction of Emotional Distress
        3.   Civil Conspiracy
    II.     Immunity
      A.    Claims Against Hyman
        1.   Absolute Prosecutorial Immunity
        2.   Qualified Immunity
        3.   State Law Claims
      B.    Claims Against Hartnett
      C.    Claims Against Trutenko
      D.    Claims Against Kunkle
        1.   Absolute Prosecutorial Immunity
        2.   Qualified Immunity
        3.   State Law Claims
      E.    Claims Against Horvat
      F.    Claims Against Daley
        1.   Eleventh Amendment Immunity
        2.   Absolute Prosecutorial Immunity
    III.   Sufficiency of Wilson's Claims
      A.    Individual Constitutional Claims (Counts I, II, III)
        1.   Claims Against Hartnett
          a.   Color of Law
          b.   Sufficiency of Counts I, II, and III

    2.     Claims Against Hyman
    3.     Claims Against Kunkle
    4.     Claims Against Horvat
    5.     Claims Against Shines, Hillard, Needham, and Martin
        a.    Suppression of Evidence (All City Defendants)
        b.    Failure to Supervise or Intervene (Martin)
        c.    Count III Under the Fourteenth Amendment (All City Defendants)
    6.     Claims Against Daley
        a.    Sufficiency of Count I
        b.    Conspiracy
  B.     Individual State-Law Claims (Counts VI and VII)
    1.     State-Law Malicious Prosecution Claim
        a.    Commencing or Continuing Prosecution
        b.    Probable Cause
    2.     Intentional Infliction of Emotional Distress
  C.     Conspiracy
    1.     Federal and State Conspiracy Claims
    2.     Intra-Corporate Conspiracy Doctrine
  D.     *Monell* Claim (Count V), Respondeat Superior (Count IX), and Indemnification (Count X)
IV.    Illinois Torture Inquiry and Relief Commission Act
  A.     The Act
  B.     Standing
    1.     Standing Doctrine Application to Defenses
    2.     Hyman's Standing
  C.     Constitutionality of the Act

Conclusion

On February 9, 1982, Chicago Police Officers William Fahey (Officer Fahey) and Richard O' Brien (Officer O'Brien) were shot and killed during a traffic stop. The murders led to the largest manhunt in the history of the City of Chicago. Five days later, Plaintiff Jackie Wilson (Wilson) and his brother Andrew Wilson (Andrew) were arrested by the Chicago Police Department (CPD) for the murders, at which time they were allegedly tortured by Chicago Police Officers into confessing to the murders. Wilson and Andrew were tried for the murders and found guilty. Wilson was sentenced to life imprisonment. The Illinois Appellate Court reversed Wilson's conviction and granted him a new trial. Wilson was re-tried and convicted for the murder of Officer O'Brien; but acquitted of the murder of Officer Fahey. Wilson's conviction was affirmed by the Illinois Appellate Court.

Wilson subsequently filed a complaint with the Illinois Torture Inquiry and Relief Commission (the Commission), alleging that his statements were involuntary, as they were the product of torture committed by Chicago Police Officers. In 2018, the Circuit Court of Cook County ruled that Wilson's confession was tortured from him and granted him a new trial at which the confession would be barred. Two years later the Office of the Special Prosecutor began Wilson's third trial, relying on manufactured and false evidence. The Special Prosecutor, however, mid-trial moved to dismiss all charges against Wilson with prejudice.

Wilson then filed a sprawling ten-count Complaint against seventeen defendants, who include Chicago Police Officers, former Cook County State's Attorneys, former City of Chicago officials, and the City of Chicago (the City),

1

asserting 42 U.S.C. § 1983 claims and supplemental state law claims. R. 1, Compl.[1]
Defendants move to dismiss the Complaint on several grounds, including the statute
of limitations, absolute and qualified immunity, failure to state a claim, and the
unconstitutionality of the Illinois Torture Inquiry and Relief Commission Act, 775
ILCS 40/1, *et seq.*[2] R. 47, Trutenko Mot. Dismiss; R. 58, Horvat Mot. Dismiss; R. 59,
Hartnett Mot. Dismiss; R. 69, Daley Mot. Dismiss; R. 72, Hyman Mot. Dismiss; R. 74,
Kunkle Mot. Dismiss; R. 75, City Mot. Dismiss; R. 168, Martin Mot. Dismiss.[3]

## Background[4]

## VI.  Defendants Burge, McKenna, O'Hara, and Yucaitis

On February 9, 1982, during the course of a traffic stop, Chicago Police Officers
Fahey and O'Brien were shot and killed. Compl. ¶¶ 57, 80–81. Wilson allegedly was

---

[1]Citations to the docket are indicated by "R." followed by the docket number or filing name, and, where necessary, a page or paragraph citation.

[2]While the length of this Opinion offends the "less is best" principle, it is necessitated by the number of motions and pages the Court had to address, which total more than 775 pages.

[3]The remaining Defendants have responded to the Complaint as follows: Defendants Doug Stahle, as Special Representative for the Estate of Jon Burge; Brian O'Hara, as Special Representative for the Estate of Patrick O'Hara; and Geri Lynn Yanow, as Special Representative for the Estate of John Yucaitis (collectively Estate Defendants) joined City Defendants' Motion to Dismiss and Reply in support. R. 161. The Court granted Defendant Cook County's (the County) Motion for Entry of Order in Lieu of Answer, in which the Court exempted the County from filing an answer to the Complaint, finding "1. There is no basis for liability on the part of the County articulated in [Wilson's] Complaint; [and] 2. The County remains in this case solely for purposes of indemnification as alleged in Count [X] of Plaintiff's Complaint, and reserves all of its defenses with respect to Count [X]." R. 134. Finally, Defendant William Coleman was served on July 27, 2021, but has not appeared or answered the Complaint. R. 37. The Court makes no determination as to whether service on Coleman was proper.

[4]The Court accepts as true all of the well-pled facts in the Complaint and draws all reasonable inferences in favor of Wilson. *Platt v. Brown*, 872 F.3d 848, 851 (7th Cir. 2017).

the driver of the car and Andrew a passenger. *Id.* ¶¶ 82–83. The murders led the CPD to conduct the City's largest manhunt in history. *Id.* ¶ 57. Defendant Jon Burge (Burge), who was the commanding Violent Crimes Lieutenant at Area 2, was in charge of investigating the murders of Officers Fahey and O'Brien. *Id.* ¶ 58.

Three days after the murders, on February 12, 1982, Anthony Williams (Williams), an African American, was arrested and told that he "was the one that shot" the two officers. Compl. ¶¶ 63, 232. At CPD headquarters, Burge, among other CPD officers, tortured Williams. *Id.* ¶ 64. Burge tried unsuccessfully to get Williams to confess to killing Officers O'Brien and Fahey. *Id.* ¶ 65.

Also on February 12, 1982, an eyewitness to the murders tentatively identified Donald White (White), an African American, as the shooter of the two officers and White's brother-in-law, Dwight Anthony (Anthony), also an African American, as the driver of the car in which the shooter was riding. *Id.* ¶¶ 67–68, 232. White and Anthony were arrested the evening of February 12, and Defendants Thomas McKenna (McKenna), Patrick O'Hara (O'Hara) (both CPD detectives who worked at Area 2), Burge, and others questioned White. *Id.* ¶¶ 59, 68–69. Burge and the other CPD officers tortured White, who eventually gave a false statement. *Id.* ¶¶ 70–77.

Two days later, on February 14, 1982, Wilson, who is African American, was arrested and taken to Area 2, where he was interrogated by several Chicago Police Officers, including Detectives McKenna and O'Hara. *Id.* ¶¶ 38, 107–08, 113. After Wilson denied any knowledge about the murders of Officers Fahey and O'Brien, McKenna struck Wilson several times about the face and body, and then hit him in

3

the head several times with a phone book. *Id.* ¶¶ 115–16, 118. O'Hara also hit Wilson in the face, chest, and side while Wilson denied involvement in the murders. *Id.* ¶ 116. After Burge instructed O'Hara to stop hitting Wilson in order to not "leave marks . . . on his face," McKenna later started to choke Wilson and then put a revolver in Wilson's mouth. *Id.* ¶¶ 129–30. When Wilson still refused to make a statement, Burge told McKenna to take the gun out of Wilson's mouth, then left the interrogation room and returned carrying a bag that contained a black box. *Id.* ¶¶ 133–34. Burge uncuffed Wilson and placed wires on Wilson's hands. *Id.* ¶ 134. Wilson felt an electric jolt go through his body. *Id.* ¶ 135. Burge electroshocked Wilson three times. *Id.* ¶ 136. Eventually, Wilson informed the officers that he would say whatever they wanted him to say. *Id.* ¶¶ 139, 141.

## VII.  Defendants Hyman and Hartnett

Shortly thereafter, Defendant Lawrence Hyman (Hyman), supervisor of the Felony Review Unit of the Cook County State's Attorney's Office (CCSAO), who was on the second floor of Area 2 in a room close to where the interrogations of Wilson and Andrew were taking place, walked into the interrogation room, and said that he heard that Wilson was going to make a statement. Compl. ¶¶ 49, 142. Wilson instead told Hyman that he wanted to see his attorney, after which Hyman left and McKenna and O'Hara returned, beat Wilson again, and told him that if he requested a lawyer again he would be tortured again. *Id.* ¶ 144. Wilson, believing the only way he would leave Area 2 alive was to give a statement, finally agreed to give a statement. *Id.* Hyman, along with Defendant Michael Hartnett (Hartnett), a Cook County Court

Reporter who was also present at Area 2 as Wilson and Andrew were being tortured, were called into the interrogation room to take Wilson's statement. *Id.* ¶¶ 11, 146, 148. Hyman and Hartnett took Wilson's statement in McKenna's presence. *Id.* ¶ 149. Hyman, in derogation of CCSAO policy and practice at that time, did not ask Wilson if he had been physically abused or otherwise mistreated. *Id.* ¶ 150.

Andrew was separately arrested, taken to Area 2, and tortured into confessing to the murders the same day as Wilson. Compl. ¶¶ 85, 88, 92, 105.

## VIII.  Defendants Kunkle, Trutenko, Horvat, and Coleman

Defendant William Kunkle (Kunkle) was a Cook County ASA from 1973 to 1987 and was the lead prosecutor at Wilson's first trial. Compl. ¶¶ 53, 188. Before Wilson was tried in January 1983, Kunkle was informed that Wilson had been tortured for his confession. *Id.* ¶ 171. Also before Wilson's trial, Kunkle and Assistant State's Attorney (ASA) Mike Angarola (Angarola) met with potential witness DeWayne Hardin (Hardin), who informed them that Wilson was not involved in the robbery and murder of Officers Fahey and O'Brien. *Id.* ¶¶ 175–76. Angarola, with Kunkle's encouragement, repeatedly threatened Hardin to force him to falsely implicate Wilson. *Id.* ¶ 177. Two days later, Area 2 detectives went to Hardin's house and told him that he "better do what the State's Attorney" told him to do as they put a bag over his face. *Id.* ¶ 179.

In November 1982, after charges had been brought against Wilson, a hearing was held on Wilson's motion to suppress. Compl. ¶ 168. As part of the conspiracy to cover up their misconduct, Hartnett, Hyman, Burge, McKenna, O'Hara, and Yucaitis,

5

coached by Kunkle, presented false denials at the hearing, and Wilson's motion was denied. *Id.* ¶¶ 169, 172.

In January 1983, Wilson and Andrew were tried jointly for the murders of Officers Fahey and O'Brien. Compl. ¶ 173. Wilson and Andrew's alleged tortured confessions were introduced at the joint trial. *Id.* ¶ 182. Hardin also falsely testified consistent with what Kunkle, Angarola, and the Area 2 detectives coerced him to say. *Id.* ¶¶ 180–181. Wilson and Andrew were convicted of the murders and robbery of Officers Fahey and O'Brien. *Id.* ¶ 182. Wilson received two life sentences and Andrew received the death penalty. *Id.* ¶ 184.

In 1987, the Illinois Appellate Court reversed Wilson's conviction and he was granted a new trial that was to be severed from Andrew's trial. Compl. ¶ 185.

Defendant Nicholas Trutenko (Trutenko) was a Cook County ASA from 1981 to 1991, and again from 2008 to 2020. Compl. ¶ 50. Trutenko replaced Kunkle as the lead prosecutor in Wilson's second trial in or about 1989. *Id.* ¶¶ 188, 192. Before the retrial, Trutenko manufactured additional false, inculpatory evidence. *Id.* ¶ 188. Specifically, Trutenko met on several occasions with Defendant William Coleman (Coleman), a jailhouse informant, career criminal, and British national. *Id.* ¶¶ 54, 189. At these meetings, Coleman and Trutenko fabricated a story, which Trutenko reduced to an official memorandum, that Wilson had admitted his involvement in the murders. *Id.* ¶¶ 189–190. In exchange for this manufactured evidence, Trutenko not only promised Coleman that Coleman's drug charge would be dismissed, but also promised him financial rewards and undisclosed assistance in obtaining relief from

6

pending federal and international charges. *Id.* ¶ 191. Prior to and during Wilson's 1989 retrial, Trutenko and Coleman destroyed and otherwise suppressed exculpatory and impeaching evidence from Wilson, his lawyer, and the court. *Id.* ¶ 192. Additionally, before the retrial, Trutenko met with Hardin, and threatened Hardin with perjury if he did not present false inculpatory testimony against Wilson. *Id.* ¶ 194.

At Wilson's second trial in 1989, his alleged tortured confession was introduced into evidence. Compl. ¶ 195. Coleman also presented the false and perjured testimony that he and Trutenko had manufactured, and withheld significant parts of the promises that Trutenko had made to convince Coleman to fabricate and present this false testimony. *Id.* ¶ 193. Wilson was found guilty of the murder of Officer O'Brien and the armed robbery of Officers Fahey and O'Brien, but was acquitted of the murder of Officer Fahey. *Id.* ¶ 195.

Shortly after Wilson's retrial, Coleman and Trutenko appeared before a Cook County judge and "consummated the deal to which [they] had agreed." Compl. ¶ 196. Around the same time, Trutenko informed Kunkle, who was then working as Special City of Chicago Corporation Counsel (Corporation Counsel), that Coleman claimed that Andrew had purportedly made inculpatory jailhouse statements to Coleman. *Id.* ¶ 197. Kunkle was then representing Burge, Yucaitis, and O'Hara in Andrew's Section 1983 case alleging torture. *Id.* ¶ 198. Trutenko and Kunkle both knew that Coleman's story about Andrew was false, but Kunkle still presented Coleman to

falsely testify at Andrew's civil trial. *Id.* ¶¶ 199–200. Two months later, Defendant Coleman returned to his homeland of England "as a free man." *Id.* ¶ 201.

Wilson appealed his conviction after his retrial, in large part based on Coleman's lack of credibility. Compl. ¶ 202. While the appeal was pending, Trutenko and Kunkle continued communicating with Coleman, during which Coleman allegedly "extorted" money from them that Trutenko and Kunkle had previously promised him for his prior testimony and as "hush money" to prevent him from revealing that his testimony in Wilson and Andrew's cases was false and manufactured. *Id.* ¶ 203. Neither Trutenko nor Kunkle informed Wilson, his counsel, or the court about their continued communications with Coleman, extortion of hush money, the fact that he had been promised money for his testimony, and that they considered him to be a "con man" whose testimony was not believable. *Id.* ¶ 205. The Illinois Appellate Court affirmed Wilson's 1989 conviction in 1993. *Id.* ¶ 208.

In 2011, Wilson filed a petition for review before the Commission. Compl. ¶ 209. In 2015, Wilson's petition was granted, and his case was reopened and sent to the Circuit Court of Cook County's criminal courts for an evidentiary hearing on the question of whether his confession was obtained via torture. *Id.* ¶ 210. In June 2018, following discovery and an evidentiary hearing, Judge William H. Hooks of the Circuit Court of Cook County (Judge Hooks) found that Wilson's confession was tortured from him and granted him a new trial, at which the confession would be barred. *Id.* ¶ 211. The Office of the Special Prosecutor (OSP) appealed Judge Hooks' decision to the Illinois Appellate Court. *Id.* ¶ 212; *see also People v. Wilson*, 158 N.E.3d

1067, 1070 (Ill. App. Ct. 2019). The Illinois Appellate Court affirmed Judge Hooks' decision on December 10, 2019. Compl. ¶ 212; *Wilson*, 158 N.E.3d at 1070.

In September 2020, OSP prosecuted Wilson for the third time for the murder of Officer O'Brien. Compl. ¶¶ 213, 215. OSP relied primarily on Coleman's 1989 manufactured testimony and Hardin's manufactured false statement. *Id.* ¶ 213. Before trial, neither Trutenko, nor Kunkle, nor Coleman revealed any of the exculpatory or impeaching evidence about Coleman, nor that he was alive and continued to be in contact with Trutenko. *Id.* ¶ 214. During the 2020 trial, OSP asserted that Coleman was unavailable and likely dead, and offered his false testimony from the 1989 trial. *Id.* ¶ 216. During this time, Defendant T. Andrew Horvat (Horvat), a Cook County ASA, joined the conspiracy with Trutenko and Kunkle to withhold the exculpatory and impeachment evidence about Coleman of which they were aware. *Id.* ¶¶ 51, 217–218.

Immediately prior to Trutenko's testimony at Wilson's third trial, Horvat warned the Special Prosecutor about Trutenko's testimony, in an effort to withhold exculpatory evidence from Wilson. Compl. ¶ 219. During his testimony, Trutenko admitted that Coleman was alive, living in England, and that Trutenko had communicated with him during the trial; Trutenko committed perjury when he denied that he had discussed Coleman during his meeting with one of the Special Prosecutors. *Id.* ¶¶ 220–21. Immediately after his testimony, Trutenko destroyed and otherwise suppressed evidence of his relationship with Coleman by wiping his cell phone and suppressing email communications between him and Coleman. *Id.* ¶ 223.

9

On October 1, 2020, during Trutenko's testimony, the Special Prosecutor immediately moved to dismiss all charges against Wilson with prejudice, and Judge Hooks granted the motion. Compl. ¶ 222. On December 18, 2020, Judge Hooks granted Wilson a certificate of innocence, finding, among other things, that Wilson had been physically tortured. *Id.* ¶ 224. All told, Wilson spent 36 years incarcerated, and was adjudged innocent 38 years and 10 months after his arrest for the murders and armed robbery of Officers Fahey and O'Brien. *Id.* ¶¶ 1, 225, 308.

## IX. Defendants Daley, Martin, Shines, Hillard, and Needham

Defendant Richard M. Daley (Daley) was the State's Attorney of Cook County from 1981 to 1989. Compl. ¶ 46. In February 1982, Daley closely monitored developments in the manhunt for Officers Fahey and O'Brien's killers, and he received reports from his top assistants who were at Area 2. *Id.* ¶¶ 231, 234, 238. Daley learned about the torture and abuse of White, Williams, Wilson, and Andrew, and allegedly did nothing to prevent or stop that torture and abuse, or to discipline or investigate Burge and the other detectives who perpetrated it. *Id.* ¶¶ 234, 239–61.

Three days after Wilson was arrested, CPD Superintendent Richard Brzeczek (Brzeczek) received a letter from Dr. John Raba, the Director of Medical Services at Cook County Jail (the Raba Letter), informing Brzeczek that a medical examination of Andrew revealed unmistakable evidence that Andrew had been tortured while in police custody, and that Andrew reported being tortured with electric shock. Compl. ¶ 245. Brzeczek sent the Raba Letter to Daley and advised that, absent instructions from Daley, he would not investigate the matter. *Id.* ¶ 247. Daley showed the letter

10

to his First Assistant, Richard Devine (Devine), as well as other ASAs, including Kunkle. *Id.* ¶ 248. Daley never responded to Brzeczek, nor did he launch any kind of investigation—via CPD, the CCSAO, or an independent agency—into the Raba Letter's allegations. *Id.* ¶¶ 249, 252.

Wilson claims that, as a result of Daley's failure to act, Burge and other Area 2 and 3 detectives tortured numerous additional suspects, who were almost exclusively African American, with electric shock, baggings, mock executions, and beatings, often while using racial epithets, in the period from February 1982 to November 1991. Compl. ¶¶ 235–236. Between February 1982 and 1988, Cook County prosecutors, under Daley's direction, prosecuted at least 30 African American men, including Wilson and Andrew, on the basis of tortured confessions, despite prosecutors knowing that the men had been tortured. *Id.* ¶¶ 257–267.

Defendant Leroy Martin Sr. (Martin) was the Commander of Area 2 in 1983 and at that time was Burge's direct supervisor. Compl. ¶ 268. As Commander, Martin learned that Burge and detectives under Burge's command systematically tortured numerous African American suspects, including Wilson and Andrew, but Martin failed to initiate investigations or to discipline Burge in connection with any of these cases. *Id.* ¶¶ 269–270. Martin was named CPD Superintendent in 1987 and did not do anything to address Burge and his subordinates' practices of torture; instead, Martin worked to conceal and suppress evidence of the pattern of torture. *Id.* ¶¶ 43, 271–273.

In 1989, Daley became Mayor of Chicago. Compl. ¶ 277. In 1990, CPD's Office of Professional Standards (OPS) prepared a report, which found that there was systematic abuse of suspects at Area 2 and that Area 2 command personnel were aware of the systematic abuse and encouraged it by actively participating or failing to take action to stop it (Goldston Report). Compl. ¶ 283. In 1991, OPS supplemented this report with a finding that Burge, O'Hara, McKenna, and Yucaitis were "prime movers" in this pattern of abuse. *Id.* ¶ 284. In a companion report, OPS found that Burge, O'Hara, and Yucaitis had tortured Andrew and recommended their termination (Sanders Report) (collectively with the Goldston Report, the OPS Reports). *Id.* ¶ 285.

Martin allegedly delayed, obstructed, and undermined the OPS investigation, and the OPS Reports, by suppressing their findings that Andrew was tortured and by refusing to suspend or remove Burge either before, or for nearly a year after, the OPS Reports' findings were first made known to him in 1990, and by suppressing the findings that there was systematic abuse at Area 2, which implicated Martin, Burge, O'Hara, Yucaitis, McKenna and other Area 2 detectives who worked under Burge's command. Compl. ¶¶ 286–288.

On or before February 1992, Daley was specifically informed or was otherwise aware of the Goldston Report's findings of "systematic" Area 2 torture that was "condoned and participated in" by Area 2 command personnel. Compl. ¶¶ 289–290. Daley knew or should have known that Martin had been the commanding officer at Area 2 and Burge's direct supervisor during part of the time the Goldston Report

found there to be "systematic" torture, and that Martin therefore had a motive and intent to suppress and discredit the Goldston Report. *Id.* ¶ 292. Despite his previous knowledge and the Goldston Report's findings, Daley did not (1) seek an independent federal investigation; (2) direct Martin to initiate a criminal investigation or to open disciplinary proceedings against the Area 2 detectives, supervisors and command officers identified in the Goldston Report; or (3) seek the prosecution of Burge and his associates. *Id.* ¶ 292. Instead, Martin and Daley sought to publicly discredit the Goldston Report and defend Martin's prior suppression of it, saying "these are only allegations . . . rumors, stories, things like that." *Id.* ¶ 293.

The intent and effect of these statements allegedly was to undermine the validity of the Goldston Report's finding that torture at Area 2 was "systematic" and participated in by command personnel. Compl. ¶ 294. Daley and Martin, through several hearings held by the Chicago City Council and the Chicago Police Board, and from an Amnesty International report, were given further notice that Burge and his men systematically tortured suspects in order to obtain confessions. *Id.* ¶ 296.

In 1993, OPS re-opened investigations into approximately ten Area 2 torture cases. Compl. ¶¶ 299–300. After exhaustive reinvestigations, OPS investigators sustained numerous allegations that two of Burge's self-admitted "right hand men" abused and tortured six suspects. *Id.* ¶ 299. Defendant Gayle Shines (Shines), who was the OPS Director, allegedly under pressure from other Defendants, suppressed these findings and the evidence that supported them by secreting the files in her personal office for five years. *Id.* ¶¶ 47, 300. Despite the findings in the Goldston

13

Report, Martin and Shines refused to investigate numerous other allegations of police torture that were brought to their attention, including allegations of electric shock by Burge. *Id.* ¶ 295.

In 1998, Defendant Terry Hillard (Hillard), the Superintendent of CPD, and his Administrative Assistant, Defendant Thomas Needham (Needham), with full knowledge that Burge, Yucaitis, O'Hara, McKenna, and other Area 2 and Area 3 detectives participated in a pattern and practice of torturing suspects, including Wilson, overturned the OPS sustained findings in the re-opened cases; refused to investigate other torture claims; refused to investigate Shines' suppression of evidence; and suppressed the sustained OPS files and findings from Wilson. Compl. ¶¶ 44–45, 302. Daley also insisted from the time he became Mayor until 2011, that the City continue to finance the defense of Burge and his men, even after Burge was indicted and convicted of perjury and obstruction of justice and despite Daley's personal knowledge that Burge committed, supervised, and condoned torture against African American men. *Id.* ¶¶ 303–304.

## X.     Defendant City of Chicago

Wilson alleges that the pattern and practice of torture and abuse at Area 2, its cover-up, and the resulting wrongful prosecutions and convictions were known before, during, and after Wilson was tortured and wrongfully convicted, including by many individuals in supervisory positions, such as Martin, Burge, Daley, Hillard, and Shines, among others. Compl. ¶ 347. The pattern and practices of torture and the continuing police code of silence have been repeatedly admitted to, and apologized

14

for, by Mayors Daley, Emanuel, and Lightfoot; have been recognized by the Chicago City Council, by Martin, and by OPS; and have also been established by findings of OSP, numerous state and federal trial and appellate courts, including Judge Hooks in Wilson's case, the Seventh Circuit in Andrew's Section 1983 case, and in Burge's criminal appeal, and several federal court juries. *Id.* ¶¶ 78, 297, 348–349.

According to Wilson, the interrelated policies, practices, and customs were known to, maintained, implemented, and ratified with deliberate indifference by city policymakers, including Martin, Hillard, Shines, Needham, and Daley. Compl. ¶ 352. He alleges that these policies, practices, and customs encouraged the coercing of statements from suspects, witnesses and arrestees, by torture and related abusive tactics, which caused, among other things, fabricated confessions and other false witness evidence, as well as suppression and destruction of evidence of torture and other exculpatory evidence. *Id.* Therefore, Wilson maintains that policies, practices, and customs were a moving force behind, and a direct and proximate cause of, the unconstitutional acts and perjury committed by Defendants and their co-conspirators, and the injuries suffered by Wilson. *Id.*

After spending approximately 36 years in prison, Wilson subsequently filed this lawsuit against numerous Defendants asserting Section 1983 claims for violation of Due Process (Fourteenth Amendment, Count I); Coercive Interrogation (Fifth and Fourteenth Amendments, Count II); Deprivation of Liberty without Probable Cause (Fourth and Fourteenth Amendments, Count III); Conspiracy to Deprive Constitutional Rights (42 U.S.C. §§ 1983, 1985, and 1986, Count IV); *Monell* Policy

15

Claim (Count V); and state law claims for Malicious Prosecution (Count VI); Intentional Infliction of Emotional Distress (Count VII); Conspiracy (Count VIII); *Respondeat Superior* (Count IX); and Indemnification (Count X). Compl. Before the Court are Defendants' Rule 12(b)(6) motions to dismiss the Complaint.

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint. *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Under Rule 8(a)(2), a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss, a complaint need only contain factual allegations, accepted as true, sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79.

16

## Analysis

### I.    Statute of Limitations

Defendants Shines, Hillard, Needham, and Martin (collectively, City Defendants),[5] as well as Trutenko, Hartnett, Daley, and Hyman, argue that Wilson's Section 1983 claims and state law claims are untimely.[6] City Mot. Dismiss at 6–20. The Court begins with Wilson's federal claims.

The statute of limitations is an affirmative defense. Fed. R. Civ. P. 8(c)(1). And plaintiffs "need not anticipate and attempt to plead around all potential defenses." *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004). A plaintiff can plead himself or herself out of court on a statute of limitation basis, however, if the face of the complaint reveals that the claim is time-barred. *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 383 (7th Cir. 2010); *see also Small v. Chao*, 398 F.3d 894, 898 (7th Cir. 2005) ("Although the statute of limitations is ordinarily an affirmative defense that must be pleaded under Fed. R. Civ. P. 8(c), a

---

[5]Martin filed his Motion to Dismiss separately from that filed by Shines, Hillard, and Needham. *See* Martin Mot. Dismiss; City Mot. Dismiss. Martin's Motion raises many of the same arguments—related to the statute of limitations and otherwise—so the Court generally cites to the Motion and Reply filed by Shines, Hillard, and Needham when addressing arguments raised by any of the City Defendants. To the extent Martin's arguments differ, the Court so notes herein.

[6]These Defendants raise similar arguments in support of dismissal for untimeliness. Several Defendants adopt arguments raised in City Defendants' briefs. *See, e.g.*, Daley Mot. Dismiss at 4–5; Hyman Mot. Dismiss at 5. Rather than citing to each Defendant's brief, the Court cites to City Defendants' Motion to Dismiss and Reply as representative of all Defendants' timeliness arguments. To the extent that any Defendant raised a different argument than City Defendants, the Court will so note and address those arguments as appropriate.

district court may dismiss under Rule 12(b)(6) something that is indisputably time-barred.") (cleaned up).[7]

### A. Procedural History Relevant to Accrual

The Court briefly outlines the allegations concerning the procedural history relevant to the accrual analysis. Wilson's claims stem from Defendants' alleged coercion of Wilson's false confession via torture, and the prosecution's use of that confession to detain and convict Wilson. *See* Compl. ¶ 15. Wilson was first wrongfully convicted in 1983. *Id.* ¶ 6. The Illinois Appellate Court reversed his 1983 conviction and granted Wilson a new trial in 1987, but he was again wrongfully convicted in 1989. *Id.* ¶¶ 6, 20, 23–24. In 2015, the Commission found that Wilson's allegations of torture were credible and returned Wilson's case to the Cook County Criminal Court for the trial court to hold a hearing on those allegations. *Id.* ¶ 25. After an evidentiary hearing in June 2018, Judge Hooks ruled that Wilson's confession was tortured from him, and granted Wilson a new trial at which the confession would be barred. *Id.* ¶¶ 26, 211. Judge Hooks also released Wilson on bond. *Id.* ¶ 275. OSP appealed Judge Hooks' decision to the Illinois Appellate Court, which, in December 2019, affirmed Judge Hooks' decision granting Wilson a new trial. *Id.* ¶ 212. OSP retried Wilson in September 2020, relying primarily on Coleman and Hardin's false testimony, as Wilson's tortured confession was suppressed. *Id.* ¶¶ 26–27, 213–16. After a two-week

---

[7]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

bench trial, on October 1, 2020, OSP dismissed all pending charges against Wilson with prejudice. *Id.* ¶¶ 31, 222. Wilson filed this case on June 30, 2021. Compl.

### B.   Timeliness of Section 1983 Claims

It is undisputed that Section 1983 claims have a two-year statute of limitations. *See Lewis v. City of Chi.*, 914 F.3d 472, 478 (7th Cir. 2019) ("A § 1983 claim borrows the statute of limitations for analogous personal-injury claims in the forum state; in Illinois that period is two years."). While state law determines the length of the statute of limitations period, federal law determines when such a claim accrues. *Id.* A Section 1983 claim accrues when the constitutional violation is complete and the plaintiff has a present cause of action—that is, "when the plaintiff can file suit and obtain relief." *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (cleaned up). A Section 1983 cause of action for damages attributable to an unconstitutional conviction or sentence (that necessarily implies the invalidity of the conviction or sentence) does not accrue until the conviction or sentence has been invalidated. *Heck v. Humphry*, 512 U.S. 477, 489–90 (1994). The requirement prevents a convicted criminal from collaterally attacking his conviction with a civil suit. *Id.* at 484–87.

Defendants contend that Wilson's Section 1983 claims are time-barred because he did not file his lawsuit within two years after June 2018, when his 1989 conviction was vacated, he was released on bond, and all evidence regarding his coerced confession was ruled suppressed and inadmissible at any new trial. City Mot. Dismiss at 7. Wilson retorts that, under the *Heck* deferred-accrual rule, his Section 1983

19

claims did not accrue until his criminal proceedings ended for good in October 2020. R. 101, Resp. at 17–18. The Court agrees with Wilson.

### 1.   All Section 1983 Counts Relating to Coerced Confession[8]

Most of Wilson's Section 1983 claims, brought under the Fourth, Fifth, and Fourteenth Amendments (Counts I through IV), arise out of Defendants' alleged coercion of a false confession from Wilson, the prosecution's use of that confession to detain and convict Wilson in his 1983 and 1989 trials, and the continuation of his conviction due to the suppression of evidence of Wilson and others' torture at the hands of Burge and his associates. *See* Compl. ¶¶ 314–52; Resp. at 18 (citing Compl. ¶¶ 10–12, 21–22, 24, 28–29, 276, 281–82, 293, 300, 302). Similarly, Wilson's *Monell* allegations against the City are centered on the alleged pattern and practice of torture and abuse under Burge to coerce confessions, and the alleged cover-up and ratification of that misconduct. *See* Compl. ¶¶ 347–52. Defendants do not dispute that Wilson's claims are subject to delayed accrual under *Heck*; rather, they claim that Wilson's coerced confession claims accrued in June 2018 when Judge Hooks vacated Wilson's 1989 conviction, released Wilson on bond, and granted Wilson a new trial, ordering that Wilson's tortured confession would be suppressed and inadmissible at any further prosecution. City Mot. Dismiss at 7. Defendants reason that because

---

[8]Although some courts, including this Court, have analyzed the accrual of various Section 1983 claims count-by-count, *see Dukes v. Washburn*, 600 F. Supp. 3d 885, 893–96 (N.D. Ill. 2022); *Ochoa v. Lopez*, 2021 WL 4439426, at *4–8 (N.D. Ill. Sept. 28, 2021), the parties generally do not organize their limitations arguments by claim. *See* City Mot. Dismiss at 6–20; Resp. at 18–26. So, like the parties, the Court addresses Wilson's five counts brought under Section 1983 together for purposes of the accrual analysis, although it will address distinct theories separately if the analysis differs.

Wilson's coerced confession played no role in his 2020 trial, his claims accrued no later than June 2018 when that confession was suppressed. *Id.* at 8; R. 124, City Reply at 2–3 (citing *Savory v. Cannon*, 947 F.3d 409, 412, 418, 430–31 (7th Cir. 2020) (*Savory I*); *Moore v. Burge*, 771 F.3d 444, 446 (7th Cir. 2014)).

Defendants' arguments implicate the Supreme Court's decision in *McDonough v. Smith*, 139 S. Ct. 2149 (2019). In *McDonough*, the Supreme Court held that a fabricated evidence claim brought under the Fourteenth Amendment accrues only "once the criminal proceeding has ended in the defendant's favor, or a resulting conviction has been invalidated within the meaning of *Heck* . . . ." 139 S. Ct. at 2158. The Supreme Court "reasoned that this outcome was necessary because parallel criminal proceedings and civil litigation 'would run counter to core principles of federalism, comity, consistency, and judicial economy.'" *Brown v. City of Chicago*, 2022 WL 4602714, at *17 (N.D. Ill. Sept. 30, 2022) (*Brown II*) (quoting *McDonough*, 139 S. Ct. at 2158). As stated above, *Heck* holds that if a plaintiff establishes that if his civil Section 1983 "action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed . . . ." 512 U.S. at 487 (emphasis in original). This requirement can be satisfied if the plaintiff's conviction "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Id.* at 486–87. *McDonough*, incorporating *Heck*, stands for the proposition that a fabrication of evidence claim accrues where either a criminal prosecution ends

without a conviction or where a conviction has been invalidated on appeal. 139 S. Ct. at 2158. So too with *Brady* claims regarding the suppression of evidence favorable to the criminal defendant/§ 1983 plaintiff, *Camm v. Faith*, 937 F.3d 1096, 1111 (7th Cir. 2019) (citing *McDonough*, 139 S. Ct. at 2157–58), federal malicious prosecution claims, *Julian v. Hanna*, 732 F.3d 842, 845 (7th Cir. 2013),[9] and Fifth and Fourteenth Amendment compelled self-incrimination claims (or coerced confession claims), *see Savory I*, 947 F.3d at 412, 418, 431.

Defendants point to the reasoning underlying the *Heck* bar to argue that it does not apply to Wilson's Section 1983 claims based on his coerced confession, that is, *Heck*'s "pragmatic concerns with avoiding parallel criminal and civil litigation over the same subject matter and the related possibility of conflicting civil and criminal judgments." City Reply at 8 (quoting *McDonough*, 139 S. Ct. at 2157).

As noted above, Judge Hooks—and the Illinois Appellate Court when it affirmed Judge Hooks' ruling—did not terminate the case when ruling that Wilson's confession was tortured from him and suppressing it at a new trial. Compl. ¶¶ 211–212. On the contrary, the courts anticipated, or at least left open the possibility, of further proceedings. As another court in this District recently reasoned, "[i]f the rule

---

[9]*Julian* allowed the plaintiff to bring a malicious prosecution claim under the Fourteenth Amendment's Due Process Clause only because the court determined that Indiana did not provide an adequate state law remedy for the claim. 732 F.3d at 845–48. At the time *Julian* was decided, the Seventh Circuit had held that a plaintiff subject to prosecution in Illinois could not bring a malicious prosecution claim under the Fourth or Fourteenth Amendments. *See Navarro v. City of Aurora*, 2022 WL 1988990, at *2 (N.D. Ill. June 6, 2022). Recently, however, the Supreme Court in *Thompson v. Clark* confirmed that the Fourth Amendment housed a "malicious prosecution claim." 142 S. Ct. 1332, 1337 (2022) (cleaned up). As discussed below, *see infra* Section III.A.5.c, the Court need not determine at this stage whether a malicious prosecution claim can proceed under the Fourteenth Amendment.

were, as Defendants suggest, that Plaintiff had to file his fabrication [and coerced confession] claims within two years of the appellate court's reversal [of Plaintiff's conviction and suppression of the fabricated evidence], he would have been placed in the untenable position of mounting a civil action challenging criminal proceedings while he faced re-trial for murder charges in those same proceedings. This is the very situation *McDonough* cautioned against." *Dukes v. Washburn*, 600 F. Supp. 3d 885, 894–95 (N.D. Ill. 2022) (citing *McDonough*, 139 S. Ct. at 2158).

*Dukes*, decided after briefing in this case had concluded and therefore not cited by either party, involved a nearly identical factual scenario, and the Court finds it instructive. In *Dukes*, the plaintiff was arrested and charged with two murders, aggravated sexual assault, and several other crimes. 600 F. Supp. 3d at 889. A jury convicted the plaintiff of the two murders and in 2012, he was sentenced to life imprisonment. *Id.* In November 2014, the Illinois Appellate Court reversed the plaintiff's conviction and remanded the case for a new trial. *Id.* The appellate court also ruled inadmissible at the plaintiff's retrial (1) his confession to the murders because they took place during plea negotiations and (2) statements he made about his sexual relationship with a relative of the victims. *Id.* at 892. In July 2019, the trial judge found the plaintiff not guilty after a bench trial and released him from custody. *Id.* at 889, 892. The plaintiff filed a federal lawsuit in July 2021 asserting numerous claims under Section 1983, including Fourteenth Amendment fabrication of evidence claims based on his confession and a police report including that confession, as well as fabricated police reports that falsely state that the plaintiff told

the defendant officer, among other false information, information about his sexual relationship with the victims' relative. *Id.* at 892–94, 898–99. Relevant here, the plaintiff also brought a Fourteenth Amendment coerced confession claim, alleging that the defendants engaged in a coercive interrogation. *Id.* at 897–88.

Like Defendants in this case, the defendants in *Duke* moved to dismiss those counts as time-barred, arguing that the claims accrued on the "date of the appellate reversal because the evidence they allegedly fabricated—the confession . . . , [and] the statements about Plaintiff's sexual relationship with [the victim's relative]—were ruled inadmissible by the appellate court, and thus, the government could not introduce them at the re-trial to Plaintiff's detriment." *Id.* at 895. The issue, observed the court, was one of first impression, as no court had addressed the exact question at issue: "whether, in the context of multiple trials, favorable termination occurs upon reversal of a conviction based upon the trial court's admission of evidence that forms the basis for Plaintiff's fabrication of evidence claim, even if Plaintiff's criminal case remains ongoing." *Id.* The court noted that the "[d]efendants raise[d] a valid point . . . [since] evidence fabrication does not implicate due process rights unless the government uses it to deprive the criminal defendant of his liberty . . . and here, at least some of the evidence Defendants allegedly fabricated was not introduced at Plaintiff's re-trial and therefore could not have caused Plaintiff to be deprived of his liberty interest under the due process clause." *Id.* (citing *Bianchi v. McQueen*, 818 F.3d 309, 319 (7th Cir. 2016)). However, the court found that, absent any Seventh Circuit authority to the contrary, it was bound by the rule in *McDonough* that there

24

"is not a complete and present cause of action to bring a fabricated-evidence challenge to criminal proceedings while those criminal proceedings are ongoing." *Id.* (quoting *McDonough*, 139 S. Ct. at 2158). The court also found that the plaintiff's Fourteenth Amendment coerced confession claim accrued upon his acquittal rather than when the evidence of the confession was suppressed. *Id.* (citing, among other cases, *Savory I*, 947 F. 3d at 409, 412, 418).

City Defendants' cited cases do not compel a different conclusion, as they are distinguishable on this point. City Reply at 2–3. In *Savory I*, the Seventh Circuit specifically noted that, "[c]laims that *relate only to conditions of confinement* and that do not implicate the validity of the conviction or sentence are not subject to the *Heck* bar." 947 F.3d at 430–31 (emphasis added). The Seventh Circuit relied on *McDonough* to hold that the plaintiff's claims—which included claims under the Fifth and Fourteenth Amendments based on a coerced false confession, Thirteenth and Fourteenth Amendment claims for a fair trial and right to be free of involuntary confinement, and related *Monell* claims—accrued only after he "received a favorable termination of his conviction," namely his pardon from the governor of Illinois. *Id.* at 412–413, 430–31. In *Moore*, the plaintiffs contended that "Burge or his henchmen physically abused them during interrogations." 771 F.3d at 445. "Because the coercive interrogation claims in *Moore* were complete before judicial proceedings began, the Seventh Circuit held that the claims were immediately actionable and did not threaten to undermine the validity of the subsequently obtained convictions." *Wrice v. Burge*, 187 F. Supp. 3d 939, 954 (N.D. Ill. 2015) (citing *Moore*, 771 F.3d at 445–46).

25

However, the Seventh Circuit went on to find that, to the extent that the plaintiffs argued "that police violated their rights by giving false testimony, or that during trial prosecutors withheld material exculpatory evidence about misconduct during their interrogations, *Heck* indeed bars relief until a conviction is set aside." *Id.*

Here, Wilson's Section 1983 claims are premised on evidence relating to Wilson's tortured confession that was indeed introduced at his first two trials and resulted in his convictions; they are not claims relating to out-of-court conduct unrelated to court proceedings and his conviction, like condition of confinement claims discussed in *Savory I* or illegal search and seizure claims based on torture during interrogations discussed in *Moore*. City Defendants cite a more analogous Ninth Circuit case in Reply. City Reply at 5–6 (citing *Jackson v. Barnes*, 749 F.3d 755 (9th Cir. 2014)).

In *Jackson*, the plaintiff was convicted of rape and murder following a trial in which his inculpatory statement was introduced against him. 749 F.3d at 758. On subsequent habeas review, the Ninth Circuit vacated the murder conviction, finding that the plaintiff's constitutional rights under *Miranda* had been violated when the inculpatory statement was obtained and therefore suppressing the statement at any retrial. *Id.* at 758–59. After the initial conviction was vacated, but before a retrial, the plaintiff filed a § 1983 action based on the *Miranda* violation. *Id.* at 759. While his civil claim was pending, the plaintiff was tried a second time without the illegally obtained inculpatory statement being introduced, and he again was convicted of murder. *Id.* The district court dismissed the plaintiff's civil lawsuit on the ground it

26

was barred by *Heck*. *Id.* The Ninth Circuit reversed, ruling that the plaintiff's civil claim was not *Heck*-barred notwithstanding the second prosecution and eventual conviction because the second conviction was "entirely insulated" from the *Miranda* violation associated with the initial conviction. *Id.* at 760–61. The court concluded that the plaintiff's civil claim would not impugn his second conviction because the order vacating his original conviction precluded the government from using his unlawfully obtained statements in a second trial. *Id.* at 760.

Defendants argue that *Jackson* is instructive because, "[l]ike in *Jackson*, [Wilson's] civil claims against the City Defendants could not impugn a potential conviction in the retrial because the ruling that vacated the 1989 conviction also precluded the prosecution from using the allegedly 'unlawfully-obtained' confession in the third trial," meaning "[t]he continued prosecution of [Wilson] after June 2018 was 'entirely insulated' from the constitutional violations that are the subject" of Wilson's claims based on his tortured confession. City Reply at 6.

The Court agrees that, at first blush, this argument is persuasive, especially in light of *Heck*'s pragmatic concerns, articulated in *McDonough*, "with avoiding parallel criminal and civil litigation *over the same subject matter* and the related possibility of *conflicting civil and criminal judgments*." *McDonough*, 139 S. Ct. at 2157 (emphases added). However, not only is *Jackson* non-binding out-of-Circuit authority, it also predates *McDonough*. The Court, like the court in *Dukes*, finds that, in the absence of binding, post-*McDonough* authority, it is bound by *McDonough*'s rule that there "is not a complete and present cause of action to bring a fabricated-

27

evidence challenge to criminal proceedings while those criminal proceedings are ongoing." *McDonough*, 139 S. Ct. at 2158 (cleaned up). The Court sees no reason—and Defendants do not advance one—why this holding should not apply to Wilson's other Section 1983 claims that accrue upon favorable termination, such as his *Brady* claims, federal malicious prosecution claims, and coerced confession claims.

Before turning to Defendants' remaining arguments, the Court must address an alternative argument raised by Wilson in his Response. Wilson posits that, regardless of whether the Court finds that Wilson's claims accrue upon suppression of the tortured confession at a retrial or upon dismissal with prejudice of all claims against him, his claims were timely. Resp. at 21. Wilson reasons that if the Court were to agree with Defendants that the former was true, the correct accrual date would be December 10, 2019, when the Illinois Appellate Court affirmed Judge Hooks' 2018 decision, because Wilson could not have pursued his civil lawsuit while the criminal appeal was pending. *Id.* at 21, 24 (citing *Heck*, 512 U.S. at 487 & n.8 (listing appeal in criminal case as example of "bar to the suit" making federal court abstention appropriate); *D'Ambrosio v. Marino*, 2013 WL 256312, at *6 n.5 (N.D. Ohio Jan. 23, 2013) (*D'Ambrosio I*)).

Hartnett is the only defendant to substantively tackle this argument in his Reply. R. 126, Hartnett Reply at 9–11. Hartnett contends that Wilson's reliance on *D'Ambrosio I* is misplaced, as the Sixth Circuit, on appeal of that decision, rejected the plaintiff's argument that his civil claim did not accrue until the state could not possibly retry him. Hartnett Reply at 10–11 (citing *D'Ambrosio v. Marino*, 747 F.3d

378, 384–85 (6th Cir. 2014) (*D'Ambrosio II*) (citing *Wallace*, 549 U.S. at 393)).[10]

However, as a more recent Sixth Circuit decision pointed out, the plaintiff's civil claim

in *D'Ambrosio* accrued as soon as his conviction was vacated "by means of an

unconditional writ of habeas corpus, which by its terms barred the state from retrying

him" and therefore itself was a final termination of the state criminal proceeding.

*Jordan v. Blount Cnty.*, 885 F.3d 413, 415 (6th Cir. 2018) (citing *D'Ambrosio II*, 747

F.3d at 382, 385). *Jordan* therefore found that *D'Ambrosio*'s "comments about the

import of any anticipated future conviction . . . were merely dicta." *Id.* at 415–16

(cleaned up). The Sixth Circuit found that the plaintiff's Section 1983 claim at issue

in *Jordan* accrued not when the state appellate vacated the plaintiff's criminal

conviction and remanded to the trial court, but rather when he was acquitted a year

later, as that was when the plaintiff's criminal proceeding ended. 885 F.3d at 415–

16.

Moreover, the Court finds that Wilson's position about the accrual of his civil

claims after the appellate court's affirmance of Judge Hooks' order is in line with the

reasoning supporting delayed accrual articulated in *McDonough* and *Heck*: "concerns

for finality and consistency" and "the strong policy requiring exhaustion of state

---

[10] *D'Ambrosio II* relied in part on an unpublished Seventh Circuit decision that found that a
state appellate court's decision vacating the criminal defendant/§ 1983 plaintiff's criminal
conviction prompted accrual of his Section 1983 malicious prosecution claims, reasoning,
"[w]hat might happen in a subsequent prosecution is neither here nor there; the claim accrues
as soon as the only obstacle to the litigation—the adverse judgment—has been lifted." *Del
Real v. Gomez*, 330 F. App'x 110, 111 (7th Cir. 2009). Not only is *Del Real* non-precedential,
*see* Fed. Rule of App. P. 32.1, the Court finds that its holding is inconsistent with *McDonough*,
as discussed in more depth below as to *Johnson v. Winstead*, 900 F.3d 428 (7th Cir. 2018).
*See infra* Section I.B.2.

remedies in order to avoid the unnecessary friction between the federal and state court systems." *McDonough*, 139 S. Ct. at 2157 (cleaned up). Although the facts of this case are opposite of the usual fact pattern—the state prosecutors were "exhausting state remedies" via an appeal of Judge Hooks' order, rather than the criminal defendant/§ 1983 plaintiff appealing a conviction—the fact nonetheless remains that the order suppressing the tortured confession was still being litigated in the state courts until the Illinois Appellate Court affirmed the decision in December 2019. Accordingly, accrual upon the appellate court's ruling avoids *Heck*'s "pragmatic concerns with avoiding parallel criminal and civil litigation over the same subject matter and the related possibility of conflicting civil and criminal judgments." *McDonough*, 139 S. Ct. at 2157. In the same vein, such a ruling is in line with *McDonough*'s holding that "there is not a complete and present cause of action to bring a fabricated-evidence challenge to criminal proceedings while those criminal proceedings are ongoing," which the Seventh Circuit has found to apply with equal force in the *Brady* context. *Camm*, 937 F.3d at 1111 (quoting *McDonough*, 139 S. Ct. at 2158) (cleaned up).

What's more, the Court finds a case relied on by Defendants for another basis, *Johnson v. Winstead*, 900 F.3d 428 (7th Cir. 2018), to be on point and supports Wilson's position.[11] In *Johnson*, the criminal defendant/§ 1983 plaintiff was tried

---

[11]True, as discussed in more detail below, *see infra* Section I.B.2, the Court rejects Defendants' reliance on *Johnson*'s dual-accrual rule, as it finds, like it previously did in *Ochoa*, 2021 WL 4439426, at *5, that the rule is no longer viable in light of the Supreme Court's ruling in *McDonough*. However, that finding has no impact on the proposition from *Johnson* on which the Court relies for purposes of the instant analysis.

twice, in 2007 and again in 2012. 900 F.3d at 433. The Illinois Appellate Court vacated his first conviction and remanded the case for a new trial, at which the plaintiff was again found guilty. *Id.* The Illinois Appellate Court reversed his second conviction in December 2013. *Id.* Like OSP in this case, the State sought review before the Illinois Supreme Court, which then directed the Illinois Appellate Court to reconsider its decision as a result of intervening case law. *Id.* The Illinois Appellate Court adhered to its original decision to reverse the plaintiff's conviction and issued its reconsideration decision in December 2014. *Id.* In 2015, the plaintiff filed a federal lawsuit alleging multiple claims under Section 1983. *Id.* at 434. The Seventh Circuit held, as relevant here, that the plaintiff's claim arising from his second trial in 2012 was timely, as his conviction was not reversed until 2014 when the appellate court issued its reconsideration decision, and the plaintiff filed his suit less than a year later. *Id.*

Notably, the Seventh Circuit did not find that the plaintiff's claims accrued in December 2013 when the Illinois Appellate Court issued its initial decision reversing the plaintiff's second conviction. Rather, it found that the relevant decision for accrual was the appellate court's decision issued in 2014, which was issued after the State appealed to the Illinois Supreme Court, and the supreme court ordered the appellate court to reconsider its initial decision. Similarly here, OSP appealed Judge Hooks' decision vacating Wilson's 1989 conviction and suppressing the tortured confession, and the Illinois Appellate Court affirmed that decision in December 2019. The Court sees little daylight between the two situations: if the appellate court in this case had

31

ordered Judge Hooks to reconsider his June 2018 decision, and he issued it as a reconsideration decision, that reconsideration decision would have been the final favorable termination. Instead, the appellate court affirmed his decision, at which point it became a final, favorable termination (under Defendants' theory; as discussed above, the Court finds that Judge Hooks' decision and the appellate court's affirmance do not constitute a final, favorable termination because it allowed for a retrial).

True, in *Johnson*, the question of whether the plaintiff's Section 1983 claims accrued when the Illinois Appellate Court initially reversed his second conviction in December 2013, or when it reconsidered its decision pursuant to the Illinois Supreme Court's instruction and adhered to its original decision to reverse the plaintiff's conviction in December 2014 was not directly before the Seventh Circuit. Instead, the court assumed that the claims accrued when the "conviction was reversed in 2014" so his claims relating to that conviction were timely because he "filed suit less than a year later." *Id.* at 432, 439. His claims filed in August 2015 would have been timely even had the court assumed that they accrued upon the Appellate Court's initial reversal in December 2013. So the Court acknowledges that it can consider only as dicta the Seventh Circuit's finding that the plaintiff's Section 1983 claims accrued after the State's appeal to the Illinois Supreme Court and the Illinois Appellate Court issued its decision adhering to its original decision and reversing the conviction. However, the Court nonetheless finds that dicta to be persuasive.

Accordingly, even if the Court were to follow the Ninth Circuit's pre-*McDonough* holding in *Jackson* and find that Wilson's Section 1983 claims based on

the tortured confession and subsequent convictions accrued upon the suppression of that evidence at any retrial, his claims are still timely, because they did not accrue until December 2019, less than two years before he filed his federal lawsuit in June 2021.

### 2. Defendants' Alternative Argument for Dismissal of All Section 1983 Claims Associated with Wilson's 1983 and 1989 Convictions

As an alternative basis for dismissal,[12] Defendants contend that Wilson's Section 1983 claims, to the extent that they seek to recover for his 1983 and 1989 convictions, are untimely under the accrual analysis in *Johnson v. Winstead*, 900 F.3d 428. City Mot. Dismiss at 13. As discussed above, the plaintiff in *Johnson* was tried twice, once in 2007 and again in 2012. 900 F.3d at 433. The Illinois Appellate Court vacated his first conviction, after which the plaintiff was convicted again at a second trial. *Id.* The Illinois Appellate Court vacated that second conviction, as well. *Id.* In 2015, the plaintiff filed his federal Section 1983 suit, claiming, among other things, that detectives violated his Fifth Amendment right against self-incrimination. *Id.* at

---

[12]City Defendants state in their Motion and clarify in their Reply that they rely on the Seventh Circuit's decision in *Johnson*, 900 F.3d 428 only as "an alternative basis supporting the dismissal of [Wilson's] § 1983 claims associated with his 1983 and 1989 convictions." City Mot. Dismiss at 13; City Reply at 9 n.4. Although at first blush, City Defendants' reliance on *Johnson* does appear to apply to the entire accrual analysis, upon further examination, the Court understands the difference to be as follows: City Defendants' primary argument is that the *Heck* deferred accrual rule does not apply to certain Section 1983 claims in the narrow situation where one prosecution ended in the criminal defendant/§ 1983 plaintiff's favor, but where a new trial is allowed but at which evidence that forms the basis of the Section 1983 claims is barred. As discussed above, the Court disagrees with City Defendants' position. That argument does not apply to any Section 1983 claims based on the non-confession evidence that formed the basis of Wilson's 1983 and 1989 convictions that was *not* suppressed at Wilson's 2020 retrial. *See* Resp. at 21 n.3. Rather, those claims—in addition to Wilson's Section 1983 claims related to the coerced confession suppressed at the 2020 trial—are subject to City Defendants' alternative limitations argument based on *Johnson*. For the reasons discussed above, the Court finds that argument unavailing.

33

434. Confirming that a Fifth Amendment self-incrimination violation occurs when an unlawfully obtained confession is used in a criminal case, the Seventh Circuit evaluated the *Heck* rule and held that the plaintiff's self-incrimination claim relating to violations at his first trial in 2007 was time barred because the clock began to run in 2010 when his first conviction was reversed. *Id.* at 438–39. As discussed above, the Seventh Circuit held that his claim arising from his second trial in 2012 was timely as his conviction was not reversed until 2014, and he filed his suit less than a year later. *Id.*

The parties recognize that this Court recently analyzed *Johnson*, and found that its dual-accrual rule could not "be reconciled with . . . . *McDonough*." *Ochoa v. Lopez*, 2021 WL 4439426, at *4–5 (N.D. Ill. Sept. 28, 2021) (citing *Jackson v. City of Chicago*, 2021 WL 3883111, at *4 (N.D. Ill. Aug. 31, 2021) (holding that the plaintiff's Section 1983 claims did not accrue until the state's attorney gave formal notice that it would not prosecute the criminal defendant); *Savory v. Cannon*, 2021 WL 1209129, at *4 (N.D. Ill. Mar. 31, 2021) (*Savory II*) (holding that *McDonough* overruled *Johnson* in the context of multiple convictions)[13]; *Brown v. City of Chicago*, 2019 WL 4694685, at *1 (N.D. Ill. Sept. 26, 2019) (*Brown I*) (holding that *Johnson* is in tension with *McDonough*)). Defendants argue that *Ochoa* is distinguishable because in that case, although the criminal defendant/§ 1983 plaintiff was convicted twice, the evidence

---

[13]The Seventh Circuit in *Savory I* recognized the tension between *McDonough* and *Johnson*, but, because the issue had not been fully briefed, if found that "the more prudent course [was] to allow the district court to consider in the first instance, after full briefing from both the plaintiff and the defendants, whether and how *McDonough* affects *Johnson*." 947 F.3d at 416 n.3.

that formed the basis of his Section 1983 claims was introduced at both trials. City Mot. Dismiss at 17 (citing *Ochoa*, 2021 WL 4439426, at *6). Therefore, a verdict in favor of the plaintiff's Section 1983 claims as a result of unconstitutional practices at his first trial would call into question the validity of the ongoing prosecution or subsequent conviction before the termination of the criminal proceedings in his second trial. *Id.* True, the facts in *Ochoa* are not on all fours with the facts of this case, and indeed, *Ochoa* presented a more straightforward analysis because it more clearly implicated the "pragmatic concerns" underlying *Heck* and subsequently *McDonough*. Still, for the reasons discussed above, *see supra* Section I.B.1, the Court finds that, under *McDonough*, a Section 1983 plaintiff can bring claims only when the criminal proceedings have terminated for good, even if the evidence underlying the claims is suppressed at a retrial.

Indeed, the court in *Dukes* also found that *Johnson*'s dual-accrual rule was inconsistent with *McDonough*, even where the allegedly coerced confession was suppressed at the plaintiff's second trial. *Dukes*, 600 F. Supp. 3d at 896. If, during the pendency of this case, the Seventh Circuit addresses and affirmatively resolves the inconsistency between *Johnson* and *McDonough* (dual-accrual or one-accrual), Defendants can re-assert their statute of limitations arguments on summary judgment. *See id.*

### 3. Accrual of Claim for Deprivation of Liberty Without Probable Cause

Defendants' last alternative timeliness argument aimed at Wilson's Section 1983 claims pertains only to Count III, Wilson's claim for deprivation of liberty

without probable cause, brought under the Fourth and Fourteenth Amendments. City Mot. Dismiss at 10–12. In their Motion to Dismiss, City Defendants argue that, pursuant to *Smith v. City of Chicago*, 3 F.4th 332, 339 (7th Cir. 2021) (*Smith I*), Wilson's deprivation of liberty claim accrued when he was released from custody, not upon favorable termination. *Id.* at 11. After briefing concluded on Defendants' Motions to Dismiss, Wilson filed two notices of supplemental authority, to which Defendants responded. R. 155, Pl.'s First Mot. Suppl. Auth.; R. 166, Defs.' Resp. First Suppl. Auth.; R. 185, Pl.'s Second Mot. Suppl. Auth.; R. 187, Defs.' Resp. Second Suppl. Auth.

Wilson initially directed the Court's attention to the Supreme Court's decision in *Thompson v. Clark*, 142 S. Ct. 1332 (2022), in which the plaintiff asserted a Fourth Amendment claim for unlawful detention without probable cause, the same claim Wilson asserts in Count III. Pl.'s First Mot. Suppl. Auth. at 2 (citing *Thompson*, 142 S. Ct. at 1337 ("[A] Fourth Amendment claim under § 1983 for malicious prosecution [is] sometimes referred to as a claim for unreasonable seizure pursuant to legal process.") (citing *Manuel v. Joliet*, 580 U.S. 357, 363–64, 367–68 (2017) (*Manuel I*). In *Thompson*, the Supreme Court held that a favorable termination of the underlying criminal prosecution is an element of a Fourth Amendment malicious prosecution claim. 142 S. Ct. at 1338. Accordingly, the Supreme Court granted the petition for certiorari in *Smith*, vacated the judgment, and remanded the case to the Seventh Circuit for further consideration in light of *Thompson*. *Smith v. City of Chicago*, 142 S. Ct. 1665 (2022) (*Smith II*).

36

Wilson filed his second notice of supplemental authority after the Seventh Circuit reversed its prior decision in *Smith* on remand from the Supreme Court. Pl.'s Second Mot. Supple. Auth. The Seventh Circuit, after considering *Thompson*, held that "a Fourth Amendment claim for malicious prosecution accrues when the underlying criminal prosecution is terminated without a conviction. Here, that was the plaintiff's acquittal date, so his claim was timely." *Smith v. City of Chicago*, 2022 WL 2752603, at *1 (7th Cir. July 14, 2022), *as amended*, 2022 U.S. App. LEXIS 21590, at *1 (7th Cir. Aug. 4, 2022) (*Smith III*) (cleaned up). Defendants agree that, under *Smith III*, Wilson's claims accrued upon favorable termination of his criminal proceedings. Defs.' Resp. Second Suppl. Auth. at 3. However, Defendants insist that Count III is untimely because the entirety of the misconduct alleged relates to Wilson's tortured confession, and therefore did not form any part of the criminal proceedings against Wilson after Judge Hooks vacated his 1989 conviction and suppressed that confession and a retrial in June 2018. *Id.* For the reasons discussed in depth above, *see supra* Section I.B.1, the Court rejects Defendants' argument that Wilson's Section 1983 claims based upon his tortured confession accrued in June 2018. Therefore, under *Smith III*, the Court finds Wilson's prolonged detention claim, like his other Section 1983 claims, to be timely and accordingly declines to dismiss Count III on statute of limitations grounds.

## C.     Timeliness of State Law Claims

As stated above, City Defendants, Trutenko, Hartnett, Daley, and Hyman also move to dismiss as untimely Wilson's state law claims for malicious prosecution

(Count VI), intentional infliction of emotional distress (IIED) (Count VII), and civil conspiracy (Count VIII). City Mot. Dismiss at 18–20 (IIED and malicious prosecution claims untimely); Trutenko Mot. Dismiss at 12–13 (all state claims are untimely); Hartnett Mot. Dismiss at 17–18 (IIED claim is untimely); Daley Mot. Dismiss at 4–5 (adopting City Defendants' timeliness arguments); Hyman Mot. Dismiss at 5 (adopting City Defendants' and Hartnett's timeliness arguments); Martin (adopting City Defendants' timeliness arguments); *see also* R. 160, Estate Defs.' Mot. Join (adopting City Defendants' timeliness arguments).

Defendants maintain that all of Wilson's state law claims are subject to a one-year statute of limitations under the Illinois Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/8-101(a) (Tort Immunity Act). Trutenko Mot. Dismiss at 12. The Tort Immunity Act provides that a civil action asserted against a local entity or its employees must be "commenced within one year from the date that the injury was received or the cause of action accrued." 745 ILCS 10/8-101(a).

Wilson does not dispute that his IIED and civil conspiracy claims are subject to a one-year statute of limitations under the Tort Immunity Act. Resp. at 84, 98. However, he presents conflicting positions on whether his state law malicious prosecution claim is subject to a two-year limitations period. *Compare* Resp. at 84 (acknowledging that the Tort Immunity Act provides a one-year statute of limitations period and arguing that his state law claims, including his malicious prosecution claim, were filed less than one year after the claims accrued in October 2020); *with*

Resp. at 85 (citing *Brooks v. Ross*, 578 F.3d 574, 578–79 (7th Cir. 2009) in support of applying a two-year limitations period to state law malicious prosecution claim). To the extent Wilson indeed takes the position that any of his state law claims are subject to a two-year statute of limitations period, the Court disagrees. Illinois law is clear that the Tort Immunity Act controls each of his state law claims against Defendants, who are all employees of Illinois local governmental entities. *See* City Reply at 15 n.5 (citing 745 ILCS 10/8-101(a); *Williams v. Lampe*, 399 F.3d 867, 870 (7th Cir. 2005) ("Illinois local governmental entities and their employees benefit from a one-year statute of limitations for civil actions against them. While the two-year period still applies to § 1983 claims against such defendants, the one-year period applies to state-law claims that are joined with a § 1983 claim.") (cleaned up)). As City Defendants point out, *Brooks* simply held that the two-year statute of limitations applicable to personal injury actions in Illinois provided the relevant limitations period for §1983 actions, but did not discuss the limitations period applicable to state law claims joined with Section 1983 claims. *Id.* (citing 578 F.3d at 578–79). The Court finds that, pursuant to the Tort Immunity Act, each of Wilson's state law claims is subject to a one-year statute of limitations.

### 1. Malicious Prosecution

Defendants do not argue that Wilson's state malicious prosecution claim is not subject to *Heck*'s deferred accrual rule. Instead, they contend that, under *Heck*, it accrued in June 2018 when Wilson's 1989 conviction was overturned, the evidence of his tortured confession was suppressed, and he was released from custody. *See*

Trutenko Mot. Dismiss at 18; City Mot. Dismiss at 20. Wilson adopts his statute of limitations arguments that pertain to his federal claims to retort that his state law malicious prosecution claim also accrued on October 1, 2020, when all criminal charges against him were dismissed with prejudice. Resp. at 85. For the reasons discussed above, *supra* Section I.B.1, the Court finds that Wilson's malicious prosecution claim, like his Section 1983 claims, accrued not in June 2018, when the "criminal proceedings [were] ongoing" but rather in October 2020, when all charges were dismissed with prejudice such that there was a "complete and present cause of action." *See McDonough*, 139 S. Ct. at 2158. Accordingly, the Court denies Defendants' motions to dismiss Wilsons' state law malicious prosecution claim as untimely.

### 2. Intentional Infliction of Emotional Distress

Defendants next contend that *Heck*'s delayed accrual rule does not apply to IIED claims, as *Heck* applies only to federal civil rights claims, not Illinois state law claims. City Mot. Dismiss at 18; City Reply at 13–14 (citing, among other cases, *Bridewell v. Eberle*, 730 F.3d 672, 678 (7th Cir. 2013); *Gordon v. Devine*, 2008 WL 4594354, at *7 (N.D. Ill. Oct. 14, 2008)). Like the myriad cases cited by Wilson in Response, the Court disagrees, and finds that the *Heck* delayed accrual rule applies to IIED claims.

In *Bridewell*, the Seventh Circuit held that an IIED claim "in the course of arrest and prosecution accrues on the date of the arrest," and declined to characterize an IIED claim as a continuing tort for limitations purposes. 730 F.3d at 678. But the

40

Seventh Circuit did not address the *Heck* delayed accrual rule, as the plaintiff had not been convicted. *Id.* So, the Court agrees with Wilson that *Bridewell* does not foreclose application of the *Heck* delayed accrual rule. Resp. at 98.

Defendants also argue Illinois has not "generally adopted *Heck*," and Wilson's reliance on *Lieberman v. Liberty Healthcare Corp.* is misplaced, because *Lieberman*'s adoption of *Heck* was limited to the facts of the case. City Reply at 13–14 (citing 948 N.E.2d 1100, 1106 (Ill. App. Ct. 2011)). But, as Wilson points out and other courts have recognized, the Seventh Circuit has characterized *Lieberman* as "embrac[ing]" *Heck*'s delayed accrual rule. Resp. at 97–98 (citing *Northfield Ins. Co. v. City of Waukegan*, 701 F.3d 1124, 1137 (7th Cir. 2012) (Hamilton, J., concurring)); *see also Brown I*, 2019 WL 4694685, at *7. Indeed, numerous courts in this District have recently applied *Heck*'s delayed accrued rule to IIED claims brought under Illinois law. *See, e.g.*, *Treadwell v. Salgado*, 2021 WL 3129290, at *4 (N.D. Ill. July 23, 2021) (collecting cases); *Baker v. City of Chicago*, 483 F. Supp. 3d 543, 560 (N.D. Ill. 2020); *Brown I*, 2019 WL 4694685, at *6; *Smith v. Burge*, 222 F. Supp. 3d 669, 693 (N.D. Ill. 2016). *But see Melongo v. Podlasek*, 2019 WL 1254913, at *15 (N.D. Ill. Mar. 19, 2019) (relying on *Bridewell* and finding that IIED claim accrues at the time of arrest "even when the distress is intertwined with a claim for malicious prosecution") (cleaned up).

Wilson's IIED claims are based on the same conduct that led to and continued his 1983 and 1989 convictions; that is, he alleges that Defendants engaged in extreme and outrageous conduct by (1) coercing his confession by torture, constructing and fabricating his confession, and procuring his prosecution, conviction, and

imprisonment via his coerced and fabricated confession; and (2) fabricating, coercing, and suppressing other false evidence, by continuing Wilson's false imprisonment after procuring his wrongful convictions, by refusing to investigate or discipline the torturers, and by making false public statements. Compl. ¶¶ 356–57. Courts in this District have found nearly identical IIED allegations, which attack the validity of the plaintiffs' convictions, to be subject to *Heck*'s delayed accrual rule. *See Brown I*, 2019 WL 4694685, at *6–7; *Smith*, 222 F. Supp. 3d at 693 (finding, under *Heck*, plaintiff's claims accrued when his conviction was set aside because "[p]laintiff base[d] his IIED claim on [d]efendants coercing his confession by torture, constructing and fabricating his confession, and procuring his prosecution, conviction, and imprisonment via his coerced and fabricated confession. Under these facts, [p]laintiff . . . directly attacked the validity of his conviction.").

Like their arguments about the accrual of Wilson's Section 1983 claims based on his tortured confession, Defendants posit that, even if the Court applies the *Heck* delayed accrual rule, Wilson's claims are still untimely because they accrued in June 2018 when his conviction was overturned and the tortured confession was suppressed at any future trial, and therefore his state law claims expired in June 2019.[14] City

---

[14]As discussed above, even if the Court agreed with Defendants that Wilson's claims based on his tortured confession accrued when his conviction premised on that evidence was vacated, the Court finds that they accrued when the Illinois Appellate Court affirmed Judge Hooks' decision in December 2019. *See supra* Section I.B.1. Because Wilson's state law claims have a one-year limitations' period under the Tort Immunity Act, if the Court agreed with Defendants, the state law claims would have expired in December 2020 and his June 2021 Complaint would be untimely as to those claims. No matter, because the Court finds that his state law claims, like his Section 1983 claims, did not accrue until the charges against Wilson were dismissed with prejudice in October 2020.

Mot. Dismiss at 19. As the Court stated in its discussion about the timelines of Wilson's Section 1983 claims above, there is some merit to Defendants' argument that claims based on certain evidence should accrue upon favorable termination of a prosecution based on that evidence if it is not allowed to be introduced at a subsequent trial. However, the Court agrees with Wilson that it would make "little sense" to require Wilson to file a single IIED claim while the criminal proceedings were still pending, while prohibiting the filing of Section 1983 and state law malicious prosecution claims based on the same conduct. Resp. at 99. The Court sees no reason that the rule articulated by the Supreme Court in *McDonough*, that "there is not a complete and present cause of action to bring a fabricated-evidence challenge to criminal proceedings while those criminal proceedings are ongoing," should not also apply to IIED claims based upon the same conduct underlying the plaintiff's fabricated-evidence and related Section 1983 claims. 139 S. Ct. at 2158 (cleaned up); *see also Brown I*, 2019 WL 4694685, at *7 (plaintiff's IIED claims did not accrue when his initial criminal conviction was overturned, which would have required the plaintiff to "have filed his IIED claim related to his [initial] convictions while he was awaiting retrial," but rather when all charges were dropped against the plaintiff). The Court finds that to be the case for Wilson's IIED claims related to his tortured confession and subsequent criminal proceedings, as well as his claims related to other fabricated or suppressed evidence relating to his 1982, 1989, or 2000 trials. Compl. ¶¶ 356–57.

43

Moreover, there will be substantial overlap in the evidence supporting Wilson's Section 1983 claims based on the tortured confession and his state law claims, so Defendants will suffer little prejudice if these claims are allowed to proceed. *See Treadwell*, 2021 WL 3129290, at *4 (declining to dismiss IIED claim because, among other reasons, the case was proceeding regardless). Accordingly, for the reasons discussed above, the Court finds that, like his Section 1983 claims, Wilson's IIED claims did not accrue until October 1, 2020, when all criminal charges were dismissed with prejudice. Because his Complaint was filed in June 2021, less than one year after that dismissal, his claims are timely.

### 3. Civil Conspiracy

Defendants do not advance any specific arguments as to the timeliness of Wilson's state civil conspiracy claim. Rather, they argue only that his "state law claim(s) . . . are also untimely pursuant to the [Tort Immunity Act]." Trutenko Mot. Dismiss at 12. The Court agrees with Wilson, however, that because Wilson's other state law claims—for malicious prosecution and IIED—are timely, so too is his civil conspiracy claim based on those claims. *See* Resp. at 84 (citing *Huon v. Former Madison Cnty. State's Att'y William Mudge*, 2013 WL 12152427, at *8 (S.D. Ill. Aug. 22, 2013), *aff'd sub nom. Huon v. Mudge*, 597 F. App'x 868 (7th Cir. 2015) ("Plaintiff's conspiracy claim based on his timely state law claims (IIED and malicious prosecution) is also timely.")).

For the foregoing reasons, the Court denies Defendants' motions to dismiss any of Wilson's claims on limitations grounds. The Court turns to Defendants' arguments for dismissal on immunity grounds.

## II.      Immunity

As indicated above, in Count I, Wilson asserts a due process claim under the Fourteenth Amendment against Defendants. He alleges that Daley, Burge, O'Hara, McKenna, Yucaitis, Hartnett, and Hyman, individually, jointly and in conspiracy, caused his wrongful charging, prosecutions, convictions, and imprisonment, and that those Defendants, along with Trutenko, Horvat, Kunkle, Coleman, Shines, Hillard, Needham, and Martin, caused the continuation of that wrongful conviction. Compl. ¶¶ 315–16, 319. In Count II, Wilson asserts a claim for coercive interrogation under the Fifth and Fourteenth Amendments, claiming that Burge, O'Hara, McKenna, Yucaitis, Hartnett, and Hyman violated his rights by using torture and other coercive techniques to interrogate Wilson, by encouraging, condoning, and permitting the use of said techniques, or by failing to intervene to stop Wilson's coercive interrogation. *Id.* ¶¶ 325–26. In Count III, Wilson asserts a Fourth and Fourteenth Amendment deprivation of liberty without probable cause violation against Burge, O'Hara, McKenna, Yucaitis, Hartnett, and Hyman. *Id.* ¶¶ 331–37. And in Count IV, Wilson asserts that Daley, Burge, O'Hara, McKenna, Yucaitis, Hyman, Trutenko, Hartnett, Horvat, Kunkle, Coleman, Shines, Needham, Hillard, and Martin engaged in a

conspiracy to deprive him of his constitutional rights under 42 U.S.C §§ 1983, 1985 and 1986. *Id.* ¶¶ 339, 343.

Wilson also asserts state law claims based upon similar alleged conduct. Specifically, in Count VI, Wilson alleges that Burge, O'Hara, McKenna, Yucaitis, Hartnett, and Hyman, individually, jointly, and in conspiracy, initiated a malicious prosecution without probable cause against Wilson, and those same Defendants, together with Daley, Trutenko, Kunkle, Horvat, Coleman, Martin, Shines, Hillard, and Needham, individually, jointly, and in conspiracy, continued said prosecution and re-prosecutions, again without probable cause. Compl. ¶ 354. In Count VII, Wilson alleges a claim for IIED against the same Defendants based on the same conduct. *Id.* ¶¶ 356–57. Finally, in Count VIII, Wilson alleges that Daley, Burge, O'Hara, McKenna, Yucaitis, Hyman, Trutenko, Hartnett, Horvat, Kunkle, Coleman, Martin, Shines, Needham, and Hillard, engaged in a state law civil conspiracy to maliciously prosecute and/or continue said prosecutions, and to intentionally inflict continuing severe emotional distress on Wilson. *Id.* ¶ 361.

Defendants Hyman, Trutenko, Hartnett, Horvat, Kunkle, and Daley move to dismiss the Complaint on the basis of absolute prosecutorial immunity, qualified immunity, and/or sovereign immunity. The Court addresses each Defendant's arguments in turn, but starts with a recitation of the law.

A prosecutor is absolutely immune from Section 1983 liability when the prosecutor acts as an advocate for the state. *Hill v. Coppelson*, 627 F.3d 601, 605 (7th Cir. 2010). This immunity emanates from a "concern that harassment by unfounded

litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Imbler v. Pachtman*, 424 U.S. 409, 423 (1976). Prosecutorial immunity is absolute and "shields prosecutors even if they act maliciously, unreasonably, without probable cause, or even on the basis of false testimony or evidence." *Smith v. Power*, 346 F.3d 740, 742 (7th Cir. 2003) (cleaned up). But when a prosecutor's acts are investigative and unrelated to the preparation of and initiation of judicial proceedings, no immunity attaches for that conduct. *Hill*, 627 F.3d at 605. Prosecutorial immunity is "based upon a functional approach that considers the nature of the prosecutor's activities in the case." *Crowder v. Barrett*, 2022 WL 864519, *29 (N.D. Ill. March 23, 2022) (cleaned up). "If a prosecutor's function was quasi-judicial, the prosecutor enjoys absolute immunity. If the function was administrative or investigatory, the prosecutor enjoys only qualified immunity." *Patterson v. Burge*, 328 F. Supp. 2d 878, 892 (N.D. Ill. 2004) (*Patterson I*) (cleaned up).

Qualified immunity on the other hand "shields officials from civil liability so long as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known." *Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017) (cleaned up). "The doctrine of qualified immunity balances dueling interests—allowing officials to perform their duties reasonably without fear of liability on the one hand and affording members of the public the ability to vindicate constitutional violations by government officials who abuse their offices on the other."

47

*Lopez v. Sheriff of Cook Cty.*, 993 F.3d 981, 987 (7th Cir. 2021) (cleaned up). "The purpose of qualified immunity is to protect 'all but the plainly incompetent or those who knowingly violate the law.'" *Humphrey v. Staszak*, 148 F.3d 719, 727 (7th Cir. 1998) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Qualified immunity is an affirmative defense, but once a defendant properly raises the defense, the burden shifts to the plaintiff to defeat it. *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 2722 (2020). Courts, in determining whether qualified immunity applies, engage in a two-prong inquiry. *Id.* Under the first prong, the court inquires whether the facts, taken in the light most favorable to the injured party, show that the officer's conduct violated a federal right. *Saucier v. Katz,* 533 U.S. 194, 201 (2001), *receded from on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). Under the second prong, the court inquires whether the constitutional right was clearly established at the time of the challenged conduct. *Id*. Courts may choose which prong to address first. *Pearson*, 555 U.S. at 236.

Sovereign immunity strips a court's jurisdiction to hear a case against an agent of the State of Illinois unless the state's agent acts in violation of statutory or constitutional law or in excess of his or her authority. *See Gossmeyer v. McDonald*, 128 F.3d 481, 487 (7th Cir. 1997). An agent's conduct will be attributed to the state for purposes of sovereign immunity if: "(1) [there are] no allegations that an agent or employee of the State acted beyond the scope of his authority through wrongful acts; (2) the duty alleged to have been breached was not owed to the public generally independent of the fact of State employment; and (3) . . . the complained-of actions

48

involve matters ordinarily within that employee's normal and official functions of the State." *Richman v. Sheahan*, 270 F.3d 430, 441 (7th Cir. 2001) (quoting *Healy v. Vaupel*, 549 N.E.2d 1240, 1247 (Ill. 1990)).

### A. Claims Against Hyman

Hyman, who was an ASA, argues that he is absolutely immune from liability regarding his decision to approve charges for Wilson. Hyman Mot. Dismiss at 8 (citing, among other cases, *Imbler*, 424 U.S. at 421). Wilson, submits Hyman, does not allege that Hyman was present for or took part in any alleged abuse of Wilson. *Id.* at 9. Hyman's argument, however, ignores the allegations of the Complaint.

According to the Complaint, Hyman did more than just approve charges for Wilson. Hyman, alleges Wilson, participated in Wilson's torture and knew that Wilson had been tortured. Compl. ¶ 11. While Wilson was hit, suffocated, and electroshocked, Hyman was in close proximity to the interrogation room on the second floor. *Id.* ¶ 142. Hyman then entered the interrogation room and said that he heard that Wilson "was gonna make a statement." *Id.* Wilson told Hyman that he wanted to see his lawyer and gave Hyman his lawyer's business card. *Id.* ¶ 143. Hyman then left and Defendants McKenna and O'Hara returned and again beat Wilson. *Id.* ¶¶ 143–44. After Wilson's "torture session ended," Hyman was called in to obtain a statement. *Id.* ¶ 148. Hyman then took Wilson's statement in the presence of Defendant McKenna. *Id.* ¶ 149. Hyman, in derogation of the policy and practice of the CCSAO at that time, did not ask Wilson if he had been physically abused or otherwise mistreated. *Id.* ¶ 150.

### 1. Absolute Prosecutorial Immunity

The Court, construing Wilson's well-pled facts as true and drawing all reasonable inferences in his favor, as the Court is required to do at this procedural posture, agrees with Wilson that he has adequately alleged facts stating a plausible claim for relief that Hyman was not acting as a prosecutor when he violated Wilson's rights under federal and state law. *See, e.g.*, *Smith*, 222 F. Supp. 3d at 694 (felony review ASA alleged to be part of the Area 2 "investigative team" was not entitled to absolute immunity where the ASA "encouraged, condoned, and permitted the torture that [the police officer defendants] used to coerce [the plaintiff's] fabricated confession"); *Orange v. Burge*, 2008 WL 4443280, at *10 (N.D. Ill. Sept. 29, 2008) (*Orange III*) (absolute immunity unavailable where felony review prosecutor acted more as an investigator than prosecutor as he was "personally involved" in the interrogation by Burge and other Area 2 detectives and "coached [the plaintiff] regarding the false confession [the plaintiff] was to deliver in exchange for cessation of the alleged torture sessions").

Hyman argues that the allegations against him are similar to those in *Hunt v. Jaglowski*, 926 F.2d 689 (7th Cir. 1991), in which the Seventh Circuit found that absolute immunity barred the § 1983 plaintiff's coercion claim against a prosecutor. Hyman Mot. Dismiss at 9. True, the facts of *Hunt* are similar to the allegations in this case, but there is one crucial difference: in *Hunt* the prosecutor was not present during the coerced confession. *Id.* at 692–93. In *Hunt*, the police interrogated and allegedly beat Hunt, after which Hunt gave a coerced confession. *Id.* at 693. Hunt

50

alleged that he told the prosecutor about his beating and other mistreatment, so a jury could reasonably conclude that the ASA knew of the coercion, shared in its goal, and contributed to its effectiveness. *Id.* at 692. However, the Seventh Circuit noted that the prosecutor was not present during any of the crucial moments of alleged coercion; he was elsewhere when the plaintiff was arrested, when the confession was first given, and during the polygraph test, the lineup, and the multiple occasions when the plaintiff claimed he was beaten. *Id.* at 692–93. Indeed, the defendant-prosecutor arrived "after Hunt had confessed and the police were seeking review of and approval or disapproval of the charges they were detaining him on." *Id.* at 693. The court found that such an act was one toward "initiating a prosecution and in presenting the State's case," so the prosecutor was entitled to absolute immunity. *Id.* (cleaned up).

Here, on the other hand, Wilson alleges that Hyman was present when Wilson "was tortured into a false confession, and that he conspired with Defendants to violate [Wilson's] constitutional rights until an involuntary (and false) statement was obtained." Resp. at 37 (citing Compl. ¶¶ 11, 100–101, 142–152, 159, 241–242). These allegations suggest that Hyman was acting in an investigatory, not prosecutorial, function, and therefore is not protected by absolute prosecutorial immunity. *See Patrick v. City of Chicago*, 213 F. Supp. 3d 1033, 1045–46 (N.D. Ill. 2016) (distinguishing *Hunt* on the basis that the plaintiff alleged that the prosecutor was present during, and helped police officer obtain, his coerced confession). Of course, if discovery shows that Hyman did not actually participate in the alleged torture, but

instead was present at Area 2 only to take Wilson's statement, he may be entitled to summary judgment on grounds of immunity. *See Tillman v. Burge*, 813 F. Supp. 2d 946, 973–94 (N.D. Ill. 2011) (citing *Hunt*, 926 F.2d at 693).

Moreover, the Court agrees with Wilson that Hyman's argument that he is entitled to absolute prosecutorial immunity because he testified at trial is misplaced. Resp. at 38. Wilson points out that he has not sued Hyman for his testimony, but rather for the misconduct described above, relating to Wilson's torture on February 14, 1982. *Id.* (citing Compl. ¶¶ 11, 100–101, 142–152, 159, 241–242). "A prosecutor cannot retroactively immunize himself from conduct by perfecting his wrong-doing through introducing the fabricated evidence at trial and arguing that the tort was not completed until a time at which he had acquired absolute immunity. That would create a license to lawless conduct, which the Supreme Court has said that qualified immunity is not to do." *Fields v. Wharrie*, 740 F.3d 1107, 1114 (7th Cir. 2014) (*Fields II*) (cleaned up). Hyman's testimony does not provide absolute immunity for his earlier misconduct outside the courtroom.

Nor are Wilson's *Brady* claims against Hyman protected by absolute immunity, an argument Hyman raises in only a perfunctory manner. Hyman Mot. Dismiss at 9–10. *See Lewis v. Mills*, 677 F.3d 324, 332 (7th Cir. 2012) ("Unsupported and underdeveloped arguments are waived.") (cleaned up). No matter, because although it is true that claims for suppression of exculpatory evidence are often barred against prosecutors based on absolute immunity, *see infra* Section II.C, Hyman cannot hide behind that doctrine. Like the claims against the prosecutors in

52

*Smith*, Wilson's claims against Hyman concern Hyman's "misconduct during the investigatory stage of the proceedings, as well as his conspiratorial conduct unrelated to the prosecution of [Wilson's] claims." 222 F. Supp. 3d at 696. Moreover, like the prosecutor in *Smith*, Hyman was not the trial prosecutor and is therefore even further removed from the prosecutorial stage of the proceedings. *See id.*; *Patterson I*, 328 F. Supp. 2d at 893 (since the defendant-prosecutors "were not acting as advocates for the state when they participated in [the plaintiff's] abusive interrogation and did not personally prosecute [him], they cannot claim immunity from their later *Brady* violations simply because of their status as state's attorneys"). As such, this argument is without merit. *C.f. Serrano v. Guevara*, 315 F. Supp. 3d 1026, 1036 & n.8 (N.D. Ill. 2018).

### 2. Qualified Immunity

Hyman argues in the alternative that he is entitled to qualified immunity on Counts I through IV regarding Burge, O'Hara, and McKenna's alleged coercive techniques towards witnesses because they did not violate Wilson's rights, were not known to Hyman, and Wilson's confession was not known by Hyman to be false. Hyman. Mot. Dismiss at 17–18. Wilson responds that for decades torture has been unlawful and the Complaint alleges that Hyman knew about and was involved in the torture. Resp. at 94 (citing Compl. 11, 18, 100–01, 142–52, 241–42; *Tillman*, 813 F. Supp. 2d at 966 n.12 ("That torture is unlawful has been clearly established for decades, thus rendering futile any argument that an individual who engaged in torture should enjoy qualified immunity.") (cleaned up)). The Court agrees with

Wilson that any claims against Hyman premised on Hyman's personal involvement in the alleged torture are not barred by qualified immunity. So too as to Wilson's claims regarding evidence fabrication, coercive interrogation, or conspiracy. *Brown II*, 2022 WL 4602714, at *19 ("[b]ecause it is beyond reasonable dispute that fabricating evidence and conspiring to frame a suspect violates an individual's constitutional rights," prosecutor was not entitled to qualified immunity on those claims at summary judgment) (citing *Dominguez v. Hendley*, 545 F.3d 585, 589 (7th Cir. 2008); *Patrick*, 213 F. Supp. 3d at 1051).

Hyman also argues that he is entitled to qualified immunity on Wilson's failure to intervene claim. Hyman Mot. Dismiss at 19. Hyman maintains that, while a police officer may be held liable for failing to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens, the Seventh Circuit has not held such an obligation for prosecutors. *Id.* (citing, among other cases, *Gordon*, 2008 WL 4594354, at *10). In short, Hyman insists that it was not clearly established in 1982 that he had a duty to intervene or refuse to take Wilson's statement, and therefore qualified immunity applies. *Id.* at 20 (citing *Serrano*, 315 F. Supp. 3d at 1038–39; *Patrick*, 213 F. Supp. 3d at 1055). Wilson counters that in 2012, the Seventh Circuit decided that, when acting in an investigatory capacity, prosecutors are subject to the same rules as those governing police officers and can therefore violate a citizen's due process rights "just as easily as a police officer[.]" Resp. at 79–80 (quoting *Whitlock v. Brueggeman*, 682 F.3d 567, 580 (7th Cir. 2012)). As discussed in more detail below, the Court agrees with Wilson that prosecutors can be held liable for

54

failure to intervene post-*Whitlock*. *See infra* Section II.E. However, as Hyman points out in Reply, Wilson fails to respond directly to his argument that there was not a clearly established duty for prosecutors to intervene before 2012, and so he has waived any response. Hyman Reply at 12; *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."). And Wilson's allegations about Hyman's failure to intervene relate only to conduct that occurred in 1982.

Other courts in this District have recently addressed this issue. In *Serrano*, the court held that prosecutors who were involved in coercing witness testimony during a 1993 investigation were entitled to qualified immunity from a failure to intervene claim. 315 F. Supp. 3d at 1039. The court found no authority that shows a clearly established duty in 1993 for prosecutors, even acting in an investigatory function, to intervene when their fellow prosecutors committed constitutional wrongs. *Id.*; *see also Brown II*, 2022 WL 4602714, at *20 (relying on *Serrano* and finding that there was not a clearly established duty for a prosecutor to intervene in police officer misconduct in 1988). The Court finds the reasoning in *Serrano* persuasive and finds that Hyman is thus entitled to qualified immunity for Wilson's failure to intervene claims.

The Court recognizes that Seventh Circuit "cases make clear that the motion-to-dismiss stage is rarely the most suitable procedural setting to determine whether an official is qualifiedly immune." *Roldan v. Stroud*, 52 F.4th 335, 339 (7th Cir. 2022) (cleaned up). However, that is because qualified immunity "is a defense that often depends on the particular facts of a given case." *Id.* (cleaned up). Here, Hyman's

invocation of the defense is not fact-specific, but rather depends on the state of the law in 1982, which can be properly addressed on a motion to dismiss. *See Serrano*, 315 F. Supp. 3d at 1039. Accordingly, Hyman's Motion to Dismiss the failure to intervene claim against him is granted, and, because it is based on qualified immunity grounds, the dismissal is with prejudice.[15] *See id.* (citing *Hinnen v. Kelly*, 992 F.2d 140, 144 (7th Cir. 1993)).

### 3. State Law Claims

Finally, the Court also agrees with Wilson that, because his state law claims are predicated on the same factual allegations as his federal claims against Hyman, Hyman is not entitled to prosecutorial immunity as to Wilson's IIED, malicious prosecution, and conspiracy claims. Resp. at 39. Ironically, the parties cite to cases standing for the opposite outcome on the malicious prosecution claims that they each advocate. Wilson relies on *Tillman*, 813 F. Supp. 2d at 980, which found that the plaintiff's state malicious prosecution claim against the defendant-prosecutor was

---

[15]The Court acknowledges that dismissing Wilson's failure to intervene claim against Hyman on the basis of qualified immunity, while allowing all other claims to proceed against him, *see infra* Section III.A.2, may appear inconsistent with the Court's refusal to dismiss other theories that Defendants argue are legally unsound, *see infra* Sections III.A.5.b–c. However, in those instances, the Court declines to dismiss legal theories based on Defendants' arguments that Wilson fails to state a claim under those theories, not on qualified immunity grounds. That may seem like a distinction without a difference, but there is a practical difference: a defendant may file an interlocutory appeal based on a Court's denial of a motion to dismiss on qualified immunity grounds. *See Roldan*, 52 F.4th at 338 (citing *Behrens v. Pelletier*, 516 U.S. 299, 306–07 (1996) (explaining that the denial of qualified-immunity defense at pleading stage is immediately appealable)). Not so with the denial, or even the granting of, a portion of a motion to dismiss for failure to state a claim (at least without permission from the district court and the Seventh Circuit, *see* 28 U.S.C. § 1292). Moreover, Wilson does not argue that the Court should deny Hyman's Motion to Dismiss Wilson's failure to intervene theory on the basis that a court should not dismiss some legal theories so long as it finds he can state a claim under others. *See* Resp. at 79–80.

barred by absolute immunity. And Hyman, among other cases, cites to *Hobbs v. Cappelluti*, 899 F. Supp. 2d 738, 769 (N.D. Ill. 2012), in which the court refused to dismiss a state malicious prosecution claim against defendant-prosecutors on absolute immunity grounds, as the plaintiff had alleged that they took certain actions supporting that claim before probable cause attached. Since *Tillman* and *Hobbs*, the Seventh Circuit in *Fields II* allowed a state law malicious prosecution claim to proceed against a prosecutor who manufactured evidence before the criminal defendant/§ 1983 plaintiff was charged. *Fields II*, 740 F.3d at 1115 ("Since we've already held that [the prosecutor] is not entitled to absolute immunity from being sued on the federal claims against him, there is no basis for giving him absolute prosecutorial immunity from the state law claims [for malicious prosecution, IIED, and conspiracy] for the same conduct alleged as a violation of Illinois tort law."); *see also Smith*, 222 F. Supp. 3d at 696 (N.D. Ill. 2016) (refusing to dismiss state law claims, including malicious prosecution claim, against defendant-prosecutor who participated in the plaintiff's coerced confession). Although a close call, at this stage, the Court finds that the Complaint adequately alleges that Hyman's actions during the investigatory stage at Area 2 contributed to the initiation of Wilson's prosecution without probable cause, such that he is not entitled to absolute immunity on the malicious prosecution claim. *See Hobbs*, 899 F. Supp. 2d at 769. But, as Wilson recognizes, Hyman is absolutely immune from a malicious prosecution claim premised on his decision to initiate charges against Wilson. Resp. at 87.

And it is an easier call on the IIED and state law conspiracy claims, which can "fairly be construed as brought against [Hyman] acting not in the scope of his duties as a prosecutor, but rather as an investigator based on his participation in [Wilson's] torture." *Tillman*, 813 F. Supp. 2d at 980; *see also Fields II*, 740 F.3d at 1115.

In sum, the Court finds that Wilson's claim against Hyman based on his failure to intervene are barred by qualified immunity, but at this stage, Hyman cannot rely on absolute or qualified immunity to shield himself from Wilson's other claims.

## B. Claims Against Hartnett

Hartnett contends that he is entitled to qualified immunity for Counts I through IV because it was not clearly established that a court reporter had a constitutional obligation to either stop the police from physically harming a suspect or to refuse to record a confession of a suspect if the court reporter either knew or should have known that the statement was coerced."[16] Hartnett Mot. Dismiss at 14–16. Predictably, Wilson disagrees. Resp. at 94.

Like Wilson's claims against Hyman, Wilson alleges that Hartnett knew about and participated in Wilson's torture on February 14, 1982, and took Wilson's false confession even though he knew that Wilson had been tortured. Compl. ¶¶ 11, 145–51. Admittedly, there is a dearth of authority analyzing court reporters' constitutional obligations; however, as Hartnett recognizes, a plaintiff need not point to an identical case finding the alleged conduct unlawful, but a plaintiff must point to precedent

---

[16]As Wilson points out, and Hartnett does not dispute, court reporters are entitled to qualified, but not absolute, immunity. Resp. at 81 (citing *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 437 (1993)); Hartnett Reply at 17.

placing the "statutory or constitutional question beyond debate," or otherwise persuade the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully. Hartnett Reply at 15 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) and citing *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008)).

As with Hyman, the Court finds that claims based upon Hartnett's personal involvement in the alleged torture, including evidence fabrication, coercive interrogation, suppression of such evidence, and conspiracy, are not barred by qualified immunity. It was clearly established in 1982 that torture was unlawful. *See supra* Section II.A.2; *Brown II*, 2022 WL 4602714, at \*19; *Patrick*, 213 F. Supp. 3d at 1051 (qualified immunity was "off the table" because "there [were] facts from which a jury could infer that the ASAs participated in coercive interrogations, that they fabricated the confessions, and that they reduced the confessions to writing so the codefendants could sign them"). The Court sees no functional difference between Hartnett's alleged role in Wilson's torture, including his role in taking down the statement, and that of a police officer or prosecutor like Hyman. At this juncture, Hartnett is not entitled to qualified immunity on Wilson's claims for evidence fabrication, coercive interrogation, suppression of such evidence, or conspiracy. As discovery progresses, if it becomes evident that Hartnett did not himself participate in Wilson's torture, he can raise the argument again on summary judgment.

However, the Court agrees with Hartnett that he is entitled to qualified immunity as to Wilson's failure to intervene claims. For the same reasons the Court

finds that it was not clearly established that a prosecutor had a duty to intervene in police officer misconduct in 1982, it also finds that it was not clearly established that a court reporter, who arguably has less control over police officers, had such a duty.[17] *See supra* Section II.A.2. Accordingly, Hartnett's Motion to Dismiss the failure to intervene claim against him is granted with prejudice. *See Serrano*, 315 F. Supp. 3d at 1039.

Lastly, the Court also agrees with Hartnett, and Wilson does not dispute, that Hartnett is absolutely immune for his testimony at the motion to suppress hearing, during which Wilson alleges he presented "false denials." Hartnett Mot. Dismiss at 11 (citing *Rehberg v. Paulk*, 566 U.S. 356, 375 (2012); *Briscoe v. LaHue*, 460 U.S. 325, 335–36 (1983)); *see also Curtis v. Bembenek*, 48 F.3d 281, 285 (7th Cir. 1995) (witnesses are absolutely immune for testimony given at hearing to suppress evidence); *Maxson v. Dwyer*, 2017 WL 1493712, at *5 (N.D. Ill. Apr. 26, 2017) (recognizing that *Rehberg* rejected previously recognized "complaining witness" exception to rule of absolute testimonial immunity). Accordingly, to the extent Wilson's claims against Hartnett are premised on Hartnett's testimony at the suppression hearing, they are barred by absolute testimonial immunity and are dismissed with prejudice.

---

[17]For the same reason the Court found it was appropriate to dismiss Wilson's failure to intervene claim against Hyman despite other theories underlying his due process claim proceeding, the Court finds it appropriate to dismiss the failure to intervene claim against Hartnett. *See supra* Section II.A.2 n.15.

### C.    Claims Against Trutenko

Trutenko argues that he is entitled to absolute immunity. He notes that Wilson, "through no alleged involvement of Defendant Trutenko whatsoever, confessed, albeit allegedly under duress, to the crimes alleged against him." Trutenko Mot. Dismiss at 9. Since the only apparent prosecutorial conduct alleged about him, reasons Trutenko, occurred after the Appellate Court reversed Wilson's prior conviction in 1987, Trutenko entered the "prosecutorial picture" after: "1) [Wilson] had confessed to the crimes he was charged with; 2) there was indisputably a judicial finding of probable cause to detain . . .; and 3) [Wilson] was convicted of the same criminal offense for which he was *later* prosecuted by Defendant Trutenko." *Id.* at 10. Thus, concludes Trutenko, he was acting as an advocate, not an investigator, and therefore the claims against him are barred by absolute immunity.

Wilson responds that Trutenko is not entitled to absolute prosecutorial immunity since he fabricated evidence at a time when the state did not have probable cause to continue the initiation of charges against Wilson. Resp. at 45. Trutenko manufactured this evidence, argues Wilson, as an investigator, not as a prosecutor and did so as part of the Defendants' conspiracy to frame Wilson for a crime he did not commit, so Trutenko is not entitled to absolute immunity. *Id.* The Court finds that, under binding Seventh Circuit precedent, Wilson's claims against Trutenko are barred by the doctrine of absolute immunity.

Wilson alleges that, beginning in 1988, Trutenko met with Coleman, a jailhouse informant, during which they fabricated a story that Wilson admitted his

involvement in the murders. *Id.* ¶¶ 54, 188–89. Prior to and during Wilson's 1989 retrial, Trutenko and Coleman destroyed and otherwise suppressed exculpatory and impeaching evidence from Wilson, Wilson's lawyer, and the court. *Id.* ¶ 192. At his 1989 retrial, Coleman, coached by Trutenko, presented false testimony. *Id.* ¶ 193. Moreover, before the 1989 retrial, Trutenko threatened Hardin with perjury if he did not present false inculpatory testimony against Wilson. *Id.* ¶ 194. Shortly after Wilson's second conviction, Trutenko made good on his promise to have Coleman's criminal charges dismissed in exchange for his manufactured testimony. *Id.* ¶ 196. Coleman eventually returned to England, but stayed in contact with Trutenko and Kunkle, including to extort money from them in exchange for keeping quiet about his manufactured testimony. *Id.* ¶¶ 201, 203.

Trutenko left the CCSAO in 1991 and returned in 2008 through 2020. Compl. ¶ 50. In 1992, Trutenko and Kunkle attempted to convince Coleman to testify on behalf of Burge, Yucaitis, and O'Hara at a Chicago Police Board hearing at which they were being administratively prosecuted for torturing Andrew. *Id.* ¶ 207.

During the pretrial discovery of Wilson's third prosecution in or about 2019 or 2020, neither Trutenko nor Kunkle revealed to Wilson or his lawyers, OSP, or the court, any of the exculpatory and impeaching evidence about Coleman, nor did they reveal the fact that Coleman was alive and in contact with Trutenko. Compl. ¶ 214. At the third trial, the Special Prosecutor, asserting that Coleman was unavailable and in all likelihood dead, offered Coleman's 1989 testimony, which Judge Hooks, on the basis of these representations, admitted into evidence. *Id.* ¶ 216. Trutenko

testified at the hearing and during his testimony, revealed that Coleman was alive, living in England, and that Trutenko had communicated with him during the trial. *Id.* ¶ 220. Trutenko also falsely denied during his testimony that he had discussed Coleman during his meeting with one of the Special Prosecutors. *Id.* ¶ 221. During Trutenko's testimony, the Special Prosecutor immediately moved to dismiss all charges against Wilson with prejudice and the trial judge granted the motion. *Id.* ¶ 222.

As Trutenko points out, Wilson's allegations about Trutenko all relate to conduct that took place in 1988 or later, after Wilson's tortured confession and first conviction. *See* R. 121, Trutenko Reply at 15. The Seventh Circuit has found that:

> Once prosecution begins, bifurcating a prosecutor's role between investigation and prosecution is no longer feasible. If in the course of a trial a prosecutor were to urge one of his witnesses to lie, it would be arbitrary to describe this as an investigative act separate from prosecution; the prosecutor's conduct would have been "intimately associated with the judicial phase of the criminal process," and he would therefore be entitled to absolute immunity.

*Fields II*, 740 F.3d at 1115 (quoting *Imbler*, 424 U.S. at 430).

In *Fields II*, the Seventh Circuit found that absolute immunity did not shield a prosecutor, ASA Wharrie, from liability for § 1983 claims where the prosecutor fabricated evidence *pre-prosecution*—that is, before Fields' first criminal trial—even though that evidence was introduced at trial. 740 F.3d at 1110, 1113–14. ASA Wharrie, along with a second prosecutor, ASA Kelley, had also procured false testimony after the first trial but before the retrial. *Id.* at 1114–1116. The court found that the district court, consistent with the reasoning in *Fields I,* properly dismissed the federal and related state claims against ASA Kelley because ASA Kelley was

protected by absolute immunity under both federal and state law for procuring that false testimony before the retrial. *Id.* at 1115–16; *see also Fields v. Wharrie*, 672 F.3d 505, 511–16 (7th Cir. 2012) (*Fields I*) (finding ASA Wharrie to be absolutely immune from suit on similar allegations of misconduct—specifically, that ASA Wharrie coerced a witness to falsely implicate Fields in two murders during the interval between Fields' first and second trials, while his postconviction proceedings were ongoing and in anticipation of retrial). Applying the same reasoning, the Seventh Circuit found Fields' state law claims based on ASA Kelley's procurement of false testimony before the second trial to also be barred by absolute prosecutorial immunity, because, although ASA Kelley was not officially part of the trial team when he secured the false testimony, he was already functioning as part of the team. *Fields II*, 740 F.3d at 1115–16. This was true even though Fields' first conviction was based on evidence that Fields also alleged to have been fabricated. *Fields I*, 672 F.3d at 508–09. So, under the reasoning of *Fields I* and *II*, Wilson's claims against Trutenko based upon his procurement of Coleman and Hardin's false testimony are barred by absolute prosecutorial immunity. *Fields I*, 672 F.3d at 511–16; *Fields II*, 740 F.3d at 1115; *see also Wrice*, 187 F. Supp. 3d at 948 ("ASA Lampkin's search for additional witnesses on the eve of trial was a core prosecutorial activity even though she would not be entitled to immunity if she had undertaken the same search during the investigative stage of the case.") (citing *Whitlock*, 682 F.3d at 579). None of the cases cited by Wilson change this result.

Wilson insists that Trutenko is not entitled to prosecutorial immunity since he fabricated evidence at a time when the "state did not have probable cause to continue the initiation of charges against [Wilson]." Resp. at 45 (quoting Compl. ¶ 187 and citing *Hill*, 627 F.3d at 605; *Whitlock*, 682 F.3d at 579–580; *Lewis*, 677 F.3d at 331; *Fields II*, 740 F.3d at 1114). The facts of *Hill* and *Whitlock* are distinguishable. In *Hill*, the Seventh Circuit found that it lacked jurisdiction over the defendant-prosecutor's appeal of the district court's rejection of his absolute immunity argument because there was a question of fact as to whether the prosecutor was present before the criminal defendant/§ 1983 plaintiff's allegedly coerced confession. 627 F.3d at 606. The Seventh Circuit noted that, if the criminal defendant/§ 1983 plaintiff "confessed to the crimes before [the defendant-prosecutor] arrived, then the detectives likely did have probable cause to arrest him, which counsels toward a finding that [the defendant-prosecutor] was acting in a purely prosecutorial role for which he would be entitled to absolute immunity." *Id.* at 605. Similarly, in *Whitlock*, the district court found that the defendant-prosecutor was not entitled to absolute immunity, as "manufacturing false evidence and directing the police officers in their treatment and pursuit of the witnesses; and directing the police to abandon any inquiry about other suspects were actions taken in an investigative capacity." 682 F.3d at 577–78 (cleaned up). The Seventh Circuit found it to be a disputed issue of material fact when probable cause supported the prosecution, so it lacked jurisdiction to resolve the issue. *Id.* at 580. Here, the Complaint does not allege that Trutenko participated in, was present during, or even knew about Wilson's tortured confession; instead, it alleges that he

65

became involved in the case in 1988 for purposes of the retrial, after Wilson had confessed and been convicted.[18]

As indicated above, the Court finds the facts of this case to align with those in *Fields I* and *Fields II*, which, when taken together, stand for the proposition that a prosecutor is *not* entitled to absolute immunity for fabrication of evidence before probable cause exists and the judicial process has begun, but *is* entitled to that immunity for fabrication of evidence once proceedings have begun—even if those proceedings were premised on the underlying fabricated evidence. *See Fields I*, 672 F.3d at 511–16; *Fields II*, 740 F.3d at 1115–17. Accordingly, the Court finds that Trutenko's alleged fabrication of false testimony—both Coleman and Hardin's—is subject to absolute immunity because it was fabricated after the prosecution had begun.[19]

Absolute immunity also bars Wilson's *Brady* claims against Trutenko for withholding exculpatory evidence related to Coleman. Again, the Court finds *Fields I* controlling on the issue. Indeed, even Wilson relies on *Fields I* for the proposition

---

[18]Nor is *Lewis* on point. In *Lewis*, the Seventh Circuit found that the defendant-prosecutor was entitled to absolute prosecutorial immunity on the plaintiff's first amendment retaliation claims brought pursuant to 42 U.S.C. §§ 1983 and 1988, as the defendant-prosecutor did not play a role in the investigation of the plaintiff, but rather became involved when the case was ready for the grand jury, a core prosecutorial function. 677 F.3d at 330–332. It appears that Wilson relies on the court's statement, relying on *Buckley*, that "a showing that a prosecutor investigated and fabricated evidence against a target would automatically defeat absolute prosecutorial immunity, even if that target was later brought to trial." *Id.* at 331. That proposition is indubitably true, but also hinges on the investigation stage; as the Seventh Circuit instructed in *Fields II*, "[o]nce prosecution begins, bifurcating a prosecutor's role between investigation and prosecution is no longer feasible." 740 F.3d at 1115.

[19]Because of this finding, the Court need not address Trutenko's argument that his offer of an inducement agreement to Coleman was legitimate and entitles him to absolute immunity. Trutenko Reply at 11–14.

that a prosecutor "had a continuing *Brady* obligation to reveal material evidence to the defense until Fields' conviction became final, as the ongoing judicial process continued to evolve." Resp. at 47 (citing *Fields I*, 672 F.3d at 516). The Court agrees with Wilson that Trutenko's *Brady* obligation to disclose exculpatory evidence continued even after he was no longer involved in Wilson's criminal case. *See Fields I*, 672 F.3d at 516. However, Wilson ignores the Seventh Circuit's holding that, "[o]nce a defendant is indicted, the disclosure obligation and the due process in question correspond to his trial rights, and a prosecutor's failure to uphold that obligation, in the form of suppression, coincides with his prosecutorial function." *Fields I*, 672 F.3d at 513. Accordingly, a prosecutor is absolutely immune from claims that he or she failed to reveal material evidence to the defense, even if that prosecutor is no longer involved in the case. *Id.* at 516 ("[T]he immunity attendant to [the defendant-prosecutor's] prosecutorial disclosure obligation survives his departure from the courtroom as well."); *see also Serrano*, 315 F. Supp. 3d at 1036–37; *Gordon*, 2008 WL 4594354, at *12; *Tillman*, 813 F. Supp. 2d at 966 ("Prosecutors remain immune from having to divulge exculpatory information they obtained while prosecutors, even after they are no longer prosecutors.") (quoting *Kitchen v. Burge*, 781 F. Supp. 2d 721, 731 (N.D. Ill. 2011)).

Wilson relies on *Houston v. Partee*, 978 F.2d 362, 368 (7th Cir. 1992), which held that prosecutors who learned exculpatory information while the plaintiff's appeals were pending were not entitled to absolute immunity from a suit which sought to recover for the prolongation of the plaintiff's incarceration while the

67

information was being concealed. *Houston*'s viability on this point is questionable following the Supreme Court's decision in *Van de Kamp v. Goldstein*, 555 U.S. 335 (2009). In *Van de Kamp*, the Supreme Court considered whether a prosecutor's supervisors were entitled to absolute immunity for their failure to train him on proper *Giglio* disclosure, which resulted in a violation of the criminal defendant/§ 1983 plaintiff's due process rights, and found that absolute immunity would apply to the prosecutor *and* the supervisors because their behavior "would involve preparation for trial and would be intimately associated with the judicial phase of the criminal process because it concerned the evidence presented at trial." 555 U.S. at 345. And, as Trutenko points out, in *Fields I*, the Seventh Circuit considered *Houston* and *Van de Kamp*, and found that a prosecutor was entitled to absolute immunity from *Brady* claims for failing to disclose exculpatory evidence during the appeal or retrial because he was still acting as a prosecutor and his actions were intimately associated with the judicial phase of the criminal process even if he was not on the trial team. *Fields I*, 672 F.3d at 514–16; *see also Kitchen*, 781 F. Supp. 2d at 732 (recognizing *Houston* but relying on *Van Kamp* to find defendant-prosecutors entitled to absolute immunity for their "alleged post-trial suppression of exculpatory evidence"). Accordingly, the Court finds that *Houston* is no longer controlling on this point.

The two other cases cited by Wilson are also inapposite. *Steidl v. Fermon*, 494 F.3d 623, 630 (7th Cir. 2007) addresses *Brady* claims against police officers, not prosecutors. And the defendant-prosecutors in *Patterson I*, 328 F. Supp. 2d at 884, 889 were alleged to have actively participated with the police in torturing the

criminal defendant/§ 1983 plaintiff, fabricating his confession, and suppressing evidence of torture, and it appears that those defendant-prosecutors were not the prosecuting attorneys in the criminal case. As discussed above, Wilson does not allege that Trutenko participated in the torture, and the suppression claims against Trutenko do not involve Wilson's torture, but rather Coleman and Hardin's false testimony and other evidence related to Coleman's credibility. Even though Trutenko was a witness at Wilson's third trial in 2020, unlike Kunkle, *see infra* Section II.D, Trutenko was still a prosecutor in the CCSAO, and as such had a continuing obligation to disclose exculpatory material, as well as continuing absolute immunity for his failure to do so.[20] *See Fields I*, 672 F.3d at 516. The Court finds that Trutenko is entitled to absolute immunity for Wilson's *Brady* claims.

Wilson's allegations that Trutenko was part of a broader conspiracy do not change the conclusion that Trutenko is entitled to absolute immunity for the actions he took while he was an ASA. According to Wilson, Trutenko joined the conspiracy in 1988, when he replaced Kunkle as the lead prosecutor in Wilson's retrial. Resp. at 83. For the reasons discussed above, the Court finds that Trutenko is entitled to absolute immunity for the period he served as a prosecutor, from 1988 through 1991 and again from 2008 through 2020. "[A] prosecutor who is absolutely immune from liability because her conduct was within the scope of her prosecutorial duties does not lose that absolute immunity when engaged in an alleged conspiracy." *Serrano*, 315 F.

---

[20]Of course, any claims against Trutenko for his own false testimony during Wilson's third trial would also be barred by absolute immunity. *Rehberg*, 566 U.S. at 375; *Briscoe*, 460 U.S. at 335–36.

Supp. 3d at 1039 (N.D. Ill. 2018) (citing *French v. Corrigan*, 432 F.2d 1211, 1214 (7th Cir. 1970)); *Tillman*, 813 F. Supp. 2d at 985–86 ("[T]he operative question is whether the underlying constitutional violation committed by the coconspirator is one that, had it been committed by the prosecutor, would be covered by prosecutorial immunity. This inquiry fits within the functional approach to the common-law tradition of absolute immunity, which looks to the nature of the function performed, not the identity of the actor who performed it.") (cleaned up); *c.f. Lewis*, 677 F.3d at 332 (prosecutor entitled to absolute immunity at summary judgment even from "shadowy conspiracy allegations" where the evidence did not show that prosecutor "deviated from his prosecutorial role"). Unlike Hyman, Kunkle, and Horvat, all of the misdeeds Wilson alleges that Trutenko committed while he was a prosecutor were within the scope of his prosecutorial duties: fabrication of Coleman and Hardin's testimony and the suppression of the exculpatory evidence related to Coleman and Hardin's testimony. *See Tillman*, 813 F. Supp. 2d at 985 ("No doubt prosecutorial immunity would be worth little if it could be stripped away upon proof that the prosecutor 'agreed' with his principal witness that the latter would fabricate evidence against the accused.") (quoting *Peña v. Mattox*, , 897 (7th Cir. 1996)).

As pled, nor are Wilson's claims against Trutenko based upon Trutenko's conduct between 1991 through 2008, when he was not employed by the CCSAO, exempt from absolute immunity. Wilson is correct, and Trutenko does not dispute,[21]

---

[21]Trutenko points out that the authority Wilson relies on, *Adickes*, was abrogated by the 2010 amendments to Federal Rule of Civil Procedure 56. Trutenko Reply at 21 (citing *Sanchez v. Hartley*, 299 F. Supp. 3d 1166, 1182 & n.11 (D. Colo. 2017)). That may be true, but the

that a private citizen can be held liable for a conspiracy with a state actor to deprive someone of their constitutional rights under 42 U.S.C. §§ 1983, 1985, 1986. Resp. at 49 (citing *Adickes v. Kress*, 398 U.S. 144, 152 (1970)). Wilson alleges that during this period, Trutenko attempted to convince Coleman to testify on behalf of Burge, Yucaitis, and O'Hara at the 1992 Chicago Police Board hearing. Compl. ¶ 207. Trutenko denies that he conspired with any "state actor" because Burge was suspended as of 1991. Trutenko Reply at 20–21; *see* Compl. ¶ 39. Trutenko's argument is not persuasive because the allegation relates not only to Burge, but also Yucaitis and O'Hara, who are not alleged to have been suspended in 1992. However, for the same reasons the Court agrees with Trutenko that he is immune from any claims for withholding exculpatory evidence when he was no longer the prosecutor on the case when it was on appeal or in 2020, he is also immune from such claims even when he was no longer a prosecutor. *See Tillman*, 813 F. Supp. 2d at 966. Read in context, Wilson's allegation about convincing Coleman to testify at the Police Board hearing at which Burge, Yucaitis, and O'Hara were being administratively prosecuted for torturing Andrew relates to Trutenko's continuing role in withholding "this exculpatory and impeachment evidence as part of the effort to frame [Wilson] for crimes he did not commit." Compl. ¶¶ 206–07.

To the extent Wilson alleges that Trutenko conspired with Burge, Yucaitis, and O'Hara for Coleman to fabricate *new* evidence related to Andrew, that allegation is

---

abrogation related to whether unsworn evidence can support summary judgment; it had nothing to do with the holding as to a private citizen's liability for conspiring with a state actor to violate someone's constitutional rights.

vague, and it is unclear to the Court how such actions plausibly violated Wilson's constitutional rights by causing his continued imprisonment. *See Kitchen*, 781 F. Supp. 2d at 734 ("It cannot plausibly be argued that [the criminal defendant/§ 1983 plaintiff] would have been exonerated if Daley . . . had not ordered Burge's defense . . . ."). Indeed, even Wilson seems to acknowledge that this allegation on its own is not sufficient to state a claim against Trutenko. *See* Resp. at 49 (arguing that the court should not strike the allegation about Trutenko's role in convincing Coleman to testify at the 1992 Police Board hearing because "the issue to be decided in the present motion is not whether a portion of Plaintiff's factual allegations are sufficient to state a claim against Trutenko but whether the factual allegations as a whole are sufficient, and, as set forth above, they certainly are"). It is Trutenko's role in the *initial* fabrication of Coleman's false statement about *Wilson* (not Andrew) and Trutenko's continued withholding of impeachment evidence regarding Coleman's false statement that continued Wilson's imprisonment (and thereby sufficiently states a claim for a violation of Wilson's due process rights); however, Trutenko is immune from those claims. The Court finds that Wilson fails to sufficiently allege that Trutenko conspired to engage in any other other non-immune conduct between 1991 and 2008. Accordingly, Wilson's allegations that Trutenko was part of a conspiracy do not deprive Trutenko of absolute immunity.

Lastly, the Court turns to Trutenko's argument that Wilson's state law claims against him are also barred by absolute immunity because they are predicated upon the same factual allegations as Wilson's § 1983 claims. Trutenko Mot. Dismiss at 11

(citing *White v. City of Chicago*, 861 N.E.2d 1083, 1090 (Ill. App. Ct. 2006)). Wilson did not respond to Trutenko's argument on this point, and thus has waived his response. *See Bonte*, 624 F.3d at 466. No matter, as the Court finds that, because "Illinois and federal doctrines of prosecutorial immunity are coterminous," Trutenko is entitled to immunity on his state law claims, as well. *See Kitchen*, 781 F. Supp. 2d at 737 (finding defendant-prosecutors entitled to absolute immunity on federal claims, and therefore also entitled to immunity with respect to state law claims for malicious prosecution, intentional infliction of emotional distress, and conspiracy and declining to address sovereign immunity)[22]; *Andrews v. Burge*, 660 F. Supp. 2d 868, 879 (N.D. Ill. 2009) ("The state law rules governing prosecutorial immunity are, as everywhere or nearly everywhere, at least as broad as those found in federal law and the state law claims against [the defendant-prosecutor] are also dismissed."); *White*, 861 N.E.2d at 1090 (prosecutors were absolutely immune from claims for wrongful imprisonment, intentional infliction of emotional distress, and conspiracy claims based on allegations, among other things, that prosecutors had caused a witness to testify falsely at the grand jury and at trial, and claims were also barred by sovereign immunity doctrine); *Fonseca v. Nelson*, 2009 WL 78144, at *7 (S.D. Ill. Jan. 12, 2009) (prosecutorial conduct subject to absolute immunity could not serve as the bases for intentional infliction of emotional distress claim). Like the court in *Kitchen*, the Court

---

[22]The court subsequently denied a motion to dismiss on absolute immunity grounds an amended complaint that added allegations against the defendant-prosecutor that the prosecutor participated in the torture of the criminal defendant/§ 1983 plaintiff. *Kitchen v. Burge*, 2012 WL 346450, at *1–3 (N.D. Ill. Feb. 1, 2012).

finds that it is unnecessary to consider whether Trutenko is protected by sovereign immunity. 781 F. Supp. 2d at 737.

The Court feels compelled to note that, if true, the allegations about Trutenko's actions in fabricating Coleman's testimony and suppressing the fabrication and related evidence are reprehensible. However, as the Seventh Circuit noted in *Whitlock*, even reprehensible conduct is not exempt from prosecutorial immunity when that conduct is functionally prosecutorial. 682 F.3d at 579.

Because the dismissal of the claims against Trutenko is on absolute immunity grounds, it is with prejudice.[23] *Serrano*, 315 F. Supp. 3d at 1037 (citing *Koorsen v. Dolehanty*, 401 Fed. App'x 119, 120 (7th Cir. 2010)). However, because the Court finds that Trutenko is not entitled to absolute immunity for any actions he took apart from his continued suppression of exculpatory evidence related to Coleman's fabricated statement during the period he was no longer a prosecutor (1991 to 2008), any claims based on his conduct during this period are dismissed without prejudice.

### D. Claims Against Kunkle

Kunkle also argues, like Hyman and Trutenko, that he is entitled to absolute immunity from liability for Counts I and IV because he was acting solely in a prosecutorial role. R. 76, Kunkle Memo. Dismiss at 3–6. Similarly, Kunkle submits that Wilson's allegations that Kunkle was part of a conspiracy do not defeat absolute immunity. *Id.* at 6 (citing *French*, 432 F.2d at 1212). He also contends that he is

---

[23]Because the Court dismisses all claims against Trutenko on absolute immunity grounds, it does not consider Trutenko's arguments that he is also protected by qualified immunity. Nor does it address his arguments about the sufficiency of Wilson's claims against him.

entitled to qualified immunity on Counts I and IV, and to absolute immunity or alternatively sovereign immunity on the state law claims. Kunkle Memo. Dismiss at 9–13. The Court agrees with some, but not all, of Kunkle's arguments.

Wilson alleges that, before November 1982, Kunkle was informed that "Burge and his men had tortured" Wilson and Andrew into providing statements. Compl. ¶¶ 168–171. Knowing this, Kunkle coached Burge, McKenna, O'Hara, Yucaitis, Hartnett, and Hyman to present false denials concerning the torture of Wilson and Andrew at the motion to suppress hearing. *Id.* ¶¶ 169–171.

Additionally, "during the pretrial investigation, Defendant O'Hara and Detective Hill told DeWayne Hardin that he qualified for the reward money before putting pressure on him to come back from Texas to testify." Compl. ¶ 174 (cleaned up). After Hardin returned to Chicago, he met with Kunkle and Angarola and informed that them that Wilson was not involved in the robbery and murder. *Id.* ¶¶ 175–76. In response, Angarola, in Kunkle's presence, repeatedly threatened Hardin in order to force him to falsely implicate Wilson in the crimes. *Id.* ¶ 177. Kunkle did not intervene to stop the misconduct, but rather encouraged Angarola. *Id.* ¶ 177. Two days later, Area 2 detectives came to Hardin's house and told him that he "better do what the State's Attorney" wanted him to do as they put a plastic bag over his face. *Id.* ¶ 179. Hardin subsequently falsely testified at Wilson's 1983 trial consistent with what Kunkle, Angarola, and the Area 2 detectives coerced him to say. *Id.* ¶¶ 180–181.

Wilson also alleges that Kunkle knew that Coleman's testimony about Wilson and about Andrew was false. Compl. ¶ 199. While Wilson's appeal from his 1989 trial was pending, Trutenko and Kunkle—who, between 1988 and 1996 was Corporation Counsel—continued to communicate with Coleman, during which Coleman "extorted" money from them that they had previous promised in exchange for his false testimony and his silence about the fact that the testimony was false. *Id.* ¶¶ 53, 203. Kunkle never informed Wilson, his counsel, or the court about his or Trutenko's continued relationship with Coleman, nor about Coleman's false testimony, including before or during Wilson's third trial in 2020. *Id.* ¶¶ 205, 215. Additionally, Kunkle, at Trutenko's urging, presented Coleman to testify falsely at Andrew's civil § 1983 trial. *Id.* ¶ 200.

### 1. Absolute Prosecutorial Immunity

Starting with the low hanging fruit, the Court finds that Kunkle is absolutely immune from any claims premised on his actions taken related to the November 1982 suppression hearing. Even in viewing the allegations of the Complaint in the light most favorable to Wilson, Kunkle was indisputably acting as an advocate at that point in the proceedings. *See Burns v. Reed*, 500 U.S. 478, 491–92 (1991) (prosecutor's role in presenting evidence at a probable cause hearing "clearly involved the prosecutor's role as advocate for the State, rather than his role as administrator or investigative officer" and thus warranted absolute immunity, as "pretrial court appearances by the prosecutor in support of taking criminal action against a suspect present a

substantial likelihood of vexatious litigation that might have an untoward effect on the independence of the prosecutor") (cleaned up).

Although Kunkle argues that he is entitled to absolute immunity as to all of Wilson's federal claims against him, his Motion to Dismiss makes no specific arguments relating to Wilson's claims premised on Kunkle's suppression of evidence that Coleman's testimony was false during Wilson's second or third trials in 1989 and 2020, respectively. Kunkle Memo. Dismiss at 3–6. Wilson responds that Kunkle, like Trutenko, had an ongoing obligation to disclose evidence discovered after trial. Resp. at 47 (citing, among other cases, *Fields I*, 672 F.3d at 516). As discussed above, *see supra* Section II.C, *Fields I* and the other authority cited by Wilson stand for the proposition that a prosecutor, even if she is no longer working on a case, has an ongoing obligation to disclose exculpatory information she learns while the legal proceedings, including post-conviction proceedings, are ongoing. 672 F.3d at 516. However, in *Fields I*, the defendant-prosecutor, although he was no longer assigned to the criminal defendant/§ 1983's plaintiff's case, was still a prosecutor in the state's attorney's office. *Id.* So too with the defendant-prosecutors in *Houston*. 978 F.2d at 368.

In Reply, Kunkle insists that he had no duty to disclose exculpatory information after he left the CCSAO in 1987, and even if he did, he was absolutely immune from suit for failing to disclose any information he obtained while a prosecutor. *Id.* at 8–9 (citing, among other cases, *Kitchen*, 781 F. Supp. 2d at 731). The Court addresses the former argument below, *see infra* Section III.A.3, but agrees

77

with Kunkle as to the latter for the reasons discussed above, *see supra* Section II.C. That said, that immunity does not extend to information that he learned after leaving the CCSAO. *See Kitchen*, 781 F. Supp. 2d at 734 ("Daley would not be immune for suppressing exculpatory information he learned after leaving the State's Attorney's Office."). Kunkle was no longer part of the CCSAO after 1987. And Wilson alleges that Coleman was under Trutenko and Kunkle's control from 1988 to the present. Compl. ¶ 54. Therefore, Kunkle is not entitled to absolute immunity for his role in fabricating or suppressing evidence related to Coleman's false statement, or a conspiracy to do the same.

Next, the Court addresses whether Kunkle is absolutely immune regarding his role in procuring a false statement from Hardin. Kunkle maintains that he is immune because Wilson had confessed—and therefore probable cause to arrest and charge Wilson existed—before Kunkle's involvement. Kunkle Memo. Dismiss at 5 (citing *Hill*, 627 F.3d at 605). Wilson retorts that all of the acts relating to Hardin occurred before any legitimate evidence was developed supporting probable cause for his arrest. Resp. at 42–43 (citing, among other cases, *Hobbs*, 899 F. Supp. 2d at 769). Wilson insists that a manufactured, coerced, and false confession cannot form the basis of probable cause, so Kunkle's actions relating to Hardin were investigatory, in that they were aimed at procuring false evidence to support probable cause. *Id.* at 43. For the first time in Reply, Kunkle asks the Court to take judicial notice of a "True Bill of Indictment," dated February 17, 1982, which he maintains shows that probable cause existed as of that date. R. 132, Kunkle Reply at 2 (citing R. 132-1, Exh. A; 725

78

ILCS 5/112-4(d) ("If 9 grand jurors concur that the evidence before them constitutes probable cause that a person has committed an offense the State's Attorney shall prepare a Bill of Indictment charging that person with such offense.")). Although Kunkle is correct that a court can take judicial notice of court records, *Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*, 128 F.3d 1074, 1081–82 (7th Cir. 1997), generally the Court will not consider an argument or case asserted for the first time on reply. *Narducci v. Moore*, 572 F.3d 313, 323 (7th Cir. 2009). No matter, because even without the True Bill of Indictment, the Court finds that Kunkle is entitled to absolute immunity as to Wilson's claims relating to Hardin's testimony presented at Wilson's first trial in 1983.

Viewing the allegations in the light most favorable to Wilson, as the Court must, the Court finds that Kunkle's actions in participating in the interview where Hardin was coerced into providing false testimony implicating Wilson's participation in the murder took place after Wilson had been arrested and charged, and thus Kunkle's conduct was prosecutorial. The parties agree that the line between when a prosecutor's conduct is investigatory and when it is prosecutorial "is the presence (or absence) of probable cause." *Harris v. City of Chicago*, 2015 WL 5445012, at *3 (N.D. Ill. Sept. 15, 2015) (citing *Whitlock*, 682 F.3d at 580; *Buckley v. Fitzsimmons*, 509 U.S. 259, 274 (1993); *Fields I*, 672 F.3d at 512 ("Prosecutors do not function as advocates before probable cause to arrest a suspect exists.")). As indicated above, they disagree as to whether the allegations of the Complaint support that probable cause to arrest and charge Wilson existed before Kunkle's role in procuring Hardin's false statement.

According to the Complaint, Wilson was arrested and tortured on February 14, 1982, and "[b]ased on the false, fabricated, and coerced statement, by the evening of February 14, 1982, Jackie Wilson was charged with the armed-robbery and murders of Officers Fahey and O'Brien." Compl. ¶¶ 10, 13. Wilson does not allege that Kunkle was present for or participated in procuring his tortured confession, although he does allege that Kunkle knew Wilson was tortured in order to obtain a statement. *Id.* ¶ 171. Wilson contends that there was no probable cause for his arrest or the charges against him at the time Kunkle procured Hardin's false statement, because the only evidence supporting probable cause was Wilson's tortured confession, which Kunkle knew was tortured. Resp. at 43–44. However, the Complaint alleges that Kunkle's meeting with Hardin occurred after charges had been initiated against Wilson as part of the pretrial investigation. *See* Compl. ¶¶ 13, 174–75 ("*During the pretrial investigation*, Defendant O'Hara and Detective Hill told DeWayne Hardin that he qualified for the reward money before putting 'pressure on [him] . . . to come back' from Texas to testify. . . . *Prior to the 1983 trial*, Hardin participated in a meeting with . . . Kunkle . . . .) (emphases added). Wilson has not cited to any cases, nor is the Court aware of any, finding that a prosecutor's procurement of false or coerced testimony *after* a suspect has been arrested and charged with a crime, even if the arrest is based on the suspect's tortured confession, is not protected by absolute immunity.

The cases cited by Wilson are all distinguishable, as the defendant-prosecutors either fabricated the evidence before the criminal defendant/§ 1983 plaintiff's arrest,

or they participated in the coerced confession. *See Fields II*, 740 F.3d at 1111 (prosecutor not protected by absolute immunity for procuring false statements from prospective witnesses occurred a month before the criminal defendant/§ 1983 plaintiff's arrest); *Hill*, 627 F.3d at 605–06 (question of fact as to whether the criminal defendant/§ 1983 plaintiff confessed before or after defendant-prosecutor arrived at the police station and therefore Seventh Circuit lacked jurisdiction to address absolute immunity question); *Lewis*, 677 F.3d at 331 (prosecutor entitled to absolute immunity because there was no evidence that he was involved in the case until after the investigation was completed and the case was ready for a grand jury); *Whitlock*, 682 F.3d at 578 (prosecutor was not entitled to absolute immunity for manufacturing false evidence and directing police officers how to treat and question witnesses and to abandon other suspects, where such actions took place before criminal defendant/§ 1983 plaintiff's arrest). The statement of law Wilson relies on from *Lewis* implies that investigatory work *pre-arrest* cannot be shielded by immunity just because the suspect is later arrested, indicted, and tried. Resp. at 44 (citing *Lewis* 677 F.3d at 331 ("[A] showing that a prosecutor investigated and fabricated evidence against a target would automatically defeat absolute prosecutorial immunity, even if that target was later brought to trial[.]") (quoting *Buckley*, 509 U.S. at 276 ("A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, *after a suspect is eventually arrested, indicted, and tried*, that work may be retrospectively described as 'preparation' for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent

citizens by ensuring that they go to trial.") (emphasis added)). True, in *Whitlock*, the Seventh Circuit did not address the correctness of the district court's decision that the defendant-prosecutor was protected by absolute prosecutorial immunity *after* he submitted arrest warrants and a judge determined that probable cause existed to support the arrests of the criminal defendant/§ 1983 plaintiff. *Whitlock*, 682 F.3d at 578. However, as discussed above, *see supra* Section II.C, other authority indicates that a prosecutor's post-arrest, and certainly post-charged, conduct *is* protected by absolute immunity. *See Fields II*, 740 F.3d at 1115 ("Once prosecution begins, bifurcating a prosecutor's role between investigation and prosecution is no longer feasible.").

Even in *Hobbs*, 899 F. Supp. 2d at 767–69, the case cited by Wilson that the Court finds to be most on-point, the defendant-prosecutors arrived at the police station *before the criminal defendant / § 1983 plaintiff had been arrested*. Accordingly, their actions of advising the police on how to coerce the criminal defendant/§ 1983 plaintiff were taken during the investigatory stage, before an arrest had been made or charges filed. *Id.* The Court recognizes that the two cases cited by Wilson stand for the proposition that a manufactured, coerced, and false confession cannot form the basis of probable cause. Resp. at 43 (citing *Tillman*, 813 F. Supp. 2d at 980–81; *Smith*, 222 F. Supp. 3d at 691). However, as in *Hobbs*, the courts in *Tillman* and *Smith* refused to apply absolute immunity to the federal claims against the defendant-prosecutors because the prosecutors *participated in* the coerced interrogations and confessions. *Tillman*, 813 F. Supp. 2d at 973–74, 980; *Smith*, 222 F. Supp. 3d at 694–

95. Moreover, as noted above, *see supra* Section II.A, the court in *Tillman* found that the defendant-prosecutor was entitled to absolute immunity as to the state law malicious prosecution claim, finding that the plaintiff's allegation that the defendant-prosecutor "initiated a prosecution without probable cause is precisely the type of action barred by absolute prosecutorial immunity." *Tillman*, 813 F. Supp. 2d at 980.

Other binding decisions on this Court, in determining whether a prosecutor has absolute immunity for actions taken after a criminal defendant/§ 1983 plaintiff is charged, have found that absolute immunity applies, even if the defendant-prosecutor knew that the confession forming the basis for probable cause (and therefore, for the arrest and charges) was coerced. *See Hunt*, 926 F.2d at 693; *Fields II*, 740 F.3d at 1112.

Based on the weight of the authority, the Court finds that absolute immunity protects a prosecutor's allegedly unconstitutional actions, including the fabrication of evidence, that take place after the criminal defendant/§ 1983 plaintiff has been arrested and charged. The Court recognizes that this line might appear somewhat arbitrary and unjust, especially when, as Wilson alleges, the arrest and charges are based upon a tortured confession. But, as the Seventh Circuit and Supreme Court have instructed, even though "a prosecutor guilty of the fabrication . . . might never be incentivized to reveal his violation—regardless of absolute immunity—we recognize this possibility as a cost outweighed by absolute immunity's effect on the 'ultimate fairness of the operation of the [judicial] system [overall].'" *Fields I*, 672 F.3d at 516 (quoting *Imbler*, 424 U.S. at 427). This immunity extends to any allegations

about Kunkle's continued suppression or role in a conspiracy to suppress Hardin's false statement even after Kunkle left the CCSAO in 1987. *See Kitchen*, 781 F. Supp. 2d at 734. No matter how odious the allegations, it is up to the Seventh Circuit, not this Court, to revise the current state of the law to find that a prosecutor's role in manufacturing evidence after a criminal defendant/§ 1983 plaintiff has been arrested and charged based on other unconstitutional evidence, is investigatory, not prosecutorial, and accordingly is not protected by absolute immunity.

Like Wilson's conspiracy claims against Trutenko, the Court finds that Wilson's allegations that Kunkle was part of a broader conspiracy do not alter the conclusion that Kunkle is entitled to absolute immunity for his allegedly unconstitutional actions taken in a prosecutorial role. *See supra* Section II.C. It is worth briefly touching upon the allegations that Kunkle became involved in the conspiracy in 1982, earlier than Trutenko in 1988. Wilson alleges that before a November 1982 suppression hearing, "Kunkle had previously been made aware that Burge and his men had tortured Plaintiff in order to obtain his statement." Compl. ¶¶ 168, 171. However, Wilson does not allege that Kunkle conspired to coercively interrogate Wilson. Instead, he alleges that Kunkle conspired to cause "the continuation of that wrongful conviction." *See id.* ¶ 316; *see also id.* ¶¶ 339–40 (conspiracy allegations against Defendants, including Kunkle, that they "together reached an understanding, engaged and continue to engage in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to commit the unconstitutional overt acts set forth in the facts above"); Resp. at 83.

These allegations do not implicate Kunkle's participation in Wilson's torture, or knowledge of it as it was occurring, such that he could be plausibly understood to have participated in the torture or investigation of Wilson and as such be barred from absolute immunity. *See infra* Section II.F.2.

However, as noted above, Kunkle is *not* absolutely immune from unconstitutional actions based on his role in suppressing evidence that he learned of after he left the CCSAO in 1987. So, Wilson's due process claim and conspiracy claims, premised primarily on Kunkle's agreements with Trutenko and Coleman to fabricate evidence or suppress information about Coleman's false statements in order to continue Wilson's wrongful prosecution, are not protected by absolute immunity.[24]

---

[24]The Court agrees with Kunkle, and Wilson does not dispute, that Wilson cannot bring individual claims against Kunkle based on Kunkle's actions during Andrew's civil trial. *See* Kunkle Memo. Dismiss at 6–7; Resp. at 48. Kunkle contends that he is immune from any claims brought against him for his role as a private attorney defending Burge and other Defendants. Mot. Dismiss at 7. However, one of the cases cited by Kunkle contradicts his position. In *Wainwright v. Doria*, the court relied on a Seventh Circuit case to find that "[i]t is therefore clearly possible for a private citizen, even one who happens to be an attorney, to be liable for deprivation of civil rights under color of law if that citizen is engaged in a conspiracy with others who do act under color of law." 1994 WL 178347, at *4 (N.D. Ill. May 9, 1994) (citing *Brucar v. Rubin*, 638 F.2d 987 (7th Cir. 1980)). Although, as with Trutenko's role in trying to convince Coleman to testify at the 1992 Police Board hearing, the Court is skeptical that Kunkle's role in *Andrew*'s civil trial has much to do with the deprivation of *Wilson*'s civil rights. But, as Wilson points out, the issue at this stage "is whether the factual allegations as a whole support a claim upon which relief can be granted," and the Court finds that Wilson has pled a valid claim against Kunkle for his role in conspiring to fabricate false evidence and withhold exculpatory evidence from Wilson. Therefore, the Court will not strike the allegations about Kunkle's defense of Burge and other Defendants. Kunkle may raise arguments about the relevance of such allegations to Wilson's conspiracy claim at a later stage. Of course, as stated above, Kunkle is absolutely immune for any claims, including conspiracy claims, premised on suppression of evidence he learned while an ASA.

### 2. Qualified Immunity

Kunkle argues that, in the alternative, he is entitled to qualified immunity from liability for Wilson's Section 1983 claims. Kunkle Memo. Dismiss at 9–10. For the reasons discussed above, the Court finds that Kunkle is entitled to absolute immunity for his role in fabricating Hardin's statement (and suppressing evidence regarding that fabrication), as well as his actions at the suppression hearing, so the Court need not address Kunkle's qualified immunity arguments relating to claims premised on those allegations. Kunkle does not address whether his actions after he left the CCSAO in 1987 and became Corporation Counsel are entitled to qualified immunity. Given qualified immunity is an affirmative defense, it is up to the defendant to properly raise the defense. *Leiser*, 933 F.3d at 701. Kunkle has not done so, and therefore the Court will not dismiss Wilson's allegations based on Kunkle's post-1987 conduct on qualified immunity grounds.

### 3. State Law Claims

For the same reasons the Court finds that Wilson's state law claims against Hyman are not barred by absolute immunity, neither are Wilson's claims against Kunkle based on his post-1987 conduct, apart from any claim premised on his withholding of exculpatory evidence related to Hardin's false statement. *See supra* Section II.A. On the other hand, for the same reasons Wilson's state law claims against Trutenko are barred by absolute immunity, so too are his state law claims based on Kunkle's conduct through 1987 barred against Kunkle. *See supra* Section II.C.

### E.     Claims Against Horvat

Horvat contends that he is entitled to qualified immunity because it was not clearly established that withholding evidence of Trutenko's relationship with Coleman violated Wilson's constitutional rights. Horvat Mot. Dismiss at 15–17. The Court disagrees.

It is well established that a prosecutor not directly involved in the prosecution of a case may still be liable under Section 1983 for suppressing exculpatory evidence and other unconstitutional conduct. *See Houston*, 978 F.2d at 368; *Fields I*, 672 F.3d at 512; *Patterson I*, 328 F. Supp. 2d at 893–94; *see also United States v. Bagley*, 473 U.S. 667, 690–91 (1985) (Marshall, J., dissenting) (failure to disclose evidence about key witness' reliability violates defendant's constitutional rights).

Wilson alleges that, by Wilson's third trial in 2020, Horvat, an ASA, joined the conspiracy among Defendants to withhold the exculpatory and impeachment evidence about Coleman of which they were aware, and that Coleman was not only alive, but in continuing contact with Defendant Trutenko. Compl. ¶¶ 51, 218. Horvat met with Special Prosecutors on at least two occasions: once with Trutenko, during which they continued their deception about Coleman, and another time during which Horvat "provided a warning about the testimony to Special Prosecutor Larry Rosen," which "was designed to withhold exculpatory evidence from [Wilson]." *Id.* ¶¶ 217, 219.

Horvat's secondary argument that, in acting as counsel for Trutenko, he was bound by Illinois Rule of Professional Conduct 1.6 and its prohibition against

divulging Trutenko's confidences, fares no better. Horvat Mot. Dismiss at 17 (citing Ill. Rule of Prof. Conduct 1.6(a); ABA Model Rule of Prof. Conduct 1.6(a)). As Wilson alleges, not only did Horvat withhold exculpatory evidence, but he also affirmatively acted in furtherance of the conspiracy by providing a warning to OSP prosecutors to avoid certain areas of inquiry that would have elicited exculpatory and impeaching evidence from Trutenko while he was testifying. Resp. at 73. And, given he was in the meeting with OSP and Trutenko during which they discussed Coleman, he was at least aware that Trutenko committed perjury when, during his testimony, Trutenko denied that he had discussed Coleman during that meeting. Compl. ¶¶ 217–18, 221. "[U]nder no circumstance may a lawyer either advocate or passively tolerate a client's giving false testimony." *Nix v. Whiteside*, 475 U.S. 157, 170–71 (1986) ("The suggestion sometimes made that a lawyer must believe his client, not judge him in no sense means a lawyer can honorably be a party to or in any way give aid to presenting known perjury.") (cleaned up); *see also* Ill. Sup. Ct. R. 1.6(b) (setting forth situations in which a lawyer "may reveal information relating to the representation of a client," including "to prevent the client from committing a crime," "to prevent, mitigate or rectify substantial injury to the financial interests or property of another that is reasonably certain to result or has resulted from the client's commission of a crime or fraud in furtherance of which the client has used the lawyer's services," and "to comply with other law or a court order"). The Court agrees with Wilson that it was clearly established in 2020 that he, as an ASA, had a duty to disclose exculpatory and

impeachment evidence to the court, Wilson, and OSP. *See* Resp. at 95. Horvat is not protected by qualified immunity.

Horvat also attacks Wilson's failure to intervene claim, arguing that (1) he was not alleged to have been in a position to stop Wilson's 1983 or 1989 prosecution, (2) he was only peripherally involved in Wilson's 2020 trial, and (3) the prosecuting OSP was entirely separate from Horvat's employer, the CCSAO.[25] Horvat Mot. Dismiss at 13–14. The Court, however, is not convinced that Horvat was unable to intervene or had no duty to intervene as a matter of law. As a prosecutor employed with the CCSAO, he allegedly had material exculpatory evidence and actively withheld that information, which when later revealed during Trutenko's testimony resulted in Wilson's immediate acquittal.

True, as the Court found above, it was not clearly established that a prosecutor had a duty to intervene to stop constitutional violations by third parties in the 1980s. *See supra* Section II.A.2. However, as Wilson points out, in 2012, the Seventh Circuit found that that prosecutors acting in an investigatory capacity can violate due process rights "just as easily as a police officer." Resp. at 79–80 (quoting *Whitlock*, 682 F.3d at 580. Post-*Whitlock*, courts in this District have allowed failure to intervene claims to proceed against prosecutors. *See, e.g.*, *Harris*, 2015 WL 5445012,

---

[25]Horvat frames his argument for dismissal of Wilson's failure to intervene claim as one for failure to state a claim. Horvat Mot. Dismiss at 13–14. However, as indicated above, *see supra* Section II.A.2, such an argument can be framed as a qualified immunity argument, as other courts in this District have done. *See Serrano*, 315 F. Supp. 3d at 1039. Ultimately, it matters not, as the Court finds that by 2020 it was established that prosecutors had a duty to intervene in unconstitutional conduct, and Wilson sufficiently alleges that Horvat violated that duty.

at *4 ("I agree with plaintiff that, post-*Whitlock*, a prosecutor acting as an investigator can be held liable for failing to intervene."); *Saunders v. City of Chicago*, 2013 WL 6009933, at *10 (N.D. Ill. Nov. 13, 2013). Accordingly, Wilson's duty to intervene claim against Horvat survives, and is not barred by qualified immunity. *See Gibson v. City of Chicago*, 2020 WL 4349855, at *8 (N.D. Ill. July 29, 2020) (permitting plaintiff to pursue failure to intervene theory as alternative basis for liability). That said, the Court agrees, and Wilson does not dispute, that Horvat was not involved before 2020, so his individual claims against Horvat are not premised on any failure to intervene in Wilson's 1983 or 1989 trials. *See* Compl. ¶¶ 27–28; Resp. at 73 n.13.

### F.  Claims Against Daley

Daley moves to dismiss all claims against him as State's Attorney on immunity grounds. Daley Mot. Dismiss at 5–14. For the following reasons, the Court finds that Eleventh Amendment immunity does not apply, but that absolute prosecutorial immunity shields Daley from all claims against him in his role as Cook County State's Attorney. The question of Daley's absolute immunity is admittedly a close call.

#### 1.  Eleventh Amendment Immunity

Daley argues that, although Wilson alleges that Daley is sued in his individual capacity, in fact, the allegations of the Complaint make it clear that Daley is being sued in his official capacity as Cook County State's Attorney. Daley Mot. Dismiss at 5 (citing Compl. ¶ 46). Therefore, reasons Daley, Wilson's § 1983 claims against Daley as State's Attorney are barred by the Eleventh Amendment. *Id.* (citing, among other

cases, *Hernandez v. Joliet Police Department*, 197 F.3d 256, 264–65 (7th Cir. 1999)). Wilson does not directly address this argument in Response, as Daley points out in Reply. R. 120, Daley Reply at 9 n.4. No matter, as viewing the allegations in the light most favorable to Wilson, the Court finds that Wilson seeks to hold Daley liable not because he was the Cook County State's Attorney at the time of the wrongdoing, but because of his personal failure to intervene, to investigate, or to appropriately supervise prosecutors after he became aware that some of them had been involved in procuring confessions through torture. *See* Compl. ¶¶ 237–67; *Smith*, 222 F. Supp. 3d at 696 n.7 (rejecting Daley's Eleventh Amendment immunity argument based on similar allegations against Daley as the Cook County State's Attorney) (citing *Parker v. Lyons*, 757 F.3d 701, 706 (7th Cir. 2014), *overruled on other grounds by Hadzi-Tanovic v. Johnson*, 2023 WL 2493740 (7th Cir. Mar. 14, 2023)); *Fields v. City of Chicago*, 805 F. Supp. 2d 536, 550 (N.D. Ill. 2011) (subsequently affirmed in part and reversed in part on other grounds by *Fields I* and *II*).

The Court denies Daley's Motion to Dismiss Wilson's claims against him during his time as State's Attorney on Eleventh Amendment grounds.

### 2. Absolute Prosecutorial Immunity

Daley's invocation of absolute immunity in these types of cases is nothing new, as both Wilson and Daley acknowledge that at least four courts in this District have addressed nearly identical claims against Daley in his capacity as State's Attorney and Mayor brought by other Section 1983 plaintiffs who were prosecuted and convicted based on tortured confessions. Daley Mot. Dismiss at 3; Resp. at 53–61;

91

Daley Reply at 6–14 (both citing *Smith*, 222 F. Supp. 3d at 696–97; *Tillman*, 813 F. Supp. 2d at 982–90; *Kitchen*, 781 F. Supp. 2d at 733–35; *Wrice*, 187 F. Supp. 3d at 948–50). The Court finds the decisions to be well-reasoned and persuasive, and therefore follows the holdings of *Smith*, *Tillman*, *Kitchen*, and *Wrice* that Daley is entitled to absolute prosecutorial immunity for all claims brought against him as State's Attorney.

Wilson fails to offer a basis to depart from the consensus in this District that Daley is absolutely immune from all actions at issue that he allegedly took while he was the State's Attorney between 1981 and 1989. Daley Mot. Dismiss at 6–9. Like other Section 1983 plaintiffs who were victims of torture at Area 2, Wilson claims that Daley "closely monitored developments in the manhunt" for Wilson and Andrew. Compl. ¶¶ 234, 238. More specifically, Wilson alleges that Daley was informed of Wilson and Andrew's arrests on the morning of February 14, 1982, high-ranking ASAs were reporting directly to Daley during the day, and those ASAs knew or should have known that Wilson and Andrew were being tortured. *Id.* ¶¶ 240–243. Neither Daley nor any of his assistants lifted a finger to stop or prevent the torture of Wilson or Andrew. *Id.* ¶ 244. Daley also received the Raba Letter detailing evidence of Andrew's torture from Brzeczek three days after Wilson and Andrew's arrests, and did not investigate or have another agency investigate the torture. *Id.* ¶¶ 245–52. Additionally, between the time of Wilson's arrest in 1982 and when Daley left the CCSAO in December 1988, the CCSAO, under Daley's direction, "not only prosecuted [Wilson and Andrew], but also at least thirty other African American men who were

tortured by Defendant Burge, and Area 2 detectives under Burge's command and supervision." *Id.* ¶ 257. According to Wilson, Daley did not disclose exculpatory information with regard to torture under Burge's watch, including the torture of Andrew, nor did he pursue an investigation into other allegations of torture. *Id.* ¶¶ 258–59. Finally, Wilson alleges that, because he reviewed cases in which the death penalty was at issue, including Andrew's case, Daley knew that Andrew and many other African American men claimed to have been tortured in identical ways. *Id.* ¶¶ 260–63. Despite his knowledge of credible claims of torture, Daley declined to investigate the wrongdoing and failed to disclose exculpatory information. *Id.* ¶¶ 264–65.

As Daley points out, apart from cursorily contending that *Tillman*, *Smith*, *Kitchen*, and *Wrice* are "contrary" to controlling law, Wilson does not explain how the facts of this case differs from the facts alleged in those cases; indeed, he fails to make any developed argument as to why absolute immunity does not bar any of Wilson's claims against Daley in his capacity as State's Attorney. Daley Reply at 7 (citing Resp. at 53); *see Lewis*, 677 F.3d at 332; *see also Bonte*, 624 F.3d at 466. Critically, Wilson does not allege that Daley specifically knew of Wilson's torture, or that he was part of any agreement to torture Wilson, although he does allege that Daley knew of Andrew's torture. *See* Compl. ¶ 234. Even keeping in mind that absolute immunity should be applied "sparing[ly]," *Buckley*, 509 U.S. at 269, the Court finds it to be a close call as to whether Wilson's allegations about Daley's knowledge of *Andrew*'s torture and communication with ASAs at Area 2 on February 14, 1982 may be enough

to deprive Daley of absolute immunity for his role in or agreement to torture *Wilson* to confess (or, under § 1986, knowledge of the conspiracy to torture Wilson and/or obtain a false tortured confession, and ability to stop it but a failure to do so, *Tillman*, 813 F. Supp. 2d at 987–88), and, in the absence of any argument on the question from Wilson, the Court will not do his work for him, *see, e.g.*, *Vertex refining, NV, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 374 F. Supp. 3d 754, 765 (N.D. Ill. 2019) ("It is not the role of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel.") (cleaned up).

So, the Court follows the reasoning in *Tillman*, *Smith*, *Kitchen*, and *Wrice* and finds that because "Daley was the Cook County State's Attorney at the time of [Wilson's] prosecution, any decisions to initiate [Wilson's] prosecution or his other activities in his role as State's Attorney fall under the protection of absolute immunity, including knowingly using false testimony at trial and suppressing exculpatory evidence." *Smith*, 222 F. Supp. 3d at 696; *see Tillman*, 813 F. Supp. 2d at 984. So too with the conspiracy claims against Daley in his role as State's Attorney. Like Wilson's conspiracy claims against Kunkle based on his role as an ASA, *see supra* Section II.D.1, although Wilson alleges that Daley became aware of Wilson's torture shortly after it occurred, he does not allege that Daley conspired with any other parties *to torture* Wilson, including to torture him for his false confession. Rather, he alleges that Daley, as State's Attorney, conspired to cover up the abuse of Wilson and other African American men at Area 2, and to continue the prosecution against Wilson and others. *See* Resp. at 50–53. That, while condemnable if true, still falls

94

within his prosecutorial discretion and does not exempt him from prosecutorial immunity even from Wilson's conspiracy claims. *See Tillman*, 813 F. Supp. 2d at 985–87. For the reasons explained above, *see supra* Section II.C, the cases cited by Wilson regarding absolute immunity as to *Brady* claims are inapposite. The Court therefore grants Daley's Motion to Dismiss Wilson's claims against him premised on Daley's role as State's Attorney, and dismisses those claims with prejudice. *See Serrano*, 315 F. Supp. 3d at 1037.

The Court addresses Daley's arguments for dismissal of the claims against him as Mayor below, including Daley's arguments premised on absolute immunity for his alleged suppression of information that he learned while he was State's Attorney. *See infra* Section III.A.6.

## III.    Sufficiency of Wilson's Claims

Numerous Defendants argue that Wilson fails to adequately plead his claims against them. The Court addresses each argument in turn.

### A.    Individual Constitutional Claims (Counts I, II, III)

#### 1.    Claims Against Hartnett

##### a.    Color of Law

Hartnett argues that the federal claims against him must be dismissed because, as a court reporter, he was not acting under color of law. Hartnett Mot. Dismiss at 8–9. Hartnett's argument contrary to the allegations of the Complaint and controlling case law and therefore fails.

95

Wilson alleges that Hartnett "is a former court-reporter that served as a contractor and agent of Cook County and its State's Attorneys' Office at the time in question." Compl. ¶ 52. Hartnett contends, however, that not all state employees are considered state actors for purposes of Section 1983 liability, and points to public defenders as an example. Hartnett Mot. Dismiss at 9 (citing *Polk Cnty. v. Dodson*, 454 U.S. 312, 321–22 (1981)). Hartnett argues that court reporters, like public defenders, retain "professional independence" even if they are paid by the state or county, and therefore cannot be sued under Section 1983. *Id.*

Hartnett's argument is unsupported by caselaw. In *Antoine v. Byers & Anderson*, 508 U.S. 429, 437 (1993), the Supreme Court rejected absolute immunity for court reporters, but indicated that they could assert qualified immunity. Qualified immunity protects only government officials. *See id.* at 433 n. 4. So, although the Supreme Court did not expressly address the question of whether a court reporter employed by a state or county is a "state actor" for purposes of Section 1983 liability, its finding that they are entitled to qualified immunity indicates that the answer is affirmative. And in a case cited by neither party, but which is binding on this Court, the Seventh Circuit expressly found that, if court "reporters deliberately altered a transcript as part of a conspiracy to defraud a litigant, they can, lacking absolute immunity, be held liable [under Section 1983]." *Loubser v. Thacker*, 440 F.3d 439, 442 (7th Cir. 2006), *overruled on other grounds by Hadzi-Tanovic*, 2023 WL 2493740; *see also Atkins v. Gilbert*, 52 F.4th 359, 360–61 (7th Cir. 2022) (implying that a properly pleaded § 1983 claim could proceed against a court reporter by affirming district

96

court's dismissal of § 1983 claim against court reporter because "it did not arise under the Fourth, Fifth, or Eighth Amendment and therefore fell outside of the *Bivens* theory now recognized by the Supreme Court").

And a brief survey of cases across the country show that courts generally find that "[a] court reporter employed by the state acts under color of state law, while independent contractors do not." *Hieshetter v. Sawyer*, 2014 WL 1875119, at *5 (W.D. Mich. May 8, 2014), *aff'd* (Sept. 30, 2015) (citing *Burroughs v. Dorn*, 2013 WL 3820673, at * 4 (E.D.N.Y. July 22, 2013)); *see also Goodrum v. Churchill Cnty. Clerk of Ct.*, 2021 WL 1324131, at *3 (D. Nev. Mar. 23, 2021), *report and recommendation adopted*, 2021 WL 1318319 (D. Nev. Apr. 8, 2021) (same); *Mitchell v. Allen*, 2012 WL 787015, at *2 (D.S.C. Jan. 17, 2012), *report and recommendation adopted*, 2012 WL 786955 (D.S.C. Mar. 9, 2012), *aff'd in part, dismissed in part*, 474 F. App'x 246 (4th Cir. 2012) ("Defendant Holston, as a state court reporter, . . . [is a] 'state actor[]' amenable to suit under § 1983.") (citing *Antoine*, 508 U.S. at 437); *Curry v. Watkins*, 2008 WL 4442598, at *3 (D.S.C. Sept. 25, 2008) (same) (collecting cases).

Hartnett points to no authority holding that court reporters employed by a governmental entity—as he is alleged to be—are *not* state actors for Section 1983 purposes. Accordingly, based on the allegations of the Complaint and the foregoing caselaw, at this juncture the Court finds that Hartnett is a "state actor" for purposes of liability under Section 1983. If Hartnett can produce evidence that he was an independently employed court reporter, he can raise the issue again at summary

97

judgment. The Court turns next to Hartnett's arguments for dismissal of Counts I through III for failure to state a claim.

### b. Sufficiency of Counts I, II, and III

Hartnett posits that, even if the Court finds that he was acting under color of law, Wilson fails to state a claim under each count. Hartnett Mot. Dismiss at 9–13. In Count I, Wilson alleges that Hartnett "caused the wrongful charging, prosecution, convictions, and imprisonment of [Wilson]." Compl. ¶ 315. In Count II, Wilson alleges that Harnett, individually and in conspiracy with others, used torture and other coercive techniques to interrogate Wilson. *Id.* ¶¶ 325–26. In Count III, Wilson claims that "the Defendants" used false evidence that they manufactured to accuse Wilson of criminal activity and cause the institution or continuation of criminal proceedings against Wilson without probable cause. *Id.* ¶ 331.

Hartnett argues that the only allegations pled with any specificity about him are that Hartnett transcribed Wilson's confession.[26] Hartnett Mot. Dismiss at 10–11. However, contends Hartnett, Wilson "does not allege that Hartnett incorrectly transcribed a single word that [Wilson] said or that Hartnett omitted any statements from the transcript." *Id.* at 11. Wilson counters that Hartnett was "intimately involved in fabricating [Wilson's] statement (in addition to the fabricated statements of Andrew Wilson and Derrick Martin) in the absence of any legitimate evidence of probable cause with regard to [Wilson's] alleged involvement in the crimes." Resp. at 70.

---

[26]For the reasons stated above, *see supra* Section II.B, the Court agrees with Hartnett that his testimony at suppression hearing is protected by absolute testimonial immunity.

Looking at the allegations of the Complaint and viewing them in the light most favorable to Wilson, while a close call, the Court finds that they support Wilson's claims. Specifically, the Complaint alleges that Wilson's "torture occurred with the knowledge and participation of . . . Hartnett." Compl. ¶¶ 11, 147. Although thin, at this stage, those allegations are sufficient to support Wilson's coercive interrogation claim against Hartnett. The Complaint also alleges that, despite knowing about and participating in Wilson's torture, Hartnett nonetheless took Wilson's statement. *Id.* ¶¶ 11, 149, 151. Wilson also alleges that his "wrongful conviction was based on the tortured false and fabricated statement, Andrew Wilson's tortured statement, and Hardin's manufactured and coerced testimony." *Id.* ¶ 183. Read together, the allegations support the reasonable inference that Hartnett transcribed Wilson's statement knowing that it was false and had been tortured from him, and that the transcribed statement was used to wrongfully prosecute and convict Wilson. That is enough to sufficiently plead due process and deprivation of liberty claims based on fabricated evidence. *See Whitlock*, 682 F.3d at 580 (that manufacturing of "false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way"). *C.f. Ladyman v. Meade*, 2018 WL 3972258, at *2 (N.D. Ind. Aug. 20, 2018) (rejecting constitutional claim based on errors in transcript of suppression hearing where plaintiff "[made] no claim, much less a showing, that the transcript prepared by [the court reporter] adversely affected the outcome of the suppression hearing, much less the larger prosecution"). As stated above, *see supra* Section II.B, the Court finds that qualified immunity

protects Hartnett from a failure to intervene claim; whether or not he indeed "participated in" the torture can be raised again at summary judgment.

That leaves Wilson's *Brady* claims against Hartnett. Hartnett raises two primary arguments: (1) as a court reporter, Hartnett does not have a *Brady* obligation, and (2) Wilson's coerced confession cannot support a *Brady* claim because Wilson is aware of his own confession. Hartnett Mot. Dismiss at 11 (citing *Carvajal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008); *Wallace v. City of Chicago*, 440 F.3d 421, 429–30 (7th Cir. 2006)).

Starting with Hartnett's second argument, the Court agrees, and Wilson does not dispute, that a *Brady* claim cannot be based solely on evidence known to the criminal defendant/§ 1983 plaintiff: namely, that his confession was coerced. *See Avery v. City of Milwaukee*, 847 F.3d 433, 443 (7th Cir. 2017). But Wilson counters that Hartnett not only suppressed information about Wilson's coerced false confession; according to Wilson, Hartnett and other Defendants also suppressed "the implements of [their] abuse, buried evidence of systemic abuse, and obstructed investigations into the systematic abuses," which is sufficient to support a *Brady* claim. Resp. at 71–72 (citing *Smith*, 222 F. Supp. 3d at 680–81). Hartnett contends that the Complaint is devoid of allegations that he participated in any of this additional conduct. Hartnett Reply at 16. Again, the Court finds the allegations to be thin, but sufficient at the pleading stage to allege that Hartnett failed to disclose exculpatory evidence about the pattern and practice of torture at Area 2 beyond Wilson's own torture, which led to Wilson's conviction and continued imprisonment.

*See infra* Section III.A.5.a (discussing sufficiency of claims against City Defendants premised on their alleged suppression of a pattern of torture at Area 2). In particular, Wilson also alleges that Hartnett was present for Andrew's statement, which he gave after being tortured, after which Hartnett took a photograph of Andrew. *Id.* ¶¶ 105–06. After Hartnett took Andrew's photograph, Andrew told Hartnett he was going to be tortured again, and Hartnett told Andrew he "couldn't do anything about it" and left. *Id.* ¶ 106. As stated above, Wilson alleges that his "wrongful conviction was based on . . . Andrew Wilson's tortured statement," among other evidence. *Id.* ¶ 183. The failure to disclose the circumstances regarding Andrew's tortured confession is sufficient to support a *Brady* claim.

That leads to Hartnett's first argument against Wilson's *Brady* claim, consisting of just one sentence: Hartnett had no duty to disclose exculpatory information as a court reporter, as that duty lies only with prosecutors and the police. Hartnett Mot. Dismiss at 11. In support, Hartnett points to *Carvajal*, 542 F.3d at 566, in which the Seventh Circuit stated that, "[w]hile most commonly viewed as a prosecutor's duty to disclose to the defense, the duty extends to the police and requires that they similarly turn over exculpatory/impeaching evidence to the prosecutor, thereby triggering the prosecutor's disclosure obligation." Wilson urges the Court instead to look to *Buckley*, 509 U.S. at 269, in which the Supreme Court directed courts to apply a "functional approach" and look to the "nature of the function performed, not the identity of the actor who performed it," when determining whether a state actor is entitled to immunity. But, as Hartnett points out in Reply, *Buckley*

101

addresses whether a state actor is entitled to *immunity*, not whether he or she can be sued under various theories of liability, such as *Brady*. Hartnett Reply at 14.

Neither party cites to authority that directly addresses whether a court reporter has a duty to disclose exculpatory evidence under *Brady*. As noted above, Hartnett devotes just a single sentence to his argument in his Motion, and although he attacks the cases cited by Wilson in Reply, he points to no other authority. Hartnett Mot. Dismiss at 11; Hartnett Reply at 14. The Court finds that the only case Hartnett cites, *Carvajal*, does not foreclose such a duty. As Hartnett points out, *Carvajal* found that the duty to disclose commonly is that of the prosecutor, but can also extend to police. 542 F.3d at 566. *Carvajal* does not say that the duty cannot extend to other state actors. *See, e.g.*, *Whitlock*, 682 F.2d at 588 ("*Brady* and its progeny impose an obligation on state actors to disclose exculpatory evidence that is discovered before or during trial."); *see also Camm*, 937 F.3d at 1105, 1109. In the face of Hartnett's underdeveloped argument, the Court declines to dismiss Wilson's *Brady* claim against him. *See Lewis*, 677 F.3d at 332.

Moreover, even if *Brady*'s duty to disclose does not apply to court reporters, as the Court recently found in *In re Watts Coordinated Pretrial Proc.*, "because the Court has found that [Wilson's] Fourteenth Amendment due process claim can proceed based on his fabrication of evidence theory, if the claims are co-extensive, it would be improper to dismiss his *Brady* theory underlying the same claim."[27] 2022 WL

---

[27]The Court's concern, articulated in *In re Watts*, about whether a Fourteenth Amendment fabrication of evidence claim could be sustained in the Seventh Circuit, is not present here. 2022 WL 9468206, at *9. The Court found that it was a "close call" whether the criminal

9468206, at \*9 (N.D. Ill. Oct. 14, 2022) (citing *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015)). True, Wilson did not raise this argument in support of his *Brady* claim against Hartnett, and the Court recognizes that, as outlined above, the operative facts underlying Wilson's evidence fabrication claim (Hartnett's participation in his tortured confession) and his *Brady* claim (Hartnett's knowledge and suppression of Andrew's tortured confession and the pattern and practice of torture at Area 2) are related but not identical. *See Weston v. City of Chicago*, 2021 WL 2156459, at \*6 (N.D. Ill. May 27, 2021) (finding that evidence fabrication and *Brady* claims overlapped but were "not predicated on precisely the same operative facts: the former is based on what sort of evidence defendants revealed, and the latter is based on what evidence defendants withheld," but declining to "run to ground . . . whether these are two claims or one" because the court agreed that the plaintiff adequately pled claims under both theories). But, for the reasons discussed later in this Opinion, *see infra* Section III.C, the Court agrees with Wilson that he has sufficiently alleged federal and state conspiracy claims against Hartnett related to other state actors' suppression of exculpatory evidence. So, any prejudice in declining to dismiss Wilsons' *Brady* claim against Hartnett would be minimal, if not non-existent. *See In re Watts*, 2022 WL 9468206, at \*15 ("[D]iscovery on the plaintiff's Fourth Amendment claim would be coextensive with discovery on any claim that his detention violated due process under the Fourteenth Amendment.") (quoting

---

defendant/§ 1983 plaintiff's guilty plea broke the chain of causation between the fabricated evidence and his conviction. *Id.* at \*3–9. Here, Wilson went to trial.

*Treadwell*, 2021 WL 3129290, at \*3)). Accordingly, the Court denies Hartnett's Motion to Dismiss Counts I, II, and III against him.

### 2. Claims Against Hyman

Hyman also argues that Wilson fails to state a constitutional claim against him. Hyman Mot. Dismiss at 10–12, 21–23. That said, many of Hyman's arguments about the sufficiency of Wilson's claims against him are intertwined with his immunity arguments, so it is difficult to parse out whether he argues that Wilson fails to state a claim against him or whether he is entitled to absolute immunity. *See id.* Wilson did not separately respond to Hyman's argument as to the sufficiency of the constitutional claims against him, although much of his Response is also intermingled with the immunity arguments. *See* Resp. at 30–39. The Court finds that Wilson's claims against Hyman survive at this stage.

Hyman contends that the Complaint fails to allege that he participated in any alleged constitutional deprivation because he was not in the room when Wilson was allegedly tortured by police officers. Hyman Mot. Dismiss at 23. For the reasons discussed above, *see supra* Section II.A, the Court finds that, taking the allegations of the Complaint as true, Hyman, like Hartnett, "participated" in Wilson's torture, and that he did more than just approve charges against Wilson.

Next, like Hartnett, Hyman argues that Wilson cannot state a coercive interrogation or *Brady* claim against him based on Wilson's tortured confession because the coerced confession was already known to Wilson. Hyman Mot. Dismiss at 10 (citing, among other cases, *Avery*, 847 F.3d at 443). Not so. Like Wilson's

allegations against Hartnett, Wilson's allegations against Hyman also include the suppression of exculpatory evidence beyond Wilson's coerced confession. *See supra* Section III.A.1.b. Like Hartnett, Hyman allegedly knew of and participated in Andrew's torture and was present during Andrew's confession. Compl. ¶¶ 18, 100, 105, 150. Moreover, Wilson alleges that Hyman knew that Wilson's tortured confession was false due to other evidence, such as the statement of Tyrone Sims. *Id.* ¶¶ 83, 152. And Wilson also alleges that Hyman was present during the torture of another suspect in the murders, Derrick Martin. *Id.* ¶ 159. As noted above, Wilson claims that Wilson's "wrongful conviction was based on the tortured false and fabricated statement, [and] Andrew Wilson's tortured statement." *Id.* ¶ 183.

These allegations sufficiently allege that Hyman was aware of, and failed to disclose, exculpatory evidence beyond Wilson's tortured confession and therefore sufficiently allege a *Brady* claim. *See Smith*, 222 F. Supp. 3d at 680. They also support a claim for coercive interrogation because Hyman "participated in" Wilson's torture and his first and second convictions "rested large upon the allegedly coerced confession." *See id.* at 685–86.

Hyman also argues that he did not act under color of law after February 14, 1982. Hyman Mot. Dismiss at 22. But, as discussed above, *see supra* Section II.A, most of Wilson's claims against Hyman are based upon his role as an ASA in Wilson's coercive interrogation on February 14, 1982 and its use in charging Wilson. Moreover, Hyman attempts to introduce facts not included in the Complaint about when he left the CCSAO. Hyman Mot. Dismiss at 22. At the motion to dismiss stage, absent

several exceptions that do not apply here, the Court is bound to the allegations of the Complaint. *See, e.g.*, *Plumbers' Pension Fund, Loc. 130, U.A. v. Republic Piping Sys., Inc.*, 2020 WL 4437846, at *2 (N.D. Ill. Aug. 3, 2020) (citing, among other cases, *Miller v. Herman*, 600 F.3d 726, 732–33 (7th Cir. 2010)). No matter, as, for the reasons discussed below, *see infra* Section III.C, the Court finds that Wilson has adequately alleged Hyman's participation in a conspiracy to violate his constitutional rights.

### 3. Claims Against Kunkle

Kunkle raises several arguments about the sufficiency of the Section 1983 claims against him. First, he argues that Wilson's allegations against him are insufficient to sustain Counts I, and IV because they are vague and lack temporal specificity. Kunkle Memo. Dismiss at 7–8. Wilson counters that temporal specificity is not required, and that his allegations suffice under the federal pleading standards. Resp. at 28–30.

For the reasons stated above, Kunkle is immune from claims premised on Wilson's allegations about his time as an ASA. *See supra* Section II.D. So, the Court addresses only the allegations as to Kunkle's actions after 1987. Even so, the Court finds that Wilson has sufficiently alleged a due process claim and federal conspiracy claim against Kunkle. While dates are material when pled, contrary to Kunkle's suggestion, they are not required to state a claim. *McNamee v. MinXray, Inc.*, 2017 WL 6039960, at *4 (N.D. Ill. Dec. 6, 2017) ("First, the word material as used in Rule 9(f) means important, rather than an absolute requirement in all cases. Sometimes a

complaint, because of the nature of the case or because of the context provided by other allegations, need not recite precise time or place.") (cleaned up).

Nor are the allegations vague. Wilson alleges that: Trutenko replaced Kunkle in Wilson's 1989 retrial, meeting with Coleman to fabricate a story falsely implicating Wilson's guilt and exchanging a reduced sentence in exchange for Coleman's cooperation in the conspiracy; Trutenko and Kunkle communicated with Coleman, who extorted money from them in order to not disclose the falsity of his testimony; and Trutenko and Kunkle continued to fail to reveal the exculpatory and impeaching evidence during pretrial discovery in Wilson's 2020 trial. Compl. ¶¶ 188–196, 202–03, 213–14. These allegations, including the time frames specified, suffice under the federal notice pleading standards, which require only that a complaint provide a defendant with "fair notice" of the claim and its basis. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008); *Hoskins v. Poelstra*, 320 F.3d 761, 764 (7th Cir. 2003) (reversing dismissal of complaint, noting that a complaint is not supposed to contain all facts necessary to prevail and conspiracy is not required to be pleaded with particularity under Rule 9(b)).

Kunkle's second argument, raised only in Reply and in the context of his absolute immunity argument, is that because he was no longer a prosecutor after 1987, he therefore had no obligation after that time to disclose exculpatory information. Kunkle Reply at 8. As previously stated, generally the Court will not consider an argument asserted for the first time on reply. *Narducci*, 572 F.3d at 323; *see also Lewis*, 677 F.3d at 332. Even so, the Court finds that, at this stage, Wilson's

*Brady* claim can proceed against Kunkle based on his suppression of evidence while he was Corporation Counsel. In support of his argument, Kunkle cites to *Whitlock*, 682 F.2d at 579–80. But that case addresses when a state actor is entitled to *immunity*, not whether a *Brady* claim can be brought against a state actor other than a prosecutor. *Id.* Indeed, the Seventh Circuit instructed that "*Brady* and its progeny impose an obligation on state actors to disclose exculpatory evidence that is discovered before or during trial." *Id.* at 588. And the Complaint alleges that, while he was Corporation Counsel between 1988 to 1996, Kunkle "engaged in the conduct complained of in the course and scope of his employment." Compl. ¶ 53. There is no question that he was a "state actor." Absent a developed argument to the contrary, the Court finds that Wilson has sufficiently alleged that Kunkle, during his time as Corporation Counsel, suppressed exculpatory evidence relating to Coleman's false testimony, such that Wilson's individual *Brady* claim against him survives. *See supra* Section III.A.1.b.

Last, Kunkle contends that Wilson's due process claim for failure to intervene against him must be dismissed, because such a claim is not viable against prosecutors. Kunkle Memo. Dismiss at 10–11 (citing, among other cases, *Gordon*, 2008 WL 4594354, at *17). Because the Court has found that Kunkle is absolutely immune from all of Wilson's claims against him based on his conduct through 1987, including during Wilson's first trial, *see supra* Section II.D., it need not address whether Wilson can state a claim against him for failure to intervene during this time. The Complaint alleges that Kunkle was no longer a prosecutor after 1987. It

alleges that he was Corporation Counsel from 1988 through 1996, and by about 2019, was a "retired Cook County Judge." Compl. ¶¶ 53, 214.

Kunkle's arguments as to Wilson's failure to intervene claim against him focus solely on the existence of that cause of action against prosecutors; he does not address whether a cognizable failure to intervene claim can be brought against a Corporation Counsel or against a retired Judge. While the Court is skeptical that such a claim exists, it will not do Kunkle's work for him. The Court finds that Wilson has done enough to allege a failure to intervene claim against Kunkle for his failure to stop other state actors from relying on Coleman's fabricated testimony. *See* Compl. ¶¶ 22–24, 205–207, 214–15, 316–19. Moreover, although Wilson does not raise it here, as discussed elsewhere in this Opinion, the Court finds that it is improper to dismiss some legal theories while allowing others to proceed, where they are based on the same operative facts. *See supra* Section III.A.b; *infra* Section III.5.c; *City of Angola*, 809 F.3d at 325.

For the foregoing reasons, the Court grants Kunkle's Motion to Dismiss Wilson's failure to intervene claims to the extent they are premised on Kunkle's conduct before 1988 as barred by absolute immunity, but denies it to the extent they are premised on his conduct after that. If Kunkle wishes to flesh out the argument that no such claim can proceed against him based on his role as Corporation Counsel or as a retired Judge, he may do so at summary judgment.

#### 4. Claims Against Horvat

Defendant Horvat urges the dismissal of Count I, arguing that Wilson fails to allege that Horvat's actions caused any deprivation of Wilson's liberty sufficient to state a due process claim. Horvat Mot. Dismiss at 7 (citing *Whitlock*, 682 F.3d at 582). In fact, notes Horvat, Wilson alleges that he was out on bond when Horvat became involved in the 2020 trial through his representation of witness Trutenko. *Id.*; Compl. ¶¶ 215–18, 311. Horvat contends that bond conditions like appearing in court "do not fit within the historical and judicially recognized framework of what constitutes a seizure." Horvat Mot. Dismiss at 9 (quoting *Smith I*, 3 F.4th at 341). Horvat reasons that Wilson's 2020 trial, which was prosecuted by OSP and not the CCSAO, resulted in the dismissal of Wilson's charges, so no injury resulted from Horvat's alleged withholding of exculpatory evidence and warning to OSP not to ask Trutenko about Coleman. *Id.* (citing *Cairel v. Alderden*, 821 F.3d 823, 831 (7th Cir. 2016) ("Even assuming for the purposes of summary judgment that defendants fabricated evidence, plaintiffs still could not prevail on this [due process] claim. For such a claim, the plaintiff must have suffered a deprivation of liberty. . . . The need to appear in court and attend trial does not constitute such a deprivation."); *see Manuel v. City of Joliet,* 903 F.3d 667, 670 (7th Cir. 2018) (*Manuel II*) ("There is no such thing as a constitutional right not to be prosecuted without probable cause.") (cleaned up)).

Wilson counters that his allegations sufficiently allege that Horvat caused Wilson's constitutional injuries. Resp. at 74. Specifically, not only did Horvat withhold exculpatory evidence about Trutenko and Coleman's relationship and

fabricated testimony, but he also affirmatively acted in furtherance of the conspiracy by providing a warning to OSP prosecutors to avoid areas of inquiry with Trutenko at trial that would have elicited the exculpatory and impeaching evidence. *See* Compl. ¶¶ 218–19. Wilson insists that Horvat, by withholding that evidence, caused Wilson deprivation of liberty, mental anguish, humiliation, and emotional pain. Resp. at 74. Further, Wilson argues that his subsequent acquittal does not defeat his due process and *Brady* claim because his liberty was nevertheless deprived. *Id.* at 75 (citing *Cairel*, 821 F.3d at 833 ("[W]here an accused is held in pretrial custody before acquittal or dismissal, a failure to disclose exculpatory evidence may cause the type of deprivation of liberty required for a *Brady* claim even if the case ends without a trial or conviction."); *Armstrong v. Daily*, 786 F.3d 529, 553–55 (7th Cir. 2015)). Finally, Wilson contends that, as recognized by the Supreme Court, he suffered a deprivation of liberty despite his release on bond. *Id.* at 76 (citing *McDonough*, 139 S. Ct. at 2156 n.4 ("Though McDonough was not incarcerated pending trial, he was subject to restrictions on his ability to travel and other restraints not shared by the public generally, and it is undisputed that McDonough has pleaded a liberty deprivation.") (cleaned up)). He argues that *Smith I* is distinguishable, based on (1) Wilson's assertion of a Fourteenth, rather a Fourth, amendment claim and (2) Wilson's history of being convicted, rather than merely charged. *Id.* at 77 (citing 3 F.4th at 338).

The Court finds Horvat's argument unavailing. Under *McDonough*, Wilson's release on bond does not establish that he was not deprived of liberty when Horvat

began representing Trutenko. As Wilson argues, he alleges that, had Horvat disclosed the exculpatory information about Trutenko and Coleman, rather than act in furtherance of the conspiracy to conceal it, Wilson may have obtained his liberty via acquittal even sooner than he ultimately did. At this early stage of litigation, where the Court must accept Wilson's allegations as true, Wilson has sufficiently alleged that Horvat caused Wilson's continued deprivation of liberty.

Next, Horvat insists that Wilson's *Brady* claim fails because Horvat, as a private attorney representing Trutenko as a witness, owed Wilson no duty of disclosure because he was not part of the OSP "prosecution team." Horvat Mot. Dismiss at 11 (citing *United States v. Linder*, 2013 WL 812382, at *34 (N.D. Ill. Mar. 5, 2013) ("Exactly who constitutes a member of the prosecution team is determined using a case-by-case analysis of the extent of interaction and cooperation between a potential member of the team and the prosecutor.") (cleaned up)). Horvat characterizes his role as having no involvement in the prosecution of Wilson's case, so he had no obligation under *Brady* to disclose exculpatory information.

Wilson counters that prosecutors like Horvat, who worked for the CCSAO at the time, can be held liable for withholding exculpatory evidence even when not leading a prosecution. As discussed above, *supra* Section II.E, the Court agrees. *See Houston*, 978 F.2d at 368; *Fields I*, 672 F.3d at 512; *Patterson I*, 328 F. Supp. 2d at 893–94 ("A prosecutor who is not directly involved in the prosecution of a case still may be guilty of a *Brady* violation based on his suppression of exculpatory evidence during post-conviction proceedings. . . . Devine's knowing suppression of [evidence of

widespread torture and abuse] from prosecutors, judges, and defense counsel while Patterson's judicial proceedings were ongoing amounts to a violation of Patterson's due process rights.") (cleaned up).

For these reasons, the Court agrees with Wilson that he sufficiently states a *Brady* claim against Horvat. The CCSAO was responsible for Wilson's previous convictions, and Horvat was a CCSAO attorney at the time of Wilson's third prosecution, who Wilson alleges actively withheld exculpatory evidence and warned Wilson's OSP prosecutorial team about testimony that would be destructive to its case. Under these circumstances, Wilson's due process claim against Horvat survives.

### 5. Claims Against Shines, Hillard, Needham, and Martin

#### a. Suppression of Evidence (All City Defendants)

City Defendants also seek dismissal of Wilson's due process claim against them. Wilson alleges that City Defendants prolonged his illegal confinement and conviction due to their "concerted efforts to suppress all evidence related to the systematic practice of torture under Burge, ensuring that [Wilson] could not possibly gather sufficient evidence to challenge his conviction." Resp. at 67; Compl. ¶¶ 268–76, 282–302. Wilson alleges that City Defendants suppressed exculpatory material relating to the pattern or practice of abuse at Area 2 that would have been relevant in his post-conviction proceedings. Specifically, Wilson alleges that Martin, who was the Commander of Area 2 in 1983, learned of the practice of torture at Area 2, and once he became Superintendent of CPD in 1987, he worked to "actively conceal and suppress evidence of the pattern of torture." Compl. ¶¶ 268, 271, 273, 282. Wilson

also alleges that Martin "delayed, obstructed, and otherwise undermined the OPS investigation, the Goldston Report, and its findings and conclusions [of torture by Burge and his associates] . . . by suppressing the findings that Wilson was tortured and by refusing to suspend, transfer or remove Burge either before, or for nearly a year after, the Goldston Report's findings were first made known to them in November of 1990." Compl. ¶ 287. And after the OPS Reports detailing torture were released, Martin and Daley publicly discredited their findings. *Id.* ¶ 293. Martin and Shines declined to investigate the the allegations of torture in the OPS Reports and other torture allegations brought to their attention, and, after OPS found new evidence supporting allegations of torture against two of Burge's "right hand men" in 1993, Shines, "under pressure from her fellow Defendants and co-conspirators," suppressed those findings for at least five years. *Id.* ¶¶ 295, 299–300. In 1998, Hillard and Needham, with full knowledge of the pattern and practice of torture and abuse of suspects, including Wilson, at Area 2, "violated police regulations and obstructed justice by overturning the OPS sustained findings in the six re-opened cases [from the 1993 report]; by refusing to investigate other torture victims' claims that they had been tortured; by refusing to investigate Defendant Shines' suppression of evidence; and by suppressing these OPS files and findings from [Wilson] and other criminal defendants." *Id.* ¶ 302.

City Defendants advance several bases for dismissal of Wilson's due process claim against them. First, they posit that a due process claim based on a theory of "continued" imprisonment is not cognizable. City Mot. Dismiss at 22. Second, they

assert that they may not be held liable for "failing to investigate" allegations of torture. *Id.* at 24. Third, they argue that Wilson does not allege City Defendants' "personal involvement" in violating his constitutional rights. *Id.* at 21–22. Last, they maintain that Wilson cannot allege a causal connection between their misconduct and Wilson's continuing incarceration. *Id.* at 24.

Wilson points out, and City Defendants acknowledge, that several other courts in this District have rejected similar arguments based on nearly identical claims raised against City Defendants. Resp. at 65–67; City Reply at 21–22 (both citing, among other cases, *Orange v. Burge*, 2005 WL 742641 (N.D. Ill. 2005) (*Orange I*); *Patterson I*, 328 F. Supp. 2d 878; *Kitchen*, 781 F. Supp. 2d at 729. For the following reasons, the Court finds the allegations in these cases to be similar and the courts' reasoning persuasive, and similarly declines to dismiss Wilson's due process claim against City Defendants.

First, the Court agrees with Wilson that City Defendants' argument that he cannot state a claim based on a theory of "continued" imprisonment misstates the nature of his claim against them. Resp. at 64. Unlike in *Wiley v. City of Chicago*, 361 F.3d 994 (7th Cir. 2004), on which City Defendants rely, Wilson does not allege a continuing Fourth Amendment violation based on City Defendants' suppression of exculpatory evidence; rather, he brings a Fourteenth Amendment claim against them for prolonging his wrongful conviction and false imprisonment *after* his conviction through their concealment of evidence of police misconduct. Resp. at 64.

In Reply, Hillard, Needham, and Shines argue that Wilson's *Brady* claim fails because Wilson does not allege that they suppressed any evidence that was known to the State at the time of the trial, but rather only that they withheld "new evidence" uncovered during the OPS re-investigation in 1993. City Reply at 19–20. As Wilson points out, *Brady*'s protections "extend[ ] throughout the legal proceedings that may affect either guilt or punishment, including post-conviction proceedings. Put differently, the taint on the trial that took place continues throughout the proceedings, and thus the duty to disclose and allow correction of that taint continues." *Steidl*, 494 F.3d at 630. City Defendants focus on *Steidl*'s language that the duty to disclose evidence throughout the legal proceedings pertains only to evidence "known to the state at the time of the trial." City Reply at 19–20 (quoting 494 F.3d at 630). However, the question before the Seventh Circuit in *Steidl* "present[ed] only the same question as the Court addressed in *Brady*, namely, whether exculpatory evidence discovered before or during trial must be disclosed during post-conviction proceedings." 494 F.3d at 629. Therefore, it explicitly declined to address the question presented here, as there was "no need here to decide whether disclosure of exculpatory evidence discovered post-trial is required under *Brady*." *Id.* at 629. As City Defendants point out, the court in *Wrice v. Burge* dismissed a due process claim against them because the plaintiff did not allege that "they came into possession of any exculpatory information relating to his case that was known to the state at the time of his original trial." 187 F. Supp. 3d 939, 958 (N.D. Ill. 2015). The court engaged in little analysis on this point, however, rather assuming that such

evidence could not form the basis for a *Brady* claim. *Id.* And at least one court, post-*Steidl*, has found that similar allegations against Shines, Hillard, and Needham based on their suppression of evidence uncovered after the criminal defendant/§ 1983 plaintiff's first trial, to sufficiently state a *Brady* claim, although it did not specifically address the argument now raised by City Defendants. *See Tillman*, 813 F. Supp. 2d at 964. Absent controlling authority the other way, the Court declines to hold that evidence discovered after a plaintiff's original trial cannot form the basis for a *Brady* claim.

The Court also finds City Defendants' second argument to be misplaced. Wilson does not allege that City Defendants are liable for failing to investigate evidence that might have proved his innocence; rather, he claims that they actively suppressed evidence of police misconduct, which he claims is indicative of his own innocence. Resp. at 66; *Kitchen*, 781 F. Supp. 2d at 729.

As to City Defendants' personal involvement, for now Wilson has done enough to adequately allege City Defendants' personal involvement in suppressing exculpatory evidence related to police torture, and it matters not that Shines, Needham, and Hillard assumed their respective supervisory roles after Wilson was tortured and convicted—he alleges that, after they assumed their positions, they were personally involved in suppressing exculpatory evidence related to police misconduct. Resp. at 64–65; *Kitchen*, 781 F. Supp. 2d at 729; *Howard v. City of Chicago*, 2004 WL 2397281, at *13 (N.D. Ill. Oct. 25, 2004)).

Most of City Defendants' arguments are aimed at whether their suppression of the OPS Reports, including the 1993 report, caused his continued wrongful conviction and imprisonment. City Mot. Dismiss at 23–25; City Reply at 20–22. City Defendants urge the Court to find that the "chain of inferences" necessary to establish causation is "too tenuous" to support a claim. City Mot. Dismiss at 24–25 (citing *Orange v. Burge*, 2008 WL 4425427, at \*5 (N.D. Ill. Sept. 25, 2008) (*Orange II*)). As indicated above, this argument has been rejected by numerous other courts in this District, which have found that it raises factual questions that cannot be decided at this stage of the proceedings. *See Kitchen*, 781 F. Supp. 2d at 729; *Orange I*, 2005 WL 742641, at \*13; *Patterson I*, 328 F. Supp. 2d at 890; *Cannon v. Burge*, 2006 WL 273544, at \*12 (N.D. Ill. Feb. 2, 2006); *Howard*, 2004 WL 2397281, at \*13.

The Court agrees with City Defendants that *Cannon* and *Howard*, cited by Wilson, are of limited use to the analysis here, as the plaintiffs in those cases alleged that City Defendants were personally involved in the suppression of evidence related to the torture of those plaintiffs in particular. *Cannon*, 2006 WL 273544, at \*12; *Howard v. City of Chicago*, 2004 WL 2397281, at \*13; Compl. ¶ 299.

The Court disagrees with City Defendants, however, that *Orange I* and *Patterson I* are inapplicable. City Defendants also urge the Court to discount the analyses in *Orange I* and *Patterson I*, as later decisions in those cases ultimately rejected the plaintiffs' theory of causation, finding that the chain of inferences to be too tenuous to support a due process claim. City Reply at 21–22 (citing *Orange II*, 2008 WL 4425427, at \*5; *Patterson v. Burge*, 2010 WL 3894433, at \*4 (N.D. Ill. Sept.

118

27, 2010) (*Patterson II*)). True, the court in *Orange II*, while addressing a summary judgment motion, applied a Rule 12(b)(6) standard to the due process claim at issue, but the facts nonetheless are distinguishable so *Orange II* does not impact the holding of *Orange I*. The court in *Orange II* declined to allow the plaintiff to amend his complaint to add a *Brady* claim against Devine for the period between 1981 and 1983, which was before the plaintiff was prosecuted in 1984, finding that Devine could not have suppressed exculpatory information related to the plaintiff before the plaintiff had even been prosecuted. 2008 WL 4425427, at *5. The court did *not* overturn its previous holding that the plaintiff had sufficiently alleged a causal link as to the City Defendants' suppression of exculpatory evidence *after* the plaintiff's arrest and conviction. *See id.*; *see also Kitchen*, 781 F. Supp. 2d at 729 n.1 (distinguishing *Orange II*). *Patterson II* is even more distinguishable, as the court in that case relied on *Orange II* to grant summary judgment for Devine on the plaintiff's *Brady* claim based on Devine's suppression of evidence before the plaintiff was arrested. 2010 WL 3894433, at *4. Accordingly, the Court finds that the relevant and persuasive analysis in *Orange I* and *Patterson I* relating to *Brady* claims against City Defendants are unchanged by *Orange II* and *Patterson II*. The Court therefore finds that, at the pleading stage, Wilson has alleged a causal connection between the withheld evidence and his continued prosecution and imprisonment. *See, e.g.*, *Tillman*, 813 F. Supp. 2d at 964 (plaintiff adequality pled causation where he "alleged torture from the get-go, and the impeachment of the officers involved in his interrogation, or those overseeing it (such as Burge) could reasonably have been expected to cast the charges against

119

Plaintiff in a very different light"). City Defendants' arguments about causation are more appropriately raised at summary judgment.

Similarly, the Court rejects Martin's argument that Wilson fails to allege that he concealed what he knew about abuse and torture at Area 2 because evidence of a pattern of torture became public via public pleadings, hearings, and reports as early as 1989, including through Martin's own admission in a January 1992 publicly filed pleading. Martin Mot. Dismiss at 10. Wilson alleges that Martin knew of, and suppressed, evidence of the pattern of torture at Area 2 as early as 1983 when he became Area 2's Commander, and he continued this suppression when he became Superintendent of CPD in 1987. Compl. ¶¶ 268–74, 276, 282. Moreover, Wilson alleges that Martin suppressed the OPS Reports' findings when he first learned of them in 1990, and they did not become public until 1992. *Id.* ¶¶ 287–89. This Court follows other courts' findings that such allegations sufficiently show that Martin suppressed exculpatory evidence of a pattern of torture at Area 2, and Wilson states a *Brady* claim against Martin. *See, e.g.*, *Tillman*, 813 F. Supp. 2d at 964–65.

### b. Failure to Supervise or Intervene (Martin)

Martin also moves to dismiss Wilson's due process claim against him for failure to supervise or intervene. Martin Mot. Dismiss at 5–6.

It is undisputed that the Seventh Circuit recognizes liability for failure to adequately supervise subordinates. R. 172, Pl.'s Resp. Martin at 6–7 (citing, among other cases, *Jones v. City of Chicago*, 856 F.2d 985, 992–93 (7th Cir. 1988) (for liability, a supervisor must "know about the conduct and facilitate it, approve it,

condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference.")); *see also Kitchen*, 781 F. Supp. 2d at 736 ("The Seventh Circuit has recognized liability for faulty supervision."). But, absent allegations against a supervisor rising to the level of deliberate indifference, there is no general right to an internal investigation of a police department or police misconduct. Martin Mot. Dismiss at 7–8 (citing, among other cases, *Bandari v. City of Chicago*, 2000 WL 89135, at *6 (N.D. Ill. 2000) (rejecting the allegation that defendants failed to investigate alleged police misconduct, and noting that a failure to investigate "does not rise to the level of a constitutional violation")).

Wilson alleges in Count I that "Martin's failure to supervise or intervene with regard to Burge and his confederates, and his suppression of his knowledge of a pattern of torture at Area 2, were direct and proximate causes of [Wilson's] wrongful conviction which continued for decades after [Wilson] was first convicted." Pl.'s Resp. Martin at 5 n.1. Martin contends that he cannot be held liable under this theory because he had no direct involvement in Wilson's torture. Martin Mot. Dismiss at 5–6. He points out that he was not the Area supervisor until 1983, a year after Wilson was tortured in 1982, so he could not have intervened to prevent Wilson's tortured confession. *Id.* at 8. He also moves to dismiss as too speculative Wilson's theory that, if Martin had disciplined Burge or his associates for their misconduct in 1983 or later, Wilson's conduct would not have been admitted into evidence and he would not have been convicted and/or would have been exonerated sooner. *Id.*

In Response, Wilson argues that Martin "misapprehends [Wilson's] allegations" by construing them to claim that Martin could have intervened in 1982 to prevent his tortured confession. Pl.'s Resp. Martin at 8. Wilson clarifies that the Complaint claims that Martin facilitated the coercive interrogation techniques at Area 2 beginning in 1983, and if he had "taken firm steps to intervene to supervise and discipline offending officers when he was Commander of Area 2 in 1983, the practice would have come to an end and [Wilson] would not have been convicted based on the tortured confession that was used against him at trial." *Id.* at 8–9. To the extent that Wilson seeks to hold Martin liable for Wilson's tortured confession, which took place in 1982, via a theory of supervisory liability, *see* Pl.'s Resp. Martin at 7–8 n.2, that claim fails, since the Complaint does not allege that Martin knew about or had any authority to stop the pattern and practice of torture at Area 2 in 1982, and does not name Martin as a Defendant in Count II, for coercive interrogation, or in Count III, for deprivation of liberty without probable cause, *see* Compl. ¶¶ 325–29. *C.f. Kitchen*, 781 F. Supp. 2d at 727, 735–36 (declining to dismiss failure to intervene claim for Martin's failure to stop other officers from eliciting the plaintiff's coerced confession that formed the basis for his conviction, where the plaintiff was tortured in 1988, after Martin was Commander of Area 2 and while he was Superintendent of Police).

The Court agrees with Martin that the conclusion that, if Martin had disciplined officers in 1983 or later for misconduct at Area 2 involving other individuals, then Wilson's confession would not have been admitted into evidence

against him, he would not have been convicted at his first or second trials, or he would have been exonerated sooner, is rather attenuated. *See* Martin Reply at 10. However, the Court sees little difference between the allegations supporting the failure to supervise theory of liability and those supporting Wilson's claim that Martin suppressed exculpatory evidence about the pattern and practice of torture at Area 2. Put another way, there is no practical difference between Martin's role as a supervisor who failed to stop the practice of torture and Martin's knowledge of the practice and suppression thereof, both of which Wilson alleges led to Wilson's continued prosecution and incarceration. For the reasons stated above, the Court finds that Wilson's *Brady* claim survive Martin's Motion to Dismiss. *See supra* Section III.A.5.a. Although Wilson does not argue in Response to Martin's Motion to Dismiss that legal theories matter not at the pleadings stage, he does so in his Consolidated Response, filed before Martin's Motion. Resp. at 25 n.5 (citing *City of Angola*, 809 F.3d at 325; *KFC Corp. v. Iron Horse of Metairie Rd., LLC*, 2020 WL 3892989, at *3 (N.D. Ill. July 10, 2020)). Under that principle, because the Court finds that Wilson's *Brady* claim survives against Martin, the Court declines to dismiss Wilson's failure to intervene theory, as it is premised on the same operative facts. *See KFC Corp.*, 2020 WL 3892989, at *3 ("Rule 12(b)(6) does not authorize the dismissal of legal theories.").

### c. Count III Under the Fourteenth Amendment (All City Defendants)

City Defendants argue that Count III should be dismissed for failure to state a claim to the extent Wilson seeks to assert a Fourteenth Amendment claim for

federal malicious prosecution or unlawful pretrial detention. City Mot. Dismiss at 11. City Defendants maintain that since *Manuel*, the Seventh Circuit has repeatedly held that a claim for post-legal process, pretrial detention arises only under the Fourth Amendment. *Id.* (citing, among other cases, *Young v. City of Chicago*, 987 F.3d 641, 646 (7th Cir. 2021); *Lewis*, 914 F.3d at 476–78 (collecting cases)).

As an initial matter, although Count III references "Defendants," the demand for judgment makes it clear that the claim is not asserted against City Defendants. *See* Compl. at 56. The Court briefly addresses City Defendants' argument, as Wilson responds to it, and the Court finds it lacks merit at the motion to dismiss stage.

Wilson responds that the Seventh Circuit has instructed that courts should not parse out claims by legal theory at the pleading stage, dismissing some theories and allowing others to proceed. Resp. at 25 n.4 (citing *City of Angola*, 809 F.3d at 325 ("A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief."); *KFC Corp.*, 2020 WL 3892989, at *3 ("As long as the plaintiff can, in response to a motion to dismiss, identify some plausible theory that would entitle it to relief on its claim, that claim may move forward and a motion to dismiss other legal theories must be denied.")). This Court recently addressed this very question in *In re Watts*, and, following the majority of courts in this District, agreed with Wilson's position that "it is not appropriate to dismiss [his] Fourteenth Amendment pretrial detention claim at this stage in the proceedings. [Wilson] has pled a plausible claim for relief; whether he can prevail

turns on whether his arrests and pretrial detentions were supported by probable cause, not whether he has invoked the Fourth or Fourteenth Amendment." 2022 WL 9468206, at *14–15 (cleaned up) (collecting cases). So too with Wilson's malicious prosecution claim raised under the Fourteenth Amendment, since such a claim can proceed under the Fourth Amendment. *See id.* at *15 (citing *Thompson*, 142 S. Ct. at 1337).

City Defendants' citation to *Young v. City of Chicago* does not change the analysis. City Reply at 11 (citing 987 F.3d 641, 646 (7th Cir. 2021)). As the court recognized in *Treadwell*, the Seventh Circuit in *Young* reaffirmed its holding in *Lewis* that the Fourth Amendment, not the Due Process Clause, governs a claim for wrongful pretrial detention. *Treadwell*, 2021 WL 3129290, at *3. However, as *Treadwell* points out, "while *Young* reaffirmed *Lewis*, it did not discuss the question left open about the availability of relief for unlawful pretrial detention in *McDonough*." *Id.* For the same reasons articulated in many decisions in this District, including this Court's decision in *In re Watts*, the Court finds it to be the better course to allow Wilson's claims proceed as pled, and declines to dismiss his Fourteenth Amendment malicious prosecution and pretrial detention claims. Defendants against whom these claims have been pled may challenge these claims at summary judgment.

### 6.  Claims Against Daley

Daley argues that, in addition to the claims against him as State's Attorney, all claims against him as Mayor must also be dismissed. Daley Mot. Dismiss at 9–14.

As in *Tillman*, *Smith*, *Kitchen*, and *Wrice*, Wilson alleges that, between 1989 and 2011 while Daley was Mayor of Chicago, he violated Wilson's rights individually and as a co-conspirator by concealing and covering up exculpatory information related to Burge-connected torture, which prolonged Wilson's unjust conviction and incarceration. *See* Resp. at 51 (citing Compl. ¶¶ 277–304). More specifically, Wilson alleges that Daley: (1) discredited the OPS Reports, which had found that Burge and his subordinates, with the knowledge and participation of certain Area 2 command personnel, systematically abused African American suspects in their custody; (2) overruled his senior staff's recommendation and directed that City lawyers continue to defend Burge (rather than sue him), even after Burge was indicted by federal authorities for crimes arising out of the torture; (3) promoted Area 2 detective Peter Dignan to lieutenant after the Goldston OPS report had identified him as one of the main "players" in the Burge pattern and practice of torture and after OPS investigators had sustained administrative charges of racially motivated electric shock torture and other brutality against him in several cases; and (4) continued to conceal the information regarding the Burge torture pattern and practice that he personally had learned both during his years as State's Attorney, and later as Mayor. Resp. at 52–53 (citing Compl. ¶¶ 237–307). Wilson asserts claims against Daley for violation of his due process rights (Count I), conspiracy under 42 U.S.C. §§ 1983, 1985, 1986 (Count IV), state law malicious prosecution (Count VI), IIED (Count VII), and state law conspiracy (Count VIII).

### a. Sufficiency of Count I

Daley argues that Wilson's individual due process claims against him as Mayor should be dismissed, as Wilson fails to allege that Daley suppressed exculpatory information, and no cause of action for failure to investigate exists. Daley Mot. Dismiss at 9–14. The Court agrees.

As an initial matter, the Court agrees with Daley that his suppression as Mayor of evidence that he learned as State's Attorney is protected by absolute immunity. *See supra* Section II.C; *Kitchen*, 781 F. Supp. 2d at 731. Daley additionally contends that the remaining allegations relating to his time as Mayor have nothing to do with Wilson, his continued prosecution, or continued imprisonment, and thus do not support Wilson's claims in this action. Daley Mot. Dismiss at 11. Wilson does not substantively address these arguments, but rather summarily argues that "Daley's efforts to cover up the Burge torture evidence materially and significantly continued the wrongful prosecution of [Wilson]. These allegations are sufficient to state a claim against Daley individually, . . . as Mayor, for his involvement in the efforts to cover up the Burge scandal and thereby conceal exculpatory information." Resp. at 53. Wilson also recognizes that the courts in *Tillman*, *Smith*, *Kitchen*, and *Wrice* granted motions to dismiss the plaintiffs' individual claims against Daley as Mayor, and in passing discourages the Court from following those decisions. *Id.* at 53. On the other hand, Wilson urges the Court to follow the holdings in *Tillman* and *Smith* allowing the plaintiffs' conspiracy allegations against Daley as Mayor to proceed. *Id.* at 53–54.

127

The Court again finds the analysis in *Tillman*, *Smith*, *Kitchen*, and *Wrice* well-reasoned and persuasive as to the individual claims against Daley, and agrees with the reasoning in *Tillman* and *Smith* as to the conspiracy claims against him.

Relying on *Tillman*, Daley contends that "the evidence allegedly suppressed by Daley does not appear to be the type of material exculpatory evidence that *Brady* addresses." Daley Reply at 10 (quoting *Tillman*, 813 F. Supp. 2d at 967). Specifically, Daley's statements discrediting the OPS reports do not constitute suppression, and Wilson does not allege that Daley personally withheld the reports between their creation and when they were made public in 1992. *Id.*; *see also Kitchen*, 781 F. Supp. 2d at 734. Similarly, refusing to launch investigations and promoting Dignan "are also not fairly characterized as suppression." *Tillman*, 813 F. Supp. 2d at 967. And his decision to defend Burge in civil suits rather than sue him also does constitute the suppression of exculpatory information. *Id.* at 968. As in *Tillman*, Wilson alleges generally that Daley, while Mayor, "did not disclose exculpatory information in his possession at any time from the date he resigned as State's Attorney of Cook County, until he left the Mayor's office in 2011." Compl. ¶ 281. But, also as in *Tillman*, Wilson "fails to allege with any specificity what that information might have been, whether it differed from information that had already trickled out into the public, or whether Daley took specific steps to conceal that information." 813 F. Supp. 2d at 968.

The Court also adopts the court's position in *Tillman* rejecting Daley's contention that no *Brady* violation could have occurred because Wilson did not allege that Daley concealed any evidence related to Wilson: "[h]ad Daley been in possession

of undisclosed information that Burge and his subordinates had engaged in other instances of torture at Area 2, such information could be material and exculpatory even if it did not relate directly to Plaintiff." 813 F. Supp. 2d at 968. But, for the reasons stated above, the Court finds that Wilson's allegations about Daley do not relate to undisclosed information, and therefore cannot support a *Brady* claim. *See id.*; *Kitchen*, 781 F. Supp. 2d at 734–35.

Next, Daley contends that his alleged failure to direct CPD or other agencies to investigate Burge or his associates does not state a claim for constitutional deprivation. Daley Mot. Dismiss at 14 (citing, among other cases, *Slagel v. Shell Oil Refinery*, 811 F. Supp. 378, 382 (C.D. Ill. 1993), *aff'd* 23 F.3d 410 (1994); *Sneed v. Fox, Eaves, Shaw & Patterson*, 2012 WL 246461, at *3 (N.D. Ill. Jan. 25, 2012)). Wilson does not respond to this argument, and has therefore waived his response. *See Bonte*, 624 F.3d at 466. No matter, as the Court nonetheless agrees with Daley. Daley's Motion to Dismiss Count I against him is granted. The dismissal is without prejudice.

**b. Conspiracy**

Daley also contends that the Court should dismiss Wilson's conspiracy claims against him as Mayor, because the allegations that he conspired with others to suppress and discredit evidence of torture are based on the suppression of evidence that he learned while he was the State's Attorney and thus he is protected by absolute immunity. Daley Reply at 10–14. As an initial matter, Daley raises this argument for the first time in Reply. That said, his arguments could be considered an extension of his position in his Motion to Dismiss Wilson's individual *Brady* claim against him

129

based on his alleged suppression of evidence that he learned as State's Attorney. Daley Mot. Dismiss at 12; *see Hernandez v. Cook Cty. Sheriff's Off.*, 634 F.3d 906, 913 (7th Cir. 2011) ("While arguments made for the first time in a reply brief are generally treated as waived, it does not necessarily follow that arguments that are better developed in a reply brief are waived."). No matter, since the Court disagrees that Daley is protected by absolute immunity as to all of the actions he took as Mayor.

As discussed above, the Court agrees with Daley that he cannot be held liable for suppressing evidence he learned as a prosecutor, even if that suppression occurs as part of a conspiracy (via his own overt acts or those of a co-conspirator). *See supra* Sections II.C, II.F.2; *Kitchen*, 781 F. Supp. 2d at 734 n.2; *Tillman*, 813 F. Supp. 2d at 985–86. But, as City Defendants point out in support of dismissal of Wilson's due process claims against them, new evidence of a pattern of torture came to light in 1993. *See supra* Section III.A.5.a. Specifically, the Complaint alleges that, "[i]n 1993 the OPS re-opened investigations into approximately ten Area 2 torture cases. After exhaustive re-investigations, which uncovered substantial new evidence in support of the allegations, OPS investigators sustained numerous allegations that two of Defendant Burge's self-admitted 'right hand men,' Sergeant John Byrne and Detective Peter Dignan, racially abused and tortured" six men. Compl. ¶ 299. It goes on to allege that, "[f]rom 1993 until 1998, Defendant Shines (who had previously been appointed by Defendant Daley), under pressure from her fellow Defendants and co-conspirators, suppressed these findings and the evidence which supported them by secreting the files in her personal office." *Id.* ¶ 300. True, Wilson does not specifically

130

allege that Daley was one of the Defendants to pressure Shines to suppress this new OPS Report, but reading the allegations in context create a plausible inference that he conspired with Shines to do so. Moreover, the allegations of new evidence of torture uncovered *after* Daley was no longer State's Attorney also allow a plausible inference that the other actions taken by Daley as Mayor (such as refusing to direct CPD to initiate criminal investigations into Burge and his associates, financing Burge's defense, among others), which the courts in *Tillman* and *Smith* found to be sufficient to support a claim for conspiracy to conceal evidence of police torture, are part of a conspiracy to conceal evidence of torture that he learned as Mayor rather than as State's Attorney. *See Tillman*, 813 F. Supp. 2d at 989–90; *Smith*, 222 F. Supp. 3d at 697. The Court therefore denies Daley's Motion to Dismiss Wilson's conspiracy claims against him as premised on his actions as Mayor.

### B.    Individual State Law Claims (Counts VI and VII)

### 1.    State Law Malicious Prosecution Claim

Horvat, Kunkle, Hyman, Hartnett, and City Defendants argue that Wilson's malicious prosecution claim should be dismissed because Wilson's allegations fail to state a claim under Illinois law. Horvat Mot. Dismiss at 17; Kunkle Memo. Dismiss at 13–14; Hyman Mot. Dismiss at 23; Hartnett Mot. Dismiss at 16; City Mot. Dismiss at 23–24; Martin Mot. Dismiss at 12–13. "To state a claim for malicious prosecution under Illinois law, a plaintiff must allege that: (1) he was subjected to judicial proceedings; (2) for which there was no probable cause; (3) the defendants instituted or continued the proceedings maliciously; (4) the proceedings were terminated in the

131

plaintiff's favor; and (5) there was an injury." *Sneed v. Rybicki*, 146 F.3d 478, 480–81 (7th Cir. 1998) (cleaned up); *Hurlbert v. Charles*, 938 N.E.2d 507, 512 (Ill. 2010). If any element is missing, the claim fails. *See Ross v. Mauro Chevrolet*, 861 N.E.2d 313, 319 (Ill. App. Ct. 2006).

### a.  Commencing or Continuing Prosecution

Horvat, Kunkle, Hyman, Hartnett, and City Defendants contend that they did not commence or continue Wilson's prosecution. Horvat argues that his only involvement with Wilson's criminal case was his representation of Trutenko at Wilson's 2020 trial, which he began after the trial started, and it was OSP that decided to prosecute Wilson. Accordingly, says Horvat, he played no "significant role in causing the prosecution of plaintiff." Horvat Mot. Dismiss at 18 (quoting *Beaman v. Freesmeyer*, 131 N.E.3d 488, 498 (Ill. 2019). Kunkle mentions that he "is alleged only to have played a relevant role in the first prosecution and trial of [Wilson], in 1983." Kunkle Memo. Dismiss at 14. Hyman, for his part, acknowledges that he made the decision to approve Wilson's murder charge (for which he is entitled to immunity, *see supra* Section II.A.3), but argues that he resigned from his prosecutorial role in May 1982, and there are no allegations that he played a "significant role" in the prosecution besides approving charges. Hyman Mot. Dismiss at 24. Hartnett argues that the Complaint alleges only that he "recorded the words spoken by [Wilson]," and that he did not play a role in influencing the decision to prosecute Wilson. Hartnett Mot. Dismiss at 16–17. City Defendants argue only in cursory fashion that Wilson

fails to plausibly allege a malicious prosecution claim against them. City Mot. Dismiss at 23; Martin Mot. Dismiss at 12–13.

The Court disagrees with Defendants. "[A] person can be liable for commencing or continuing a malicious prosecution even if that person does not ultimately wield prosecutorial power or actively deceive prosecutors." *Beaman*, 131 N.E.3d at 499. "[T]he presumption of prosecutorial independence can be overcome by showing that the defendant improperly exerted pressure on the prosecutor, knowingly provided misinformation to him or her, concealed exculpatory evidence, or otherwise engaged in wrongful or bad-faith conduct instrumental in the initiation of the prosecution." *Id.*; *see also Johnson*, 447 F. Supp. 3d at 721. Horvat allegedly withheld exculpatory evidence from OSP and warned OSP to avoid inquiring of Trutenko about his relationship with Coleman. Compl. ¶¶ 217–19. Kunkle is alleged to have withheld evidence about Coleman's false testimony while Wilson was appealing his second conviction, which allegedly continued the proceedings as Coleman's credibility was a major point of Wilson's appeal. *Id.* ¶¶ 197, 202–06. And Hyman is alleged to have known about and withheld evidence of Wilson's and Andrew's torture while investigating the case as a prosecutor before his 1982 resignation. *Id.* ¶¶ 11, 18, 100, 105, 142–50. Similarly, Hartnett allegedly knew when he transcribed Wilson's confession that it was false and was a result of torture. *Id.* ¶¶ 11, 149, 151. Wilson's transcribed tortured confession allegedly resulted in his wrongful conviction. *Id.* ¶ 183. Lastly, as to the City Defendants, the Complaint alleges that Martin concealed exculpatory evidence of torture in Area 2 and "delayed, obstructed, and otherwise

133

undermined the OPS investigation, the Goldston Report, and its findings and conclusions"; Shines suppressed the 1993 OPS investigation findings of torture of additional suspects; and Hillard and Needham obstructed justice by "overturning the OPS sustained findings . . . and suppressing these OPS files." Compl. ¶¶ 268–74, 287, 299–300, 302. Wilson claims that City Defendants' actions of suppressing torture and OPS findings of torture caused his continued prosecution. For now, that is sufficient. *See, e.g.*, *Tillman*, 813 F. Supp. 2d at 981 (denying City Defendants' motion to dismiss state law malicious prosecution claim based on similar allegations).

Wilson alleges wrongdoing by Horvat, Kunkle, Hyman, Hartnett, and City Defendants that perpetuated Wilson's prosecution. *See Beaman*, 131 N.E.3d at 499 ("The established definition of 'commence or continue' reflects that the fundamental purposes of tort law are to hold wrongdoers liable for foreseeable consequences of their actions and to deter wrongful conduct."). The Court finds that Wilson sufficiently alleges that these Defendants had a "meaningful role" in the ensuing prosecution, thereby commencing or continuing Wilson's prosecution, and the malicious prosecution claims survive. *Hill v. Cook Cnty.*, 463 F. Supp. 3d 820, 845 (N.D. Ill. May 31, 2020).

> **b. Probable Cause**

Horvat, Kunkle, Hyman, and Hartnett also argue that probable cause existed to prosecute Wilson, so the malicious prosecution claim fails. *See, e.g.*, Kunkle Memo. Dismiss at 14 (citing *Humphrey*, 148 F.3d at 727 ("If a case involves a question of whether probable cause existed to support an officer's actions, the case should *not* be

permitted to go to trial if there is any reasonable basis to conclude that probably cause existed.") (cleaned up) (emphasis in original)). Defendants emphasize that Wilson had confessed, the state court had found probable cause to detain, and Wilson was convicted—all of which support a finding of probable cause that defeats a malicious prosecution claim. *See id.*

However, as Wilson argues, "Defendants cannot manufacture their own probable cause by fabricating evidence and manipulating eyewitnesses," to avoid a state law malicious prosecution claim. *Kuri v. City of Chicago*, 2017 WL 4882338, at *7 (N.D. Ill. Oct. 30, 2017). Evidence that such conduct was used to procure an indictment rebuts the presumption that an indictment is *prima facie* evidence of probable cause. *Patrick*, 213 F. Supp. 3d at 1057. According to Wilson's allegations, these Defendants knew that Wilson's confession and Hardin and Coleman's testimony—which formed the basis of the state court's finding of probable cause, Wilson's detention, and/or Wilson's conviction—were either coerced through torture, false, or fabricated. In addition, eyewitness Tyrone Sims had reported that Wilson was not responsible for the murders. Compl. ¶¶ 79–84. Because Defendants allegedly knew that probable cause did not exist to prosecute Wilson or continue his prosecution, the Court cannot find that probable cause existed, especially at this early

stage where such factual assessments are typically premature.[28,29] *See Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993).

### 2. Intentional Infliction of Emotional Distress

Defendants Horvat, Harnett, Hyman, and City Defendants move for dismissal of Wilson's state claim for intentional infliction of emotional distress (IIED). To plead an IIED claim, Wilson must allege: (1) extreme and outrageous conduct; (2) Defendants' intent that the conduct inflict severe emotional distress, or knowledge that there is a high probability that the conduct will cause severe emotional distress; and (3) the conduct in fact cause severe emotional distress. *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003). Extreme and outrageous conduct "must go beyond all bounds of decency and be considered intolerable in a civilized community." *Cairel*, 821 F.3d at 835 (cleaned up).

Defendants Hartnett and Horvat argue that their alleged conduct does not rise to such an extreme and outrageous level. Additionally, Horvat claims Wilson does not allege emotional harm resulting from Horvat's failure to disclose Trutenko and Coleman's relationship. Horvat Mot. Dismiss at 19. First, as Wilson argues, he alleges that Hartnett did more than simply record Wilson's confession; rather, Harnett knew

---

[28]The Court recognizes that this finding may appear to be in tension with its finding that Trutenko and Kunkle are entitled to absolute immunity for their role in Wilson's prosecution after he was arrested and charged, *see supra* Sections II.C–D. However, controlling caselaw supports these disparate conclusions as to absolute immunity and state law malicious prosecution claims.

[29]To the extent that Defendants argue there is no allegation of malice, "malice can be inferred when a defendant lacks probable cause and the circumstances indicate a lack of good faith." *Holland v. City of Chicago*, 643 F.3d 248, 255 (7th Cir. 2011). Such an inference is plainly appropriate here, given Wilson's allegations.

and participated in Wilson's torture, saying he "didn't give a damn" about the torture. Compl. ¶¶ 11, 145–51. At the motion to dismiss stage, the Court must accept these allegations, which establish the sort of extreme and outrageous conduct required for an IIED claim. The same applies to Horvat, a government official who is alleged to have met with a key witness before Wilson's 2020 trial and withheld critical exculpatory information from Wilson, prolonging the trial and causing emotional harm and deprivation of liberty. Compl. ¶¶ 217–221, 316, 319, 359; *see Fox v. Tomczak*, 2006 WL 1157466, at *6 (N.D. Ill. Apr. 26, 2006) ("Allegations that a state official fabricated false or misleading evidence of guilt or concealed exculpatory evidence would be sufficiently outrageous to support an IIED claim") (cleaned up).

Martin does not dispute that Wilson has alleged extreme and outrageous conduct, but rather argues that Wilson fails to allege how Martin engaged in extreme and outrageous conduct directed *at Wilson* that was intended to inflict severe emotional distress *on Wilson*. Martin Mot. Dismiss at 13. Wilson's allegations on this point, suggests Martin, are merely unsupported conclusions. *Id.* The Court disagrees. Wilson alleges that that Martin knew of Burge and his subordinates' torture of twelve African-American men, *including Wilson*, but took no steps to investigate any of the cases or to discipline any of the offending officers. Pl.'s Martin Resp. at 7 (citing Compl. ¶¶ 269–70). Wilson also alleges that, knowing about Wilson's tortured confession, Martin discredited and concealed OPS's findings about systematic abuse of suspects held in custody in Area 2, and he also refused to investigate allegations of torture that surfaced in the wake of the OPS investigations. *Id.* at 2–3 (citing Compl.

137

¶¶ 272–73, 283–95). As stated above, allegations that state officials concealed exculpatory evidence are sufficiently outrageous to support an IIED claim. *Fox*, 2006 WL 1157466, at *6. At this stage, Wilson's allegations are enough to support the elements of an IIED claim that Martin either intended to, or knew that there was a high probability that his conduct would cause Wilson severe emotional distress, and that his conduct did in fact cause Wilson severe emotional distress. *C.f. Tillman v. Burge*, 2011 WL 4837481, at *2 (N.D. Ill. Oct. 12, 2011) (dismissing similar IIED claims against municipal defendants, including Martin, because complaint did not allege that the defendants knew of the alleged torture of the plaintiff or that they "were aware of [the plaintiff] at all").

As with the malicious prosecution claim, Shines, Hillard, and Needham argue only in passing that Wilson fails to adequately state an IIED claim against them. City Mot. Dismiss at 23–24. Although the Court is skeptical that Wilson's claims against these Defendants rise to the level of outrageousness required for an IIED claim, it will not make the argument for them. *See Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704 (7th Cir. 2010) ("It is not this court's responsibility to research and construct the parties' arguments, and conclusory analysis will be construed as waiver.") (cleaned up). In a heading, Hyman states that Wilson "fails to state a claim for IIED and the Claim is time barred." Hyman Mot. Dismiss at 24. But the text of his brief addresses only the timeliness of the IIED claim, not the sufficiency of it. *Id.* Like City Defendants, Hyman has waived the argument. And Daley and Kunkle's motions to

dismiss are silent as to Wilson's IIED claims against them. *See* Daley Mot. Dismiss; Kunkle Memo. Dismiss.

For the foregoing reasons, Wilson's IIED claim survives against all Defendants but Trutenko, although the claims may only be based on conduct from which Defendants are not protected by immunity.

## C.    Conspiracy

### 1.    Federal and State Conspiracy Claims

Numerous Defendants urge the dismissal of Wilson's conspiracy claims because Wilson's underlying constitutional and state law claims fail. *See* City Mot. Dismiss at 25–26. True, conspiracy is not an independent basis of liability in a § 1983 action, but is instead a way of proving that a defendant is legally responsible for that violation. *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008); *see also Hurst v. Cap. Cities Media, Inc.*, 754 N.E.2d 429, 438 (Ill. App. Ct. 2001) ("Conspiracy is not a separate and distinct tort in Illinois."). To the extent that Wilson's constitutional and state law claims survive, Defendants' argument about the conspiracy claims fails.

Kunkle, Hyman, Horvat, Hartnett, and City Defendants also assert that the conspiracy allegations are unduly vague and fail to sufficiently establish the existence of a conspiracy. *See* Horvat Mot. Dismiss at 14–15 (citing *Evers v. Reak*, 21 F. App'x 447, 450 (7th Cir. 2001) (sustaining dismissal of conspiracy claim because "vague and conclusory allegations of the existence of a conspiracy are not enough; a complaint must contain factual allegations suggesting that the defendants reached a meeting of the minds" and plaintiff "did not specifically allege the what, when, why, and how of

the defendants' supposed agreement to deprive him of his constitutional rights")
(cleaned up); *Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir. 2009) ("mere suspicion"
of a conspiracy is not enough)).

Defendants are correct that under Illinois law, a "complaint must do more than
merely characterize a combination of acts as a conspiracy," and must allege an
agreement. *Merrilees v. Merrilees*, 998 N.E.2d 147, 162 (Ill. App. Ct. 2013). And under
federal pleading standards, Wilson must "set forth the parties to the conspiracy, the
purpose of the conspiracy, and the approximate dates of the conspiracy." *Smith*, 222
F. Supp. 3d at 687 (citing *Cooney*, 583 F.3d at 971). But contrary to Defendants'
assertions, Wilson has done that here. In summary, he alleges that all Defendants
made an agreement with other Defendants to withhold exculpatory information
about Wilson's torture, his coerced confession, and witnesses' false testimony in order
to deprive him of his constitutional rights. Specifically, Wilson alleges in part that:
(1) Hyman and Hartnett participated in the 1982 torture and coercion of Wilson's
confession with Burge, McKenna, and O'Hara; (2) Kunkle agreed with Trutenko and
Coleman to continue suppressing the falsity of Coleman's testimony and his
relationship with Trutenko during Wilson's appeal of his second conviction;
(3) Horvat joined the conspiracy in 2020 when he met with Trutenko and worked with
him to actively conceal exculpatory evidence at the 2020 trial through communication
with OSP; (4) Martin knew of and facilitated the coercive interrogation practices in
Area 2 starting in 1983, and suppressed evidence of torture as Area 2 Commander
and CPD Superintendent; (5) Daley refused to direct CPD to initiate criminal

investigations into Burge and his associates and financed Burge's defense; (6) Shines suppressed findings of torture at the urging of other Defendants; and (7) Needham and Hillard continued to suppress findings and undermine investigations into torture at Area 2 after they took office. These allegations regarding overt acts in furtherance of the alleged conspiracy to deprive Wilson of his constitutional and state rights suffice to state federal and state conspiracy claims.[30] *See, e.g.*, *Smith*, 222 F. Supp. 3d at 688–89; *Tillman*, 813 F. Supp. 2d at 976.

### 2. Intra-Corporate Conspiracy Doctrine

Relatedly, Hyman argues that the intra-corporate conspiracy doctrine applies. Hyman Mot. Dismiss at 21 (citing *Haliw v. City of S. Elgin*, 2020 WL 1304697, at *4 (N.D. Ill. Mar. 18, 2020)). The intra-corporate conspiracy doctrine holds that

---

[30]City Defendants and Daley take issue with Wilson's position that defendants can be civilly liable for acts of co-conspirators done before the defendant joins the conspiracy. The parties rely on cases that stand for the opposite propositions. *Compare* Resp. at 54 (citing, among other cases, *United States v. Read*, 658 F.2d 1225, 1230 (7th Cir. 1981) ("Each conspirator is liable for overt acts of every other conspirator done in furtherance of the conspiracy, whether the acts occurred before or after he joined the conspiracy.")) *with* Daley Reply at 13 (citing, among other cases, *United States v. Covelli*, 738 F.2d 847, 859 (7th Cir. 1984) (conspirator "cannot be held *criminally* liable for substantive offenses committed by members of the conspiracy before that individual had joined . . . the conspiracy") (emphasis added)); City Reply at 23–24 (same). Neither side cites a civil case directly on point. Nor do Defendants address the authority cited by Wilson; instead they argue that the authority they cite is controlling. At least one court in this District has recently relied on *Read* to find a defendant could be civilly liable for his co-conspirator's overt acts before he joined the civil conspiracy. *Sypolt v. Illinois Gaming Bd.*, 2022 WL 170063, at *5 (N.D. Ill. Jan. 19, 2022). Because the Court has found City Defendants, Daley, and their alleged co-conspirators engaged in allegedly unconstitutional conduct after the time those Defendants joined the conspiracy (City Defendants) or lost their absolute immunity (Daley), the Court need not definitively decide the question now. If any party raises at summary judgment or trial the issue of any Defendant's liability for the overt acts of his or her co-conspirators that took place before the Defendant joined the conspiracy, the Court will consider the arguments and authority presented by the parties at that time, and expects the parties to engage with the authority cited by the opposing party.

"employees of the same corporate entity cannot be liable under a conspiracy theory if the employees act within the scope of their employment." *Haliw*, 2020 WL 1304697, at *4 (citing *Travis v. Gary Cmty. Mental Health Ctr.*, 921 F.2d 108, 110 (7th Cir. 1990)).

Hyman recognizes that the Court has recently found that the intra-corporate conspiracy doctrine does not apply in cases where the conduct at issue "is not the product of routine decision-making by police departments." *Ochoa*, 2021 WL 4439426, at *9. He does not explain, however, why the Court should consider the allegations in this case to constitute routine decisions of government officials, such that the intra-corporate conspiracy doctrine should apply. As did the plaintiff in *Ochoa*, here, Wilson has "alleged the deprivation of numerous civil rights, and that cannot be the goal of the City or its police department." *Id.*

The Court agrees with Wilson that the doctrine does not apply to his conspiracy claims, *see* Resp. at 83 n.17, and accordingly denies Hyman's Motion to Dismiss on this basis.

### D. *Monell* Claim (Count V), *Respondeat Superior* (Count IX), and Indemnification (Count X)

Because Wilson's constitutional claims survive against City Defendants, the Court rejects City Defendants' argument that Wilson's *Monell* claim should be dismissed because the alleged underlying constitutional violations fail. City Mot. Dismiss at 28–29; *see Walker v. City of Chicago*, 559 F. Supp. 3d 747, 754 (N.D. Ill. 2021). Similarly, Wilson's state law claims for *respondeat superior* and

142

indemnification survive against the City because Wilson's state law claims against City Defendants survive.[31] City Mot. Dismiss at 29.

The Court now turns to the last remaining argument for dismissal of the Complaint: the constitutionality of the Illinois Torture Inquiry and Relief Commission Act.

## IV. Illinois Torture Inquiry and Relief Commission Act

Hyman moves to dismiss the Complaint on the basis that the Illinois Torture Inquiry and Relief Commission Act, 775 ILCS 40/1, *et seq.* (the Act) is unconstitutional.[32] Hyman Mot. Dismiss at 3–4.

The Commission moved to intervene under 28 U.S.C. § 2403(b) to address Hyman's constitutional challenge. R. 151. Following briefing on the Commission's Motion to Intervene, the Court granted the motion. R. 156. The Commission and Hyman filed additional briefs regarding the constitutionality of the Act. R. 158, Comm. Br.; R. 169, Hyman Resp.; R. 170, Comm. Reply. For the following reasons,

---

[31]Wilson's indemnification claim (Count X) is asserted against the City and the County. As stated above, *see supra* n.3, the Court granted the County's motion for entry of order in lieu of answer. R. 134. Accordingly, the County neither answered nor moved to dismiss Wilson's sole count against it, and therefore Wilson's indemnification claim proceeds against the County.

[32]While Hyman's Motion to Dismiss is made under Federal Rules of Civil procedure 12(b)(1) and 12(b)(6), he does not specify whether his arguments for dismissal based on the unconstitutionality of the Act are brought under Rule 12(b)(1) or 12(b)(6). *See* Hyman Mot. Dismiss at 1, 3. Other courts in this Circuit that have addressed similar arguments relating to a statute's unconstitutionality have done so under Rule 12(b)(6). *See, e.g., Fee v. Illinois Inst. of Tech.*, 2022 WL 2791818, at *1, *4 (N.D. Ill. July 15, 2022); *Stauffer v. Innovative Heights Fairview Heights, LLC*, 2020 WL 4815960 (S.D. Ill. Aug. 19, 2020). The Court thus treats Hyman's motion as one for failure to state a claim under Rule 12(b)(6). However, as discussed below, Wilson and the Commission challenge Hyman's standing to attack the constitutionality of the Act, a challenge necessarily addressed under Rule 12(b)(1). *See, e.g., Rhein v. Pryor*, 2014 WL 1099157, at *3 (N.D. Ill. Mar. 20, 2014).

the Court declines to dismiss Wilson's claims based on Hyman's arguments that the Act is unconstitutional.

Hyman cursorily argues that the Act, which created the Commission, is unconstitutional for several reasons. Hyman Mot. Dismiss at 3–4. First, it is special legislation on its face, as it can only be enforced against one person within the State of Illinois, Burge, who is deceased.[33] *Id.* at 3. Second, the Act is an unconstitutional executive infringement on the judiciary. *Id.* (citing *Best v. Taylor Machine Works*, 689 N.E.2d 1057, 1078 (Ill. 1997)). Third and finally, the Circuit Court of Cook County failed to comply with Section 8.1 of the Illinois Constitution, which provides rights for crime victims. *Id.* at 3–4. Therefore, concludes Hyman, Wilson's 2011 petition pursuant to the Act, as well as the Commission's return of Wilson's case in 2015 to the Circuit Court of Cook County on the issue of whether Wilson's confession was tortured from him, were all for naught, as the Act was and is invalid. *Id.* at 3 (citing *People v. Gersch*, 553 N.E.2d 281, 283 (Ill. 1990) ("The effect of enacting an unconstitutional amendment to a statute is to leave the law in force as it was before the adoption of the amendment."); *People v. Schraeberg*, 179 N.E. 829, 830 (Ill. 1932)).

Wilson responds that the Court should deny the motion out of hand, as Hyman's arguments are underdeveloped and are not supported by any authority.

---

[33]The definition of "claim of torture" was amended in July 2016 to expand it from including only allegations of torture committed by or under the supervision of Burge, to include allegations of torture "occurring within a county of more than 3,000,000 inhabitants." 2016 Ill. Legis. Serv. P.A. 99-688 (S.B. 392); 775 ILCS 40/5(1) (2016). Hyman contends that even after the amendment, the Act still unconstitutionally restricts enforcement to Cook County to the exclusion of the other 101 Illinois counties, which he claims is an arbitrary classification violating the Illinois Constitution. Hyman Mot. Dismiss at 3 (citing *Chicago Nat. League Ball Club, Inc. v. Thompson*, 483 N.E.2d 1245, 1251 (Ill. 1985)).

Resp. at 26–27. Wilson points out that that Hyman fails to explain: (1) why the Act is unconstitutional, (2) why it would bar Wilson's lawsuit even if it was unconstitutional, and (3) his standing to challenge the Act. *Id.* at 27. Nonetheless, Wilson argues that Hyman's arguments lack merit. *Id.* In arguing that the Act is constitutional, Wilson relies on the Illinois Appellate Court's explanation of the application of the Act in its decision upholding Judge Hooks' finding that Wilson demonstrated by a preponderance of the evidence that his confession was the product of torture. *Id.* at 27–28 (citing *Wilson*, 158 N.E.3d at 1076–78). Wilson does not argue why the process explained by the Illinois Appellate Court (and explained in this Opinion below) support the constitutionality of the Act, as that question was not before the Illinois Appellate Court; however, as stated above, it is Hyman's burden, as the party challenging the constitutionality of the Act, to clearly demonstrate that it is unconstitutional. *See People v. Montgomery*, 53 N.E.3d 1084, 1087 (Ill. App. Ct. 2016).

The Commission, for its part, argues that the Court should reject all of Hyman's arguments regarding the Act because Hyman lacks standing to challenge the constitutionality of the Act. Comm. Br. at 3. Therefore, reasons the Commission, because the Court can resolve Hyman's Motion to Dismiss on non-constitutional grounds, it need not—and indeed should not—delve into the constitutionality of the Act. *Id.* at 3–4 (citing *Koger v. Bryan*, 523 F.3d 789, 801 (7th Cir. 2008)).

### A.    The Act

The Court begins its analysis with the Act. The Act "establishes an extraordinary procedure to investigate and determine factual claims of torture related to allegations of torture[.]" 775 ILCS 40/10. As noted above, *see supra* Section IV n.33, under the version of the Act in effect when Wilson filed his petition, and which the Commission granted, a "[c]laim of torture" was defined as "a claim on behalf of a living person convicted of a felony in Illinois asserting that he was tortured into confessing to the crime for which the person was convicted and the tortured confession was used to obtain the conviction and for which there is some credible evidence related to allegations of torture committed by Commander Jon Burge or any officer under the supervision of Jon Burge." 775 ILCS 40/5 (eff. Aug. 10, 2009 to July 28, 2016). That version of the Act applied to claims of torture filed no later than August 10, 2014—five years after the effective date of the Act.[34] *Id.* § 40/70.

The Act established the Commission, which is an independent commission under the Illinois Human Rights Commission for administrative purposes. 775 ILCS 40/15(a). The Commission consists of eight voting members appointed by the Governor, with the advice and consent of the Senate, for one-, two-, or three-year terms. *Id.* § 40/20(a), 40/25(a). The Commission's duties include, but are not limited to, conducting inquiries into claims of torture, coordinating the investigation of cases accepted for review by the Commission, and preparing "written reports outlining

---

[34]The Act has since been amended to apply to claims of torture filed not later than 10 years after the Act's effective date. 2016 Ill. Legis. Serv. P.A. 99-688 (S.B. 392); 775 ILCS 40/70 (2016).

Commission investigations and recommendations to the trial court at the completion of each inquiry." *Id.* § 40/35. The Commission must also employ an Illinois-licensed attorney as its Director, who "shall assist the Commission in developing rules and standards for cases accepted for review, . . . prepare reports outlining Commission investigations and recommendations to the trial court," among other duties. *Id.* § 40/30.

"A claim of torture may be referred to the Commission by any court, person, or agency." 775 ILCS 40/40(a). The Commission may, in its discretion, either informally screen and dispose of a case summarily or grant a formal inquiry of the claim. *Id.* The Commission may only conduct a formal inquiry if the convicted person first: signs an agreement waiving his or her procedural safeguards and privileges, including the right against self-incrimination; agrees to cooperate with the Commission; and agrees to provide full disclosure regarding any inquiry requirements of the Commission. *Id.* § 40/40(b). If a formal inquiry regarding the torture claim is granted, the Commission's Director "shall use all due diligence to notify the victim[35] in the case and explain the inquiry process," and the Commission shall notify the victim that he or she "has the right to present his or her views and concerns throughout the Commission's investigation." *Id.* § 40/40(c).

---

[35]The Act defines "victim" as "the victim of the crime, or if the victim of the crime is deceased, the next of kin of the victim, which shall be the parent, spouse, child, or sibling of the deceased victim." 775 ILCS 40/5(5). Although elsewhere in this Opinion the Court refers to victims of torture, as used within this Section on the constitutionality of the Act, unless otherwise specified, "victim" refers to the victim of a crime as defined by the Act.

At the completion of the Commission's formal inquiry, the Director reports the results and his or her recommendation to the full Commission. 775 ILCS 40/45(a); Ill. Admin. Code tit. 2, § 3500.375(i). After all relevant evidence is presented to the full Commission, the Commission may, in its discretion, conduct a hearing. *Id.* If the Commission decides to hold an evidentiary hearing, the Director must "use all due diligence to notify the victim at least 30 days prior to any proceedings of the full Commission held in regard to the victim's case" and notify the victim that he or she is permitted to attend proceedings otherwise closed to the public, subject to limited exceptions. 775 ILCS 40/45(b). At the hearing, "all relevant evidence from the formal inquiry shall be presented to the full Commission in summary form as part of the Director's report and recommendation [and] [t]he Director shall present the additional evidence the Commission has elected to consider, unless the Commission orders otherwise." Ill. Admin. Code tit. 2, § 3500.380(a)(1)–(2).

After the hearing, the full Commission votes "to establish further case disposition." 775 ILCS 40/45(c). If five or more of the eight voting members of the Commission "conclude by a preponderance of the evidence that there is sufficient evidence of torture to merit judicial review, the case shall be referred to the Chief Judge of the Circuit Court of Cook County by filing with the clerk of the court the opinion of the Commission with supporting findings of fact, as well as the record in support of such opinion, with service on the State's Attorney in non-capital cases . . . ." *Id.* The Director must also "use all due diligence to notify immediately the victim of the Commission's conclusion in a case." *Id.*

148

If the Commission determines that judicial review is warranted, then

the Chair of the Commission shall request the Chief Judge of the Circuit Court of Cook County for assignment to a trial judge for consideration. The court may receive proof by affidavits, depositions, oral testimony, or other evidence. In its discretion the court may order the petitioner brought before the court for the hearing. Notwithstanding the status of any other postconviction proceedings relating to the petitioner, if the court finds in favor of the petitioner, it shall enter an appropriate order with respect to the judgment or sentence in the former proceedings and such supplementary orders as to rearraignment, retrial, custody, pretrial release or discharge, or for such relief as may be granted under a petition for a certificate of innocence, as may be necessary and proper.

775 ILCS 40/50(a).[36] The State's Attorney or its designee shall represent the State at the hearing before the assigned judge. *Id.* § 40/50(b).

If, on the other hand, less than five of the eight voting members of the Commission "conclude by a preponderance of the evidence that there is sufficient evidence of torture to merit judicial review, the Commission shall conclude there is insufficient evidence of torture to merit judicial review." 775 ILCS 40/45(c).

Unless authorized by the Act, "the decisions of the Commission are final and are subject to review as final decisions under the provisions of the Administrative Review Law, and shall only be overturned if the court finds that they are against the manifest weight of the evidence." 775 ILCS 40/55(a).

Before the Court addresses the constitutionality of the Act, it must first determine whether Hyman has standing to challenge the constitutionality of the Act. *See Scott Air Force Base Properties, LLC v. Cnty. of St. Clair, Ill.*, 548 F.3d 516, 520

---

[36]This Section of the Act only was amended on January 1, 2023. 2020 Ill. Legis. Serv. P.A. 101-652 (H.B. 3653). The only change made from the prior 2009 version was replacing "bail" with "pretrial release." *Id.*

(7th Cir. 2008) (before a court can address the merits of a dispute, it must first determine whether it has subject-matter jurisdiction); *see also Koger*, 523 F.3d at 801 ("Federal courts are supposed to do what they can to avoid making constitutional decisions, and strive doubly to avoid making unnecessary constitutional decisions.") (cleaned up).

### B.    Standing

Article III of the Constitution limits the jurisdiction of the federal courts to "cases" and "controversies." U.S. CONST. art. III, § 2. "The case-or-controversy requirement ensures that the judiciary 'confines itself to its constitutionally limited role of adjudicating actual and concrete disputes, the resolutions of which have direct consequences on the parties involved.'" *Pierre v. Midland Credit Mgmt., Inc.*, 29 F.4th 934, 937 (7th Cir. 2022) (quoting *Genesis Healthcorp. v. Symczyk*, 569 U.S. 66, 71 (2013)).

Article III standing consists of three elements: the aggrieved party "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). Generally, the standing doctrine applies to the party bringing the lawsuit. The injury-in-fact inquiry asks whether the aggrieved party "has suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146, 1151–52 (7th Cir. 2020) (cleaned up).

150

A concrete injury "must actually exist" and must be "real and not abstract." *Spokeo*, 578 U.S. at 340 (cleaned up).

The Commission argues that Hyman lacks standing to challenge the constitutionality of the Act because the alleged constitutional defects he identifies have not caused him to suffer an actual injury. Comm. Br. at 3. According to the Commission, the only injury Hyman has suffered is being sued by Wilson, which was not caused by the "purported constitutional issues with the Act." *Id.* at 3–4 (citing *Native Am. Arts, Inc. v. Duck House, Inc.*, 2007 WL 8045973, at *6 (N.D. Ill. Mar. 1, 2007)).

Hyman responds that, contrary to the Commission's suggestion, the standing doctrine applies only to plaintiffs. Hyman Resp. at 7–8 (citing *Wynn v. Carey*, 599 F.2d 193, 196 (7th Cir. 1979); *United States v. Sidley Austin Brown & Wood LLP*, 2004 WL 905930, at *1 (N.D. Ill. Apr. 28, 2004)).

### 1. Standing Doctrine Application to Defenses

The threshold issue, before reaching the merits of whether Hyman has standing to assert this defense, is determining whether the standing doctrine applies to Hyman as a Defendant. A brief overview of the caselaw is necessary to answer this question.

In *Wynn*, the plaintiffs filed suit seeking a declaration that portions of the Illinois Abortion Act of 1975 and Illinois Abortion Parental Consent Act were unconstitutional. 599 F.2d at 194. The defendants were state officials charged with implementing and enforcing the statutes. *See Wynn v. Scott*, 449 F. Supp. 1302, 1306

(N.D. Ill. 1978). Dr. Diamond, a physician, sought and was granted leave by the district court to intervene as a party defendant to defend the constitutionality of the statutes. *Id.* The district court found certain provisions of the statutes unconstitutional and entered a permanent injunction enjoining enforcement of those provisions of the statutes. *Id.* at 1331; *Wynn*, 599 F.2d at 194. On appeal, among other issues, the plaintiffs asked the Seventh Circuit to dismiss intervenor Diamond's appeal based on lack of standing. *Wynn*, 599 F.2d at 196. The Seventh Circuit affirmed the district court's decision. *Id.* The court found the challenge to standing "misdirected," stating that that the mechanism by which to challenge whether an intervening defendant has a sufficient interest in the case to prosecute an appeal "is to determine whether the district court abused its discretion in permitting the defendant to intervene pursuant to Rule 24, Fed. R. Civ. P." *Id.* The Seventh Circuit did not have to address this issue because the plaintiffs failed to raise it. *Id.* The court noted that it was "unaware of any persuasive authority suggesting that an intervening defendant's appeal may be dismissed for lack of his standing" and stated that "the standing doctrine, which is derived from the Article III case or controversy requirements of the Constitution, applies only to plaintiffs." *Id.*

Following *Wynn*, two courts in this District reiterated *Wynn*'s statement that the standing doctrine applies only to plaintiffs. *See SmartSignal Corp. v. Expert Microsystems, Inc.*, 2006 WL 1343645, *2 (N.D. Ill. May 12, 2006); *Sidley Austin Brown & Wood LLP*, 2004 WL 905930, at *1. However, although the court in *SmartSignal* cited *Wynn* for the aforementioned proposition, it in fact held the

152

opposite, that a counter-defendant "must have standing to challenge the merits of [counter-plaintiff's] counterclaims." 2006 WL 1343645, *2. (True, the counter-defendant was also a plaintiff, but the court examined whether the party, in its capacity as "essentially a defendant with regard to [the] matter (i.e., a counter defendant)" must have standing to challenge the counterclaims against it. *Id.*). *Sidley Austin* involved permissive intervenors, and in finding that the intervenors need not establish standing, the court relied on *Wynn*'s statement that standing applies only to plaintiffs, and on a subsequent Seventh Circuit case, *Transamerica Insurance Co. v. South*, 125 F.3d 392, 396 n.4 (7th Cir. 1997), which noted that "it is an 'open question' in the Seventh Circuit as to 'whether Article III standing is required for permissive intervention under Rule 24(b).'" 2004 WL 905930, at *1.

To state the obvious, a district court cannot disregard Seventh Circuit precedent. *Corpeno-Argueta v. United States*, 341 F. Supp. 3d 856, 863 (N.D. Ill. 2018). The Court "is bound by a decision of the Seventh Circuit unless it is 'powerfully convinced that the [Seventh Circuit] would overrule it at the first opportunity.'" *Id.*

The Commission invites the Court to follow a district court case, *Duck House*, which, as discussed herein, found that *Wynn* has been overruled in relevant part. Comm. Br. at 3–4 (citing 2007 WL 8045973, at *5). In *Duck House*, the plaintiff, a Native American arts and crafts organization, filed suit against the defendant for violating the Indian Arts and Crafts Acts, 25 U.S.C. §§ 305–10 (IACA), by advertising, marketing, and distributing goods that are falsely suggested to be Indian products or Indian produced. *Id.* at *1. The defendant asserted, among other things, that IACA

was unconstitutional in that "it is racially discriminatory to permit Indian arts and crafts organizations and individual members of Indian tribes to bring claims pursuant to [IACA], but not to permit arts and crafts organizations not composed of members of Indian tribes or individuals who are not members of Indian tribes who were aggrieved by violations of [IACA] to bring a claim." *Id*. at *5. The plaintiff argued that the defendant lacked standing to question the constitutionality of the statute. *Id*. The district court began by recognizing that in *Wynn*, the Seventh Circuit stated that the standing doctrine only applies to plaintiffs. *Id*. That decision, observed the court, was issued prior to the United States Supreme Court's decision in *Diamond v. Charles*, 476 U.S. 54, 65 (1986), which according to the court, overruled the "particular standing holding of *Wynn* and its general statement that defendants never need to satisfy standing." *Id*. The *Duck House* court therefore found that when a defendant "raises an affirmative defense that is not encompassed in the plaintiff's case in chief, the defendant must satisfy the usual standing requirements." *Id*. (collecting cases). As for the two district court cases that followed *Wynn*, those courts, according to the court, ignored *Diamond*, the most recent Supreme Court pronouncement on the issue. *Id*. at *5.

The Court turns to a brief discussion of *Diamond*. In *Diamond*, plaintiff-physicians who provided abortion services in Illinois sued the State of Illinois seeking to enjoin enforcement of the Illinois Abortion Act of 1975. 476 U.S. at 57. Diamond,[37]

---

[37]"Diamond involved the same intervening physician as in *Wynn*, but concerned a constitutional challenge to a different aspect of the same Illinois abortion law." *Duck House*, 2007 WL 8045973, at *5 n.9.

a physician, sought and was given leave by the district court to intervene to defend the constitutionality of the statute. *Id.* at 57–58. The district court permanently enjoined enforcement of several provisions of the statute and the Seventh Circuit affirmed. *Id.* at 58–61. While the State of Illinois did not file an appeal with the United States Supreme Court, Diamond did. *Id.* at 61. The state, however, did file a "letter of interest" stating that while it was not an appellant, it remained a party before the court with an interest in the proceedings identical to the appellant; the Supreme Court rejected this argument and found that the State was not an appellant based on the letter. *Id.* at 61, 63–64. The Supreme Court held that Diamond could not maintain the appeal because he lacked Article III standing in that he could not establish that he had or would suffer an injury in fact based on the enjoinment of the Illinois Abortion Act. *Id.* at 65–67, 69, 71. The Supreme Court found that Diamond's status as an intervenor below did "not confer standing sufficient to keep the case alive in the absence of the State on this appeal." *Id.* at 68. It declined to decide whether a party seeking to intervene before a district court must satisfy Article III's standing requirement in addition to the Federal Rule of Civil Procedure 24's intervention requirements. *Id.* at 68–69.

Subsequently, the Seventh Circuit has distinguished between "three distinct but related concepts: intervention pursuant to Federal Rule of Civil Procedure 24; Article III standing to pursue the original controversy; and Article III standing to

appeal the judgment below." *Transamerica Ins.*, 125 F.3d at 396.[38] In *Transamerica Ins.*, the court recognized that it "is well-established that permission to intervene in a district court action does not automatically confer standing to appeal." *Id.* (citing *Diamond*, 476 U.S. 54). It also acknowledged that it remained "murky" whether an intervenor must satisfy Article III's standing as well as Rule 24's requirements, and declined to decide the issue. *Id.* More recently still, the Seventh Circuit in *City of Chicago v. Fed. Emergency Mgmt. Agency* declined to address the issue definitively, but signaled that an intervenor must have Article III standing even where the existing parties remain in the case. 660 F.3d 980, 984–85 (7th Cir. 2011) (noting that cases that find that intervenors need not have Article III standing where the existing parties remain in the case "dispense with the requirement overlook the fact that even if a case is securely within federal jurisdiction by virtue of the stakes of the existing parties, an intervenor may be seeking relief different from that sought by any of the original parties. His presence may turn the case in a new direction—may make it really a new case, and no case can be maintained in a federal court by a party who lacks Article III standing") (cleaned up); *see also Bond v. Utreras*, 585 F.3d 1061, 1072 (7th Cir. 2009) ("[W]hen a third party seeks intervention under Rule 24(b) for the purpose of challenging a protective order in a case or controversy that is no longer live—as when the case has been dismissed and none of the original parties has sought

---

[38]Hyman, the Commission, and Wilson do not cite to *Transamerica Ins.*; however, as noted above, it is cited in *Sidley Austin*, 2004 WL 905930, at *1, which Hyman cites in his Response to the Commission's brief. Hyman Resp. at 8.

this relief postjudgment—the intervenor must meet the standing requirements of Article III in addition to Rule 24(b)'s requirements for permissive intervention.").

These more recent Seventh Circuit cases make clear that the Seventh Circuit, post-*Diamond*, no longer stands by *Wynn*'s broad statement that "the standing doctrine . . . applies only to plaintiffs." *Transamerica Ins.*, 125 F.3d at 396 (recognizing that an intervenor must have standing to appeal). Moreover, the question at issue in *Wynn* was whether Diamond, an intervenor, had standing to appeal the judgment below, which, as explained in *Transamerica Ins.*, is a different question than whether a party has standing to pursue the original controversy, as is at issue here. So, it is not clear that *Wynn*'s statement about standing requirements applying only to plaintiffs ever governed the question of standing as it applies to the parties before the district court.

Still, the analysis does not end there. Simply because the standing doctrine is not limited to only plaintiffs does not necessarily mean that it is required for a defendant to raise an affirmative defense. Interestingly—and seemingly inconsistently with his position that standing applies only to plaintiffs—Hyman argues that, "[w]hen a defendant raises an affirmative defense that is not encompassed in the plaintiff's case in chief, the defendant must satisfy the usual standing requirements in order to pursue the defense." Hyman Resp. at 8. The Commission agrees. Comm. Reply at 4. Neither party cites, and the Court is not aware of, any Seventh Circuit cases so holding, and both parties rely on *Duck House*

as the only in-Circuit authority supporting the proposition.[39] Hyman cites to a
number of out-of-Circuit cases cited by the *Duck House* court, as well. Hyman Resp.
at 8 (citing *FDIC v. Main Hurdman*, 655 F. Supp. 259, 268–69 (E.D. Cal. 1987);
*United States v. Dunifer*, 997 F. Supp. 1235, 1239–40 (N.D. Cal. 1998) ("[w]here the
defendant asserts an affirmative defense requiring the litigation of issues not
encompassed in the plaintiff's case-in-chief, the defendant is in a similar situation on
those issues to a plaintiff who is invoking the jurisdiction of the court" and therefore
concluding that defendant must, but could not, show standing to raise a
constitutional attack on regulations under which he was being prosecuted), *aff'd on
other grounds*, 219 F.3d 1004 (9th Cir. 2000); *Resol. Tr. Corp. v. Babovich*, 1990 WL
86479, at *2 (E.D. La. June 19, 1990)). As the court in *Dunifer* recognized, the "Ninth
Circuit . . . in at least two cases, has analyzed whether defendants have standing to
raise, as an affirmative defense, the unconstitutionality of the statute and regulations
that form the basis of the government's case-in-chief." 997 F. Supp. at 1239 (citing
*United States v. Hugs*, 109 F.3d 1375, 1378 (9th Cir. 1997); *United States v. Thirty
Eight (38) Golden Eagles or Eagle Parts*, 649 F. Supp. 269, 274, 276 (D. Nev. 1986),
*aff'd*, 829 F.2d 41 (9th Cir. 1987)). On the other hand, the Eighth Circuit has declined
to decide the issue, despite recognizing the district court's holding that a defendant
must establish standing to raise an affirmative defense. *United States v. Neset*, 235
F.3d 415, 417, 420–21 (8th Cir. 2000). The Court agrees with the reasoning of the

---

[39]Hyman also cites to *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Cont'l Illinois Corp.*, 666
F. Supp. 1180, 1194 (N.D. Ill. 1987), which addressed the plaintiff's standing to bring a claim,
and distinguished for factual, not legal, reasons, an Eastern District of California case that
held that defendants did not have standing to challenge an affirmative defense.

courts that have substantively addressed the issue, that, in raising an affirmative defense, a defendant seeks the jurisdiction of the court to hear claims just as plaintiff does with his case in chief. *See Dunifer*, 997 F. Supp. at 1239–40; *see also United States v. Neset*, 10 F. Supp. 2d 1113, 1115–16 (D. N.D. 1998).

Hyman argues that Wilson's Complaint "discusses, encompasses and centers around" the Act, and as such, his affirmative defense *is* encompassed within Wilson's case in chief so Hyman need not establish standing. Hyman Resp. at 8. The Commission responds that, although the proceedings under the Act were part of the narrative of the Complaint, none of Wilson's claims are brought under or otherwise predicated on the Act, and as such, Hyman's defense that the Act is unconstitutional is separate and subject to a standing analysis. Comm. Reply at 5. The Court finds it to be a close call. As the Commission points out, Wilson's claims are brought under Section 1983 and state law, not under the Act itself. But Hyman is correct that, absent Wilson's petition being granted by the Commission, and ultimately the Circuit Court of Cook County, vacating his first and second convictions, he would not have the "favorable termination" necessary to assert many of his claims against Defendants.

The Court finds *Duck House* to be persuasive on this point. In *Duck House*, the plaintiff's claims against the defendant were brought pursuant to IACA, but the court *still* found that the defendant must satisfy standing requirements to raise his constitutional challenge to IACA. 2007 WL 8045973, at *5. The relationship between Wilson's claims and the Act is even more attenuated in this case. The Court finds that Wilson's petition under the Act, which ultimately led to Judge Hooks granting Wilson

vacating Wilson's second conviction and granting him a new trial, does not mean that the Act is "encompassed" within Wilson's Complaint such that Hyman need not establish standing to attack the Act's constitutionality. No matter, however, because, for the reasons discussed below, *see infra* Section IV.B.2, the Court finds that Hyman has sufficiently established standing to challenge the Act on the basis that it is an "unconstitutional Executive infringement on final judicial judgments." Hyman Mot. Dismiss at 3; Hyman Resp. at 10–11. The Court therefore starts with that argument, and addresses in turn Hyman's standing to attack the Act on other bases.

### 2. Hyman's Standing

Having determined that Hyman must establish standing to raise a constitutional challenge to the Act, the Court turns to the provisions of the Act with which Hyman takes issue, to determine whether they have caused Hyman to suffer an injury. "A party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights. As a general rule, if there is no constitutional defect in the application of the statute to a litigant, he does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations." *Cnty. Ct. of Ulster Cnty., N. Y. v. Allen*, 442 U.S. 140, 154–55 (1979).

Starting with Hyman's third argument, Hyman contends that the Act constitutes an "unconstitutional Executive infringement on final judicial judgments" because the Commission is placed under the executive Human Rights Commission rather than the judicial branch. Hyman Mot. Dismiss at 3; Hyman Resp. at 10–11.

160

Hyman maintains that the establishment of the Commission "outside of extensive Judicial due process guarantees of Article VI are infringements of the Illinois Constitution as it improperly affords a[n Act] Plaintiff the opportunity to be heard in a 'closed' star chamber proceeding, *without burdens of proof and without notice to the victims, which Plaintiff would not have been able to secure under Article VI.*" Hyman Resp. at 11 (emphasis in original). The Court reads this to be a challenge to (1) the independent nature of the Commission under the Human Rights Commission and the membership of the Commission (775 ILCS 40/15, 40/20); (2) the Commission's authority to make a formal or informal inquiry into claims of torture (75 ILCS 40/40); (3) the procedures for an evidentiary hearing and voting of the Commission (775 ILCS 40/45); and (4) the Commission's referral of the petition to a trial judge in the Circuit Court of Cook County (775 ILCS 40/50).

True, as outlined in more detail above, Wilson's petition was granted by the Commission, which referred it to the Circuit Court of Cook County, where Judge Hooks held an evidentiary hearing and determined that Wilson's confession was tortured from him, and granted him a new trial, at which the confession would be barred. Wilson was then subsequently tried a third time, in the middle of which the Special Prosecutor immediately moved to dismiss all charges against Wilson with prejudice, and the motion was granted, after which Wilson was granted a certificate of innocence. But as the Commission points out, and as the Court noted above, Wilson does not bring any claims against Hyman (or any other defendant) pursuant to any provision of the Act. However, it is well established that a plaintiff's Fourth

Amendment Section 1983 claims will be barred unless the plaintiff can show that his criminal prosecution ended in a "favorable termination," as will fabrication of evidence and *Brady* claims. *See Thompson*, 142 S. Ct. at 1335; *McDonough*, 139 S. Ct. at 2154–55; *Camm*, 937 F.3d at 1111. So too with state law malicious prosecution claims. *See Beaman*, 131 N.E.3d at 495. Counts II, III, and VI are asserted against Hyman, and could not have been brought absent Wilson's petition being considered and granted by the Commission, and subsequently the Circuit Court of Cook County. True, the chain of events is long, but the Court finds that it is not so attenuated that it deprives Hyman of standing. For this reason, Hyman's motion cannot be resolved on non-constitutional grounds, and the Court will address whether Hyman's claim that the Act is an executive infringement on the judiciary has merit.

Before turning to the merits of that claim though, the Court must address Hyman's standing to raise two other attacks on the Act. Hyman argues in passing that the Act is impermissible special legislation because, as originally enacted, it could only be enforced against Jon Burge, and even as amended, applies to claims of torture in Cook County to the exclusion of other counties. Hyman Mot. Dismiss at 3. The Illinois Constitution's Special Legislation Clause prohibits a "special or local law when a general law is or can be made applicable. Whether a general law is or can be made applicable shall be a matter for judicial determination." Ill. Const. 1970, art. IV, § 13. This Section "prohibits the General Assembly from conferring a special benefit or exclusive privilege on a person or a group of persons to the exclusion of others similarly situated." *Best*, 689 N.E.2d at 1069. While the legislature has

162

discretion to make statutory classifications, the Special Legislation Clause prevents it from making classifications that arbitrarily discriminate in favor of a selected group. *Crusius v. Illinois Gaming Board*, 837 N.E.2d 88, 94 (Ill. 2005). Illinois courts apply a two-part test to determine whether a law constitutes special legislation: (1) does "the statutory classification at issue discriminate[] in favor of a select group and against a similarly situated group"; and if so, (2) is the classification arbitrary. *Piccioli v. Bd. of Trustees of Teachers' Ret. Sys.*, 137 N.E.3d 745, 751 (Ill. 2019). To determine whether a classification is arbitrary, Illinois courts use the rational basis test, unless the statute affects fundamental rights. *Id.*; *see also Best*, 689 N.E.2d at 1071. Under the rational basis test, a "court may hypothesize reasons for the legislation; any conceivable basis for finding a rational relationship" will uphold the law in question. *Piccioli*, 137 N.E.3d at 751 (cleaned up). The party challenging a statute's constitutionality bears the burden of clearly establishing that the classifications are not rationally related to a legitimate government interest. *Allen v. Woodfield Chevrolet, Inc.*, 802 N.E.2d 752, 758 (Ill. 2003); *see also Montgomery*, 53 N.E.3d at 1087 ("All statutes are presumed to be constitutional and the burden for rebutting that presumption is on the party challenging the validity of the statute to demonstrate clearly a constitutional violation.").

Hyman, however, is not a person convicted of a felony based on a tortured confession that occurred at the hands of a police officer other than Burge or one of his associates, or that occurred in a county of less than 3,000,000 people, who cannot bring a petition under the Act. Comm. Br. at 3. So, the Court agrees with the

Commission that Hyman lacks standing to attack the Act's limited definition of "claims of torture." As the court in *Duck House* found when faced with a similar defendant's constitutional challenge, the remedy for the challenge would not be to render the Act unenforceable but rather to take away the limitation on where allegations of torture must have occurred. 2007 WL 8045973, at *6. Such relief would not have prevented Wilson from filing his petition and obtaining the subsequent hearings before the Commission and Circuit Court, but rather would allow persons convicted of felonies based on allegedly tortured statements to file petitions in other counties. *Id.* Accordingly, Hyman lacks standing to challenge the Act on the basis that it is special legislation.[40]

Finally, Hyman takes issue with the Act's denial of due process to victims and related failure to comply with Section 8.1 of the Illinois Constitution. Hyman Mot. Dismiss at 3–4; Hyman Resp. at 11–12. Specifically, Hyman argues that Officers Fahey and O'Brien's families were ignored. *Id.* However, Hyman is not himself a crime victim and as such, has not suffered an injury based on the alleged inconsistencies between the Act and Section 8.1 of the Illinois Constitution.[41] Comm.

---

[40]Even if Hyman did have standing to attack the Act as special legislation, he fails to engage both prongs of the two-part test articulated in *Piccioli*, 137 N.E.3d at 751. He spills much ink on the first prong, arguing that the Act benefits only a subclass of individuals tortured by Burge or in Cook County, to the exclusion of others similarly situated. Hyman Reply at 2; Hyman Resp. at 9–10. But he ignores the second prong: whether such classification is arbitrary, that is, whether it is "rationally related to a legitimate state interest." *Piccioli*, 137 N.E.3d at 751. As stated above, Hyman bears the burden of "clearly establishing" that no rational basis for the classification exists, which he clearly did not do. *Allen*, 802 N.E.2d at 758.

[41]Although not argued by the parties, this argument implicates the prudential standing doctrine, which stands for the proposition that a "litigant cannot sue in federal court to

164

Br. at 3; Comm. Reply at 5. Accordingly, Hyman lacks standing to challenge the Act on this basis.

The Court turns to the merits of the only argument which Hyman has standing to raise: whether the Act is an executive infringement on the judiciary.

## C.     Constitutionality of the Act

Hyman's argument that the Act is an unconstitutional executive infringement on final judicial judgments is long on hyperbole, but short on substance. Hyman Mot. Dismiss at 3; Hyman Resp. at 10–12. And while Hyman relies on just one case in support of this argument, he fails to develop any argument as to how that decision should inform the Court's decision here. *Id.* (citing *Best*, 689 N.E.2d at 1071). Wilson argues that the Court should deny Hyman's motion because his arguments are undeveloped and are not supported by any authority. Resp. at 27. As noted elsewhere in this Opinion, generally, "[p]erfunctory and undeveloped arguments" and "arguments unsupported by legal authority" are waived. *See Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016). No matter, because, even without substantive analysis on the issue from the Commission,[42] based on the limited argument and authority presented by Hyman, the Court finds that he fails to

---

enforce the rights of third parties." *Rawoof v. Texor Petroleum Co.*, 521 F.3d 750, 757 (7th Cir. 2008).

[42]The Court gave the Commission an opportunity to substantively address the constitutionality of the Act by granting the Commission's Motion to Intervene, despite that motion being untimely, R. 156, but the Commission fumbled that opportunity by simply arguing that the Court can dispose of Hyman's challenge to the Act on standing grounds only, Comm. Br.

rebut the presumption that "[a]ll statutes are presumed to be constitutional." *Montgomery*, 53 N.E.3d at 1087.

In *Best*, the plaintiff challenged a statute that applies to personal injury lawsuits and provided a mandatory $500,000 limit on compensatory damages for noneconomic injuries. 689 N.E.2d at 1063 (citing 735 ILCS 5/2–1115.1). The Illinois Supreme Court found that the provision at issue violated the separation of powers clause by impermissibly invading the judiciary's power to limit excessive awards of damages. *Id.* at 1081. The court noted that "courts are constitutionally empowered, and indeed obligated, to reduce excessive verdicts where appropriate in light of the evidence adduced in a particular case. Section 2–1115.1, however, reduces damages by operation of law, without regard to the specific circumstances of individual jury awards." *Id.*

Here, the Act empowers the Commission, when it concludes that there is sufficient evidence of torture to merit judicial review, to "request the Chief Judge of the Circuit Court of Cook County for assignment to a trial judge for consideration." 775 ILCS 40/50(a). The assigned trial judge then may receive evidence, and make her *own* determination as to whether sufficient evidence exists as to the petitioner's claims that he or she was tortured. *Id.* If the court finds in favor of the petitioner, then the *court* shall enter an appropriate order "with respect to the judgment or sentence in the former proceedings and such supplementary orders as to rearraignment, retrial, custody, pretrial release or discharge, or for such relief as may be granted under a petition for a certificate of innocence, as may be necessary and

166

proper." *Id.* Unlike the statute in *Best*, which divested the power of the court to limit damages awards, the Act, while providing for some proceedings before the Commission, ultimately leaves any action regarding the petitioner's original judgment or sentence to the *court*. Accordingly, the Court finds that the Act does not impermissibly violate the separation of powers doctrine. As such, the Court denies Hyman's Motion to Dismiss on the basis that the Act is unconstitutional.

## Conclusion

For the foregoing reasons, the Court grants Trutenko's Motion to Dismiss [47]; grants in part and denies in part Hyman, Hartnett, Kunkle, and Daley's Motions to Dismiss [59], [69], [72], [74]; and denies Horvat and City Defendants' Motions to Dismiss [58], [75], [168].

A. All claims against Defendant Trutenko are barred by absolute prosecutorial immunity and therefore are dismissed with prejudice. However, to the extent Wilson alleges federal or state law conspiracy claims against Trutenko based on his actions during the period when he was no longer a prosecutor (1991 to 2008), apart from his suppression of evidence he learned as a prosecutor, those claims are dismissed without prejudice. Trutenko is terminated as a Defendant.

B. All claims against Defendant Hyman may proceed, except for the failure to intervene claim, which is dismissed with prejudice, as it is barred by qualified immunity.

C. All claims against Defendant Hartnett may proceed, except for the failure to intervene claim, which is dismissed with prejudice, as it is barred by qualified immunity.

D. The claims against Kunkle premised on his conduct while he was a prosecutor through 1987, as well as his post-1987 suppression of Hardin's false statement, are barred by absolute immunity and dismissed with prejudice. However, all claims based on Kunkle's conduct after he left the CCSAO, apart from his suppression of evidence he learned as a prosecutor, may proceed.

E. All claims against Daley premised on his role as State's Attorney are barred by absolute immunity and are dismissed with prejudice. Count I is dismissed without prejudice against Daley in his role as Mayor. The other claims against Daley in his role as Mayor may proceed.

F. All claims against Horvat may proceed.

G. All claims against Shines, Hillard, Needham, and Martin may proceed.

H. All claims against Defendants Doug Stahle, as Special Representative for the Estate of Jon Burge; Brian O'Hara, as Special Representative for the Estate of Patrick O'Hara; and Geri Lynn Yanow, as Special Representative for the Estate of John Yucaitis may proceed.

Franklin U. Valderrama
United States District Judge

Dated: March 31, 2023

168